Matthew Campbell
FEDERAL DEFENDERS OF EASTERN WASHINGTON AND IDAHO
10 North Post, Suite 700
Spokane, Washington 99201
(509) 624-7606

Attorneys for Defendant

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
(HONORABLE LONNY R. SUKO)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR-11-075-LRS |
| | ) | |
| Plaintiff, | ) | MOTION TO SUPPRESS |
| | ) | |
| vs. | ) | |
| | ) | |
| JEREMY JEFFREY BRICE, | ) | |
| | ) | 05/08/13 |
| Defendant. | ) | With Oral Argument 10:30 AM |
| | ) | Spokane, WA |

JOSEPH JEFFREY BRICE, through counsel, Matthew Campbell for the Federal Defenders of Eastern Washington and Idaho, moves to suppress all evidence seized from his jail cell.

**I. Background[1]**

---

[1] The facts set forth herein stem largely from discovery provided by the Government, as well personal knowledge and investigation. Should the Government contest any of the facts contained herein, Mr. Brice is prepared to

MOTION TO SUPPRESS

1

1   On June 21, 2011, the Grand Jury returned a superseding indictment charging
2   one count of manufacturing an unregistered firearm pursuant to 26 U.S.C.§ 5861,
3   one count of distribution of information relating to explosives pursuant to 18 U.S.C.
4   § 842(p)(2), and one count of attempt to provide material support to terrorists
5   pursuant to 18 U.S.C. § 2339A.

6   On May 18, 2012 Mr. Brice's jail cell in the Spokane County Jail was
7   searched. That search was performed without a search warrant or any form of court
8   authorization. No special master, or similar neutral party, was used to perform the
9   search, nor was consent given by Mr. Brice authorizing the search.  That search was
10  specifically performed in order to search Mr. Brice's written materials.

11  The initial search was performed by Deputy United States Marshal Hank
12  Shafer. Deputy Shafer personally reviewed all of Mr. Brice's written materials
13  which were in an envelope marked "Legal," and separated those documents into two
14  categories – (1) privileged legal materials and (2) other materials.  The legal
15  materials contained therein included attorney-client and work-product privileged
16  materials including trial strategy.  As it ultimately turned out, approximately ten
17  months later, the other materials also contained attorney-client and work-product

---

19  prove these facts at an evidentiary hearing.  Mr. Brice reserves the right to
20  supplement these facts and present additional facts as necessary, as well as contest
21  facts presented by the Government via discovery, proffer or witness testimony, as
22  necessary, at an evidentiary hearing.

MOTION TO SUPPRESS
2

privileged materials.

The Government initially claimed that Deputy Shafer was selected to perform the search because he was not part of the investigation of Mr. Brice. Therefore he was chosen to conduct the initial screening of the material and separate out that which was privileged.[2] However Deputy Shafer and his canine Lori, who is trained in explosives detection, participated in the search of Mr. Brice's girlfriend's vehicle as well as Mr. Brice's apartment. Both searches occurred at the time of Mr. Brice's arrest, and Deputy Shafer authored at least one report which has been provided to the defense as part of discovery. Additionally Deputy Shafer was also involved in a conversation about this case with Mr. Brice in November, 2011.

After reading all of Mr. Brice's materials, Deputy Shafer provided the materials claimed not to be privileged to SA McEuen and FBI Intelligence Analyst Pulcastro for further review. The Government initially claimed that Analyst Pulcastro was selected to review the materials in order to determine which were privileged and which were not.[3] Pulcastro had also previously been involved in the

---

[2]     Upon information and belief, undersigned counsel would assert that Deputy Shafer has not graduated from law school, nor has Deputy Shafer been admitted to the Bar of any state or territory in the United States.

[3]     Undersigned counsel has been provided no information demonstrating Analyst Pulcastro's qualifications to determine whether materials are protected by the Sixth Amendment, the attorney-client privilege or the work-product privilege.

MOTION TO SUPPRESS

3

1   investigation of Mr. Brice.

2       Upon the conclusion of Deputy Shafer's review and Analyst Pulcastro's

3   review, the materials found not to be privileged were then delivered to SA McEuen.[4]

4   SA McEuen then reviewed the entire stack of documents turned over to him by

5   Shafer and Pulcastro, which were allegedly not privileged.

6       AUSA Russell Smoot had been contacted prior to the search of Mr. Brice's

7   cell, and he was also contacted after the search had been performed. After the

8   materials were reviewed by SA McEuen, they were delivered to AUSA Smoot. Mr.

9   Smoot thus had access to the materials for approximately four days until

10  undersigned counsel learned of the jail search.

11      This four day delay occurred because when Mr. Brice's cell was searched, he

12  was transferred to 6-East, the most restrictive area in the Spokane County Jail. Mr.

13  Brice had immediately asked to cal undersigned counsel. That request was refused.

14  Mr. Brice was not allowed to make a single phone call until four days later.

15  Undersigned counsel was not informed of the search by Mr. Brice until May 22,

16  2012, when Mr. Brice was finally allowed to make a phone call. The government

---

[4] According to the California State Bar Association, SA McEuen graduated from the University of San Diego Law School, and was admitted to the California State Bar in 1995. As the case agent in this case, however, once he reviewed the materials given him by SA Pulcastro, "the cat was out of the bag" as far an the privileged material contained therein.

MOTION TO SUPPRESS
4

1  made no effort to inform undersigned counsel of the search,

2  Undersigned counsel contacted the US Marshals Office, because counsel was
3  told that the search was conducted by the Marshals.  The Marshal's Office directed
4  counsel to contact AUSA Smoot.  Counsel then contacted AUSA Smoot regarding
5  the search.  AUSA Smoot told counsel that inquiries should be directed to the US
6  Marshals.  Counsel told AUSA Smoot that the Marshals had directed inquiries to
7  AUSA Smoot. AUSA Smoot gave a noncommittal response that he would like to
8  share information about the search, but could not do so at this time.

9  Undersigned counsel filed an emergency motion for a hearing with this court
10 regarding this issue.  By the time undersigned counsel contacted AUSA Smoot, he
11 had already reviewed three of the documents provided to him by FBI agents.  AUSA
12 Smoot advised SA McEuen to obtain reports from the FBI agent and Deputy
13 Marshal who performed the search of the cell, and requested that SA McEuen seal
14 the three documents reviewed by Mr. Smoot in one envelope, and the remaining
15 documents not yet reviewed in a second envelope.

16 At the time of the search of Mr. Brice's cell, both Deputy Shafer and the
17 Government were aware of the potential for conflict further involvement by Deputy
18 Marshal Shafer would cause.  Although the United States Attorney's Office had
19 attempted to "wall off" AUSA Smoot from the conflict issue raised by Deputy
20 Shafer's communication with Mr. Brice in November 2011, then-First Assistant
21 United States Attorney Thomas Rice had been involved with discussions with the
22 Federal Defenders about this issue.  Then-Criminal Chief AUSA Joseph Harrington

23

24
MOTION TO SUPPRESS
5

1  had both written and telephonic contact with undersigned counsel regarding the
2  issue.
3      The parties litigated, first in this Court, issues surrounding the privileged
4  nature of the written materials seized from Mr. Brice's cell.  From the outset,
5  undersigned counsel argued that there was no privilege, rule or case law which
6  prevented a copy of the materials seized from being delivered to undersigned
7  counsel, in order to allow for adequate briefing as to any privileged documents.
8  Ultimately, the Court reviewed the documents *in camera*, and determined that they
9  were not privileged.
10      Mr. Brice filed an interlocutory appeal/petition for writ of mandamus to the
11  Ninth Circuit.  Mr. Brice renewed his arguments, and explicitly argued that copies of
12  the documents should be delivered to undersigned counsel so that counsel could
13  adequately brief the issue of privilege.  Once again, counsel's arguments fell on deaf
14  ears.  The Ninth Circuit, after reviewing the documents *in camera*, denied the
15  appeal/petition.
16      Based on the Ninth Circuit's mandate, this Court ordered that the documents
17  be released to the Government, and released to undersigned counsel under a strict
18  protective order.  The documents were finally delivered to undersigned counsel on
19  March 22, 2013, ten months after counsel first requested them.  The documents were
20  received by counsel's office late in the day on Friday, March 22nd.
21      The draft presentence investigation report ("PSR") was disclosed to the parties
22  on Monday, March 25, 2013.  The author of the PSR states that "1.5 days were spent
23
24  MOTION TO SUPPRESS

with the case agent looking at evidence and exhibits pertaining to this case." (PSR at p. 7, ¶15). The seized materials are prominently featured in the PSR. (PSR at 40-45). Included in that section of the PSR is material which was seized during the search of Mr. Brice's cell on May 18, 2012.

## II. The search of Mr. Brice's jail cell violated Mr. Brice's constitutional rights

### A. Jail inmates retain basic, albeit diminished, rights

Those confined in prison retain basic constitutional rights. *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *Turner v. Safley*, 482 U.S. 78, 84 (1987) ("Prison walls do not form a barrier separating prison inmates from the protections of the Constitution"). The Fourth Amendment guarantees the right to be free of "unreasonable searches and seizures."

Admittedly, the expectation of privacy of a jail inmate is diminished. *Bell v. Wolfish, supra*. Based on that diminished privacy interest, the Supreme Court, in *Bell v. Wolfish,* established the applicable standard for a Fourth Amendment balancing inquiry regarding prison inmates:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Id.,* at 559. Thus, while neither the right of free speech nor the right of privacy is absolute, the interests they protect must be considered against governmental interests

MOTION TO SUPPRESS
7

in regulation. *Cohen v. California*, 403 U.S. 15, 19 (1971); *Roe v. Wade*, 410 U.S. 113 (1973). An inmate does not retain rights inconsistent with proper incarceration. *Shaw v. Murphy,* 532 U.S. 223, 229 (2001). He does, however, maintain rights consistent with proper incarceration.

### B. Jail searches have been justified based on concerns of institutional security, and when such searches are carried out as part of institutional policy

Actions which infringe upon a jail inmate's constitutional rights are unconstitutional if the interest in jail security could be protected by less burdensome means. *See Procunier v. Martinez*, 416 U.S. 396, 413-14 (1974); *Taylor v. Sterrett*, supra at 479-92. Prison regulations authorizing mail censorship, for example, must be generally necessary to protect one or more legitimate governmental interests, such as the maintenance of prison order and security. *Thorburgh v. Abbott,* 490 U.S. 401, 401 (1989). Restrictions on mail and phone calls are precautions related to the safety of the staff and inmates and the security of the jail, which are often upheld. *See, e.g., Block v. Rutherford,* 468 U.S. 576, 588 (1984).

The Court's opinion in *Bell v. Wolfish,* 441 U.S. 520 (1979), is the starting point for understanding how this framework applies to Fourth Amendment challenges. That case addressed a rule requiring pretrial detainees in any correctional facility run by the Federal Bureau of Prisons "to expose their body cavities for visual inspection as a part of a strip search conducted after every contact visit with a person from outside the institution." *Id.,* at 558. Inmates at the federal

MOTION TO SUPPRESS

Metropolitan Correctional Center in New York City argued there was no security justification for these searches.  Officers searched guests before they entered the visiting room, and the inmates were under constant surveillance during the visit.  *Id.,* at 577–578 (Marshall, J., dissenting).  There had been but one instance in which an inmate attempted to sneak contraband back into the facility. See *id.,* at 559 (majority opinion).  The Court nonetheless upheld the search policy.  It deferred to the judgment of correctional officials that the inspections served not only to discover but also to deter the smuggling of weapons, drugs, and other prohibited items inside. *Id.,* at 558.  The Court explained that there is no mechanical way to determine whether intrusions on an inmate's privacy are reasonable.  *Id.,* at 559.  The need for a particular search must be balanced against the resulting invasion of personal rights. *Ibid.*

Similarly, in *Hudson v. Palmer,* 468 U.S. 517 (1984), the Supreme Court addressed the question of whether prison officials could perform random searches of inmate lockers and cells even without reason to suspect a particular individual of concealing a prohibited item.  *Id.,* at 522–523.   The Court upheld such practices.  *Id.*

These cases establish that correctional officials have been permitted to devise reasonable search policies to detect and deter the possession of contraband in their facilities.  See *Bell,* 441 U.S., at 546, 99 S.Ct. 1861 ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of retained constitutional rights of both convicted

MOTION TO SUPPRESS
9

prisoners and pretrial detainees"). The task of determining whether a policy is reasonably related to legitimate security interests is "peculiarly within the province and professional expertise of corrections officials." *Id.,* at 548. The Court has confirmed the importance of deference to correctional officials and explained that a regulation impinging on an inmate's constitutional rights must be upheld "if it is reasonably related to legitimate penological interests." *Turner v. Safely,* 482 U.S. 78, 89 (1987).

### C. The search of Mr. Brice's cell was a warrantless search for evidence of a crime, and not a legitimate institutional security search

*United States v. Cohen,* 796 F. 2d 20, 24 (2d Cir. 1986), holds that persons being held before trial retain a limited expectation of privacy that protects them from searches conducted for other then legitimate security reasons. The purpose of monitoring telephone calls and mail is thus for the security of the institution, not to gather evidence or continue investigation of a crime. *Id*.

Here, the issue is not whether the Spokane County Jail could take reasonable and necessary measures designed to provide institutional security. The search of Mr. Brice's cell was not the result of such steps. Rather, here, the investigating case agent, along with other investigating law enforcement personnel, conducted a search of Mr. Brice's cell in order to gather additional evidence and further investigate the charged offenses. The cases cited above in no way countenance such a result.

Any doubt regarding the true nature of this search is eliminated by considering who instituted and carried out the search. SA McEuen, the case agent, took part in

MOTION TO SUPPRESS
10

the search. SA McEuen is an FBI agent, and not a sheriff's deputy. There is no reason why SA McEuen would be taking part in such a cell search, except in order to further his investigation in this case. Deputy Marshal Shafer, while not the case agent, nevertheless assisted in the investigation of Mr. Brice by taking part in two searches, one of a car and one of a residence, at the time Mr. Brice was arrested. FBI Intelligence Analyst Pulcastro, like SA McEuen, is employed by the FBI. There would be no reason for Analyst Pulcastro to perform a search at the Spokane County Jail if that search were being performed as part of standard Spokane County Jail procedures. Instead, he was apparently involved specifically because of the desire by the United States Government to further investigate this case.

It is also noteworthy that AUSA Smoot was apparently involved, or at least briefed, on the search of Mr. Brice's jail cell prior to that search. He was similarly briefed after the search was performed. Additionally, it appears that none of the seized material was ever given to jail staff at the Spokane County Jail so that they could evaluate any institutional security issues. Rather, the materials were immediately placed in the custody of SA McEuen. SA McEuen then read them in their entirety, before beginning the process of disseminating the information to AUSA Smoot. It was at this point in the investigation that Mr. Brice was finally allowed to call undersigned counsel, who immediately protested the investigative search. These circumstances, however, clearly demonstrate that this entire process was never part of institutional security measures put in place by Spokane County Jail, but was instead part of a federal investigation launched by the United States

MOTION TO SUPPRESS
11

Government as part of its prosecution of Joseph Brice.

The facts in *United States v. Cohen* demonstrate the unlawfulness of the search of Mr. Brice's cell:

> On July 5, 1984 MCC corrections officer, Lt. William Chevere, conducted a so-called "contraband" search of Barr's cell. The search lasted approximately half an hour and consisted entirely of an examination of Barr's papers. A short time later, Lt. Chevere returned and examined Barr's papers for an additional hour. Assistant United States Attorney Michael R. Bromwich later admitted in his affidavit that he initiated the July 5 "contraband" search by Lt. Chevere. He directed MCC prison authorities to enter Barr's cell "to look for certain types of documents that may have contained the names and phone numbers of other of Barr's co-conspirators and witnesses who Barr had already contacted and was still in the process of trying to contact."
>
> In order to establish the requisite probable cause to obtain a search warrant for Barr's cell the next day, Det. Rocco R. Sanfillippo relied primarily on the information found by Lt. Chevere during the July 5 warrantless search of Barr's papers. Based on this information, a magistrate issued a search warrant on July 6 authorizing the seizure of all "written, non-legal materials belonging to Harold Barr." Pursuant to the warrant, Det. Sanfillippo and Lt. Chevere seized numerous sheets of paper from Barr's cell which included witness lists, notes on specific charges, personal matters, notes on conversations between Barr and his attorneys, and a sheet of paper on which the government contended Barr was practicing to disguise his handwriting.
>
> Upon Barr's motion to suppress this evidence, the district court suppressed some of the material on Sixth Amendment grounds because they related to Barr's right to counsel. But the trial court refused to suppress the remaining papers or to declare the search unlawful on Fourth Amendment grounds.

*Id.* at 21.

On appeal, Barr challenged the July 5th search of his prison cell as a warrantless search conducted in violation of the Fourth Amendment. The government relied on *Hudson v. Palmer,* 468 U.S. 517 (1984), for the proposition that the Fourth Amendment provided no protection for a prisoner's claim of a

MOTION TO SUPPRESS

12

privacy right in his prison cell.  The Court noted that prior to *Hudson*, decisions upholding cell searches had done so only in cases where prison officials had grounded the reason for the search on security.  *Id*. at 23 (citing cases).  The *Cohen* Court then considered whether the Supreme Court's decisions in *Hudson v. Palmer* and *Bell v. Wolfish* required a finding that "a pre-trial detainee retains no Fourth Amendment rights, regardless of the circumstances underlying the search."  *Id*. at 23.

The *Cohen* Court refused to adopt that finding.  Instead, the Court held that "[t]he door on prisoner's rights against unreasonable searches has not been slammed shut and locked."  *Id*.  This decision was based on the factual conclusion that the decision to search "was initiated by the prosecution, not prison officials. The decision to search for contraband was not made by those officials in the best position to evaluate the security needs of the institution, nor was the search even colorably motivated by institutional security concerns."  *Id.*  The Court "[took] seriously the Court's statement that no iron curtain separates prisoners from the Constitution, and that the loss of such rights is occasioned only by the *legitimate* needs of institutional security."  *Id*. (emphasis in original).  The Court explained "because conditioning the exercise of such rights rests on the twin-rationale of *objective* administrators insuring prison *security,* a limitation imposed on prisoners' constitutional rights cannot stand when the objectives the rationale serves are absent."  *Id.*

Under these circumstances, the Court held as follows:

> In this case it is plain that no institutional need is being served. Were it

MOTION TO SUPPRESS

13

a prison official that initiated the search of Barr's cell, established decisional law holds that the search would not be subject to constitutional challenge, regardless of whether security needs could justify it. But here the search was initiated by the prosecution solely to obtain information for a superseding indictment. In our view, this kind of warrantless search of a prisoner's cell falls well outside the rationale of the decided cases. Barr retains a Fourth Amendment right – though much diminished in scope – tangible enough to mount the attack on this warrantless search.

We hold therefore that Barr retains an expectation of privacy within his cell sufficient to challenge the investigatory search ordered by the prosecutor. Because his effects were searched at the instigation of non-prison officials for non-institutional security related reasons, the validity of the search may be challenged. An individual's mere presence in a prison cell does not totally strip away every garment cloaking his Fourth Amendment rights, even though the covering that remains is but a small remnant.

Thus, the district court's refusal to suppress all of the evidence obtained in Barr's cell search is reversed.

*Id*. at 24.[5]

The *Cohen* decision has been followed elsewhere. *See, e.g., United States v. Clrk*, 2002 WL 31368933 (S.D. Ohio 2002)(Fourth Amendment violated where jail inmate's property initially seized for institutional security, but then transferred to case agent for prosecution of matters not related to institutional security); *United States v. Santos*, 961 F.Supp. 71 (S.D.N.Y. 1997) (finding Fourth Amendment

---

[5] The *Cohen* Court remanded for consideration of whether the failure to suppress was harmless error in light of other, non-tainted overwhelming evidence. There was no doubt, however, but that a constitutional error had occurred. Harmlessness is not an issue in this case, as the issue is ripe for *de novo* factual and legal determination by this Court.

MOTION TO SUPPRESS

14

violation when federal agents conducted pretextual inventory search which exceeded the necessary scope, in order to find incriminating information for federal case); *United States v. Vasta*, 649 F.Supp. 974, 984 (S.D.N.Y. 1986) (Government concedes under *Cohen* that searches were unlawful). *See also McGarry v. Pallito*, 687 F.3d 505, 513 & fn. 7 (2d Cir 2012) (citing *Cohen* as still-valid law); *Ahlers v. Rabinowitz*, 684 F.3d 53, 61 (2d Cir. 2012).

Warrantless searches "are *per se* unreasonable," "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357 (1967). No exception applied here, and suppression of all fruits of the *per se* unreasonable search is mandated.

There is no principled way to distinguish *Cohen* and the cases following it from the facts in Mr. Brice's case. The searches performed by FBI Special Agent McEuen and FBI Intelligence Analyst Pulcastro were not performed as part of jail institutional security procedures. Rather, the searches were part of the investigation and prosecution of Mr. Brice. As such, the searches violated the Fourth Amendment. All evidence seized, and any fruits derived therefrom, must be suppressed. *See, e.g., Wong Sun v. United States*, 371 U.S. 471 (1963)

### III.  Conclusion

For the reasons expressed herein, Mr. Brice respectfully requests that all evidence seized during the search of his jail cell, as well as any fruits deriving therefrom, be suppressed.

MOTION TO SUPPRESS

15

1   Alternatively, Mr. Brice requests that an evidentiary hearing be held and
2   testimony taken from all Government agents and employees who were involved in
3   the search of Mr. Brice's cell, as discussed herein.

4   Because this search uncovered materials in violation of the Sixth Amendment
5   and the attorney-client and work-product privileges (*see* ECF No. 380).  Mr. Brice
6   hereby incorporates that motion by reference as if reproduced herein, and moves for
7   relief as discussed therein for the reasons expressed therein (*see* ECF No. 380),
8   because those violations are fruit of the poisonous tree of this search.

10  Dated:  April 24, 2013

                                              Respectfully Submitted,

12                                            s/ Matthew Campbell
                                              WA 38696
13                                            Attorneys for BRICE
                                              Federal Defenders of
14                                            Eastern Washington and Idaho
                                              10 North Post, Suite 700
15                                            Spokane, Washington 99201
                                              Telephone: (509) 624-7606
16                                            Fax: (509) 747-3539
                                              Email: Matt_Campbell@fd.org

MOTION TO SUPPRESS
                                      16

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following: Russell E. Smoot, Assistant United States Attorney.

> s/ Matthew Campbell
> WA 38696
> Attorneys for BRICE
> Federal Defenders of
> Eastern Washington and Idaho
> 10 North Post, Suite 700
> Spokane, Washington 99201
> Telephone: (509) 624-7606
> Fax: (509) 747-3539
> Email: Matt_Campbell@fd.org

MOTION TO SUPPRESS