1  Matthew Campbell
   FEDERAL DEFENDERS OF EASTERN WASHINGTON AND IDAHO
2  10 North Post, Suite 700
   Spokane, Washington 99201
3  (509) 624-7606

4  Attorneys for Defendant

5              UNITED STATES DISTRICT COURT
             EASTERN DISTRICT OF WASHINGTON
6
   UNITED STATES OF AMERICA,
7                                    Case No.: CR-11-0075-LRS
              Plaintiff,
8                                    SENTENCING MEMORANDUM
      vs.
9
   JOSEPH JEFFREY BRICE,
10
              Defendant.
11

12        Understandably, the infamous, dastardly and tragic deeds and
   events of September 11, 2001, have caused a maelstrom of
13 human emotions to be not only released but to also create a
   human reservoir of strong emotional feelings such as fear,
14 anxiety and hatred as well as a feeling of paranoia in many of
   the hearts and minds of the inhabitants of this great nation.
15 These are strong emotions of a negative nature which, if not
   appropriately checked, cause the ability of one to properly
16 reason to be impeded or to be blinded in applying our basic
   principles of law. In applying our democratic principles of
17 law, the only blindness that is allowed and acceptable is that
   in which justice is blind to such things as a person's national
18 origin or ethnic background or one's race or color or religious
   beliefs, because those characteristics play no role in deciding
19 legal issues such as those that confront this Court today. If we
   truly believe in principles espoused in this nation's
20 Declaration of Independence and the United States
   Constitution, we must give more than lip service to those
   principles. We must fairly and fully apply those principles to

SENTENCING MEMORANDUM- 1

each and every person entitled to their protection no matter how distasteful, frightening or loathsome it might be to some in doing so. We must always be vigilant to make certain that the rule of law, and not emotion, carries the day. There can be no doubt that the Constitution of the United States and our concepts of democracy provide sufficient strength and protection to bring citizens to justice without weakening our security. We must never adopt an "ends justifies the means" philosophy by claiming that our Constitution and democratic principles must be temporarily furloughed or put on hold in cases involving alleged terrorism in order to preserve our democracy.  To do so, would result in victory for the terrorists.

*United States v. Goba, et al,* 02-M-107 (W.D.N.Y. October 8, 2002)(Decision and Order, Mag. J. H. Kenneth Schroeder, Jr., Preamble).

Mr. Brice is before this Court facing his first criminal conviction. The instant offense is anomalous in an otherwise law-abiding life.  His appearance at a sentencing hearing in this matter will be an errant departure from the principles and values that he has learned from his family and followed throughout his life.

There is no simple or defensible explanation for Mr. Brice's conduct. However, his conduct is better understood in the context of his life, as well as the serious psychological damage caused by his severe injuries, damage which has only been recognized years later.  Equally important is Mr. Brice's resolve to plead guilty to his illegal conduct. His decision was based on the simple fact that he had engaged in wrongful conduct.  Given these circumstances, a sentence below the guideline range would be more than an appropriate sentence for Mr. Brice.

And while it is easy to decry Joey Brice as morally evil and sentence him to a lengthy punishment based on condemnation of his acts, it is equally critical not to lose sight of the good person who lies within Joseph Brice.

There is no question that Mr. Brice did wrong. And he has already suffered for what he has done. He will continue to suffer for his actions – through the record which will follow him for the rest of his life, through the damage done to his body, through the supervised release conditions which will be imposed upon him for many years, and through the loss of over two years of his life while incarcerated. He will be branded "a terrorist" for the rest of his life – a "scarlet 't'" reminiscent of Hawthorne.

Thankfully, Joey Brice has an amazingly supportive family to stand behind him and help him through the trials and tribulations to follow. They love him and care about him, and have done everything possible during this ordeal. Joey has finally realized that the scars to his psyche outweigh the damage done to his body, and should be repaired first if he is to reach real happiness. He has a long way to go, but he has taken his first steps. A minimal sentence will allow him to begin that lengthy journey with small steps, while requiring him to prove all the while that he is worthy of such a sentence. He has all the incentive in the world to succeed, since the slightest mistake could send him back to prison for the remainder of his supervised release term – thereby providing a powerful incentive for Mr. Brice to succeed.

Mr. Brice respectfully asks this Court to heed Magistrate Judge Schroeder's

1   words, set aside the most sensationalist aspects of this case, and follow the

2   parsimony principle and sentence to Mr. Brice to a term sufficient but not greater

3   than necessary to serve the goals and purposes of the Sentencing Reform Act.

4

5   **The Procedural Sentencing Framework**

6          In *United States v. Booker,* 43 U.S. 220 (2005), the Supreme Court

7   transformed the Sentencing Guidelines from a mandatory scheme into an advisory

8   resource.  In *Kimbrough v. United States*, 128 S.Ct. 558, 570 (2007), the Supreme

9   Court re-affirmed the sentencing regime announced in *United States v. Booker*, 534

10  U.S. 220 (2005), which requires district courts to consider the advisory Guidelines,

11  but also permits district courts to tailor a sentence in light of the other statutory

12  concerns set forth in 18 U.S.C. § 3553(a).  The Supreme Court reiterated in *Gall v.*

13  *United States,* 128 S.Ct. 586, 596 (2007) that "the Guidelines are not mandatory, and

14  thus the range of choice dictated by the facts of the case is significantly broadened."

15  *I d.,* at 602 (citations omitted).

16         Under § 3553(a), district courts are directed to impose the minimally-

17  sufficient sentence to achieve the statutory purposes of punishment – justice,

18  deterrence, incapacitation, and rehabilitation – by imposing a sentence sufficient, but

19  not greater than necessary, to comply with the purposes set forth in 18 U.S.C. §

20  3553(a)(2). *Kimbrough*, 128 S.Ct. at 570; 18 U.S.C. § 3553(a).  This "parsimony

provision" is "an overarching provision," representing a cap above which a district

court is statutorily prohibited from sentencing- even when a greater sentence is

recommended by the advisory Sentencing Guidelines, which, per § 3553(a), are

statutorily subordinate to the parsimony principle. *See Kimbrough*, 128 S.Ct. at 570.

Thus, after properly calculating the advisory range under the Sentencing

Guidelines, a factor which serves as only the "starting point" or "initial benchmark,"

district courts must then consider each of the § 3 553 (a) factors to impose a sentence

sufficient, but not greater than necessary, to fulfill the purposes of sentencing. *Gall*

*v. United States*, 128 S.Ct. 586, 596-97 (2007). The Supreme Court has explained

that district courts may not presume the advisory Guidelines range to be reasonable.

*Id*. at 596.  Further, the advisory Guidelines range is to be given no greater weight

than any other§ 3553(a) factor.  *Id*. at 602.  The Supreme Court has rejected an

appellate rule requiring extraordinary circumstances or the use of a mathematical

formula to justify a sentence outside the Guidelines range.  *Id*. at 595.  Instead,

appellate courts will apply the abuse of discretion standard of review to all

sentencing appeals whether a district court imposed a sentence within or outside of

the Guidelines range.  *Id*. at 596.  In order to facilitate this review, the district court

"must adequately explain the chosen sentence ... to promote the perception affair

sentencing." *Id*. at 597.  The justification must be "sufficiently compelling to

support the degree of the variance." *Id*. at 598.

District courts are afforded sentencing discretion because it is the district

courts who are "in a superior position to find facts and judge their import under § 3 55 3( a) in the individual case." *Gall*, 128 S.Ct. at 598. The district court "judge sees and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." *Id*.

Furthermore, under 18 U.S.C.§ 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of the person convicted of an offense," that this Court may "consider for the purposes of imposing an appropriate sentencing." Thus, "when a party raises a specific, nonfrivolous argument tethered to a relevant § 3553(a) factor in support of a requested sentence, then the judge should normally explain why he [or she] accepts or rejects the party's position." *Rita v. United States*, 127 S.Ct. 2456, 2468 (2007). Mr. Brice presents the following for the Court's consideration relative to the factors outlined in 18 §§ 3553(a) and 3661.

The Supreme Court requires judges "to 'impose a sentence sufficient, but not greater than necessary to comply with' the basic aims of sentencing" in § 3553(a), *Rita v. United States,* 127 S.Ct. 2456, 2463 (2007), which include the need for the sentence "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment; to create adequate deterrence; to protect the public from further crimes of the defendant and to provide the defendant with needed ... medical care, or other correctional treatment in the most effective manner," 18 U .S.C.§ 3553(a). Section 3553(a)(l) also gives sentencing courts "a broad command

to consider 'the nature and circumstances of the offense and the history and

characteristics of the defendant.'" *Gall,* 128 S.Ct. at 596 & n.6.

Sentencing a criminal defendant should be a difficult task for any

conscientious jurist.  It should neither be an easy nor merely a reflexive task

because, after evaluating and weighing all of the doctrines, theories and applicable

law, the decision to be reached is not really about arriving at the "right" result since

there are no right results; "a criminal sentence must reflect an individualized

assessment of a particular defendant's culpability rather than a mechanistic

application of a given sentence to a given category of crime." *United States v.*

*Floyd,* 945 F.2d 1096, 1102, (9th Cir. 1993), (quoting *United States v. Barker,* 771

F.2d 1362, 1363 (9th Cir. 1985)), *reversed on other grounds, United States v.*

*Atkinson,* 990 F.2d 501, 503 (9th Cir. 1993 ). A criminal sentence, therefore, should

adequately address and reflect how an individual got to this place in life. The

guidelines are only one factor of many the Court is directed to consider.  *Gall,* 128

S.Ct. at 596.

Regardless of the calculations in the pre-sentence report, the advisory

Guidelines level and range for Mr. Brice are so draconian and disproportionate that

they do not provide the slightest framework within which to craft the appropriate

sentence.  Indeed, even in the advisory Guidelines context, there are multiple

grounds for departure, which also double as grounds for eschewing the advisory

1    Guidelines altogether.

2

3    **Application of 18 U. S. C. § 3553(a) 's Sentencing Factors**

4         A study of all terrorism convictions by the New York University Center on

5    Law and Security reveals that the average sentence for material support offenses is

6    less than the fifteen year maximum sentence applicable to Count III. *See* Exhibit E.

7    The wide-ranging sentences given in these cases, as the United States District Court

8    for Minnesota has recognized, is significant when determining an individualized

9    sentence: "In short, while participation of any sort in a terrorist enterprise is a

10   deplorable step, and is appropriately dealt with harshly under federal law, the nature

11   of that participation will of course vary, and not every participant will merit equal

12   punishment…In sum, when the record is reduced to those facts that have been

13   sufficiently proven to play a role in a sentencing in the American criminal justice

14   system, this Court simply finds nothing to suggest that Warsame merits a sentence at

15   the higher end of those imposed on convicted terrorists." *United States v. Warsame*,

16   651 F.Supp.2d 978, 981-982 (D. Minnesota 2009).  Like Warsame, Mr. Brice is

17   simply not on the same level as convicted terrorists such as Richard Reid, Faisal

18   Shahzad (Times Square attempted car bomber), and Terry Nichols (Timothy

19   McVeigh's co-defendant), who received the maximum sentences applicable under

20   their charges.

**I.    Nature and Circumstances of the Offense and the History and Characteristics of Joseph Brice**

**A.    Childhood and Family**

Joseph Brice was born in Lewiston, Idaho, to Jefferey and Kathy Brice. His parents divorced when the defendant was 6 years old. After the divorce, Joey and his siblings lived with their father, primarily because their father had a higher income, but also because Kathy Brice had issues with alcohol.

Joseph Brice has three sisters and one brother.



Scott Brice, age 34, lives in Colbert, Washington, and he is employed as a pilot for Continental Airlines; Stephanie Brice, age 30, resides in Clarkston, Washington, and she works as a registered nurse; Amy Brice, age 28, lives in Lewiston, Idaho, and she is a radiology scheduler; and Emma Lee Brice, age 25, lives in Lewiston, Idaho, and she is working on her master's degree in psychology.  She also works at St. Joseph's Hospital in the medical supply department, and she is a faculty member at

1    Clarkston Community College in Clarkston, Washington.

2         Mr. Brice's father, Jefferey Brice, owns Valley Dental Lab in Clarkston,

3    Washington.  Jefferey Brice married Lisa Nanniga when the defendant was 16 years

4    old. She works at St. Joseph's Hospital in the medical supply department in

5    Lewiston, Idaho. Lisa Nanniga Brice has a daughter from a previous relationship.

6    Lindsey Nanniga is 29 years old, and she is employed as a teacher.  She lives in

7    Lewiston, Idaho.

8         Kathy Brice has been involved in a long-term relationship with Ronald

9    Anderson.  They have an 8-year-old child together, Mitchell. Kathy Brice reported

10    regular visitation with her children after she and Jefferey divorced.

11         While growing up, Joey Brice noted some significant family problems. His

12    stated his father was controlling and verbally abusive regarding the defendant's

13    interest in literature and technology and his lack of interest in sports.  The

14    defendant's mother provided little to no support during most of his life.  As a result,

15    Joseph Jefferey Brice stated that he has significant self-esteem issues.

16         Later, Dr. Mays would observe this phenomenon:

17         I think he felt that he was "a minus" who needed to be "a plus" to
average things out, as it were. As [Joey] said in another letter, *" .. .I've always
felt overshadowed and preceded by brothers and sisters and that I do desire to*

18    *prove myself by trying to be the best out of all ofthem. So I ask: What is the
point of being the best of my siblings and friends? Answer: Feeling of*

19    *triumph."*

20    (Exh. M at 10).  These feelings would ultimately come back to haunt Joey.

1    The feelings of isolation and emotional disconnect from his family would later

2   hamper efforts to heal from the physical damage and the emotional scars suffered

3   thereby.  As testing showed:

4        A primary source of stress may involve relationship issues because he
         believes that his social relationships offer him little support; family
5        relationships may be somewhat distant or ridden with conflict, and friends
         may not be available when needed. Interventions directed at key problematic
6        relationships (such as those involving family or marital problems) may be of
         some use in alleviating what may be a major source of dissatisfaction.

7   (Exh.M at 8).  Thus, based in significant part on family history, and Joey's own

8   psyche, he was unable and/or unwilling to turn to family for help and assistance

9   when it was most needed.  What resulted was an intensification of isolation and

10  desire for acceptance in whatever form.

11       Emma Brice described a close relationship with her brother.  She said that

12  their father provided a stable, positive environment when they were growing up.

13  Emma Brice confirmed that their mother "is hard to get along with."

14       Joey attended Clarkston High School in Clarkston, Washington, from August

15  31, 2004, until March 9, 2009. According to the school, the defendant was unable to

16  graduate with his class due to incomplete credits, and he was very upset.

17  Apparently, he focused on helping other students, and he fell behind in his own

18  classes. According to his transcript, his grade point average was 1.97 upon receiving

19  his diploma.

20       While it is tempting to ascribe Joey's internet activity solely to the

psychological scars caused by the explosion.  As Dr. Mays suggests however (Exh. M), doing so would be far too simplistic.  Instead, it appears that Joey's difficulties began long before his accident.  As Dr. Mays observes:

> He nonetheless showed subtle signs of psychological difficulties early on. It's noted, for example, that he is perceived as intellectually bright and capable academically, scoring above average on a test of intelligence, yet he never really achieved at school, leaving Lewis and Clark College, taking two classes at Walla Walla Community College and failing one of them, yet simultaneously eager to help and provide tutoring to others.

(Exh. M at 1).  While it is not clear necessarily what the exact root cause is, it nevertheless is apparent that there is a psychological root to his difficulties.


### B.    Adulthood

Joey subsequently attended Lewis-Clark State College in Lewiston, Idaho, from August 24 until December 17, 2009. Mr. Brice stated he was pursuing a degree in political science. The school indicated that Mr. Brice received an academic warning while attending the school.  Joey attended Walla Walla Community College in Walla Walla, Washington, from September until December 2010. According to the school, he took two classes; American literature and world civilization (history). He failed his literature class and received a B- in history.

From age 19 until age 21, Joseph Brice was involved in a relationship with Alyssa Pittman, who is now age 21. Ms. Pittman is employed at a Quality Inn hotel restaurant. Both Joey and Alyssa confirmed that their relationship ended, and they

maintain weekly to bi-weekly contact. Alyssa remains supportive of Joey.

Joseph Brice first experimented with marijuana at age 16. He stopped using the substance for an unknown period of time. At age 17, he started using marijuana again mostly on a social basis. Prior to his injury on April 18, 2010, he used marijuana daily.

At age 18 or 19, Joey first tried cocaine by inhalation. Before his injuries, he used cocaine once or twice. Mr. Brice tried mushrooms two or three times in high school, and he also experimented with MDMA (estascy) on several occasions in early 2011.

Joey Brice worked for his father, Jefferey, who owns Valley Dental Laboratory in Clarkston, Washington, from 2006 until 2011. According to Jefferey, he paid his son $10 per hour, and his hours varied. Jefferey stated, "Joe basically grew up in the dental lab. After receiving his driver's license, he began to do deliveries. Joe always went out of his way for me. Did a good job and made me proud. He was getting quite good at fabricating dentures. He was just about to leave for school at the L.H. Bates College in Tacoma, WA. His plan was to return home after completing school, and over time he would gradually take over the lab. From time to time, I would leave him alone, and he always performed well."

### C.    April 18, 2010 and its Aftermath

On April 18, 2010, Joey was almost killed when a pipe bomb prematurely

detonated.  In summary, he was airlifted to Harborview Medical Center in Seattle, Washington, on April 18, 2010, after the destructive device exploded. It was noted that Joseph Jefferey Brice sustained the following injuries: soft tissue avulsion (avulsion is an injury in which the body structure is forcibly detached); blast injury to posterior thigh and leg (18%); deep avulsion about left ankle with exposed bone (tibia); left hand soft tissue injury; left gluteal soft tissue and muscle laceration/avulsion; left scapula area soft tissue injury; left pubic ramus (part of the pelvis) fracture; left tibial plateau fracture. The defendant was intubated (tube inserted into windpipe so that oxygen can be supplied to the lungs). A feeding tube and catheter were inserted. He was heavily sedated with Ativan (anxiety), 4 mg per hour; Lorazepam, 40 mg; Fentanyl (pain) 100 mcg per hour; Oxycodone, 20 mg, every 3 hours; methadone; and numerous other medications. He received four units of packed red blood cells, fresh frozen plasma and  platelets due to blood loss.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20

The lengthy list of medications given to Joey changed numerous times over the course of his recuperation. On April 20, 2010, the nursing progress notes indicated that Mr. Brice had three wound vacs (therapy for wounds which promotes healing through the delivery of negative pressure (a vacuum) to the wound site) on his right leg, left hip and right ankle. His right anterior thigh tendons and bone were exposed. He had multiple areas with abrasions, especially to the left side. He had a deep puncture wound on his left forehead, left

chest, left forearm, left hands, and right foot. Staples were applied to his left buttocks and thigh. It was also noted that he was tachycardic (heart rate exceeded the normal range) and febrile (feverish). Wound care was performed on Mr. Brice continuously. Joseph Jefferey Brice was also turned frequently, and he was given additional pain medications prior to being moved.



Contained in Mr. Brice's medical records from Haborview Medical Center in Seattle, were social worker assessments regarding his mental health. On April 21, 2010, Joey's mother, Kathy Brice, told the social worker that her son had always been a "loner," but he had many friends. Joseph Jefferey Brice was described as enjoying things to do by himself like being on his computer. Mrs. Brice indicated that she was concerned that her son may be suffering from depression.

Mr. Brice had the following noted surgeries (however, this may not be inclusive): On April 20, 2010, debridement of wounds on lower extremities, left hip and left chest wall; April 22, 2010, irrigation and debridement of left hand, fixation of fractures on left hand; April 23, 2010, removal of wound vacs, debridement of

subcutaneous tissue and muscle from lower left extremity wounds, irrigation and replacement of wound vacs; April 26, 2010, cutting of tendons due to damage of the left achilles, left hamstring, skin grafting; May 3, 2010, skin grafting; May 7, 2010, debridement of skin, subcutaneous tissue, muscle, and bone from left ankle wound. Negative pressure dressing and skin grafting; May 12, 2010, debridement, reconstruction and skin grafting to left ankle and lower leg; May 17, 2010, debridement, reconstruction and skin grafting to left ankle and lower leg; June 4, 2010, removal of hardware in left hand; July 23, 2010, injection of Restylane into the vocal fold; December 20, 2010, debridement of right nonhealing ankle wound, complex repair of right ankle wound.



Joey remained in the intensive care unit until May 5, 2010. On that date, he was moved to the acute care unit at Harborview Medical Center in Seattle.  A physical therapy initial assessment was conducted on May 5, 2010. It was noted that

short-term goals were to prevent skin breakdown and limit loss of range of motion. It was recommended that Mr. Brice participate in physical therapy two to three times per week.

On May 6, 2010, Joey was referred to a psychologist at Harborview Medical Center in Seattle, for an assessment for acute stress disorder/post traumatic stress disorder and anxiety management. Dr. Jeffrey Sherman met with Mr. Brice. When they met, Joey denied depressive or anxiety symptoms at that time. He admitted that he felt considerable anxiety, fear, and confusion up until May 3, 2010. Once he understood his situation, he felt calmer. Joey denied intrusive recollections of the explosion. He also denied avoidance, disasociatiove, and arousal symptoms.  Joey expressed feelings of embarrassment and guilt. He was encouraged to talk to his family and friends about his feelings. No additional recommendations were made by Dr. Sherman.



Joey participated in physical therapy at Haborview Medical Center until June 8, 2010 (when he was discharged). It was noted on June 3, 2010, that Mr. Brice's strengths were that he was cooperative and motivated. His barriers were cognitive deficits, orthotic/brace, weight bearing precautions, and multiple areas of tissue injury to protect. His discharge recommendations included 24-hour supervision with low intensity therapy.

Mr. Brice was discharged from Harborview Medical Center in Seattle, Washington, on June 8, 2010. At that time, he was provided with the following medications: aspirin, 81; Bacitracin, topical cream; Enocaparin, 30 mg; Iansoprazole, 30 mg per feeding tube twice daily, Quetiapin, 25 mg daily; Scopolamine 1. 5 mg transdermal; multivitamin with minerals, 15 ml per feeding tube daily. He was also given the following medications to take as needed: Al hydroxide, as needed for indigestion/heartburn; Diphenhydraime, 25-50 mg per feeding tube as needed for itching/insomnia; ibuprofen, 600 mg per feeding tube; milk of magnesia; Metoclopramide, 10 mg for nausea/ vomiting; Ondansetron, 8 mg as needed for nausea; and Oxycodone, 5-30 mg per feeding tube every 3 hours as needed for pain. He was provided with instructions for wound care, etc., and Jevity for nutrition.

Joseph Jefferey Brice was moved to Kindred Hospital in Seattle, Washington, on June 8, 2010. Kindred Hospital specializes in acute, long-term medical care for patients needing to recuperate from serious injuries or disease. When he was

transferred to Kindred Hospital, he continued to have a feeding tube (taking nothing by mouth), because of his left vocal cord paralysis.

Upon entry into Kindred Hospital in Seattle, Washington, on June 8, 2010, an initial assessment was completed. His current problems were determined to be: wound care; dysphagia with swallowing difficulty, requiring speech evaluation; neuropathic pain and hypergranulation of the left hip wound. His overall condition upon admission was "good." Upon discharge on July 2, 2010, it was noted that Mr. Brice did very well in their care. He was weight bearing as a result of physical therapy and walking. It was noted that he needed additional plastic surgery and continued rehabilitation.



Mr. Brice was reevaluated on July 6, 2010, by Dr. Jo Ann Brockway. Joey Brice stated that he experienced some sleep difficulties due to mild physical discomfort. He expressed some "periods of depression," in which he felt "hopeless."

He attributed his depressed periods to his "never-ending" hospital stay. He described those periods as transient, and something he "snapped out of" when engaged in a positive activity (i.e. a visit from his girlfriend). Mr. Brice said he had nightmares while in intensive care, which he felt may have been related to medications. He denied having present nightmares or symptoms indicative of anxiety. Joseph exhibited a positive and optimistic outlook regarding his future at that time. He used humor in discussing the severity of his scars ("I hope it's true that chicks dig scars."). It was noted that Mr. Brice was participating fully in his recuperation. It was Dr. Brockway's impression that Joey could benefit from rehab psychology intervention to assist him in good health habits regarding skin care, e.g., remembering to use lotion and suncreen on his scars. Rehab psychology was to follow only if needed.

Psychological testing demonstrates the validity of the psychological damage caused by the explosion. Unfortunately, the full extent of that damage was not recognized at the time, and instead Joey's care centered largely if not exclusively on physical harm, while his psyche was largely ignored:

> the respondent has likely experienced a disturbing traumatic event in the past- an event that continues to distress him and produce recurrent episodes of anxiety. Whereas the item content of the P AI does not address specific causes of traumatic stress, possible traumatic events involve victimization (e.g., rape, abuse), combat experiences, life-threatening accidents, and natural disasters.

(Exh. M at 5-6).

### D.    Post-Injury Recovery Period

After his release from the hospital in 2010, he did not take his pain medications as prescribed, and he used marijuana daily instead. He estimated that he spent approximately $25 to $50 on marijuana every 2 or 3 days. However, his increased marijuana use caused anxiety, and he used less marijuana (and drank more alcohol) for a period of time.  Mr. Brice drank alcohol socially at parties at age 18. He drank more frequently after his injury, but his use varied. Some weeks he drank daily (beer), and other weeks less frequently.

The psychological effect of his physical harm are once again evident. Psychological testing demonstrates that he was affected by the explosion, and that the physical damage was omnipresent psychologically.  (Exh. M at 6).

From January until May 2011, he used Cocaine regularly, and the amount varied. He indicated the substance was difficult to obtain, but 1 gram of cocaine would last a few days.

In regard to treatment, after his arrests on January 20, 2011, for marijuana possession, use of drug paraphernalia, loaded pistol in vehicle, and minor in possession, Joey was ordered to participate in an alcohol class. He indicated that the 3-hour class was helpful. Joey is also interested in participating in the Bureau of Prisons' intensive drug treatment program while incarcerated.

Kathy Brice described her son as a wonderful, compassionate and caring person that would never hurt anyone.  She believes that after his "accident," he

1   suffered from post traumatic stress.  She noticed that he was irritable, paranoid, and

2   he had a hard time coping after he was injured. He continued to have trouble

3   sleeping, and he drank more beer to help his insomnia.

4        The fact that Mr. Brice's depression went largely ignored by all but his mother

5   is not surprising.  In fact, it is largely consistent with psychological testing:

6            The respondent reports a number of difficulties consistent with a
         significant depressive experience. He is likely to be plagued by thoughts of
7        worthlessness, hopelessness, and personal failure. He admits openly to
         feelings of sadness, a loss of interest in normal activities, and a loss of sense
8        of pleasure in things that were previously enjoyed. However, there appear to
         be relatively few physiological signs of depression.

9   (Exh. M at 6).  Once again, Mr. Brice presents contradictions. While he suffers these

10  symptoms internally, and might admit them if asked, he also seeks to hide those

11  symptoms, which may not be self-evident.  In his case, as documented herein, he had

12  an overwhelming desire to be seen as valuable, and to impress others.  This became

13  a near-obsession, fueled in large part by his feelings of inferiority and failure.

14       Jefferey Brice knows what Joseph Brice has told him; however, he knows

15  "Joe" would never hurt anyone, and he remains very supportive of him.

16       Emma Brice noticed changes in her brother.  He was embarrassed about the

17  scarring on his legs after the explosion.  Joey Brice could not snowboard or do the

18  things he normally liked to do.  She also confirmed that Joey drank more alcohol

19  after he was injured.  Emma Brice remains supportive of her brother.

20       Psychological testing demonstrates that the behavioral observations of his

1  family are accurate and valid.  As noted, testing shows that substance abuse is likely

2  a problem which had considerable influence on his behavior.  (Exh. M at 4-5).

3  Moreover, testing indicates a cyclical phenomenon consistent with that observed by

4  his family, in which anxiety causes certain behaviors and phobic reactions:

> The respondent indicates that he is experiencing specific fears or anxiety
> surrounding some situations. The pattern of responses reveals that he is likely
> to display a variety of maladaptive behavior patterns aimed at controlling
> anxiety. He does not appear to have significant problems with obsessive-
> compulsive thoughts and behaviors. However, phobic behaviors are likely to
> interfere in some significant way in his life, and it is probable that he monitors
> his environment in a vigilant fashion to avoid contact with the feared object or
> situation. He is more likely to have multiple phobias or a more distressing
> phobia, such as agoraphobia, than to suffer from a simple phobia.

(Exh. M at 5).  Certainly, the circumstances presented herein make increased

feelings of anxiety understandable.  In conjunction with Mr. Brice's other

psychological issues, anxiety was a powerful factor in creating otherwise

unexplainable behavior.


**E.**    **The Offense Itself**

   **1.**    **The government's conduct regarding Count 3**

   The investigation of Mr. Brice and Count 3 began no later than December,

2010.  (*See, e.g.,* PSR at ¶20, page 8).  As the investigation continued, on March 30,

2011, an FBI online covert employee (OCE) requested an account on the Deen al-

Haqq website using the online moniker "Abu Harith" and an email account of

Harith1978@gmail.com. The account was activated several days later.  (PSR at ¶49,

pages 25-26).

On May 1, 2011, an individual started a thread titled, "Medical Care," in the English section forum on Deen al-Haqq. The FBI OCE indicated that the posting discussed acquiring blood-clotting medicine to save the lives of wounded mujihadeen. The individual provided detailed information regarding two specific blood-clotting medicines. The first was QuickClot, which the individual indicated was manufactured in the United States, and it could not be shipped internationally. The second was Celox, which the individual indicated was manufactured in the United Kingdom. The individual acknowledged those two treatments were "from Kuffar lands," but urged others to acquire Celox to "protect and save the lives of our mujihaden [sic]." The individual stated she was attempting to identify distributors of Celox in "Muslim lands."

On May 1, 2011, Yusuf90 replied to the thread titled, "Medical Care," with the following posting:

> Buying this powder in large amounts will bring unnecessary attention, even more so if it is ordered in regions where our mujahideen brothers, may Allah bless them, are fighting the occupiers. So if someone was to use this advice in order to help the Jihad movement, one would have to buy it far away and travel to deliver. These types of styptic powders can be found in most medical stores, but they are only found in small amounts.
> I suggest calcium carbonate powder. This is used for those with weak bones and bad hearts. They are pills but if it is crushed into powder, it works the same way as this website link you have shown us. These type of medical items are less suspicious and can be bought in large amounts. But one should realize that these powders will not stop the progression of an explosive injury or wound. It should only be used to temporarily stop bleeding from ammunition wounds or deep cuts until the akhi can be brought to get medical

1    help. Infection is only a major issue when trying to use these for devastating
     wounds.

2            May Allah be pleased with your advice though.
             JakakAllah khair Sister

3    (PSR at ¶55, page 29).

4        In reality, this information is worthless.  A simple internet search will reveal

5    that calcium carbonate cannot be used in powder form and pressed into wounds as

6    suggested.  Doing so would be no more effective than pressing dirt, or salt or any

7    other random substance into a wound.  Nevertheless, the government saw this as an

8    opportunity to see if it could encourage Mr. Brice to commit a crime.

9        On May 1, 2011, the FBI OCE also replied to the thread titled, "Medical

10   Care," with the following posting:

11       Shukran Jazillan Ukhti for the great information, Jazaki Allahu Khayran.
         Same for you akhi Yusuf
12       As I watch Al Jazeerah everyday and see what is going on in our Umma, from
         Iraq to Afghanistan to Yemen, Libya, and now Syria I cannot help but think
13       how badly needed this is. While akhi yusuf offers great alternative solutions it
         is very limited. We need to think of how we can work around those limitations
14       and try to find and ship this great and well needed product to our brothers and
         sisters who need it most.
15       Let us put our heads together and find a solution and do our Jihad instead of
         just talking about it.
16
17   (PSR at ¶56, pages 29-30).  As noted above, this is not a "great alternative solution"

18   for anything.  It is useless information which would provide no assistance to an

19   individual suffering a wound.  But the government's goal was to see if it could

20   convince Mr. Brice to commit a crime.  It sought to do so knowing that he would be

     indicted two days later.  It was, instead, seeking to convince Mr. Brice to commit a

1    more serious offense.  Unfortunately, he took the government's bait.

2        On May 1, 2011, the FBI OCE sent a private message to Yusuf90 titled,

3    "Help," with the following posting:

4    > AKhi Yusuf,
> Thank you again for you valuable information again. You seem like a very
5    > knowledgeable mujahid. You mentioned that Calcium Carbonate is easily
> obtainable in big quantities. Would please let me know where I can get it. My
6    > situation allows me to travel much here in the U.S. and allows me great
> flexibility of buying it from different states without inshallah drawing
7    > attention.
> Guide me to where I can get it and we can both serve our brothers and the
8    > mujahideen in our struggle against the kuffar. Also can I buy it online without
> drawing any attention? Also if I do buy it online will the companies I buy it
9    > from ship overseas?
> I look forward to your advice
10   > Jazak Allahu Khayran Allah, May Allah favor you in Yawm Al Qiyama.
> Akhook Abu Harith

11   (PSR at ¶57, page 30).  By sending this private message to Mr. Brice, it was the

12   government and not Mr. Brice who escalated the level of contact in an effort to

13   convince him to commit a crime.  As noted, this information has no value, so

14   regardless of what Mr. Brice said about it, these remarks were not criminal, as they

15   could not constitute training.  In terms of measuring the harm caused by passing

16   along such information, it is clear that there is no harm to passing along worthless

17   information.

18       On May 2, 2011, Yusuf90 replied to the private message from the FBI OCE

19   titled, "Re: Help," with the following posting:

20   > My akhi Abu,
> If you look for "calcium carbonate bulk" on search engines, you will find

SENTENCING MEMORANDUM- 27

many places to buy up to 50 lbs. Each mujahid should have .5 kg of this crushed into smaller powder. Not too thin of powder. You take a bandage, apply on the wound, then put pressure on the wound. It will hurt very bad but so does ani septic (sic). The powder must stay clean or you will spread infection or cause healing issues. But you must remember, Allah may wish the mujahid to enter paradise so many deep puncture wounds can't not be delayed or slowed greatly. This advice is only for minor rifle injury, cut injuries or explosive injuries.

You may translate "calcium carbonate bulk" to your native language if it helps you find it closer to your region. Do you mind if I ask where you live? You don't have to answer but if you need help I may need to know this. I am worthy of trust.

Do you know AllahsServant well?

wa'l-salaam

(PSR at ¶58, pages 30-31).  Once again, this is worthless information.  It is no more medically valuable than suggesting one pour salt into open wounds.  To the extent that it suggests purchasing large quantities of calcium carbonate to open wounds, it is simply an invitation to waste money.

On May 2, 2011, the FBI OCE replied to the private message from Yusuf90 titled, "Re: Help," with the following posting:

As Salamu 3alaykum Akhi Yusuf,

Shukran Akhi for your eagerness to help. I am sure in lieu of the yesterday's events the time to help with calcium carbonate has passed. Before we can trust you to help us we need to know about you and your expertise.

For security reasons all I can divulge to you is that I [sic] live in, midwest, Dar El Harb [Translation: "America"]. We need to be very careful akhi and in the future I would like to communicate through secure e-mail like gmail.

Regarding your other question I am not in the habit of discussing my ikhawan wa akhawat.

Jazaka Allahu Kharan

Akhook Abu Harith

(PSR at ¶59, page 31).  Thus, it was the FBI OCE, and not Mr. Brice, who sought to

1  shift the conversation from worthless medical advice to other subjects.  The

2  government's efforts became all the more apparent in the messages which followed.

3       On May 3, 2011, the FBI OCE sent an additional reply to Yusuf90 titled, "Re:

4  Help," with the following text:

5       Akhi Yusuf,
       I have reading your posts and it is time to act. Are you willing help.
6       contact me on abuharith1978@gmail.com
       Jazak Allah Kheyr
7       Akhook Abu Harith

8  (PSR at ¶61, pages 31-32).  It was thus the FBI OCE who escalated the situation by

9  initiating the call for action.  Mr. Brice had not suggested that it was time to act.  Mr.

10  Brice had been talking, at most, about theoretical issues and not actual use of any

11  type of force or violence.

12       On May 5, 2011, Mr. Brice created the email account

13  allahguidance@gmail.com. The fact that he had to create an account is further

14  evidence  that this was not a longstanding plan to carry out jihadist activities.  After

15  all, he had to create a new email account simply to correspond with the FBI agent

16  desperately attempting to convince Mr. Brice to commit a crime.  Mr. Brice sent a

17  message to the FBI OCE, "The Beginning," with the following text:

18       as-salaamu 3alaykum [Translation: "Peace be upon you."]
       I am sorry it took me days to respond Akhi [Translation: Brother] Abu. I am
       also in Dar al-Harb [Translation: "America; house or land of war"]
19       Indeed, now is the time for action. But we must keep safe in this time as
       well.
20       Knowledge is for acting upon, so our duty as Muslims is to act swift and
       with strength.

1
   Stay safe.
   May Allah, the merciful, watch over us.
2
   Amen [Translation: "Amen"]
   Yusuf

3
(PSR at ¶62, page 32).  As an initial matter, the delay in response time by Mr. Brice

4
demonstrates that he was not eagerly waiting for this message waiting to respond.

5
Instead, it appears that he was going on with his life, which, as demonstrated herein,

6
included matters well beyond concern with Islam.  Moreover, his response amounts,

7
largely, to nothing. At most, he advised the FBI OCE to stay safe.

8
   It is also interesting to note that by the time this email was sent, the

9
government had already indicted Mr. Brice for manufacturing an unregistered

10
firearm, based on the April, 2010 incident in which he was injured during the

11
explosion.  Thus, at this point, the FBI knew that it was going to arrest Mr. Brice.

12
The only question was when.  Based on this fact, it appears that the FBI decided to

13
escalate the pressure and intensify its efforts to convince Mr. Brice to commit a

14
crime.

15
   On May 6, 2011, the FBI OCE replied to the email titled, "Re: The

16
beginning," with the following text:

17
   Akhi [Translation: "brother"] Yusuf,
   Assalamu 3alaykum wa ra7matu Allahi wa barakatihi. [Translation:
18
   "Peace be upon you and Allah's blessing and blessings."]
   Thank you for the reply I was start to worry about you not wanting to help.
19
   Let me command you for your cautiousness by reaching for me on gmail, it is
   safest. Living in Dar El Harb [Translation: "House or land of War"] we have
20
   to be very safe.
   Akhi [Translation: "Brother"] we read your posts on Din el Haqq and are very

impressed by your know of chemistry. We are in the middle of planning something big that will hurt the kuffar [Translation: "Infidels"] and inshallah [Translation: "God willing"] teach them a lesson. Forgive me for not providing you with details, the less you know the better for you. But we need your help very soon.
We have the needed material but are having problems with consistently making the tafjir [Translation: "detonation"]. Can you help us?
Jazak Allah Kheyr Akhi. [Translation: "May Allah reward you for your good deeds brother."]
Akhook Abu Harith [Translation: "Your brother Abu Harith"]

(PSR at ¶63, page 32-33).  It was the FBI OCE who created this mythical crime, not Mr. Brice.  The FBI did so three days after Mr. Brice had already been indicted.  Perhaps they were not satisfied with charging him with an offense punishable by up to ten years in prison.  Perhaps they were unsatisfied with the sentencing guidelines range he would have been facing for that offense.  But based on this email, it was the FBI who was "planning" a crime, while Mr. Brice was planning nothing.

On May 7, 2011: Yusuf replied to the email titled, "Re: The beginning," with the following posting:

[Arabic Printing] [Translation: "Peace be upon you"]
I am always willing to help my brothers but I must know more specific parts of your plan. I must also stress that the kafir [Translation: "infidel"] is becoming very smart in order to fool fellow brothers and sisters into joining them, then they are arrested. Can you prove to me you are who you say you are and that I can trust you?
What problems are you having with your project? If you have the needed materials, insha'Allah [Translation: "Allah or God willing"] you should be able to build the correctly. My trust is in you, therefore I expect in return. Stay safe.
[Arabic Printing] akhi [Translation: "May Allah reward you for your good deeds brother"]
Y.

1    (PSR at ¶64, page 33).  Beyond the rhetoric expressed herein, there is nothing of

2    substance in this email.  He responded to the FBI's questions with more questions.

3    He explained nothing, and simply parroted rhetoric he had picked up from reading

4    on the internet.

5         On May 7, 2011, four days after Mr. Brice was indicted by the grand jury, the

6    FBI OCE replied to the email titled, "Re: The beginning," with the following text:

7         [Arabic Printing] [Translation: "Peace be upon you as well and Allah's
          mercy and blessings."]

8         Akhi [Translation: "Brother"] Yusuf

9         I am very impressed by your cautiousness and have to agree with you about
          the Kufar [Translation: "infidels"]. I have been living in Dar El Harb [House
          or land of war] for a while and have seen too many ikhwan mujahideen

10        [Translation: "holy warrior brothers"] being arrested, because of carelessness
          and have to be honest wondered about you as weell [sic]. WHat [sic)] can I do

11        to prove to you that I am who I say I am?
          As for the target I cannot go into details for the same reasons we talked

12        about before, but I can tell you that the target is those who have been hurting
          our Ikhwan [Translation: "brothers"] in Iraq and other places for years and

13        specifically our Sheikh Abu Abdallah [Translation: "Usama Bin Laden"] last
          week, the junud [Translation: "Soldiers"].

14        Akhi [Translation: "brother"] I will let you decide whether you want to help
          or not. Here is our problem. We are using nail polish remover (acitone) [sic]

15        and beroxide [sic] cap in diesel fuel and amoniom [sic] ntrate [sic] but we are
          not always getting infijar [Translation: "Detonation"] all the time, ahyanan

16        [Translation: "sometimes"] yes wa [and] ahyanan [Translation: "sometimes"]
          No.

17        Akhi [Translation: "brother"] you decide if you want to help or not but
          either way let me know soon.

18        [Arabic Printing] [Translation: "May Allah reward you for your good
          deeds."]

19        [Arabic Printing] [Translation: "Your brother in Allah Abu Harith."]

     (PSR at ¶64, page 33). Once again, it was the FBI OCE who intensified the situation
20
     – four days after Mr. Brice had already been indicted.  He is the one who brought up

specific questions regarding acetone and detonation.  It appears that the FBI was

dissatisfied with the responses it had received so far.  The FBI was dissatisfied with

Mr. Brice's responses to date, and appeared determined to entice him into

committing a terrorism offense.

May 8, 2011: Yusuf  replied to the email titled, "Re: The beginning," with the

following posting text:

> The only way to earn my trust is to give me more information what you are planning.
> Do not use nail polish remover. Use real 90% or higher acetone, you can buy this at hardware stores. If you are making TATP which is acetone peroxide, you cannot use this as a blasting cap for ANFO (ammonium nitrate/diesel). If you are using tatp for your caps you need to build a booster to bridge the two. ANFO is difficult to detonate. You need to take your acetone peroxide and dehydrate your nitrate by baking in the oven for 30-60 minutes. Ammonium nitrate will not work properly if the water molecules from the air are absorbed. DO NOT PUT THE ACETONE PEROXIDE IN THE OVEN.  JUST THE FERTILIZER.
> A booster should be around 300-500 grams.
> To make this, take a ratio of 12:88 APAN (Acetone peroxide-ammonium nitrate). So if you have 100 grams of APAN, you should measure 12 grams of AP and 88 grams of nitrate .. and then mix the two well. This booster can be detonated with a simple acetone peroxide blast cap. Bury the cap in the booster with just the fuse or wire from the cap sticking out. It's important to cover the cap inside the booster entirely or you may have a failed detonation.
> Once you have a booster made, you can then mix your Ammonium nitrate-diesel fuel at a ratio of 94:6 . Remember that this measurement is by weight so if you made a 100 gram anfo device, you would measure 94 grams of nitrate and 6 grams of fuel. Mix this well and let it absorb for a hour. Make sure to seal both the booster and the anfo so it does not absorb water from the air. Plastic gallon sized bags are good to use. Double wrap them to avoid fuelleaking through and getting on your hands or to hide the smell of fuel. Wrap the AN-FO around the booster. If you have done this correctly, your nitrate will detonate. ANFO requires heavy detonation so you must use a booster to build a bridge between the cap and the ANFO.

BUT, you have to perfect your work, there are often many failed detonations before you achieve success. Be careful, this is dangerous work, follow all precautions safely.

First you need to make sure you are making correct acetone peroxide, then move on to your booster. Test your booster before building a large explosive as to avoid wasting your time.

You will most likely need to ask me more questions because it is hard to explain everything in one email. But I need you to tell me, where are you getting your ammonium nitrate from? You have to be using the correct type. Some have new ingredients in the nitrate so that they cannot be made into explosives.

I will design a diagram for you to better understand how to use the booster but first I need you to answer these questions in the next email.
-Where are you getting your nitrate from?
-Are you stabilizing the acetone peroxide with baking soda powder after you filter it?
-In acetone peroxide there are 3 chemicals; Acetone, hydrogen peroxide, and third is an acid. Sulfuric acid is too difficult to acquire, use an acid called "muriatic acid". This is found in all hardware stores for a very low price, it is used to clean pools and concrete ground. It is dangerous so avoid inhaling. Jazak Allah khayr akhi [Translation: "May Allah reward you for your good deeds brother."]

(PSR at ¶66, page 34-36). Finally, after many efforts, Joey Brice did what the FBI wanted. He committed another crime. They could have arrested him five days before, but chose not to do so. Would this crime have ever occurred had the FBI not actively sought it out? We'll never know.

Mr. Brice wishes to make clear what now be all to obvious – he takes responsibility for his crimes. This discussion is not offered as an entrapment defense. But in assessing Mr. Brice's moral culpability for sentencing purposes, one must examine the circumstances surrounding the crime. While the FBI may not have approved of Mr. Brice's internet activity, prior to May 8th, that activity was not

criminal.  In an effort to entice Mr. Brice into committing a crime, the FBI came at him over and over, finally directly and overtly asking for information, at which time he was arrested the following day.

Mr. Brice was, in some ways, a psychologically-predisposed target.  "His behavior is also likely to be reckless and impulsive; he can be expected to entertain risks that are potentially dangerous to himself and to those around him."  (Exh. M at 7).  In light of his injuries, this observation is perhaps all too obvious.  Nevertheless, hsi psychological profile demonstrates that his inexplicable behavior has roots deeper than simpler antisocial behavior:

> His sense of vulnerability from the bomb blast is evident. Intertwined with these concerns is the implicit view of himself as significantly special such as to warrant an atypical response from the world. At some points he was overtly paranoid. Paranoia often has at its base an implicit sense of grandness, such that a person would warrant such extraordinary efforts on the part of other people. Following his loss of control, humiliation, and physical vulnerability with the bomb explosion and his hospitalization, this aspect of his world view became even more heightened.

(Exh. M at 11).

But for the fact that Mr. Brice had evidenced an interest in explosives, this offense may well have been dismissed for outrageous government conduct.   The standard for proving outrageous government conduct "is met when the government engineers and directs a criminal enterprise from start to finish." *United States v. Gurolla*, 333 F.3d 944, 950 (9th Cir. 2003).  While Mr. Brice had expressed interest in explosives and Islam such that the Government may not have engineered the

1   enterprise from the start, it is clear that the Government was directing the enterprise

2   at the finish.  Had agents or informers engineered and directed the criminal

3   enterprise from start to finish, due process would prevent the conviction of even a

4   predisposed defendant. *United States v. Citro*, 842 F.2d 1149, 1153 (9th Cir.1988).

5   Here, it was the Government that planted the seeds to further germinate its own plot.

6   *See, e.g., United States v. Williams*, 547 F.3d 1187, 1199 (9th Cir.2008).

7          Mr. Brice was particularly vulnerable to the type of flattery in which the FBI

8   OCE engaged, because of his varying concept of self.  While most would brush

9   away such inquiries as reprehensible, Joey was struggling with severe self-esteem

10  issues, both based on his childhood and adolescence as well as his self-

11  consciousness resulting from his disfigurement.  As psychological testing

12  demonstrated:

13          The self-concept of the respondent appears to be poorly established and
        his attitude about himself is likely to fluctuate. His self-perception will vary
14      from states of harsh self-criticism and severe self-doubt to  periods of relative
        self-confidence and intact self-esteem. His self-perception will tend to vary as
15      a function of the current status of close relationships; apart from a sense of
        identity established from such relationships, he likely feels incomplete,
16      unfulfilled, and inadequate. As a result, his self-esteem is quite fragile and is
        likely to plummet in response to slights or oversights by other people.
17      Associated with these drops in self-esteem are corresponding shifts in identity
        and attitudes about major life issues.

18  (Exh. M at 8).  This observation explains a great deal.  It explains how he could have

19  been convinced by the FBI OCE to answer the questions asked, and provide

20  information about explosives.  Moreover, it provides a psychological context for

other posts in which he appears almost desperate to be recognized as an expert, as accomplished, regardless of the topic of discussion.  His near-fatal injuries were self-inflicted, and caused Joey to internalize a great deal of ridicule.  As he retreated into isolation, his desire for acceptance via the internet became more pronounced and acute.

As Dr. Mays explains:

> Unfortunately, his accident with the bomb and the publicity surrounding it caused him to feel even more deficient, and to need to correct this by some form of extraordinary success. Unable to do this through vocational and personal endeavors, he turned to more misguided, and in some ways imaginary, ways of achieving these goals. Unsuccessful at college, now physically limited and socially blemished, he could at least impart those skills which he thought made him special and valuable, if only to a limited audience, no matter what that audience might be.

(Exh. M at 10-11).  But for this constellation of factors, factors with longstanding psychological roots exacerbated by devastating physical injuries and lack of follow-up psychological treatment, this offense would never have occurred.

### 2.    The nature of the "material support"

In determining the appropriate sentence for Mr. Brice, it is important to examine the actual information conveyed by Mr. Brice, and how valuable that information would be in the hands of a would-be terrorist.  And the answer to that inquiry is: not very.

For twenty years, Jerry Taylor was an Explosives Enforcement Officer

employed by the Bureau of Alcohol, Tobacco and Firearms. He participated in thousands of investigations.  He was the lead Enforcement Explosives Officer in the Oklahoma City Bombings, the Utah Mormon Bombings, the Randy Weaver case, the Waco investigation, several Unabomber crime scenes and the John Orr serial arsonist investigation. (*See* Exh. J).  Since 2000, he has been in private practice as a consultant.  In addition to other consultations, he frequently designs and trains law enforcement officers in the field of explosives, as well as performing contract work for the State Department in the Middle East.  Mr. Taylor's credentials are impeccable, as he literally trains the experts.  (*See* Exh. J).

Mr. Taylor explains that:

> There is clear discussion on acetone peroxide (AP or TATP-triacetone triperoxide) as Joseph Brice states: "in acetone peroxide there are 3 chemicals; Acetone, hydrogen peroxide, and third is an acid. Sulfuric acid is too difficult to acquire, use an acid called "muriatic acid." This is found in all hardware stores for a very low price, it is used to clean pools and concrete ground…" Plus there is: "Are you stabilizing the acetone peroxide with baking soda after you filter it?"
>
> **It was clear that Brice was attempting to provide information to someone that he thought may have been wanting to become an active terrorist. However, after manufacturing improvised explosives with the military or in federal law enforcement for over 30 years, I could not manufacture acetone peroxide based upon Brice's above quoted question and information provided without more detailed instructions .**

(Exh. K at 1).  If Mr. Taylor could not manufacture acetone peroxide based upon this information, that raises an important question – who could?

As Mr. Taylor explains:

Acetone Peroxide (TATP) does consist of hydrogen peroxide (but the

concentration levels are not provided or discussed); acetone (standard variety); and muriatic acid (hydrochloric acid). Sulfuric acid could also be used in place of muriatic acid regardless what Brice stated.

(Exh. K at 1). This was the first, but not the last, statement of questionable accuracy that Mr. Taylor cites. Although, at various times, the government has attempted to portray Mr. Brice as a sophisticated expert, Mr. Taylor demonstrates the contrary. Mr. Brice had rudimentary knowledge about explosives, but lacked the expertise the government has sought to portray.

Mr. Brice's lack of expertise is readily identifiable, as Mr. Taylor explains:

Joseph Brice responds: "do not use nail polish remover. Use real 90% or higher acetone…" If you are making TATP which is acetone peroxide, you cannot use this as a blasting cap for ANFO (ammonium nitrate/diesel). If you are using tatp for caps you need to use need to build a booster to bridge the two. ANFO is difficult to detonate. You need to take your acetone peroxide and dehydrate your nitrate by baking in the oven for 30-60 minutes." Additionally Brice stated: "Ammonium nitrate will not work properly if the water molecules from the air are absorbed. DO NOT PUT THE ACETONE PEROXIDE IN THE OVEN. JUST THE FERTILIZER."
Either Brice is confusing two different issues or he truly doesn't have sufficient knowledge on these subjects. First of all TATP detonators can be used to explode ANFO IF THE CORRECT BOOSTER EXPLOSIVE IS USED, and secondly water molecules in air are not the problem but rather the moisture content of the ammonium nitrate (AN). Depending upon the prill size, cooking/baking AN until the moisture level is in the low single digit may still require another step before adding the TATP to for the booster explosive APAN.

(Exh. K at 2). Once again, Mr. Brice's knowledge regarding manufacturing explosives is questionable at best.

According to Mr. Taylor:

In my opinion Brice did not provide sufficient detail for someone to

1

2

manufacture AP/TATP.  However, he did provide detailed information how to manufacture ANFO and how to connect the explosive train. There was no discussion from either party on the manufacturing of a complete Weapon of Mass Destruction.

3

4

(Exh. K at 3).  Thus, Mr. Brice provided some information, but not enough to teach a

5

novice how to create an IED from scratch.  Certainly, this type of "assistance" pales

6

in comparison to some of the efforts put forth by other defendants in other cases, as

detailed *infra*.

7

Mr. Taylor identifies at least five easy-to-find locations at which a person

8

could find information detailing how to manufacture these types of explosives.

9

(Exh. K at 2).  Several of these locations contain far more accurate and complete

10

information than the information provided by Mr. Brice in his May 8th email.  One of

11

the locations identified by Mr. Tayloro was the well-known website Wikipedia.

12

(Exh. K at 2).  Wikipedia is the sixth highest ranked website for web traffic in the

13

entire United States.  (*See* www.alexa.org).  In a very real sense, Mr. Brice's email

14

amounts, functionally speaking, than providing the FBI OCE with a link to the

15

appropriate Wikipedia page.

16

17

**F.    Incarceration Period**

Subsequent to his arrest and detention in this matter, Joey Brice was released

18

from federal custody, and on December 1, 2011, the defendant underwent surgery on

19

his second and third toes on his left foot. According to the operative report by Dr.

20

Richard Allen in Lewiston, Idaho, the surgery was performed to correct Mr. Brice's

hammertoe on the hallux (his big toe), and claw toes on his second and third toes. Those toes were severely contracted as a result of his injury and burns at the back of his leg. From Dr. Allen's post operative notes, the surgery was successful.

Mr. Brice continues to have issues with hearing loss, and he states that he needs knee surgery.

Mr. Brice's medical records were obtained from the Spokane County Jail. They noted that he had suffered from depression since he was injured after detonating the explosive device on April 18, 2010. On November 7, 2011, he was prescribed Neurontin, 600 mg, and Buspar, 15 mg. On March 19, 2012, Mr. Brice was prescribed Neurontin, 600 mg; Prozac, 40 mg; and Klonopin, 2 mg, by the jail medical staff. Later on March 19, 2012, his prescription changed in regard to his Klonopin medication. He was prescribed one pill at noon and one at bedtime. On April 27, 2012, he was given Klonopin, 1 mg, at noon and Klonopin, 2 mg, at bedtime. Some modifications were made in his medication regime. Mr. Brice refused treatment on August 3, 2012, and he refused to sign a refusal treatment form on August 16, 2012. From the records provided from the jail, it appears the defendant's medications were stopped at his request on August 3, 2012.

Mr. Brice was subsequently moved to the Benton County Jail in Kennewick, Washington. His medical records were received on March 14, 2013. Mr. Brice was prescribed the following medications: Klonopin, 2 mg; Prazosin, 2mg; Wellbutrin, 150 mg; Risperdal, 2 mg; and Prozac, 20 mg.

1          Unfortunately, it is only now that the full extent of Joey's psychological issues

2    are being determined.  After explaining the purpose and criteria for Axis I and Axis

3    II diagnoses, Dr. Mays explains:

4             The best diagnostic information on Joey Brice is that he has problems

5        on both dimensions. On Axis I, he shows signs of anxiety, depression, and
         substance abuse, as well as some aspects of a bipolar disorder. His emotional

6        reactions to his current situation would be formally labeled as an Adjustment
         Disorder with Mixed Anxiety and Depressed Mood, which is likely caused by

7        his reaction to his circumstances of incarceration and fears about continuing
         confinement. He also displays symptoms of the anxiety disorder of

8        Posttraumatic Stress Disorder, and shows symptoms of this as a result of the
         trauma of being mutilated, burned, rendered helpless, and confined to

9        treatment at Harborview Medical Center. He has a history of Substance
         Abuse, escalating since his injuries, in remission since his incarceration. He

10       also has aspects of a Bipolar Disorder, as indicated by his intermittent
         involvement with overly stimulating activities, grandiosity, altered sleep

11       patterns, a diagnosis also confirmed his by his apparent responsiveness to
         Risperdal while incarcerated. Risperdal is an antipsychotic medicine also

12       helpful in treatment of bipolar disorders.

13   (Exh. M at 2).  While it might be more comfortable to label Mr. Brice under a single

14   heading, Dr. Mays' comprehensive report explains in great detail that such a solitary

15   diagnosis would simply be inaccurate.  Moreover, in the context of the evidence as

16   reviewed herein, a multi-faceted analysis reflects the seeming contradictions in

17   Joey's behavior.  It also explains why his behavior appears unpredictable, and why it

18   has not always been moderated by a single medication, or even several medications.

19        Some of Joey's stranger behaviors are more easily understood in light of Dr.

20   Mays Axis II analysis:

             He also has an Axis II condition, formally labeled a Personality

Disorder, Not Otherwise Specified (NOS), with Schizotypal, Compulsive and Narcissistic Aspects. "Schizotypal" refers to odd and erratic behavior. This is a non-psychotic condition, with Joey Brice referring to his eccentricity of thought and behavior. There is also a compulsive and narcissistic aspect to this man's personality, in that he tends to be overly confident in his own skills and abilities, a confidence not justified by his experience or abilities, and his tendency to persist in behaviors which are problematic for him.

(Exh. M at 3). What the government would describe, perhaps, as "antisocial" or perhaps even "evil" is more properly understood in terms of these conditions. Moreover, once diagnosed, these issues can be addressed. As discussed herein, however, these problems have gone undiagnosed for years. It should not be surprising that such significant problems, as exacerbated by the harm caused by his injuries, would manifest in unacceptable behavior.

This is not to say, however, that Joey Brice is irrevocably broken. Nor is it the case that Mr. Brice is so psychologically scarred as to require isolation from society. To the contrary, while recognizing Mr. Brice's multi-faceted problems, Dr. Mays also rightly points out that some of Mr. Brice's beliefs are at least exacerbated by demonstrable reality. For example, endorsing such items during psychological testing as "I believe I am being followed;" "I am sure I am being talked about;" and "I have often felt that strangers were looking at me critically," as examples, make him appear more psychiatrically disturbed than is the case. (Exh. M at 3).

**G.    Use of computers**

Based on the government's evidence and the PSR, it would appear that all

1    Joey ever did was use a computer for violent, jihadist, explosive purposes.  This

2    presentation is selectively misleading, at best.  Instead, Joey Brice is a complex

3    person with complex problems.  The effort to portray him as possessing a unitary

4    philosophy is psychologically misleading:

5        He's able to form attachments, such as with his girlfriend and family, yet has
         an unexpectedly small support group. Politically conservative, he nonetheless
6        is recorded as providing information about bomb making on a website adverse
         to his political and religious philosophy. He is a box of contradictions.

7    (Exh. M at 1-2).

8        A sampling of joey's email accounts demonstrates that he was, and is, a well-

9    rounded individual with a variety of interests.  Here are some examples from the

10   Chslosers email account (*see* Exh. G):

11       April 4, 2008–      email demonstrating satellite sighting information for the

12                           Lewiston area; evidencing Mr. Brice's interests in

13                           astronomy;

14       Undated–            email demonstrating interest in extremely popular online

15                           computer game, World of Warcraft;

16       Numerous dates–     email demonstrating interest in mainstream campaign of

17                           John McCain in 2008;

18       Numerous dates–     email demonstrating interest in election of President

19                           Obama;

20       Numerous dates–     email reflecting ordering of computer equipment;

Numerous dates–    email reflecting interest in news shows on various networks;

Numerous dates–    email reflecting interest in shopping for normal clothing;

Undated–    correspondence from grandmother and grandfather; correspondence from family friends

Undated–    email regarding the creation of the universe;

Undated–    email regarding energy policy;

Undated–    email regarding blood drive;

Undated–    email regarding fiscal crisis;

Undated–    email regarding interest in sports.

A review of Mr. Brice's hotmail email account demonstrate that it too was used for ordinary purposes, including contact with family and friends (*see* Exh. I):

Undated    email to Tri-State Hospital Family and Administrative Team, expressing thanks for all of their assistance;

July 6, 2010    correspondence with mother regarding thank-you cards and medical needs;

June 6, 2010    correspondence about purchasing an SUV;

May 12, 2010    correspondence with mother about new wallet;

May 10, 2010    correspondence with mother about iPod and sister;

April 8, 2010    email to friend regarding sending out of "spam";

March 24, 2010    craigslist sale of an xbox;

November 25, 2009        email regarding possible house to rent;

November 19, 2009        email discussing craigslist posting regarding sale of a hard-drive;

November 11, 2009        craigslist sale of an xbox 360;

Undated        letter of support for Rwandan refugee;

Numerous comments were posted under the username Newspeakgeneration. These comments demonstrate that Mr. Brice had a number of political thoughts and other ideas which were not consistent with the ideas stated on the Deen Al Haq website or in other related forums. Here are some examples (*see* Exh. H):

May 4, 2011        "pakistan isn't in control of their nukes.. the us is making sure the nukes are safe. the moderates in pakistan will shatter if the 3 billion wasn't there ..."

May 4, 2011        "...bush knew all about his suspected whereabouts.. they have been watching the building for up to 5 years.. and got the original tip in 2003.. obama happened to just be president.. and give the ok to kill him.. what a mind breaking decision.. to kill bin laden or not. Geez give obama another nobel."

May 3, 2011        "...they gave him an opportunity to give up. His wife gave up freely, osama did not. They weren't playing around with him, this wasn't his choice ."

May 3, 2011          "...they tried.. he had a rifle.. and refused.. their helicopter had already went down.. they weren't going to play around with this motherfucker. He refused so they shot him and took him with ease."

May 1, 2011          "...fox has it's own news channel. fox news was the very first to report Bin Laden dead.. fox was the first to report on the specific details.. msnbc and cnn looked like they were watching fox to get their details because it took them 5 minutes later for everything fox announced.."

May 1, 2011          ".... bill maher invites 2 liberal guests and one conservative on most of his shows.. plus bill being a liberal thats 3-1 .. even bill o reilly gives more balance then that.. and that's saying something."

April 30, 2011        "the US commerce and US products including the new automobiles that will come out in this decade will create a stronger middle class for China. China needs the US more than we need them. Their GDP is not even close to us.."

April 30, 2011        "I think Sarah Palin is retarded but she has a better grasp on how to handle energy production and distribution.. her record in alaska shows that. She made big oil pay the

people . What the fuck has obama ever done in these 4 years to show us he has any idea regarding how to handle energy production? I find it funny that when conservatives propose drilling oil , liberals tell us 'it wont effect us for ten years' but they support solar and wind which wont affect us for years"

April 30, 2011    "billion is like a day and a half worth of spending when we buy oil.. it won't affect anything. Saudi Arabia slowed down their oil production to make up for a massive amount of infrastructure and free housing to offset uprising in their country.. that's why it costs so much."

April 28, 2011    "We all know the monarchy has no real standing power other than the millions in tax payer dollars they receive a year. But why would I want to follow the Uk that celebrates monarchs..? No thanks, i have my own individual country id like to form a unique path with."

April 28, 2011    "most tell me i am a beck/fox viewer but i hate that network including beck. I watch msnbc all day and then I'll pick up some of this authors video at night. I label myself as Conservative."

April 26, 2011    "I didn't say they were currently forcing any federal laws..

1    i said they support federal laws.. the only reason vermont

2    isn't supporting a federal healthcare bill now is because it

3    isn't as communal or single paid as they would like.. i

4    didn't diss them on supporting single payer i just said they

5    should support a more republic form of government

6    because they wouldn't have to worry about federal

7    oversights, they could do whatever they felt like."

8    April 26, 2011    "First off Jesus .. traveled with a very wealthy man named

9    Joseph of Arimathea .. and lawrence completely distorts

10    the "eye of the needle " bible quote.  When Jesus said it

11    was easier for a camel going through the eye of a needle ..

12    he was stating that a rich man will find it more difficult

13    because it will be harder to leave behind his worldly

14    possessions.. Jesus WOULDN'T TAKE , he would suggest

15    charity."

16    April 26, 2011    "high oil prices arent because of big oil"

17    April 25, 2011    "msnbc promotes democrats.. fox promotes republicans."

18

19    April 20, 2011    "I have no problem with people who don't like big business

    or corporations but I do have a problem when they claim

20    it's all goes to the GOP.. it goes to both parties.. it's bad.

Really bad and this election whoever wins it will increase

spending.. i really don't know a single politician who

would follow their word. Even Ron Paul would have to

drop a lot of his agenda.

April 19, 2011    "Ron paul wont stop the war.. in a sense. He will definitely

have to come up with a swifter withdrawal.. a 4 year plan,

he knows that and I still support him. it's good timing too

because he could use that to win the 2nd term."

April 19, 2011    "people who think donald trump went through bankruptcy

know nothing regarding on how why and what type of

bankruptcy ..."

April 17, 2011    "michael medved has one of the best radio shows in the

country.."

April 17, 2011    "i would believe ufos if they all appeared to have similar

characteristics.. if they all had similar streams of material

or same general shapes and engineering.. i would believe

it.. but most of these look completely different."

April 10, 2011    "dylan talks about Islam like the sects are so incredibly

complicated that they differ from hardcore Christians..

hardcore catholics and timid christians/catholics.. Islam

1                      sects aren't difficult to understand.. they are illiterate

2                      animals."

3     April 7, 2011     "clinton's surplus is a complete lie.. anyone want to get

4                      shut down? try to debate me."

5     April 7, 2011     "didn't andrew jackson balance the budget .. couple years

6                      later , awful recession..."

7     April 7, 2011     "Maybe I'd vote for Huckabee but if they think they are

8                      getting my vote with romney , they are dead wrong. If they

9                      put up the same old GOP corporate hacks then ill vote for

10                     obama, even though i dislike him. They need to be taught a

11                     lesson that ron paul is the real conservative."

12     April 7, 2011     "they are lying regarding the medicare solution.. people

13                     need to read it. Ryan's solution is great actually. 15k for

14                     each person qualifying.. more money for those in low

15                     income or high risk bracket.. they go out , get their own

16                     insurance and get better care because they don't have to go

17                     to medicaid clinics."

18

19    April 6, 2011     "ventura is wrong regarding the healthcare thing..

                      senators/congressman get private insurance, they have a

20                     choice of private insurance companies, the american

people just subsidize it."

April 6, 2011          "Fox is very biased but they are unintelligent, do you know

why i hate msnbc with a passion? Because they are

intelligent and bias.. they fully know what they are lying

about when they speak."

April 3, 2011          "her statement regarding russia is slightly true considering

the russian owned islands are in sight."

April 3, 2011          "ed calls rush fat but rush is now at a lower weight than ed

.. he get's so mad about the mr ed joke lol that's so

pathetic."

April 3, 2011          "huckabee is too nice to his opponents.. he sits there

complimenting them instead of proving himself."

April 3, 2011          "this is why im a conservative republican"

April 2, 2011          "Im conservative but i think you need to read a history

book and stop with the whole "republicans" did this or

"lincoln was a republican" . The republicans of the past are

completely different from the republicans of today, so take

your own advice, go read a history book regarding the

southern strategy."

April 1, 2011          "not really, i worked hard all my life and now i have a

great career and awesome financials.. the rich made money too, im happy for them, it's how the game works. In fact, it's the rich who make my job possible, not the poor. Poor people don't buy pools, poor people don't buy/build houses, poor people don't go to hotels or vacations. No it's the rich who do , and it's the rich who keep the money circulating.I'm sorry your life has been in the gutter, work hard, get out of it like me."

March 29, 2011    "i have a cabin on the lake."

March 28, 2011    "again , read a book. I am Christian so you can stop with your retarded "liberal enabler..muslim puppet" fallacy. If you claim you are a Conservative with that kind of wording you used in your original comment, then wow, you are embarrassing to the Conservative movement."

March 27, 2011    "I don't like NPR, I'm very Conservative, and I'm educated so I'm not a dummy who just stereotypes a massive portion of the world population..."

March 27, 2011    "What you consider bias and what someone else considers bias can be completely different based on the point of the spectrum you are viewing from. So your statement seems

complete nonsense, I watch msnbc way more than FOX, I see strong bias all day long. But I also see it on FOX, I can't even stand Beck. You are lying to yourself if you really think the "other network" is real non-objective news ."

March 26, 2011    "darwin admitted there were large gaps missing in his theory..."

March 26, 2011    "Christians go to church because we ARE NOT perfect , there wouldn't be a need for church if everyone was perfect.."

March 21, 2011    "Maybe in the recent years Conservative politics has dominated.. before talk radio liberals completely mastered the airwaves and talk radio came on as a little guy in the match and completely kicked ass because people started realizing others thought the same as they did. Also Al Gore completely tricked every single progressive that joined with him on his global warming. He invested in the

software that regulates cap and trade so every industrial company has to buy it"

March 20, 2011    "amish people and their diverse sects are really great

1    actually.. they are conservative environmentally, they live

2    and produce their own goods, treat each other kindly, help

3    the community build houses, and raise equally kind

4    children. They aren't weirdos, they pay taxes and I've even

5    seen them eat at a Pizza Hut. Don't judge people, who are

6    you to judge true kind religious people?"

7    March 20, 2011    "Sorry I'm an American who has lived in Germany for a

8    very long time so I speak in shorter English because my

9    main language is now Deutsch."

10    March 19, 2011    "it's illegal to obstruct democracy"

11    March 17, 2011    "michelle bachman knows a large amount more regarding

12    tax and law.. weiner has his bachelor of arts degree.. and

13    bachman has her JD and tax degree which is like an LL M

14    or N something.. weiner grew up a democrat and continues

15    that ideology.. bachman grew up with democrats and

16    became a republican on her own at the age of adulthood ..

17    people dissing on her need to realize that just because

18

19    weiner can ask very gotcha emotionally based questions

    doesn't mean he is correct or as trustworthy."

20    March 17, 2011    "never trust any religious person who states as fact God's

SENTENCING MEMORANDUM- 55

mindset or if it's possible.. "feelings" God is

incomprehensible.."

March 13, 2011    "unions didnt give us the work weekend and 8 hours btw.."

March 10, 2011    "although not a muslim, I am a member of many islamic

discussion forums..."

March 4, 2011    "Lately I've noticed Matthews brings 2 liberal guests to

talk about Conservative matters.. making it 3 liberals

against 0 conservatives during the debate. What were you

saying about FOX being unfair?"

March 1, 2011    "Why do people keep saying unions are the heart and soul

of america? 93.1% of workers choose or are not in a

union."

February 25, 2011 "liberals basically think they know better than you do"

February 16, 2011 "If you look at life expectancy when SS was

created and even years later.. the average life length

was 60 and growing. It wasn't intended for people to

just retire and live off it for another 30 years.. people

need to realize that. I'm not against social security,

but I am for facts and those are undeniable."

February 16, 2011 "You are acting like GOP = Wall Street and Democrat=

Middle America . Democrats are just as much Wall St as

1          the Republicans are. Rockefeller anyone?"

2          It should not come as a surprise that a young person might exhibit, on the

3  internet, what might seem otherwise strange behavior on the internet.  The online

4  disinhibition effect is a loosening (or complete abandonment) of social restrictions

5  and inhibitions that would otherwise be present in normal face-to-face interaction

6  during interactions with others on the Internet. This effect is caused by six factors:

7  dissociative anonymity, invisibility, asynchronicity, solipsistic introjection,

8  dissociative imagination, and minimization of authority. Suler, John (2004). "The

9  Online Disinhibition Effect", *CyberPsychology & Behavior* 7 (3): 321.

10         Because of this loss of inhibition, some users may exhibit benign tendencies

11 such as: becoming more affectionate, more willing to open up to others, less guarded

12 about emotions, all in an attempt to achieve emotional catharsis.  This particular

13 occurrence is called "benign disinhibition."  Suler, John (2004). "The Online

14 Disinhibition Effect", *CyberPsychology & Behavior* 7 (3): 321.

15         With respect to bad behavior, users on the Internet can frequently do or say as

16 they wish without fear of any kind of meaningful reprisal.  In most Internet forums,

17 the worst kind of punishment one can receive for bad behavior is usually being

18 banned from a particular site.  In practice, however, this serves little use; the person

19 involved can usually circumvent the ban by simply registering another username and

20 continuing the same behavior as before.  This phenomenon is called "toxic

disinhibition."  Suler, John (2004). "The Online Disinhibition Effect",

*CyberPsychology & Behavior* 7 (3): 321.

Six primary factors behind why people sometimes act radically different on the internet than when they do in normal face-to-face situations. The first is known as "dissociative anonymity". The notion of "You Don't Know Me" comes down to simple anonymity: when the person remains anonymous, it provides a sense of protection. That protection is neither good nor bad, although it can allow for behavior which would otherwise not occur. Within the framework of the Internet, this anonymity allows the user to move about without any kind of indication of identity or even distinguishing characteristics other than potentially a username. This kind of protection can provide a meaningful release for people in that they feel free to say things they might otherwise be embarrassed to, but by the same token, it also provides an outlet for behaviors that others might term antisocial or harmful. Suler, John (2004). "The Online Disinhibition Effect", *CyberPsychology & Behavior* 7 (3): 321.

A second factor is that of invisibility. The Internet provides a shield to its users; often all one receives when interacting with another person on the Internet is a username or pseudonym that may or may not have anything to do with the real person behind the keyboard. This allows for misrepresentation of a person's true self; online a male can pose as a female and vice versa, for example. Additionally, the invisibility of the Internet prohibits people from reading standard social cues; small changes in facial expression, tone of voice, aversion of eyes, etc., all have

specific connotations in normal face-to-face interaction.  Suler, John (2004). "The

Online Disinhibition Effect", *CyberPsychology & Behavior* 7 (3): 321.

This particular aspect overlaps heavily with anonymity, because the two often

share attributes.  However, even if one's identity is known and anonymity is

removed from the equation, the inability to physically see the person on the other

end causes one's inhibitions to be lowered.  One can't be physically seen on the

Internet, typically – therefore, the need to concern oneself with appearance and tone

of voice is dramatically lowered and sometimes absent.  Suler, John (2004). "The

Online Disinhibition Effect", *CyberPsychology & Behavior* 7 (3): 321.

A third factor is asynchronicity.  In e-mail and message boards,

communication is asynchronous. People don't interact with each other in real time.

Others may take minutes, hours, days, or even months to reply to something you say.

Not having to deal with someone's immediate reaction can be disinhibiting. In real

life, it would be like saying something to someone, magically suspending time

before that person can reply, and then returning to the conversation when you're

willing and able to hear the response.  Immediate, real-time feedback from others

tends to have a very powerful effect on the ongoing flow of how much people reveal

about themselves.  In e-mail and message boards, where there are delays in that

feedback, people's train of thought may progress more steadily and quickly towards

deeper expressions of what they are thinking and feeling.  Some people may even

experience asynchronous communication as "running away" after posting a message

that is personal, emotional, or hostile.  It feels safe putting it "out there" where it can be left behind.  Suler, John (2004). "The Online Disinhibition Effect", *CyberPsychology & Behavior* 7 (3): 321.

A fourth factor is solipsistic introjection.  The absence of face-to-face cues combined with text communication can have an interesting effect on people. Sometimes they feel that their mind has merged with the mind of the online companion.  Reading another person's message might be experienced as a voice within one's head, as if that person magically has been inserted or "introjected" into one's psyche.  The individual may not know what the other person's voice actually sounds like, and so assigns a voice to that companion. In fact, consciously or unconsciously, the individual may even assign a visual image to what he thinks that person looks like and how that person behaves.  The online companion now becomes a character within our intrapsychic world, a character that is shaped partly by how the person actually presents him or herself via text communication, but also by the viewer's expectations, wishes, and needs. Because the person may even remind the viewer of other people known, he fills in the image of that character with memories of those other acquaintances.  Suler, John (2004). "The Online Disinhibition Effect", *CyberPsychology & Behavior* 7 (3): 321.

As the character now becomes more elaborate and "real", the viewer may start to think, perhaps without being fully aware of it, that the typed-text conversation is all taking place within their heads, as if it's a dialogue between him and this

character in his imagination - as if they are authors typing out a play or a novel. In their imagination, where it's safe, people feel free to say and do all sorts of things that they wouldn't in reality. At that moment, reality IS one's imagination. Online text communication can become the psychological tapestry in which a person's mind weaves these fantasy role plays, usually unconsciously and with considerable disinhibition. All of cyberspace becomes a stage and we are all merely players. Suler, John (2004). "The Online Disinhibition Effect", *CyberPsychology & Behavior* 7 (3): 321.

When reading another's message, it's also possible to "hear" that person's words using one's own voice. One may be subvocalizing as he reads, thereby projecting the sound of one's voice into the other person's message. Perhaps unconsciously, it feels as if one is talking to/with himself. When one talks to himself, his is often willing to say all sorts of things that he wouldn't say to others. Suler, John (2004). "The Online Disinhibition Effect", *CyberPsychology & Behavior* 7 (3): 321.

A critical factor is dissociative imagination. If solipsistic introjection and the escapability of cyberspace are combined, we get a slightly different force that magnifies disinhibition. People may feel that the imaginary characters they "created" exist in a different space, that one's online persona along with the online others live in an make-believe dimension, a dream world, separate and apart from

the demands and responsibilities of the real world.  They split or "dissociate" online fiction from offline fact.  Suler, John (2004). "The Online Disinhibition Effect", *CyberPsychology & Behavior* 7 (3): 321. Once they turn off the computer and return to their daily routine, they believe they can leave that game and their game-identity behind.  *Id*.

Although anonymity tends to amplify dissociative imagination, dissociative imagination and dissociative anonymity usually differ in the complexity of the dissociated part of oneself.  Under the influence of anonymity, the person may try to be invisible, to become a non-person, resulting in a reducing or simplifying of identity.  During dissociative imagination, the self that is expressed, but split-off, tends to be more elaborate.  Suler, John (2004). "The Online Disinhibition Effect", *CyberPsychology & Behavior* 7 (3): 321.

Another factor is that of minimizing authority.  While online, a person's status in the face-to-face world may not be known to others and it may not have as much impact as it does in the face-to-face world.  If people can't see you or your surroundings, they don't know if you are the president of a major corporation sitting in your expensive office, or some "ordinary" person lounging around at home in front of the computer.  Even if people do know something about your offline status and power, that elevated position may have little bearing on your online presence and influence.  In most cases, everyone on the internet has an equal opportunity to voice him or herself.  Everyone –  regardless of status, wealth, race, gender, etc. –

starts off on a level playing field.  Although one's status in the outside world ultimately may have some impact on one's powers in cyberspace, what mostly determines influence on others is skill in communicating (including writing skills), persistence, the quality of ideas, and technical know-how.  Suler, John (2004). "The Online Disinhibition Effect", *CyberPsychology & Behavior* 7 (3): 321.

People are reluctant to say what they really think as they stand before an authority figure. A fear of disapproval and punishment from on high dampens the spirit. But online, in what feels like a peer relationship – with the appearances of "authority" minimized – people are much more willing to speak out or misbehave. Suler, John (2004). "The Online Disinhibition Effect", *CyberPsychology & Behavior* 7 (3): 321.

According to traditional Internet philosophy, everyone is an equal: Peers share ideas and resources.  In fact, the net itself is engineered with no centralized control. As it grows, with a seemingly endless potential for creating new environments, many people see themselves as independent-minded explorers.  This atmosphere and philosophy contribute to the minimizing of authority.

Overall, does the disinhibition effect release inner needs, emotions, and attributes that dwell beneath surface personality presentations?  Does it reveal your "true self"?  This is a tempting conclusion. In fact, the very notion of a true self is tempting because it is useful in helping people articulate their experiences in how and what they express to others about themselves.  However, a comprehensive

psychological as well as philosophical analysis reveals complexities in this thing called self that stretch far beyond this tempting notion. In an in-depth exploration of the online disinhibition effect, the idea of a true self is too ambiguous, arbitrary, and rudimentary to serve as a useful concept.  While online people may feel they have more opportunities to present themselves as they would like to present themselves, particularly in the carefully composed text of asynchronous communication.  They may have more chances to convey thoughts and emotions that go "deeper" than the seemingly superficial persona of everyday living. These opportunities are very valuable aspects of cyberspace, but not necessarily evidence of a more true self. What we reveal about ourselves spontaneously, often right on the surface for others to see but without our being consciously awareness of it, may be just as real and true.  Suler, John (2004). "The Online Disinhibition Effect", *CyberPsychology & Behavior* 7 (3): 321.

The precise parameters of how internet usage affect one's behavior are too complex and variable to come up with an absolute predictor of how people in general behave on the internet.  What is clear, however, is that the factors identified herein can affect an individual's behavior.  This phenomenon is demonstrated by the facts of this case.  Joey Brice was horribly injured.  After those injuries, he retreated from society, and began to spend more and more time on the internet.  His behavior evidences many of the factors discussed, *ante*.  The government focuses nearly exclusively on the internet persona that Mr. Brice evidenced, and ignores the entire

person.  As a result, the "person" the government focuses on is a skewed presentation of the entire person that Joey is.  Joey's entire person bears little resemblance to the image the government seeks to portray.

Equally importantly, the internet persona evidenced here can be understood in regard to the psychological phenomena discussed here.  Seemingly unexplainable behavior can now be understood.  Behavior which is understood can now be treated, modified and controlled.  Mr. Brice will be the first to admit that he has psychological issues which need to be addressed.  Those issues pre-existed his injuries, and were intensified thereafter.  Joey wants to more fully understand his psyche, and address his issues.  While this process may be lengthy, it is by no means impossible.  Moreover, as discussed herein, it can be done in the context of supervised release far more efficiently than it can be done in a prison environment.

As Dr. Mays explains, Joey Brice's personality, and its flaws, cannot be encapsulated by one email string, or even a collection of related internet posts:

> It would be easy, and incorrect, to look at Joey Brice's behavior, as displayed in the actions with which he's been criminally charged, and conclude that he is motivated by political or religious ideology. He is not. It would be misleading to look at his behavior and conclude that he has an antisocial personality disorder or some other disorder that he desires to do harm to other people. He does not. Instead, he has a psychological disorder with various aspects which causes him to view the world in a distorted way and pursue goals based upon a view of the world and himself which is misguided and pathological.

(Exh. M at 2).

**H.    Communications relied on by the Government beyond the charged offenses do not warrant a lengthy sentence**

Many of the comments contained in the PSR, and relief upon by the Government, are related to religion generally, and Islam specifically.  Other comments address matters of politics and international relations, particularly in relation to the Middle East.  It appears that the PSR and the government assert that Mr. Brice is deserving of additional punishment based upon these comments.  Using these comments in this fashion would run afoul of  First Amendment protections.

Some of the comments cited are simply statements regarding religion, such as "Islam is the light", "insha'Allah", other references to Islam, and other topics which are clearly legitimate comments on current events.  By including them in this aggravating fashion, the clear message of the government, and thus by the author of the PSR, is that Mr. Brice should be punished because of statements related to Islam, Chechnya, and other public issues.  Seeking additional punishment of Mr. Brice for political or religious views (which he may or may not hold) would amount to a violation of the First Amendment.

"Congress shall make no law [abridging] the freedom of speech." U.S. Const. Am. 1.  Despite Justice Hugo Black's opinion that these words are clear and absolute, Hugo Black, *The Bill of Rights*, 35 N.Y.U. L. Rev. 865, 874, 879 (1960), some speech certainly can be prohibited.  In contrast, however, much of speech outlined in the PSR cannot be constitutionally subjected to punishment under the

First Amendment.

Mr. Brice is alleged to have engaged in discussions and watched and translated readily available media on the topics of global politics, wars, and religion, all of which are topics of public concern. That his particular expressed views on these topics may be offensive or disagreeable to others is of no consequence to the heightened protection to which his expression is entitled as a result of its status as core political speech. Although there are categories in which speech can be restricted, the First Amendment remains a bulwark against prohibiting speech that is unpopular, particularly on government policies. *Snyder v. Phelps*, 131 S.Ct. 1207, 1215 (2011) ("The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'") (*quoting New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). To suggest otherwise is to allow precisely the folly against which the First Amendment seeks to protect. An individual is free to "say anything [he] wish[es] on any topic." *Holder v. Humanitarian Law Project ("HLP")*, 561 U.S. ----, 130 S.Ct. 2705, 2722-23 (2010). The Supreme Court in *Holder* explicitly stated that independent advocacy, even of a terrorist organization, is protected by the First Amendment. *Id.* at 2723, 2728.

The government alleges, among other actions, that the Mr. Brice (1) posted videos; (2) posted magazines; (3) commented on pre-existing web-postings; (4) discussed politics and religion; and (5) claimed to be learning other languages. These

acts clearly fall within the First Amendment's conception of speech. *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 321 (2002); *Kaplan v. California*, 413 U.S. 115, 119-120 (1973) (films are protected by the First Amendment); *Carey v. Brown*, 447 U.S. 455, 462 n.6 (1980) (*quoting Consolidated Edison Co. of N.Y. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980)) (discussions are protected); *Kleindienst v. Mandel*, 408 U.S. 753, 762 (1972) (receiving information is protected); *Board of Educ., Island Trees Union Free School Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982) (transferring ideas is protected); *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342 (1995) (anonymity in publication is protected); *see Griswold v. Connecticut*, 381 U.S. 479, 482 (1965) (the State may not, consistent with the First Amendment, prohibit the study of a foreign language nor the right to print or distribute); *Meyer* v. *Nebraska,* 262 U.S. 390,400 (1923), *construed in Griswold v. Connecticut,* 381 U.S. 479,482 (1965) (study of foreign language protected).

Moreover, that speech, which touches upon issues of global politics, wars, and religion, is core political speech that lies at the heart of First Amendment protection. *Hill v. Colorado*, 530 U.S. 703, 787 (2000) (Kennedy, J., dissenting) ("Laws punishing speech which protests the lawfulness or morality of the government's own policy are the essence of the tyrannical power the First Amendment guards against"); *Elrod v. Burns*, 427 U.S. 347, 356 (1976) ("political belief and association constitute the core of those activities protected by the First Amendment"); *Texas v. Johnson*, 491 U.S. 397, 411 (1989) ("expression of dissatisfaction with the policies of this

country, [is] expression situated at the core of our First Amendment values").

The recent Supreme Court case *Snyder v. Phelps* suggests the type of speech that is regarded as a "matter of public concern" and that therefore lies "at the heart of the First Amendment's protection." 131 S.Ct. 1207, 1215 (2011). In *Snyder*, the Court considered the speech of religious protestors at the funeral of a fallen United States soldier. This speech consisted of protestors carrying signs saying "God Hates the USA/Thank God for 9/11," "Thank God for IEDs," and "Thank God for Dead Soldiers." *Id*. at 1213.  The Court found that this speech involved a matter of public concern and was therefore entitled to "special protection" under the First Amendment.  *Id*. at 1219. "Such speech cannot be restricted simply because it is upsetting or arouses contempt."  *Id*.  Thus, the seeming belief that discussions which touch on Islam are outside of First Amendment protection is fundamentally flawed.

If the signs in *Snyder* involved a matter of public concern, then Mr. Brice's speech certainly does as well. He had exchanges through the internet about controversial topics involving global politics and religion, and he exchanged videos of events occurring in the wars in the Middle East and Chechnya.  He put forward religious beliefs as well as political views. That these exchanges or the beliefs expressed were offensive or disagreeable does not matter.  *Id*. ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.") (*quoting Texas v. Johnson*, 491 U.S. 397, 414 (1989)).

"'Freedom of expression can be suppressed if, and to the extent that, it is so closely brigaded with illegal action as to be an inseparable part of it.'" *Garrison v. State of La.*, 379 U.S. 64, 82 (1994) (Douglas, J., concurring). "Unless speech is so brigaded with overt acts of that kind there is nothing that may be punished." *Id*. Here, this speech is not the kind which can be punished.  Comments which may be offensive to many, are not akin to discussing where a drug deal should occur. Comments about converting to Islam, or discussions of Islam in general, are protected by the First Amendment and are at the heart of First Amendment protections.  Mr. Brice should not be punished for expressing religious and political ideas, two categories of expression which the First Amendment was designed to protect.

Similarly, the PSR, and presumably the government, seek to punish Mr. Brice for communicating with Mr. Wayde Kurt.  (*See, e.g.*, PSR at ¶¶101-105, pages 40-45).  The communication which the PSR highlights simply does not warrant any additional punishment.  The PSR places this information under the category of "Offense Behavior Not Part of Relevant Conduct".  Nowhere does the PSR identify what "offense" was committed.  There is no evidence that the "behavior" of Mr. Brice and Mr. Kurt (*i.e.*, cellmates communicating with one another after they are no longer housed together), was part of any offense whatsoever.  Is it that Mr. Brice and Mr. Kurt communicated?  That is not an offense.  In fact, the Whitman County Jail had housed them together for over two months.  (*See* ECF No. 394 & Att. B).

1    Presumably, cell mates frequently communicate.  Since Mr. Brice is in jail, all of his

2    cell mates will have either been charged with criminal offenses or will have been

3    convicted of committing criminal offenses.  Simply put, based on his incarceration,

4    Mr. Brice has little choice but to communicate with criminals.

5         The PSR includes a lengthy description of Mr. Kurt's background.  It is

6    particularly noteworthy that three of Mr. Kurt's prior convictions arise from cases

7    filed in 1990.  That is the year that Mr. Brice was born.  Presumably, as an infant,

8    Mr. Brice had no role in those offenses.  Two additional convictions stem from 1996

9    cases, at which time Mr. Brice was six years old.  Again, it does not appear Mr.

10   Brice, a six-year old, was involved in these offenses.  The remaining offenses, while

11   occurring later, do not implicate Mr. Brice.  Nor is there any indication that Mr.

12   Brice was aware of the nature or substance of those charges.

13        Presumably, the PSR and the government imply that Mr. Brice is deserving of

14   punishment for communicating with someone such as Mr. Kurt.  However, Mr.

15   Kurt's background is not relevant to Mr. Brice's sentencing.  None of the

16   communications demonstrate that Mr. Brice adopted, or agreed even in part, with

17   Mr. Kurt's beliefs, or that Mr. Brice wished to engage in the type of behavior which

18   led to Mr. Kurt's criminal history.  Mr. Kurt's beliefs, and those whom he associates

19   with, are not attributable to Mr. Brice.

20        The intention in regard to Mr. Kurt is obvious.  The PSR and the government

     intend to smear Mr. Brice with "guilt by association."  But guilt of what?  Mr. Kurt

is, according to the government, a well-known white supremacist.  Mr. Brice, according to the government, is an aspiring Muslim and jihadist.  It is difficult to imagine two less-compatible philosophies.  While Mr. Kurt has purportedly been involved in explosives, there is no indication that Mr. Brice and Mr. Kurt were communicating about explosives.  Instead, the communication deals in large part with Mr. Kurt's chosen religion, as well as life behind prison walls generally.  The "danger" that the government wishes to portray is simply absent from the communication the government puts forth.  In other contexts, the Ninth Circuit has found that "guilt by association" evidence can be unduly prejudicial.  *Kennedy v. Lockyer*, 379 F.3d 1041, 1056 (9th Cir.2004).

    As the Court is well aware, the government has portrayed the fact that Mr. Brice and Mr. Kurt were communicating as highly troubling.  According to the government, its concerns were so strong as to warrant violating Mr. Brice's rights under the Fourth and Sixth Amendment.  To say that the government is making a mountain out of a molehill would be insulting to mountains.  And moles.  Where is the crime that was to be committed?  Which communication evidences the grave danger.  There is simply no evidence that criminal activity was even being thought about, yet alone planned.

    To the extent that one might suggest that felons should not be allowed to associate, that suggestion is easily remedied.  First, it is noteworthy that at the time of the communication, Mr. Brice was not a felon.  He had been convicted of no

SENTENCING MEMORANDUM- 72

1    crime. Moreover, as discussed herein, it was the Whitman County Jail, and by

2    agency principles, the United States Marshals, who decided to house Mr. Brice and

3    Mr. Kurt together. Mr. Brice and Mr. Kurt lacked control of their housing

4    assignments.

5        Moreover, it is frequently the case that a condition of supervised release

6    placed in judgments is that the supervisee cannot associate with known felons absent

7    prior approval from the supervising probation officer. This condition could easily be

8    included in Mr. Brice's conditions of supervised release. As discussed herein, in the

9    context of his pretrial release while on furlough, Mr. Brice has shown no difficulty

10   in complying with conditions of release. Therefore, there is no reason to believe that

11   if Mr. Brice was told not to associate with known felons, he would remain in contact

12   with Mr. Kurt, or any other felon.

13

14

15   **II.    Need for Sentence Imposed to Reflect Seriousness of Offense, Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, Protect the Public from Further Crimes, and Provide Joseph Brice with Needed Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner**

16

17

18   **A.    Joseph Brice's minimal criminal history supports a lesser sentence**

19   **1.    Joseph Brice poses a very low risk of recidivism**

20   In *United States v. Nellum*, 2005 WL 300073, *3 (N.D. Ind. Feb. 3, 2005), the

district court acknowledged the likelihood that a particular defendant might offend

again was a statutory sentencing factor required to be considered by a sentencing court. *See* 18 U.S.C. § 3553(a)(2). There, defendant Nellum fell within criminal history category III, but was sixty-five years old at the time of sentencing. *Nellum*, 2005 WL 300073, at *3. To determine the likelihood of Nellum's risk of recidivism, the district court consulted "Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines," a report issued by the United States Sentencing Commission. *Id*. (*See* Exhibit A ["Exh. A"]. In its report, the Sentencing Commission concluded the chance of recidivism for a middle-aged person in Criminal History Category III to be 19.8%. *Id*. The court ultimately found it appropriate to consider this relatively low risk of recidivism when crafting Nellum's sentence. *Id*. at 3, 5.

In addition to the Sentencing Commission's recidivism report referenced in Nellum, the Sentencing Commission issued a report entitled "*Recidivism and the 'First Offender'*" . (Exh. B). Therein, the Sentencing Commission determined 93.2% of offenders who had never before been arrested did *not* recidivate. *Id*. A defendant's minor or non-existent criminal history is therefore a factor courts should take into account at sentencing. The Third Circuit did so in *United States v. Tomko*, 563 F.3d 558 (3d Cir. 2009) *(en banc),* upholding defendant Tomko's sentence of probation on condition of one year home detention due to Tomko's "minimal criminal record."

This is a proper factor to consider under 18 U.S.C. § 3553(a). In *United*

*States v. Baker*, 445 F.3d 987 (7th Cir. 2006), the Court held that a 78 month prison term would mean more to Baker, convicted of child pornography, than to a defendant who had been previously imprisoned. *Id.* The Seventh Circuit also noted this factor is consistent with 18 U.S.C. § 3553's directive that this sentence reflect the need for "just punishment" and "adequate deterrence." *Id.*  In *United States v. Willis*, 479 F.Supp.2d 927 (E.D.Wis. 2007), the district court sentenced Willis to one year and one day of imprisonment instead of the 120 months recommended by the sentencing guidelines, in part, on a finding that the "sentence provided a substantial punishment for someone like [Willis], who had never before been to jail and who engaged in no violence." *Willis*, 479 F. Supp. 2d at 937. Likewise, in *United States v. McGee*, 479 F. Supp. 2d 910 (E.D. Wis. 2007), the district court imposed a sentence for heroin distribution below the advisory Guidelines range, in part, because McGee "had never before been to prison and '[g]enerally a lesser period of imprisonment is required to deter a defendant not previously subject to lengthy incarceration than it is necessary to deter the defendant who has already served serious time yet continues to reoffend.'" *McGee*, 479 F. Supp. 2d at 912 (*quoting United States v. Qualls*, 373 F. Supp. 2d 873, 877 (E.D. Wis. 2005)).  Mr. Brice asks this Court to take into account that he has *never* before been imprisoned for any length of time.

Applying the Sentencing Commission's findings in *"Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,"* to this

case, the Commission states there is only a 13.3% rate of recidivism for persons who fall into criminal history category I.  *See* Exhibit A, *"Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines,"* Exhibit 9.

In this context, the Supreme Court's opinion in *Koon* is instructive. "The severity of thevmisconduct, its timing, and the disruption it causes" are factors which influence a district court's determination whether the conduct in a particular case makes it atypical. 518 U.S. at 100.  Despite Mr. Brice's lack of involvement in any violent or terrorist activity, in the PSR he has been saddled with two extraordinarily punitive enhancements applied in terrorism-related eases:  (I) the "victim-related adjustment" under §3A1.4(a), that raises the offense level by twelve levels; and (2) the "horizontal" enhancement that propels Mr. Brice's Criminal History Category from 1 (0 points) to VI.

Persons with zero criminal history points are generally assigned to Criminal History category I.  Mr. Brice, who has zero criminal history points, would rightfully be assigned to Criminal History Category I.  However, the PSR suggests Mr. Brice should be placed in criminal history category VI via application of the enhancement set forth in U.S.S.G. § 3A1.4 which automatically increases the criminal history category to VI no matter how many criminal history points a defendant may have. Mr. Brice discusses *infra* the many reasons why this enhancement is inappropriate. Regardless, looking at Mr. Brice's *true* criminal history points, and his *true* criminal

1  history, it is proper to examine the possibility of recidivism based on his actual, not

2  enhanced, criminal history category.

3      Furthermore, applying the Sentencing Commission's "First Offender" statistics

4  to this case, the Sentencing Commission finds the likelihood of recidivism by Mr.

5  Brice, who has never before been arrested, is only 6.8%.  *See* Exh. B, *"Recidivism*

6  *and the First Offender,"* Exhibit 8.  There is thus a 93.2% likelihood Mr. Brice will

7  not recidivate.  Mr. Brice asks this Court to take his extremely low risk of recidivism

8  into account when fashioning his sentence.

9

10  **2.    Incarceration is more significant for a "first offender" than for a repeat offender**

11      Mr. Brice also asks the Court to acknowledge that prison time is more

12  significant for a "first offender" than it is upon an offender who has previously spent

13  significant time in prison and is therefore a factor to be considered under 18 U.S.C. §

14  3553(a).  In *United States v. Baker*, 445 F.3d 987 (7th Cir. 2006), defendant Baker

15  was convicted of distributing child pornography.  The Seventh Circuit affirmed a

16  below-the-Guidelines sentence of 78 months imprisonment when the Guidelines

17  suggested 108 months.  *Baker*, 445 F.3d at 992. The Seventh Circuit found it

18  significant the district court determined a prison term would mean more to Baker

19  than to a defendant who previously had been imprisoned.  *Id.*  The Seventh Circuit

20  also noted this factor is consistent with 18 U.S.C. § 3553's directive that the sentence

1   reflect the need for "just punishment," and "adequate deterrence." *Id.* (additional

2   citations omitted).

3       In *United States v. Willis*, 479 F.Supp.2d 927 (E.D.Wis. 2007), defendant

4   Willis was convicted of drug offenses where the suggested guideline range was 120

5   months. The district court sentenced Willis to one year and one day of

6   imprisonment based, in part, on its finding that the "sentence provided a  substantial

7   punishment for someone like [Willis], who had never before been to jail and who

8   engaged in no violence." *Willis*, 479 F.Supp.2d at 937. Likewise, in *United States v.*

9   *McGee*, 479 F.Supp.2d 910 (E.D. Wis. 2007), defendant McGee was convicted in a

10  heroin distribution case. The district court imposed a sentence below the advisory

11  Guidelines range, in part, because McGee "had never before been to prison and

12  '[g]enerally a lesser period of imprisonment is required to deter a defendant not

13  previously subject to lengthy incarceration than is necessary to deter a defendant

14  who has already served serious time yet continues to re-offend.'" *McGee*, 479

15  F.Supp.2d at 912 (*quoting United States v. Qualls*, 373 F.Supp.2d 873,877

16  (E.D.Wis. 2005)). Mr. Brice thus asks this Court take into account that he has *never*

17  before been imprisoned for any length of time.

18

19              **3.     Mr. Brice has a strong support system created by his family**
                        **which will assist him in transitioning back into society**

20      Mr. Brice comes from a solid family which has stood by him through all of his

struggles, and will continue to do so.  As is evident from the PSR, his family is law-abiding and will certainly take whatever steps they can in order to assure that Mr. Brice remains on "the "straight-and-narrow" in the future.

Perhaps more important, however, is the fact that his family members love him, accept him with his flaws, and will continue to do so.  It has become abundantly clear that Joey never really dealt with the psychological scars caused by the explosion.  While his physical injuries were addressed, the mental and psychological damage went largely untreated.  That mistake will not be repeated in the future.  In particular, Joey's mother has worked tirelessly to ensure that going forward, Joey gets the medical and psychological care that he needs to ensure a better life.



The Brices are a close-knit group.

1

2

3

4



5 Emma, Scott,      Amy and

6 Stephanie have      all been there to

7 support Joey      during this case.

8 They have      each achieved a

9 great deal in      their own lives,

10 and will be able to help Joey achieve the success that perhaps he has not yet

11 achieved.  But more importantly, they now recognize the hurt that he has felt – and

12 he knows as well that his pain need not be hidden as it has been.

13      Separation from his family by way of incarceration has also had a sobering

14 effect on Joey Brice.  Prior to his injuries, Joey had a close relationship with his

15 grandmother.

16

17

18

19

20



By the time that he was injured, his grandmother had begun to suffer symptoms of dementia, thus making meaningful communication more difficult.

Joey's grandmother's symptoms have worsened while he has been incarcerated. It is

not clear that she will know who he is if she sees him again.  He has missed a critical period of time – a time period which he cannot get back. This separation, in and of itself, constitutes a punishment of significant proportion.

Joey has missed another important milestone in the lives of his family.  While he has been incarcerated, his sister Amy got married.  Once again, this is time which can never be made up.  Prolonged absence has been a sobering experience for Joey.



Joey has also missed considerable time in the life of his half-brother.  Marshall Marshall is about ten years younger than Joey. At the time that Joey was arrested, Marshall

1   was only about ten years old.

2

3

4

5

6

7

8

9

10

11

12

13   Two-plus years is an extremely long time in the life of a young child.  The changes

14   that Marshall has undergone while Joey has been incarcerated are varied and

15   significant.  Joey will never be able to get those years back.

16         As demonstrated by the many letters which are being submitted by family and

17   friends, Joey has many admirable qualities.  He is kind and generous.  He is loyal to

18   friends and family alike.  He is a loving son, brother, cousin and friend, who cares

19   for those around him.  Those traits have not changed nor have they disappeared.  His

20   family and friends see this, and wish to bring it to the attention of the Court.(*See*

Exh. L).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20



**4.** **Severely Long and Harsh Terms of Incarceration Significantly Reduce the Likelihood That a Defendant Will Be Able to**

**Pursue a Viable, Relatively Conventional Life after Release**

The conditions of confinement to which Mr. Brice has been and will be subjected to throughout the term of his sentence constitutes a critical factor. These harsh conditions make each day of Mr. Brice's incarceration more onerous and, in effect, constitute greater punishment than ordinary defendants suffer in ordinary cases.

Mr. Brice also asks this Court to consider research that indicates imposition of a too long a sentence can actually *promote* recidivism.  The JFA Institute conducts justice and corrections research for effective policy-making.  It works in partnership with federal, state, and local government agencies, and philanthropic foundations to evaluate criminal justice practices and design research-based policy solutions. The JFA reports:

> Enduring years of separation from family and community - deprived of material possessions, subjected to high levels of noise and artificial light, crowded conditions and/or solitary confinement, devoid of privacy, with reduced options, arbitrary control, disrespect, and economic exploitation - is maddening and profoundly deleterious. Anger, frustration, and a burning sense of injustice, coupled with the crippling processes inherent in imprisonment, significantly reduce the likelihood that prisoners are able to pursue a viable, relatively conventional life after release.

JFA Institute, "Unlocking America, Why and How to Reduce America's Prison Population" (Nov. 2007) (attached as Exh. C, at 10).

1    Upon sentencing, Mr. Brice may be transferred to a Supermax prison or a

2 Communication Management Unit (C.M.U.) which operate at federal prisons in

3 Terre Haute, Indiana and Marion, Illinois. The units hold approximately 80 inmates.

4 Visitors have no physical contact with inmates and there is a strict monitoring of

5 mail, email and telephone calls.  "Since 2006, the Bureau of Prisons has moved

6 many of those convicted in terrorism cases to two special units that severely restrict

7 visits and phone calls." Shane, Scott, "Beyond Guantanamo, a Web of Prisons for

8 Terrorism Inmates," New York Times, (December 10, 2011).  The alternative is the

9 extremely harsh and isolating conditions at Supermax facilities such as in Florence,

10 Colorado. These facilities have been the source of concern for human rights activist

11 and media. *See, e.g.,* "Out of Sight, HRW Briefing on Supermaximum Prisons"

12 (hereinafter "*HRW Briefing"*), at p. 1, available at

13 http://www.hrw.org/reports/2000/supermax/.

14    The harsh conditions of administrative detention facilities have been cited by

15 several courts in determining sentences. *See Bell v. Wolfish*, 441 U.S. 520 (1979);

16 *United States v. Gallo*, 653 F. Supp. 320, 336 (E.D.N.Y. 1986); *United States v.*

17 *Behr*, 2006 WL 1586563 (S.D.N.Y 2006). *See also United States v. Farouil*, 124

18 F.3d 838, 847 (7th Cir. 1997) (harsh conditions of confinement constitute valid

19 ground for departure).  The Supreme Court has stated that conditions of confinement

20 in a supermax facility "impose atypical significant hardship under any plausible

baseline." *Wilkinson v. Austin*, 545 U.S. 209, 223 (2005). Human Rights Watch has

observed that in Supermax facilities, "[t]he conditions of confinement are unduly severe and disproportionate to legitimate security and inmate management objectives; impose pointless suffering and humiliation; and reflect a stunning disregard of the fact that all prisoners - even those deemed the 'worst of the worst' - are members of the human community." *See HRW Briefing* at p. 1.

The impact of imprisonment on Mr. Brice will be especially deleterious if he is placed in a supermax prison, such as the Administrative Maximum ("ADX") facility in Florence ("ADX Florence"), Colorado, referred to as the "Alcatraz of the Rockies."



Approximately 22% of inmates at ADX Florence have killed fellow inmates in other

1  correctional facilities; 35% have attempted to attack other prisoners or officers.

2  ADX Florence keeps most inmates in solitary confinement for at least 23 hours each

3  day.

4         ADX Florence houses inmates in a concrete room built behind a steel door

5  and grate.  The one free hour inmates have is spent exercising alone in a separate

6  concrete chamber.

7

8

9

10

11

12

13

14

15

16

17

18

19         Inmates seldom see one another, and the inmates' only direct human

20  interaction is with correctional officers.

Artist's rendering of general cell in facility based on photograph and written descriptions.

Former Warden Robert Hood described ADX Florence as a "clean version of hell."[1]

Among the inmates housed at ADX are Zacarias Moussaoui, Fed. Reg. No. 51427-054, Jose Padilla, Fed. Reg. No. 20796-424, Richard Reid, Fed. Reg. No. 24079-038, and John Walker Lindh.

Mr. Brice could also be designated to the Communications Management Unit at FCI Terre Haute.

---

[1]

60 Minutes: Supermax: A Clean Version of Hell (CBS television broadcast Oct. 14, 2007(available at http://'www.cbsnews.com/stories/2007/1 0/1 I /60minutes/main3357727. shtml?source=RSS attr=60Minutes 3357727.



The Bureau of Prisons established the Communications Management Unit (CMU) at FCC Terre Haute, Indiana, to house inmates who, "due to their current offense of conviction, offense conduct, or other verified information, require increased monitoring of communications with persons in the community."[2]  The types of inmates who may be housed there include those:

    *    convicted of, or associated with, international or domestic terrorism;

    *    convicted sex offenders who repeatedly attempt to contact their victims;

    *    who attempted to coordinate illegal activities while incarcerated via approved communication methods; and

    *    who have received extensive disciplinary actions due to their continued misuse/abuse of approved communication methods.[3]

---

[2]     State of the Bureau 2007, Bureau of Prisons Staff: Everyday Heroes, U.S. Department of Justice, Federal Bureau of Prisons, 15.

[3]    *Id.*

The CMU does not allow contact visits, and a CMU inmate is only entitled to four hours of visits per month.[4]  Yasser Aref, an inmate who served time in the CMU, wrote a book about the conditions:[5]

> The Government claims this is just an ordinary unit in a medium security prison with the only difference involving communication. They brought a couple of non-Muslims here (still foreigners though) so whenever someone criticizes the government and says that it is against the law to discriminate based on race or religion, the government will say, "It's not just for Muslims, there are Christians here too." It is the same with Arabs, there are a few non-Arabs here.
>
> ***
>
> All our visits, even with family, must be through glass. Stopping me from hugging my baby has nothing to do with national security! Again, if it's really a security concern let them give us non-contact visits for friends. But family, especially children under 10, have nothing to do with threats. Even if the people here were a danger (which I don't believe, at least in most cases) there are thousands of criminals, even murderers, in medium security prisons like this. But they are all allowed contact visits every day, not 4 hours a month and through the glass. The law should be the same and all should have the same privileges. The only difference is that we are Muslims.
>
> This summer when the temperature was above 90 degrees, it was like we were living in an oven because there was no air conditioning. I was happy winter was coming so we would be okay for a couple months, but when I

---

[4]

Institution Supplement, U.S. Department of Justice, Federal Bureau of Prisons, Federal Correctional Complex, Visiting Regulations,# THX-5267.08B, July 3, 2007, 4.

[5]

Aref, Yassin, Dead Life, Inside out and upside down: Life at the "Communication Management Unit" of Terre Haute Federal Prison, 7, http://www.albanyweblog.com/2007!10-0ct/ 10-14-07 .html.

spoke with others who were here last winter, they told me that when that happens you will wish it was summer again and accept, even prefer hell over this place in winter. I asked why and they said because the whole entire roof leaks, ... in many cells you spend most of the day bailing the water out so it doesn't fill up. I thought they were joking, but when it rained last week I saw myself that the roof started leaking. When I told them now I knew they weren't joking, they laughed and said just wait till the snow comes! ...

Even worse, we are under a threat every day. When we complain about something or ask why they don't move us somewhere else until they fix this building, they answer there is no other place except the ADX. [The Administrative Maximum or Super max prison in Florence, Colorado, where inmates are subjected to sensory deprivation, kept in solitary and continuously deprived of all human contact, slowly driving them insane]. They say they can't put us in any ordinary unit. So we constantly hear that if we don't like it here we can always go to the ADX. Also, if we get in trouble

and get a disciplinary ticket, there is always the threat that we will be transferred to the ADX.[6]

The conditions in the Supermax facility have been described by one

commentator as follows:

Supermax conditions are harsher in maximum-security facilities. While conditions in different facilities vary, several features remain constant. In general, inmates live in cells eight feet by ten feet in area. Stark concrete cells are equipped with a metal sink and toilet, but no shower. Food is passed to the inmate through a small, locked slot in the solid door. Metal flaps may be placed around the door to complete the sense of isolation. If there is a window, it is small and often placed high in the cell so that it is difficult for the inmate to peer out. The light is always on, although it may be dimmed. Cells are monitored constantly. Inmates are usually permitted to leave the cell for up to one hour, three times a week, for a shower and exercise. Guards chain an inmates' hands to their waists and shackle their feet through the slot in the door before opening the cell door. Once the inmate leaves the cell, he is constantly guarded by two or three officers and has no contact with other inmates. These brief encounters, while shackled, are the only physical human contact the inmate is afforded. Exercise usually occurs alone in a small locked cages or cement bunkers; exercise areas contain no equipment.

---

[6]    *Id.* at 6, 9.

Bishop, Maximilenne, "Supermax Prisons: Increasing Security of Permitting Persecution?" Arizona Law Review, Vol. 47:461, at 467-468 (internal citations omitted).

Beyond the physical restrictions a supermax facility imposes, the physiological and psychological effects of solitary confinement are well documented. For example, as reported in The New Yorker, "[a] U.S. military study of almost a hundred and fifty naval aviators returned from imprisonment in Vietnam, many of whom were treated even worse than [Sen. John] McCain, reported that they found social isolation to be as torturous and agonizing as any physical abuse they suffered." Gawande, Atul, "Hellhole," The New Yorker, March 30, 2009, at p. 3 (hereinafter "Hellhole").  *See* Exhibit F.

The article added that:

[a]nd what happened to them was physical. EEG studies going back to the nineteen-sixties have shown diffuse slowing of brain waves in prisoners after a week or more of solitary confinement. In 1992, fifty-seven prisoners of war, released after an average of six months in detention camp in the former Yugoslavia, were examined using EEG-like tests. The recordings revealed brain abnormalities months afterward; the most severe were found in prisoners who had endured either head trauma sufficient to render them unconscious or, yes, solitary confinement. Without sustained social interaction, the human brain may become as impaired as one that has incurred a traumatic injury.

*Id.*

Stuart Grassian, M.D., a former Professor at the Harvard Medical School of Psychiatry for more than 25 years and an expert on solitary confinement, reports that "[i]t has indeed long been known that severe restriction of environmental and social

1  stimulation has a profoundly deleterious effect on mental functioning[.]" Grassian,

2  Stuart, M.D., "Psychiatric Effects of Solitary Confinement," 22 WASH. U. J.L. &

3  POL'Y 325, 327 (2006) (hereinafter "Grassian-Psychiatric Effects").

4  According to Dr. Grassian, "[a]fter even a relatively brief period of time in

5  such a situation [as solitary confinement] an individual is likely to descend into a

6  mental torpor or 'fog,' in which alertness, attention, and concentration all become

7  impaired." *Id.* at 331. Elaborating, Dr. Grassian explains that:

8  [a]n adequate state of responsiveness to the environment requires both the
   ability to achieve and maintain and attentional set and the ability to shift
9  attention. The impairment of alertness and concentration in solitary
   confinement leads to two related abnormalities: the inability to focus, and the
10 inability to shift attention. The inability to focus (to achieve and maintain
   attention) is experienced as a kind of dissociative stupor - a mental "fog" in
11 which the individual cannot focus attention, and cannot, for example, grasp or
   recall when he attempts to read or to think.

12 *Id.*



13

14

15

16

17

18

19

20

SENTENCING MEMORANDUM- 94

Dr. Grassian concludes that "the use of solitary confinement carries major psychiatric risks." Grassian, Stuart, M.D., "Psychpathological Effects of Solitary Confinement," Am. J. Psychiatry, 140:11, November 1983, 1450, 1454. Similarly, Dr. Haney, a Professor of Psychology at the University of California at Santa Cruz and a lawyer, reports that "there is not a single published study of solitary or supermax-like confinement in which non-voluntary confinement lasting for longer than 10 days, where participants were unable to terminate their isolation at will, which failed to result in negative psychological effects."



Haney, Craig, "Mental Health Issues in Long-Term Solitary and 'Supermax' Confinement," Crime and Delinquency, Vol. 49, No. 1, 124-156 at 132 (Jan. 2003).



In *United States v. Spano*, 476 F.3d 476, 479 (7'h Cir. 2007), the Seventh Circuit stated that, "[i]n effect [defendant] is arguing that the severity of a prison sentence has two dimensions: its length, and the harshness of the conditions, and that the harsher the conditions the shorter the sentence should be. There is enough merit to the argument to allow a sentencing judge to take it into account..."

In *United States v. Noriega*, 40 F.Supp.2d 1378, 1379-80 (S.D. Fla. 1999), the sentencing judge reduced defendant Noriega's sentence from forty years to thirty years. The sentencing judge reduced Noriega's sentence, in part, because of the harsh nature of incarceration Noriega endured, stating "[t]here is little question that [segregated confinement] is a more difficult ('harder') type of confinement than in general population.  For some, the consequences of such deprivation can be serious." *Noriega*, 40 F.Supp.2d at 1379-80 (*citing McClary v. Kelly*. 4 F.Supp.2d. 195

(W.D.N.Y. Apr. 30, 1998) (discussing the effect of "social isolation" on a prisoner and stating "a conclusion however, that prolonged isolation from social and environmental stimulation increases the risk of developing mental illness does not strike this court as rocket science. Social science and clinical literature have consistently reported that when human beings are subjected to social isolation and reduced environmental stimulation, they may deteriorate mentally and in some cases develop psychiatric disturbances.")).

It is clear that the potential extreme conditions of Mr. Brice's potential confinement warrant a lesser sentence pursuant to § 3553(a)(2)(A). The isolation, deprivation, and dehumanization resulting from the conditions of such imprisonment are compelling factors in determining the length of a sentence that is "sufficient, but not greater than necessary" to accomplish the goal of sentencing, including punishment and recognition of the seriousness of the offense.

Even prior to *Booker*, courts held that presentence confinement conditions could in appropriate cases constitute a permissible basis for a downward departure. *See United States v. McCarty*, 264 F.3d 191 (2nd Cir. 2001); *United States v. Farouil*, 124 F.3d 838, 847 (7th Cir. 1997) (harsh conditions of confinement are valid grounds for departure); *United States v. Hernandez-Santiago*, 92 F.3d 97, 101 n.2 (2d Cir. 1996). *See also United States v Brinton,* 139 F.3d 718, 725 (9th Cir. 1998); *United States v. Mateo*, 299 F.Supp.2d 201 (S.D.N.Y. 2004); and *United States v. Francis*, 129 F. Supp. 2d 612, 616 (S.D.N.Y. 2001), *citing United States v.*

*Sutton*, 973 F. Supp. 488, 491-495 (D. N.J. 1997).

Mr. Brice' s term of imprisonment will likely be the harshest available within the United States.  Mr. Brice asks this Court to also consider the harshness of his imprisonment upon him and the devastating effect a long prison term would likely have upon him.

### 5.    Mr. Brice has already demonstrated that he will comply with conditions of release

As the Court remembers, Mr. Brice was previously released on a furlough, in order to allow Mr. Brice to undergo necessary surgery on his toes.  During that period, there were no issues or problems with Mr. Brice's release, and he followed all conditions.



This period strongly indicates that Mr. Brice will comply with supervised release conditions set by this Court.

On November 10, 2011, Mr Brice filed a motion for temporary release from custody. (ECF Nos. 50-52). The basis for that motion was the demonstrated medical need for surgery. The Government opposed that motion. (ECF No. 54).  Mr. Brice filed additional supporting documents in support of that motion. (ECF No. 58). A hearing was held on that motion. (ECF No. 59). Additional briefing was submitted by the Government (ECF No. 60) and Mr. Brice (ECF No. 61).

The Court ultimately granted the motion for temporary release, albeit with different conditions than those put forth by Mr. Brice in his motion. (ECF No. 62). The Court set strict conditions for temporary release, including the posting of a percentage bond. (ECF No. 63).

The Government moved to stay that order (ECF No. 66), and moved for review of that order. (ECF Nos. 67, 70). Mr. Brice opposed the stay (ECF No. 69) and opposed review of the order. (ECF No. 71). The Court granted the stay (ECF No. 73) and requested that counsel for Mr. Brice provide additional information. Counsel did so. (ECF No. 74).

The Court held a hearing on the motion for review. (ECF No. 75). The Court issued an order allowing the release, but adding conditions that United States Probation must verify that the proposed residence was suitable prior to release, and setting a status conference regarding continued release for December 19, 2011. (ECF

No. 76). Otherwise, the Court largely upheld the prior release conditions (*see* ECF No. 63).

On December 19, 2011, a status conference was held regarding Mr. Brice's temporary release. (ECF No. 98). Prior to that hearing, counsel for Mr. Brice provided medical reports to the Court, counsel for the Government and the United States Probation Office. There were no difficulties or problems raised at the hearing. The Court issued an order following the status conference, on that same date, stating that Mr. Brice shall voluntarily surrender to the US Marshal at the Spokane County Jail on January 10, 2012. (ECF No. 99).



Mr. Brice surrendered at the jail without incident, on time, as directed.

The purpose of setting conditions of release is to assure that a defendant will appear in Court as required and to protect the public. *See, e.g.,* 18 U.S.C. §3142. In

other words, those conditions are designed to ensure that a defendant follows the rules set and does not pose a danger.  In this manner, pretrial release conditions echo many of the same concerns as do supervised release conditions.  Mr. Brice has already demonstrated that he can succeed while on pretrial release conditions, thereby indicating a likelihood of succeeding while on supervised release as well.

Here, the Court set strict pretrial release conditions. Those conditions of course included the standard conditions of release. (ECF No. 63 at 1-2).  There is no reason why similar conditions could not be imposed as supervised release conditions, with identical compliance.  The Court also set conditions requiring no access to alcohol, firearms, the internet or cell phones. (ECF No. 63 at 3).  Mr. Brice was previously subject to electronic monitoring and GPS monitoring. (ECF No. 63 at 5-6).  Mr. Brice was on strict house arrest, only able to leave for court obligations, case related matters and medical appointments. (ECF No. 63 at 6).

There is no reason why similar conditions could not be imposed upon release, as opposed to simply warehousing Mr. Brice in a federal prison, with all the attendant costs and harms.  Similar conditions could be set at the outset of Mr. Brice's supervised release period.  Over time, either via supervising probation officer discretion or via Court involvement, upon demonstration of full compliance by Mr. Brice, stricter conditions might be relaxed over time.  This would occur based on Mr. Brice earning the trust of the Court and/or the supervising probation officer.  Thus, the concerns of the sentencing court can be met via release conditions,

as opposed to a lengthier prison term.

Joey Brice, while on pretrial release, was at all times well aware of the importance of following all of his release conditions.  As required by the Court, he signed the AO199c form prior to his release. (ECF No. 72).  In a similar manner, he would be required to sign off on the terms of his supervised release.  He undestood previously, and still understands, the importance of meeting all of his obligations in this matter. He attended the status conference as required without difficulty, having arrived approximately a half-hour early to ensure that he was timely. (ECF No. 98). He timely surrendered as required by the Court, when his motion to reconsider detention was denied.  (ECF No. 143).

While on pretrial release, United States Probation confirmed that Mr. Brice had complied with his conditions of supervised release.  (ECF No. 114 at 4).  He checked in telephonically with undersigned counsel frequently, and was diligent in ensuring that he knew where he needed to be and when he needed to be there.

Joey Brice was on temporary release for a period of six weeks. That six week period demonstrated that the release conditions assured his appearance in Court and protected the public. In other words, the release conditions worked. If Joey were a flight risk, it is doubtful that he would be as diligent as he has been regarding compliance with his surrender date.  He had plenty of time to violate his conditions, but did not.  He had no difficulty dealing with his supervising probation officer.

The successful six-week supervision demonstrates that release conditions are

1  sufficient to protect the public.  There is no indication that they would not do so in

2  the future.  This "parsimony provision" is "an overarching provision," representing a

3  cap above which a district court is statutorily prohibited from sentencing- even when

4  a greater sentence is recommended by the advisory Sentencing Guidelines, which,

5  per § 3553(a), are statutorily subordinate to the parsimony principle.  *See*

6  *Kimbrough, supra*, 128 S.Ct. at 570.  Since supervision and release conditions are

7  sufficient but not greater than necessary to ensure the goals of sentencing, no

8  additional imprisonment is necessary.

9

10  **6.    Joey Brice is motivated to address his issues through adequate Mental Health treatment**

11      Mr. Brice recognizes the profound issues which he must address.  While it

12  would be naive to suggest that "a cure" is around the corner, Mr. Brice is a young

13  man with a long future ahead of him.  The sooner he can begin the process of real

14  mental health treatment, the better for everyone – society included.

15      Psychological testing demonstrates his strong motivation:

16      The respondent's interest in and motivation for treatment is typical of
        individuals being seen in treatment settings, and he appears more motivated

17      for treatment than adults who are not being seen in a therapeutic setting. His
        responses suggest an acknowledgement of important problems and the

18      perception of a need for help in dealing with these problems. He reports a
        positive attitude towards the possibility of personal change, the value of

19      therapy, and the importance of personal responsibility.

20  (Exh. M at 9).  Ultimately, one of the keys to Mr. Brice's future is his willingness to

1  admit his misdeeds, and address what led him to act as he did.  While this process

2  has begun, it is far from over.

3  This is not to suggest that this process will be easy.  As testing demonstrates:

4  ...particular areas of attention or concern in the early stages of treatment could include:

5  • Current difficulties in his social support system may give a special significance to the therapeutic relationship and any impasse may need to be

6  handled with particular care.

7  • He may have initial difficulty in placing trust in a treating professional as part of his more general problems in close relationships.

8  • He may currently be too disorganized or feel too overwhelmed to be able to participate meaningfully in some forms of treatment.

9  • He is likely to have difficulty with the treating professional as an authority figure, and he may react to the therapist in a hostile or derogatory manner.

10 (Exh. M at 10).  Dr. Mays documents his own experiences in observing these issues

11 with Mr. Brice.  (Exh. M at 10).  But the fact that the process may be difficult, and

12 have its ups and downs, is not a reason to postpone that process.  Rather, it is reason

13 to begin that process in earnest, and sooner rather than later.

14

15 **B.    Mr. Brice's significant health problems create a risk that a lengthy sentence will permanently cripple him**

16 Mr. Brice suffers from severe health problems stemming from the catastrophic

17 injuries he sustained in April, 2010. He has already required surgery on his toes.  It

18 was necessary for the Court to authorize a furlough – a request that the Government

19 opposed.  He could not get the care he needed while incarcerated, however.

20 Unfortunately, further surgery is necessary.  He has already been told that he needs

surgery on his knee – his cartilage has largely been destroyed, meaning that he suffers from bone on bone damage in his knee.

While the government always claims that the Bureau of Prisons ("BOP") can manage an medical problem, government studies and press reports have chronicled the inability of the BOP to provide adequate medical care for inmates. Compounding the problems, the BOP has focused on cutting health care costs in federal prisons. See GAO report, Containing Health Care Costs for an Increasing Inmate Population, GAO/T-GGD-00-l 12, Apr. 6, 2000.  As the federal prison population increases, and the budget difficulties intensify, the problem of medical care for prisoners can only worsen.  Inadequate medical care has been cited as the number one problem reported by inmates in the federal prison system. CHAPTER IV: WOMEN AND MEN IN CRIMINAL JUSTICE, 84 Geo. L.J. 1778 (May 1996).

Medical care provided by the Bureau of Prisons is the lowest standard of care. That is not to say that in individual cases the health care provider may not be concerned with the welfare or well-being of his or her patient, but rather that when there is competition between the twin goals of meeting inmate health care needs and preserving security within the prison population, security prevails. It is respectfully submitted that such measures would deprive Mr. Brice, who because of his charges, may be incarcerated in a high-security facility, of the costly and intensive medical care he needs.  Joseph's injuries are real, and the damage he has suffered can only become acute as he goes months and years without necessary treatment.

Section 3553(a)(2)(D) requires that in fashioning a sentence that is "sufficient, but not greater than necessary," the Court shall consider "the need for the sentence imposed to provide the defendant with needed. . . medical care. . . in the most effective manner." *Simon v. United States*, 361 F.Supp.2d 35, 43 (E.D.N.Y. 2005). Keeping a man in his early twenties out of prison is vastly more reasonable than confinement that does not begin to offer anything like the level of monitoring and preventive are he will need to prevent crippling injuries he will suffer from for the rest of his life. *United States v. Carmona-Rodriguez*, 2005 WL 840464, at *4 (S.D.N.Y. 2005) (stating that *Booker*, 543 U.S. at 259, and §3553(a)(2) "require judges to impose sentences that effectively provide the defendant with needed medical care").

Mr. Brice's physical condition warrant a downward departure pursuant to U.S.S.G. §5H 1.4 (physical condition). *See United States v. Riccardi*, 1998 WL 635882 (S.D.N.Y. 1998) (downward departure warranted in part because of defendant's health problems including "coronary artery disease, hypertension, elevated lipids, obesity and depression"); *United States v. BlarekIl*, 7 F.Supp.2d 192, 212 (E.D.N.Y. 1998) (downward departure warranted where court concluded that the defendant had "an extraordinary and unpredictable impairment" because he had been HIV positive for 15 years although he had not developed discernable AIDS-related symptoms); *United States v. Gigante*, 989 F. Supp. 436 (E.D.N.Y. 1998) (Mafia boss granted substantial departure (262 months to 144) due to poor health

1   (heart) and advanced age (69 years old)); *United States v. Roth*, 1995 WL 35676

2   (S.D.N.Y. 1995) (downward departure warranted under §5H 1.4 because defendant

3   was 63 years old and suffered from a progressive incurable debilitating neuro-

4   muscular disease); *United States v. Velasquez*, 762 F. Supp. 39, 40 (E.D.N.Y. 1991)

5   (life-threatening cancer warranted downward departure).

6       In the context of the financial cost of maintaining a person in prison, and the

7   resources that cost diverts from other public priorities, Justice Kennedy cautioned

8   that "[w]hen it costs so much more to incarcerate a prisoner than to educate a child,

9   we should take special care to ensure that we are not incarcering too many persons

10  for too long." He concluded that "[o]ur resources are misspent, our punishments are

11  too severe, our sentences too long." *Id.*

12      Justice Kennedy's sentiments are also fully consistent with 18 U.S.C.

13  §3582(a)'s requirement that a sentencing court "recognize [that] imprisonment is not

14  an appropriate means of promoting correction or rehabilitation.  "The Guidelines

15  must be interpreted in light of the traditions and purposes of sentencing in imposing

16  the most *rational* sentences the system will permit." *United States v. Osei*, 107 F.3d

17  101, 104 (2nd Cir., 1997), *quoting United States v. DeRiggi*, 893 F. Supp. 171, 174

18  (E.D.N.Y.), *aff'd* 72 F.3d 7 (2nd Cir., 1995) (emphasis added by the Court in *Osei*).

19      As Justice Kennedy observed, despite a convicted defendant's illegal conduct,

20  "[s]till, the prisoner is a person; still, he or she is part of the family of humankind."

*See also Koon v. United States*, 518 U.S. 81, 113 (1996) ("[i]t has been uniform and

constant in the federal judicial tradition for the sentencing judge to consider every

convicted person as an individual and every case as a unique study in the human

failings that sometimes mitigate, sometimes magnify, the crime and punishment to

ensue").

## III.    The Kinds of Sentences Available

There is no statutory mandatory minimum sentence to be applied in this case.

The statutory maximum sentences are as follows: Count One, ten years

imprisonment; Count Three, fifteen years imprisonment.

A non-Guidelines sentence is certainly available for Mr. Brice, whose counts

of conviction do not include any mandatory minimum terms. Accordingly, analysis

of the factors in §3553(a) certainly justifies a non-Guidelines sentence. Such a

sentence would be in accordance with §3553(a): "sufficient, but not greater than

necessary" to achieve the purposes of sentencing.

Viewed in the context of *all* of the factors listed in §3553(a), Mr. Brice's

medical condition, his personal history and background, and the nature of his offense

conduct, whether reaching the level of a departure, or simply justifying a sentence

outside the advisory Guidelines, make a sentence that does not include imprisonment

wholly just and appropriate, and, in compliance with the directive in §3553(a),

"sufficient but not greater than necessary" to achieve the goals of sentencing.

Indeed, in light of the impact any incarceration will have on Mr. Brice's

health, the *only* factor militating in favor of imprisonment are the advisory

Guidelines themselves.

**IV.    The Kinds of Sentence and the Sentence Range Established for the Offense Under the Advisory Sentencing Guidelines**

    **A.    Sentencing Guidelines are not entitled to any deference when they fail to properly reflect § 3553(a) considerations or are not based on sound decisionmaking by the Sentencing Commission**

       Pursuant to the Supreme Court's decision in *Rita*, this Court can consider whether the applicable Guidelines fail to properly reflect § 3553(a) considerations, reflect an unsound judgment, do not treat defendant characteristics in the proper way, and/or require a outside-the-Guidelines sentence regardless. *Rita*, 127 S.Ct. at 2465. As conceded by the government in *Kimbrough*, judges "may vary [from Guidelines ranges] based solely on policy considerations, including disagreements with the Guidelines." *Kimbrough*, 128 S.Ct. at 570 (internal quotation marks and citations omitted).

       Whether this Court may draw any useful advice from a guideline depends, first, upon whether the Sentencing Commission, in promulgating or amending that guideline, acted in "the exercise of its characteristic institutional role." *Kimbrough*, 128 S. Ct. at 575. As described in *Rita*, the Sentencing Commission's exercise of its institutional role has two basic components: (1) reliance on empirical evidence of pre-Guidelines sentencing practice, and (2) review and revision in light of judicial

1  decisions, sentencing data, and comments from participants and experts in the field.

2  *Rita*, 127 S.Ct. at 2464-65.

3      When the Sentencing Commission does not develop a guideline based upon

4  "empirical data and national experience," it is not an abuse of discretion for this

5  Court to conclude that guideline application "yields a sentence 'greater than

6  necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough*,

7  128 S.Ct. at 575. *See also Spears v. United States*, 129 S.Ct. 840, 843-44 ("we now

8  clarify that district courts are entitled to reject and vary categorically from the crack-

9  cocaine Guidelines based on a policy disagreement with those Guidelines."); *Nelson*

10  *v. United States*, 129 S.Ct. 890 (2009) ("The Guidelines are not only *not mandatory*

11  on sentencing courts; they are also not to be *presumed* reasonable.").

12      Sentencing courts have disagreed with a wide range of Guidelines, including

13  Guidelines based on congressional directives. See *United States v. Roberson*, 573

14  F.Supp.2d. 1040, 1047 (N.D. Ill. 2008) ("*Kimbrough* held that a judicial

15  determination of the reasonableness of a sentence controls over a specific policy

16  directive of Congress that would require a harsher sentence"); *United States v.*

17  *Phinney*, 599 F.Supp.2d 1037, 1039 n.l (E.D. Wis. 2009) (noting the Supreme Court

18  "recently made clear that district judges need not defer to the guidelines or to any

19  congressional policies reflected therein") (*citing Spears*, 129 S.Ct. 840, 843-44

20  (2009)). For example, in *United States v. Grant*, 2008 WL 2485610, at* *4, 7 (D.

Neb. June 16, 2008), the sentencing court imposed a below-the-Guidelines sentence

for a second-degree murder conviction as "[t]he Guidelines that establish the base offense levels for murder are among those that were not based on empirical data and national experience, ... [so] they are a less reliable appraisal of a fair sentence and the court affords them less deference than it would to empirically-grounded Guidelines." A sentencing court's disagreement with a guideline that does "not exemplify the Commission's exercise of its characteristic institutional role" is entitled to as much appellate "respect" as a fact-based departure or variance. *See Spears*, 129 S.Ct. at 843; *Kimbrough*, 128 S.Ct. at 574-75.

There are many instances in which courts have refused to follow guidelines the Commission promulgated pursuant to explicit congressional directives to the Commission or without an empirical basis to do so. In *United States v. Beiermann*, 599 F. Supp. 2d l 087, ll 04-ll 05 (N.D. Iowa 2009), the district court rejected the child pornography guideline because it "does not reflect empirical analysis, but congressional mandates that interfere with and undermine the work of the Sentencing Commission." In *United States v. Galvez-Barrios*, 355 F.Supp.2d 958, 962-63 (E.D. Wis. 2005), the district court rejected U.S.S.G. § 2L1.2's 16-level enhancement because "[t]he Commission did no study to determine if such sentences were necessary or desirable from any penal theory ... [n]o research supports such a drastic upheaval [and] the Commission passed it with relatively little discussion." The court in *Grant, supra*, likewise varied downward 9 years, in part, due to the complete lack of empirical data to support the offense level attributed to the

otherwise applicable murder guideline. *Grant, supra*, 2008 WL 2485610 at *8.

### B.    The flaws in the Guidelines as applied to this case dictate that they advisory guideline ranges should be set aside

In the case of Joseph Brice, the guidelines calculations constitute the least meaningful of the relevant sentencing factors.  Although the guidelines must still be considered, they are demonstrably overwhelmed by the other factors listed in §3553(a): (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to further the stated purposes of sentencing (just punishment, affording adequate deterrence to criminal conduct; protecting the public from further crimes of the defendant, and providing the defendant with needed education or vocational training and medical care); and (3) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct. A guidelines sentence would be off the charts and would ignore all of the factors that implement 18 U.S.C. §3553(a) directive that a sentencing be sufficient, but not greater than necessary.  As such, only a non-guidelines sentence can constitute a just punishment for Joseph Brice in this case.

The base offense levels and sentencing enhancements (including the enhancement of Criminal History Category) set forth in the PSR suffer from the same flaws in that the Commission did not develop the base offense levels or any of

the suggested sentencing enhancements upon empirical data and/or developed the base offense levels and enhancements as a result of a congressional directive. For these reasons, the calculations suggested in the PSR are flawed and should not be relied upon by this Court, supporting a downward departure. These flaws also support a downward variance.

A guideline departure refers to the imposition of a sentence outside the advisory guideline range, or the assignment of a criminal history category, different than the one contemplated by the guidelines, to result in a sentence outside the advisory guideline range. U.S.S.G. § 1B1.1(E). Importantly, a departure results from a district court's application of a particular guidelines provision. *United States v. Smith*, 474 F.3d 888, 896(n)(3) (6th Cir. 2007).

A variance refers to the imposition of a sentence outside of the advisory guidelines range based on this Court's weighing of one or more of the sentencing factors of 18 U.S.C. § 3553(a). *United States v. Smith*, 474 F.3d 888 (6th Cir. 2007). And while it is certainly true that the same facts and analysis can, at times, be used jointly to justify a guidelines departure and a variance, the concepts are distinct.

**1.    Application of U.S.S.G. §3A1.4 results in double-counting**

A district court engages in "double counting" when "precisely the same aspect of a defendant's conduct factors into his sentence in two separate ways." *United*

1   *States v. Farrow*, 198 F.3d 179, 193 (6th Cir. 1999).  Double counting is

2   impermissible unless "it appears that Congress or the Sentencing Commission

3   intended to attach multiple penalties to the same conduct."  *Id*. at 194.

4           The PSR's suggestion that U.S.S.G. § 3A1.4 should apply to Count 3 (PSR at

5   39) demonstrates one of the chief flaws in this enhancement. In *United States v.*

6   *Crocker*, Case No. 04CR10097, the PSR suggested the same 12-level enhancement

7   after defendant Crocker was convicted of, *inter alia,* possessing chemical weapons,

8   in violation of 18 U.S.C. § 229(a).  The applicable guideline for that offense is

9   U.S.S.G. § 2Ml.6 and, as applied to Crocker, resulted in an offense level of 42 as the

10  offense was committed with intent to injure the United States.  (*See* Crocker,

11  Sentencing Transcript, p. 26 (relevant portions of transcript attached as Exhibit D)).

12  As to the 12-level enhancement, the Honorable James D. Todd stated:

13          How could you ever have a2M6.l offense committed with intent to injure the
            United States that would not also have a 3A1.4 twelve-level enhancement for
            a crime intended to promote federal terrorism? I can't think of one- I can't
14          think of a crime where if you had one, you wouldn't have the other.
                                        * * *
15          It seems to me there may be some odd case where you could think of where
            you could have a 2M6.1 (a)(l) without 3A1.4, but it's not this case. It seems to
16          me in this case, this offense was committed with intent to injure the United
            States.  It's a base level42.  It seems double-counting to then add twelve more
17          levels because this felony was intended to promote a federal crime of
            terrorism.
18          And a federal crime of terrorism is described in 18 U.S.C. 2332[b]g, which I
            read earlier. But the federal crime of terrorism means an offense that is
19          calculated to influence or affect the conduct of government by intimidation or
            coercion or to retaliate against government conduct.  It seems to me that that is
20          substantially what 2M6.1 is, an offense to injure the United States. So I think
            it's a double-counting.

1  (Exh. D at pp. 26, 39).  Judge Todd therefore sustained Crocker's objection to the

2  12-level enhancement.  (Exh. D. at p. 39).

3      Applying Judge Todd's analysis to this case, application of the 12-level

4  enhancement also results in impermissible double counting in this case.  U.S.S.G. §

5  2M5.3 addresses providing material support to terrorists.   While a creative mind

6  might be able to think of "some odd case where you could think of where you could

7  have a [2M5.3] without 3A1.4," that is not this case.  Judge Todd's analysis is

8  equally appropriate in this case.  It is impossible for Count III to *not* involve a

9  federal crime of violence.  Applying U.S.S.G. § 3A1.4 amounts to double-counting.

10  Under such circumstances, it would be appropriate not to include this enhancement.

11  If the Court determines that it must apply the enhancement, this double-counting

12  provides ample support for a variance.

13

14  **2.    Application of U.S.S.G. § 3A1.4 Is Unworthy of Deference
        from this Court as it Is an Enhancement the Sentencing
        Commission Developed Only as a Result of a Congressional
        Directive and Is Not Based upon Empirical Data**

15

16      In 1994, Congress enacted the Violent Crime Control and Law Enforcement

17  Act of 1994. Section 120004 of that Act "direct[ ed] the [Sentencing] Commission to

18  provide an appropriate enhancement for any felony that involves or is intended to

19  promote international terrorism.  Guidelines Manual, Appendix C, Amendment 526.

20  Specifically, the Act directed the Commission as follows:

1
2
3
4

SENTENCING GUIDELINES INCREASE FOR TERRORIST CRIMES. The United States Sentencing Commission is **directed** to amend its sentencing guidelines to provide an appropriate enhancement for any felony, whether committed within or outside the United States, that involves or is intended to promote international terrorism, **unless such involvement or intent is itself an element of the crime.**

Public Law No. 103-322 (emphasis added).

5
6
7
8
9
10
11
12
13
14
15

The Sentencing Commission promptly deleted the previous upward departure provision in U.S.S.G. § 5K2.15 (which allowed district courts discretion to depart upward if the defendant committed the offense in furtherance of a terrorist action) and replaced it with U.S.S.G. § 3Al.4. This new enhancement not only created an upward adjustment, it created a minimum offense level of 32 if the offense involved or was intended to promote international terrorism, and required a criminal history category of VI, regardless of the defendant's actual criminal history.  Under the pre-1995 guideline provision of§ 5K2.15, the District Court determined the extent if any, of the departure warranted for the magnitude of the criminal behavior.  With the replaced provision § 3A1.4, the District Court has no discretion to weigh the extent of the enhancement against the extent of the behavior.

16
17
18
19
20

The Sentencing Commission did not give any reason for selecting these particular offense levels or for imposing a criminal history category of VI in every case.  The Commission also did not mention how (or even if) this adjustment addressed Congress' express limitation that the Commission was to provide for an enhancement in such cases "unless such involvement or intent is itself an element of

the crime."  The next year, Sentencing Commission amended the enhancement again, also by congressional directive, to apply the enhancement more broadly to include "Federal crimes of terrorism" as defined in 18 U.S.C. § 2332b(g). See Guidelines Manual, Appendix C, Amendment 539.

It has already been discussed herein that this Court's ability to draw any useful advice from a guideline depends, first, upon whether the Sentencing Commission, in promulgating or amending that guideline, did so in "the exercise of its characteristic institutional role." *Kimbrough*, 128 S.Ct. at 575. Section 3Al.4 simply does not warrant any deference.  This enhancement was (1) not enacted based upon reliance of empirical evidence of pre-Guidelines sentencing practice, and (2) not enacted in light of judicial decisions, sentencing data, and comments from participants and experts in the field.  *See Rita*, 127 S.Ct. at 2464-65.  Mr. Brice therefore urges this Court to exercise its discretion to conclude this enhancement "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes" in this case and either find it inapplicable or apply a downward variance to eliminate its effect upon the advisory Guidelines calculations. *See Kimbrough*, 128 S.Ct. at 575.

### 3.    Application of U.S.S.G. §3Al. 4 Would Cause Joseph Brice's Criminal History to be Over-Represented

If the Court were to apply U.S.S.G. §3A1.4, the enhancement would substantially increase Mr. Brice's Criminal History Category from Level I to level

VI.  (*See* PSR at 48-49 (discussing application of U.S.S.G. §3Al.4(b ))).  Thus, while Mr. Brice actually has *zero criminal history points,* application of U.S.S.G. § 3Al.4(b) takes him from the lowest criminal history category to the highest based solely on this enhancement.  The enhancement therefore does not accurately represent Mr. Brice's criminal history.  Stated alternatively, it results in absurd results in which a hypothetical co-defendant who has previously been convicted of numerous terrorism offenses is subject to an identical criminal history score to someone such as Mr. Brice, despite his never having been convicted of a crime.

Section 4A1.3(b )(1) of the advisory Guidelines allows this Court to depart downward from the suggested sentencing range if Mr. Brice's "criminal history category substantially overrepresents the seriousness of [his] criminal history or the likelihood that [he] will commit other crimes."  In *United States v. Fletcher*, 15 F.3d 553 (6th Cir. 1994), the Sixth Circuit specifically recognized the validity of a downward departure on this basis. The Sixth Circuit does not stand alone in recognizing U.S.S.G. § 4Al.3 as a basis for downward departures where a criminal history category overstates the seriousness of the defendant's record. *See, e.g., United States v. Shoupe*, 35 F.3d 835, 838 (3rd Cir. 1994) (holding the Sentencing Commission recognized the imprecision inherent in the criminal history classifications, thus promulgating § 4Al.3 "to give sentencing judges discretion to depart from the prescribed range where it misrepresents a defendant's criminal

history or likelihood of recidivism"); *United States v. Gayles*, 1 F.3d 735, 739 (8th Cir. 1993) (holding the court "may depart downward from an otherwise applicable sentencing range when reliable information shows that defendant's criminal history category significantly over-represents the seriousness of the defendant's past criminal conduct"); *United States v. Summers*, 893 F.2d 63, 68 (4th Cir. 1990) (affirming finding that the criminal history category over-represented the seriousness of the record, thus justifying departure); *United States v. Bowser*, 941 F.2d 1019, 1023 (l0th Cir. 1991) (same); *United States v. v. Collins*, 915 F.2d 618,621-22 (11th Cir. 1990); *United States v. Abbott*, 30 F.3d 71,73 (7th Cir. 1994); *United States v. Spencer*, 25 F. 3d 1105, 1113 (D.C. Cir. 1994); *United States v. Rivers*, 50 F.3d 1126, 1131 (2nd Cir. 1995).

A category VI designation substantially overstates the seriousness of Mr. Brice's criminal history and the likelihood of his committing future crimes. The seriousness of his record is completely overstated as his placement in criminal history category VI occurs *only* through application and operation of U.S.S.G. § 3A1.4(b)– *not* because of his own personal criminal history or record. The tremendous increase in Mr. Brice's criminal history category is simply not reflective of Mr. Brice's criminal history. This enhancement is unlike other enhancements in the Guidelines that are premised upon the offender's criminal past, such as the career offender enhancement (U.S.S.G. § 4Bl.1) or the armed career criminal enhancement (U.S.S.G. § 4Bl.4).

1       Because avoiding recidivism is one of the statutory goals of sentencing, this

2   Court should look at true indicators of the likelihood of recidivism.  As discussed

3   herein, the Sentencing Commission has found a "first offender" like Mr. Brice poses

4   only a 6.8% chance of recidivism.  *See* Exh. B, *"Recidivism and the First Offender,"*

5   Exhibit 8.  *This* is the more appropriate guide to judge Mr. Amawi's criminal history.

6   The Court should not rely upon false indicators of recidivism or criminal history,

7   such as an increase in Mr. Brice's criminal history based upon application of

8   U.S.S.G. § 3A1.4(b) purely because of the charged conduct.  Rather, the Court

9   should rely upon Mr. Brice's *actual* prior conduct.  Accordingly, Mr. Brice submits

10  criminal history category VI substantially overstates the severity of his criminal

11  history.  He requests both a downward departure under U.S.S.G. §4Al.3(b)(l) and a

12  downward variance under 18 U.S.C. § 3553(a) from that category if the Court

13  applies U.S.S.G. §3Al.4.

14

15          **4.      Mr. Brice's conduct is distinguishable from the conduct of
                    others who have received §3A1.4 terrorism enhancement**

16      The PSR seeks a twelve level increase to the base offense level and an

17  increase from criminal history category I to category VI under U.S.S.G. 3A 1.4.

18  However, Mr. Brice's conduct is distinguishable from the conduct of others who

19  have received §3A1.4 terrorism enhancement.  *See, e.g. United States v. Garey,* 483

20  F.3d 1159 (11th Cir. 2007)(terrorism enhancement given because defendant

threatened to bomb and cause mass destruction to various local businesses)[7];  *United States v. Mandhai,* 375 F.3d 1243 (11th Cir. 2004) (enhancement given for plan to blow up electrical sites in United States and demand Muslim prisoners be released and government change in Middle East policy);  *United States v. Jordi,* 418 F.3d 1212 (11th Cir. 2005)(enhancement for plot to destroy abortion clinics);  *United States v. Hale,* 448 F.3d 971 (7th Cir. 2006)(enhancement for plot to murder federal judge);  *United States v. Harris,* 434 F .3d 767 (5th Cir. 2005)(enhancement for destroying municipal building through use of Molotov cocktail);  *United States v. Dowell,* 430 F.2d 1100 (10th Cir. 2005)(enhancement for setting fire to IRS building);  *United States v. Graham,* 327 F.3d 460 (6th Cir. 2003)(enhancement for active member of the North American Militia, a paramilitary organization that planned a "first strike" in which they would attack and destroy various transportation, communication, and energy sources, kill certain federal officials);  *United States v. Meskini,* 319 F.3d 88 (2d Cir. 2003)(enhancement for plot to bomb Los Angeles airport);  *In re Terrorist Bombings of U.S. Embassies in East Africa,* 552 F.3d 93 (2d Cir. 2008)( enhancement for bombing embassies on behalf of terrorist organization).

---

[7]

    The Eleventh Circuit granted rehearing *en banc* and vacated this opinion due to an issue unrelated to the terrorism enhancement. *United States v. Garey,* 496 F.3d 1189 (11th Cir. 2007).

1        Mr. Brice's conduct differs significantly from the conduct described in these

2    reported cases where the sentencing court applied the §3A1.4 enhancement.

3        Should the Court find §3A1.4 applicable, Mr. Brice urges the court to exercise

4    it's considerable discretion and grant both a downward departure and a variance as

5    was done in *United States v. Benkahla*, 530 F.3d 300 (4th Cir. 2008).  The court in

6    *Benkahala* determined that the "terrorism enhancement" was required under a strict

7    reading of the guidelines. "But the court thought the case called for a downward

8    departure under §4A1.3 or (in the alternative) a variance under 18 U.S.C. § 3553(a).

9    "Sabri Benkahla is not a terrorist," the court stated.  *Benkahla,* 501 F. Supp.2d at

10   759.  *Benkahala, supra,* at 305-306.  As in *Benkahla,* Joseph Brice is not a terrorist.

11

12   **V.    The Need to Avoid Unwarranted Sentence Disparities Among Defendants
         with Similar Records Who Have Been Found Guilty of Similar Conduct**

13       In reviewing the sentences received by others who were charged, tried, and

14   convicted of terrorism-related offenses, it is apparent those sentences, in large part,

15   were not driven by the offense of conviction but rather by the actual conduct

16   underlying the offense of conviction.  The following summary table  outlines the

17   conduct of several of the more notorious terrorism-related cases prosecuted in the

18   United States and in Military Tribunals for purposes of comparison to the conduct in

19   this case.  Mr. Brice asks this Court to review and consider the conduct underlying

20   the convictions in each of the following cases for the purpose of avoiding an

1    unwarranted sentencing disparity in this case.

2        Mr. Brice also asks the Court to recognize that, in comparing Mr. Brice's

3    conduct to that of other defendants, it is impossible for Mr. Brice to have a higher

4    number of criminal history points than any of the defendants used in comparison as

5    Mr. Brice has zero criminal history points.

6

7

| DEF. | CHARGES/DETAILS | SENTENCE |
|------|-----------------|----------|
| **Abdhir, Rahmat**<br><br>*United States v. Abdhir*, CR-07-501, N.D. Cal. | • Guilty Plea<br>• Convicted on 1 count<br><br>**Statute(s)**<br>18 U.S.C. §2339A (Conspiracy to Provide Material Support to Terrorists) | **120 months** imprisonment<br><br>**Relevant Facts:** assisted his brother Zulkifli Abdhir, one of the FBI's most wanted who is a leader of Jemaah Islamiyahh, a group affiliatd with Al Qaeda; funneled money, radios, ammunition and other equipment; |

| | | |
|---|---|---|
| **Abdi, Nuradin**<br><br>*United States v. Abdi,* CR-04-088, S.D. Ohio | • Guilty Plea<br>• Convicted on 1 count<br><br>**Statute(s)**<br>18 U.S.C. §2339A (Conspiracy to Provide Material Support to Terrorists) | **120 months** imprisonment<br><br>**Relevant Facts:** part of a clandestine Al Qaeda cell; involved in the plot to blow up a shopping mall in Ohio |
| **Abdur-Raheem, Hammad**<br><br>*United States v. Royer,* CR-03-296 (E.D. Va) | • Bench Trial<br>• Convicted on 3 counts<br><br>**Statute(s):**<br>18 U.S.C. § 371 (Conspiracy to Commit Offense/Defraud the U.S.)<br>18 U.S.C. § (Conspiracy to Provide Material Support to Terrorists)<br>18 U.S.C. § 924 (Offenses Involving the Exportation of Firearms or Ammunition) | **52 months** imprisonment<br><br>**Relevant Facts:** In the "Virginia Jihad" case, Abdur-Raheem conspired to provide material support to Lashkar-e-Taiba ("LET"). Abdur-Raheem took part in weapons training as mujahideen with LET, the terrorist group that planned acts of jihad in the United States, Pakistan, and India. |

| | | |
|---|---|---|
| **Abujihaad, Hassan, a/k/a Paul Hall**<br><br>*United States. v. Abu-Jihaad,* No. 07-CR-57, D. Conn. | • Jury Trial<br>• Convicted on 2 counts<br><br>**Statute(s):**<br>18 U.S.C. § 793(d) (Disseminating National Defense Information) | **120 months** imprisonment<br><br>**Relevant Facts:**<br>Abujihaad was a Signalman Second Class in the United States Navy aboard the USS Benfold when he exchanged e-mails with an al-Qaeda propagandist, Babar Ahmad, in which he praised the USS Cole attack and provided Ahmad with then-classified information related to the movements and vulnerabilities of Navy ships in the middle east. |

| Ahmed, Khalil | • Guilty Plea<br>• Convicted on 1 count | **100 months** imprisonment |
|---|---|---|
| *United States v. Ahmed*, No. 07-CR-647, N.D. Ohio | **Statute(s)**<br>18 U.S.C. §2339A (Providing Material Support to Terrorists) | **Relevant Facts:** conspired with numerous individuals to joint violent jihad overseas against U.S. military, primarily in Afghanistan; traveled to Egypt in furtherance; while in U.S., sought to obtain heavy firearms and sniper rifles; conspirators traveled to Pakistan; amassed jihadist written materials and videos; |

| | | |
|---|---|---|
| **Ahmed, Zubair**<br><br>*United States v. Ahmed*, No. 07-CR-647, N.D. Ohio | • Guilty Plea<br>• Convicted on 1 count<br><br>**Statute(s)**<br>18 U.S.C. §2339A (Providing Material Support to Terrorists) | **120 months** imprisonment<br><br>**Relevant Facts:** conspired with numerous individuals to joint violent jihad overseas against U.S. military, primarily in Afghanistan; traveled to Egypt in furtherance; while in U.S., sought to obtain heavy firearms and sniper rifles; conspirators traveled to Pakistan; amassed jihadist written materials and videos; |
| **Ali, Qasim**<br><br>*United States v. Ul Haq*, No. CR-11-056, D.D.C | • Guilty Plea<br>• Convicted on 1 count<br><br>**Statute(s)**<br>18 U.S.C. §2339B(a)(1) (Conspiracy to Provide Material Support to a Foreign Terrorist Organization) | **40 months** imprisonment<br><br>**Relevant Facts:** smuggling member of Pakistani Taliban from Pakistan into the United States |

| | | |
|---|---|---|
| **Aref, Yassin**<br><br>*United States v. Aref,* No.04-cr-00402, N.D.N.Y. | • Jury Trial<br>• Convicted on 11 counts<br><br>**Statute(s):**<br>18 U.S.C. § 1956(h) (Conspiracy to Launder Funds)<br>18 U.S.C. § 1956(a)(3)(B) (Conceal/Disguise Nature of Property Believed to be Proceeds of Unlawful Activity)<br>18 U.S.C. § 2339A (Providing Material Support to Terrorists)<br>18 U.S.C. § 2339B (Providing Material Support/Resources to Designated Foreign Terrorists Organizations)<br>18 U.S.C. § 1001 (False Statement) | **180 months** imprisonment (combination of concurrent 151 month and 180 month imprisonment terms)<br><br>**Relevant Facts:** Aref conspired to conceal funds he believed to have come from the sale of a surface-to-air missile to Jaish-e-Mohammed ("JEM"), which he believed was to be used in an imminent terrorist attack in New York. Aref was to witness and guarantee the funds advanced by his co-defendant. Aref also laundered money, attempted to provide material support to JEM, and lied to the FBI about his connection to a known terrorist. |

| | | |
|---|---|---|
| **Boyd, Dylan**<br><br>*United States v. Boyd*, No. 09-CR-216, E.D. N.Car | • Guilty Plea<br>• Convicted on 1 count<br><br>**Statute(s):**<br>18 U.S.C. § 371 & 2339A (Conspiracy to Provide Material Support to Terrorists) | **96 months** imprisonment<br><br>**Relevant Facts:** numerous travels abroad to support jihadist movement; supporting jihad in Israel, Jordan, Kosovo and Pakistan |
| **Boyd, Zakariya**<br><br>*United States v. Boyd*, No. 09-CR-216, E.D. N.Car | • Guilty Plea<br>• Convicted on 1 count<br><br>**Statute(s):**<br>18 U.S.C. § 371 & 2339A (Conspiracy to Provide Material Support to Terrorists) | **108 months** imprisonment<br><br>**Relevant Facts:** numerous travels abroad to support jihadist movement; supporting jihad in Israel, Jordan, Kosovo and Pakistan |

| Chandia, Ali Asad *United States* v. *Chandia,* No. 05-cr-00401, E.D.Va. | • Jury Trial<br>• Convicted on 3 counts<br><br>**Statute(s):**<br>18 U.S.C. § 371 & 2339A (Conspiracy to Provide Material Support to Terrorists (Lashkar-e-Taiba - "LET")<br>18 U.S.C. § 2339B (Conspiracy to Provide Material Support to a Designated Foreign Terrorist Organization (Lashkar-e-Taiba - "LET")<br>18 U.S.C. § 2339B (Material support to a designated foreign terrorist organization) | **180 months** imprisonment<br><br>**Relevant Facts:** Chandia provided material support to a LET operative in the U.S. by picking the operative up from the airport, providing internet and e-mail access for procuring military-purpose equipment for LET for use in its violent jihad against India, and shipping paintball supplies to Pakistan for use in LET training operations. |

| **El-Hindi, Marwan**<br><br>*United States v. Amawi*, No. 06-CR-719, N.D. Ohio | • Jury Trial<br>• Convicted on 4 counts<br><br>**Statute(s):**<br>18 U.S.C. §956(a)(1) (Conspiracy to Kill, Kidnap, Maim or Injure Persons Outside the United States)<br>18 U.S.C. § 2339A (Conspiracy to Provide Material Support to Terrorists)<br>18 U.S.C. §842(p)(2)(A) (Distribution of Information Regarding Explosives) | **144 months** imprisonment<br><br>**Relevant Facts:**<br>He and his co-defendants taught themselves how to make and use explosives; conducted their own training exercises; shared often graphic jihadist videos and materials on the internet, including on how to make a suicide bomber's vest; tried to provide computers and explosives to mujahideen fighters overseas and attempted to set up a false company that would funnel money; discussed possible targets for their violent jihad, ultimately agreeing that they should go after U.S. soldiers in Iraq. |

| El-Mezain, Mohammed<br><br>*United States v. Holy Land Foundation*, No. 04-CR-240, N.D. Tex | • Jury Trial<br>• Convicted on 1 count<br><br>**Statute(s):**<br>18 U.S.C. § 2339B (Conspiracy to Provide Material Support/Resources to Designated Foreign Terrorists Organizations) | **180 months** imprisonment<br><br>**Relevant Facts:**<br>El-Mezain conspired to provide material support to a designated foreign terrorist organization for his role in HLF, which funded Hamas in its goal of creating an independent Palestinian State by way of violent jihad against the State of Israel. |

| | | |
|---|---|---|
| **Elashi, Basman Elashi, Bayan Elashi, Ghassan Elashi, Hazim Elashyi, Ihsam**<br><br>*United States v. Elashi/Elashyi,* No. 02cr052, N.D. Tex. | • Jury Trial<br>• Basman Elashi convicted on 26 counts<br>• Bayan Elashi convicted on 33 counts<br>• Ghassan Elashi convicted on 21 counts<br>• Hazim Elashi convicted on 10 counts<br>• Thsarn Elashyi convicted on 15 counts<br><br>**Statute(s):**<br>18 U.S.C. § 371 & 50 U.S.C. 1701 - 1706 (Conspiracy to Violate the Export Administration Regulations and Libyan Sanctions Regulations)<br>50 U.S.C. § 1701-1706 & 18 U.S.C. § 2 (Export Violations and Aiding and Abetting Lybia and Syria)<br>18 U.S.C. §§ 1001 & 2 (False Statement and Aiding and Abetting)<br>18 U.S.C. §§ 1957 & 2 (Money Laundering and Aiding and Abetting)<br>18 U.S.C. §§ 371 & 2 (Conspiracy to File False Shipper's Export Declaration Forms and Aiding and Abetting)<br>18 U.S.C. § 371 & 50 U.S.C. §§ 1701-1706 (Conspiracy to Deal in the Property of a Specially Designated Terrorist)<br>50 U.S.C. §§ 1701-1706 & 18 U.S.C. § 2 (Dealing in the Property of a Specially Designated Terrorist and Aiding and Abetting)<br>18 U.S.C. §§ 371 & 1956(h) (Conspiracy to Commit Money Laundering) | Basman Elashi: **80 months** imprisonment<br>Bayan Elashi: **84 months** imprisonment<br>Ghassan Elashi: **80 months** imprisonment<br>Hazirn Elashi: **66 months** imprisonment<br>Thsan Elashyi: **72 months** imprisonment<br><br>**Relevant Facts:**<br>The Elashi brothers ran Infocom Corp., which was engaged in illegally shipping computer goods to Libya and Syria for the purposes of financing terrorist organizations. Bayan Elashi and Ghassan Elashi also laundered money in connection Infocom's operations. |

| | | |
|---|---|---|
| **Elzahabi, Mohamad**<br><br>*United States v. Elzahabi*, CR 04-282, D.Minn | • Jury Trial<br>• Basman Elashi convicted on 3 counts<br><br>**Statutes**<br>18 U.S.C. §1546(a) (Possession of Fraudulent Immigration Documents) | **44 months** imprisonment<br><br>**Relevant Facts:** taught sniper training at Al Qaeda camps |
| **Hamdan, Salim Ahmed**<br><br>Military Tribunal, Guantanamo Bay | • Military Commission<br>• Convicted on 1 count<br><br>**Statute(s):**<br>10 U.S.C. § 950 v(b )(28) (providing Material Support to Terrorism) | **66 months** imprisonment<br><br>**Relevant Facts:** Hamdan provided material support to terrorists in his role as Usama bin Laden's driver and bodyguard, had knowledge of al-Qaeda' s goals, and knew that, by providing said services or transportation, he was directly facilitating communications and planning for acts of terrorism. |

| | | |
|---|---|---|
| **Hammoud, Chawki**<br><br>*United States* v. *Hammoud*, No. 00-cr-00147, W.D.N.C. | • Jury Trial<br>• convicted on 7 counts<br><br>**Statute(s):**<br>8 U.S.C. § 1325 (Illegal Entry, Concealment of Facts)<br>18 U.S.C. § 1546 (Fraud and Misuse of Visas/Permits)<br>18 U.S.C. § 2342 (Trafficking in Contraband Cigarettes)<br>18 U.S.C. § 1956-4999 (Money Laundering - Fraud, Other)<br>18 U.S.C. § 1956-3300 (Money Laundering - Interstate Commerce)<br>18 U.S.C. § 1029(B) (Attempt)<br>18 U.S.C. §§ 1029(A) and 2 (produces/traffics in Counterfeit Device)<br>18 U.S.C. § 1962-9999 (Federal Statutes, Other)<br>18 U.S.C. § 2339(A) (providing Material Support to Terrorists)<br>18 U.S.C. §371 (Conspiracy to Defraud the United States) | **51 months** imprisonment<br><br>**Relevant Facts:**<br>He ran a cigarette-smuggling ring that funneled profits to Hezbollah. He was charged with racketeering counts alleging membership in a Hezbollah support cell. |

| | | |
|---|---|---|
| **Hicks, David**<br><br>*United States v. David Hicks*, Military Tribunal, Guantanamo Bay | • Plea Agreement<br>• convicted on 1 count<br><br>18 U.S.C. § 2339(A) (providing Material Support to Terrorists) | **9 months** imprisonment (84 months with 75 suspended)<br><br>**Relevant Facts:** attended numerous Al Qaeda camps in Afghanistan;  met with Osama bin Laden; joined armed guards fighting against U.S. and coalition forces at Qandahar Airport; traveled to Konduz and joined John Walker Lindh and others in combat against coalition forces. |
| **Hossain, Mohammad**<br><br>*United States* v. *Aref*, No.04-cr-00402, N.D.N.Y. | • Jury Trial<br>• Conviction on all 27 counts<br><br>**Statute(s):**<br>18 U.S.C. § 1956(h) (Conspiracy to Launder Funds)<br>18 U.S.C. § 1956(a)(3)(B) (Conceal/Disguise Nature of Property Believed to be Proceeds of Unlawful Activity)<br>18 U.S.C. § 2339A (Providing Material Support to Terrorists)<br>18 U.S.C. § 2339B (Providing Material Support/Resources to Designated Foreign Terrorists Organizations)<br>18 U.S.C. § 1001 (False Statement) | **151 months** imprisonment on counts 1-11 and **180 months** on counts 12-27, concurrent<br><br>**Relevant Facts:** Hossain agreed to finance the sale of a surface-to-air missile to Jaish-e-Moharnned ("JEM"), which he believed was to be used in an imminent terrorist attack in New York. |

| **Jayyous, Kifah Wael**<br><br>*United States* v. *Hassoun,* No. 04-60001-CR, S.D. Fla. | • Jury Trial 152 months<br>• Convicted on 3 counts<br><br>**Statutes:**<br>18 U.S.C. § 956 (Conspiracy to Injury Property of Foreign Government)<br>18 U.S.C. § 371 (Conspiracy to Defraud the United States) incarceration)<br>18 U. S. C. § 2339 A (providing Material Support to Terrorists) | **152 months** imprisonment<br><br>**Relevant Facts:** Jayyousi conspired to murder, kidnap, and maim persons in foreign country. Along with his co-defendants, he was "part of a North American support cell designed to send money, physical assets, and mujahideen recruits to overseas jihad conflicts ... support[ing] and coordinat[ing] with other support networks and mujahideen groups waging violent jihad. |
| **Maldonado, Daniel**<br><br>*United States* v. *Maldonado,* No. 07-124, S.D. Texas | • Plea Agreement<br>• convicted on 1 count<br><br>18 U.S.C. § 2339D (Receiving Military Training From Foreign Terrorist Organization) | **120 months** imprisonment<br><br>**Relevant Facts:** moved to Egypt; then traveled to Somalia to practice "true Islam"; participated in Al Qaeda jihadist training program in weapons and explosives; offered to act as suicide bomber |

| Mazloum, Wassim | • Jury Trial<br>• Convicted on 2 counts | **100 months** imprisonment |
| --- | --- | --- |
| *United States v. Amawi*, No. 06-CR-719, N.D. Ohio | **Statute(s):**<br>18 U.S.C. §956(a)(1) (Conspiracy to Kill, Kidnap, Maim or Injure Persons Outside the United States)<br>18 U.S.C. § 2339A (Conspiracy to Provide Material Support to Terrorists) | **Relevant Facts:** He and his co-defendants taught themselves how to make and use explosives; conducted their own training exercises; shared often graphic jihadist videos and materials on the internet, including on how to make a suicide bomber's vest; tried to provide computers and explosives to mujahideen fighters overseas and attempted to set up a false company that would funnel money; discussed possible targets for their violent jihad, ultimately agreeing that they should go after U.S. soldiers in Iraq. |

| **Mubayyid, Muhamed**<br><br>*United States* v. *Mubayyid et al,* No.05-40026, D. Mass. | • Jury Trial<br>• Convicted on 6 counts<br><br>**Statute(s):**<br>18 USC § 1001(a)(1) (Scheme to Conceal Material Facts)<br>26 USC § 7206(1) (False Tax Return)<br>26 USC § 7212(a) (Obstruction and Impeding the IRS) | **11 Months** imprisonment<br><br>**Relevant Facts:** Mubayyid and his co-defendants fraudulently used Care International, a purported charitable organization, collecting approximately $1.7M in tax deductible donations for supporting and promoting the mijahideen and jihad. |

| | | |
|---|---|---|
| **Patterson, Gregory**<br><br>*United States v. James et al,* No 05-214, C.D. Cal. | • Guilty Plea<br>• Convicted on 2 counts<br><br>**Statute(s):**<br>18 USC § 2384 (Conspiracy to Levy War Against the United States Government Through Terrorism)<br>18 USC § 924(c) (Using and Carrying a Firearm in Connection with a Crime of Violence) | **151 months** imprisonment (91 months on Count 1 with 60 months on Count 5 running consecutively)<br><br>Kevin James, Levar washington, Gregory Patterson, Hammad Samana were indicted on terrorism charges related to conspiracy to attack military facilities in the Los Angeles area and of attempting to fund their campaign by robbing gas stations in Southern California over the previous three months. Kevin James, a Muslim convert, was accused of founding a radical Islamic group called J.I.S (Jam'iyyat Ul-Islam Is-Saheeh, Arabic for "Assembly of Authentic Islam") from his cell in Folsom Prison in California, and of recruiting fellow inmates to join his |

| | | |
|---|---|---|
| **Samana, Hammad**<br><br>*United States v. James et al,* No 05-214, C.D. Cal. | • Guilty Plea<br>• Convicted on 1 count<br><br>**Statute(s):**<br>18 USC § 2384 (Conspiracy to Levy War Against the United States Government Through Terrorism) | **70 months** imprisonment<br><br>co-defendant to Gregory Patterson (*see above*) |
| **Stewart, Lynne**<br><br>*United States v. Sattar,* No. CR-02-395, S.D.N.Y. | • Jury Trial<br>• Convicted on 5 counts<br><br>**Statute(s)**<br>18 U.S.C. §371 (Conspiracy to Defraud the United States)<br>18 U.S.C. §371 (Conspiracy to Provide Material Support to Terrorists)<br>18 U.S.C. §2339A (Providing material support to Terrorists)<br>18 U.S.C. §1001 (Making False Statements) | **120 months** imprisonment<br><br>**Relevant Facts:** conspiring, in role of defense attorney, to smuggle messages in and out of prison to Sheikh Omar Abdel Rahman regarding terrorist operations |
| **Ul Haq, Irfan**<br><br>*United States v. Ul Haq,* No. CR-11-056, D.D.C | • Guilty Plea<br>• Convicted on 1 count<br><br>**Statute(s)**<br>18 U.S.C. §2339B(a)(1) (Conspiracy to Provide Material Support to a Foreign Terrorist Organization) | **50 months** imprisonment<br><br>**Relevant Facts:** smuggling member of Pakistani Taliban from Pakistan into the United States |

| | | | |
|---|---|---|---|
| **Warsame, Mohamed**<br>*United States v. Warsame*, No. CR-04-29, D.Minn. | • guilty plea<br>• convicted on one count<br><br>**Statute(s):**<br>18 U.S.C. §2339B (Conspiracy to Provide Material Support to Terrorists) | | **92 months** imprisonment<br><br>**Relevant Facts:** traveled to Afghanistan; attended Al Qaeda training camps; also traveled to Pakistan; met with Richard Reid, Zacarias Moussaou and Usama bin Laden;  studied Islam |
| **Yousaf, Zahid**<br><br>*United States v. Ul Haq*, No. CR-11-056, D.D.C | • Guilty Plea<br>• Convicted on 1 count<br><br>**Statute(s)**<br>18 U.S.C. §2339B(a)(1) (Conspiracy to Provide Material Support to a Foreign Terrorist Organization) | | **36 months** imprisonment<br><br>**Relevant Facts:** smuggling member of Pakistani Taliban from Pakistan into the United States |

Fawzi Assi, who actually acquired night vision goggles and other things to deliver to Hezbollah, was sentenced to 10 years. *United States v. Assi*, 512 F.Supp.2d 1047 (E.D. Mich 2007).

Mr. Brice did not travel to train or attempt to train in a terrorist training camp. He did not purchase sophisticated missiles and weaponry or build large-scale destructive devices several of the above-named defendants did.  Mr. Brice was not a highly-qualified explosives expert who could provide professional skillful training to

terrorists.  He was a self-taught kid who almost killed himself when his amateurish pipe-bomb prematurely detonated.  He did not have any association with or attempt to have an association with a designated terrorist organization or any known terrorist.  He did not illegally ship or attempt to ship any products anywhere, or launder or attempt to launder funds to anyone.  He talked about explosives on the internet with an anonymous individual who was at best ambiguous about how that information would be used.  And the information that Mr. Brice provided to that anonymous individual was readily available on the internet.

Several of these other cases warrant particular attention.

**Salim Ahmed Hamdan - 66 Months Imprisonment.**

Salim Ahmed Hamdan, born in 1970, is a Yemeni citizen.[8] In November 2001, during hostilities between the United States and the Taliban, who then governed Afghanistan, Hamdan was captured by militia forces and turned over to the United States military. In June 2002, he was transported to Guantanamo Bay.[9]  A year later President Bush declared Hamdan eligible for trial by military commission for "then-unspecified crimes." After another year passed, Hamdan was charged with

---

[8]

Mahler, Jonathan (2006-01-08) "The Bush Administration vs. Salim Handan". *New York Times.*

[9]    *Hamdan v. Rumsfeld,* 548 U.S. 557, 566 (2006).

one count of conspiracy "to commit ... offenses triable by military commission."[10]



As stated in relevant part in the original charging document:

     a.    In 1996, Hamdan met Usama bin Laden in Qandahar, Afghanistan and ultimately became a bodyguard and personal driver for Usama bin Laden. Hamdan served in this capacity until his capture in November of 2001. Based on his contact with Usama bin Laden and members or associates of al Qaida during this period, Hamdan believed that Usama bin Laden and his associates were involved in the attacks on the U.S. Embassies in Kenya and Tanzania in August 1998,

[10] *Id.*

SENTENCING MEMORANDUM- 144

1
2
3
4
5
6
7



8    the attack on the USS Cole in October 2000,

9
10
11
12
13
14
15
16
17    and the attacks on the United States on September 11, 2001.

   b.  From 1996 through 2001, Hamdan:

18
     1)  delivered weapons, ammunition or other supplies to al Qaida
19
       members and associates;
20
     2)  picked up weapons at Taliban warehouses for al Qaida use and

delivered them directly to Saif al Adel, the head of al Qaida's

security committee, m Qandahar, Afghanistan;

3)    purchased or ensured that Toyota Hi Lux trucks were available

for use by the Usama bin Laden bodyguard unit tasked with

protecting and providing physical security for Usama bin Laden;



and

4)    served as a driver for Usama bin Laden and other high ranking al

Qaida members and associates. At the time of the al Qaida

sponsored attacks on the U.S. Embassies in Tanzania and Kenya

in August of 1998, and the attacks on the United States on

September 11, 2001, Hamdan served as a driver in a convoy of

three to nine vehicles in which Usama bin Laden and others were

transported to various areas in Afghanistan. Such convoys were

1          utilized to ensure the safety of Usama bin Laden and the others.

2          Bodyguards in these convoys were armed with Kalishnikov

3          rifles, rocket propelled grenades, hand-held radios and handguns.

4    c.    On diverse occasions between 1996 and November 2001, Hamdan

5          drove or accompanied Usama bin Laden to various al Qaida-sponsored

6          training camps, press conferences, or lectures. During these trips,

7          Usama bin Laden would give speeches in which he would encourage

8          others to conduct "martyr missions" (meaning an attack wherein one

9          would kill himself as well as the targets of the attack) against the

10         Americans, to engage in war against the Americans, and to drive the

11         "infidels" out of the Arabian Peninsula.

12   d.    Between 1996 and November 2001, Hamdan, on diverse occasions

13         received training on rifles, handguns and machine guns at the al Qaida-

14         sponsored al Farouq camp in Afghanistan.[11]

---

[11]

Charge Sheet, *United States v. Salim Ahmed Hamdan,* 3; see also, *Hamdan,* at 570.

SENTENCING MEMORANDUM- 147



Hamdan challenged prosecution by military commission, which ultimately resulted in the Supreme Court finding that the military commission lacked power to proceed in the prosecution of Hamdan, it violated the Geneva Convention[12] and the charge of conspiracy was not a cognizable offense against the laws of war.[13]

In the mean time, one of the Combatant Status Review Tribunals convened to

---

[12]      *Id.* at 567.

[13]      *Id.* at 600-01.

determine whether Hamdan was an enemy combatant. A Summary of Evidence memo was prepared for the tribunal, listing the alleged facts that led to his detention.[14]  The memo accused Hamdan in relevant part, of serving as a personal driver to Usama Bin Laden both before and after the September 11, 2001 attacks. As a personal bodyguard to bin Laden, Hamdan was armed with a weapon. As a driver and bodyguard, Hamdan gained a substantial amount of knowledge about al Qaida operations and came in contact with some very highly-placed al Qaida officials including Abu Hafs, Saif Al Adel and Abu Zabaydah. When Hamdan was captured in a vehicle by Northern Alliance forces near Kandahar, he was in possession of weapons.[15]

　　After the Supreme Court delivered its opinion, Congress passed the Military Commissions Act of 2006. In the interim, Hamdan tried to work out a deal for a ten-year term of imprisonment, but that offer was rejected by the prosecution.[16]  The charges against Hamdan were expanded from mere conspiracy to include a charge of

---

[14]

　　OARDEC (16 September 2004). "Summary of Evidence for combatant Status Review Tribunal- Hamdan, Salim Ahmed Salim." United States Department of Defense, 48.

[15]　　*Id*.

[16]

　　White, Josh and Branigan, William (2008-11-25) "Hamdan To Be Sent To Yemen". *The Washington Post.*

providing support for terrorism, and on December 21, 2007, the Combatant Status Review Tribunal ruled that Hamdan was an "illegal enemy combatant", who would be tried by a military commission.

Hamdan's trial began on July 21, 2008. During trial, the prosecution attempted to portray Hamdan as a hardened al Qaeda warrior. The jury of six military officers, convicted him of supporting al Qaeda by driving and guarding bin Laden and ferrying weapons for the terror group.  At the time of sentencing, prosecutors sought a 30-year term of imprisonment. The military jury, unconvinced that Hamdan was anything more than a low-level al Qaeda figure, returned with a sentence of 66 months, a mere five months longer than the 61 months he had already served.[17]

Unlike Hamdan, Joseph Brice was never tasked with carrying out sensitive activities such as delivering weapons, purchasing equipment or being around operatives planning an attack.  He certainly never sought out Usama bin Laden, or worked with someone of that stature.

**Lynne Stewart- 120 Months Imprisonment.**

On February 10, 2005, after a lengthy trial, a jury found Lynne Stewart guilty of all counts of the superceding indictment charging her in Count 1 with conspiracy to defraud the United States; Count 4 with conspiracy to provide and conceal

---

[17] *Id.*

1   material support to be used in preparation of the conspiracy charged in Count 2 -

2   murdering persons in a foreign country; Count 5, the substantive count of providing

3   and concealing material support to the conspiracy charged in Count 2; Counts 6 & 7

4   with making false statements.

5       The indictment alleged that from June 1997 through April 2002, Stewart,

6   Sheikh Omar Abdel Rahman and others named and unnamed conspired to defraud

7   the United States by obstructing the Department of Justice and the Bureau of Prisons

8   in the administration and enforcement of the Special Administrative Measures

9   ("SAM's") applicable to inmate Sheikh Abdel Rahman.



In his Opinion                                    & Order, Judge

Koeltl found, in response to Stewart's motion for judgment of acquittal, that a rational jury could find that Stewart and her co-defendants knew of the existence of the SAMs severely limiting Abdel Rahman's ability to communicate with others, and violated the SAMs by smuggling messages to and from Abdel Rahman. One such message smuggled to Abdel Rahman questioned whether he wished to withdraw support of a cease fire. Under the cease fire, the cell had suspended terrorist operations in Egypt in an effort to persuade the Egyptian government to release cell leaders, members and associates who were in prison in Egypt. The judge found that a jury could reasonably find that Stewart disseminated his statements to the media announcing Abdel Rahman's withdrawal of support of the cease-fire,[18] hence calling for a resumption of terrorist operations.[19]

Prior to one of Stewart's visits to Abdel Rahman, co-defendant Sattar had received a letter from two individuals who requested an opinion from Abdel Rahman whether the group should form a political party in Egypt. It was found that this information was relayed to Abdel Rahman by Stewart during one of the attorney/client visits.[20]

---

[18] Opinion & Order, *United States v. Sattar, et al..,* S1 02 cr. 395 (JGK)(S.D.N.Y. October 24, 2005), 8-9.

[19] *Id.* at 10.

[20] *Id.*

During another visit, it was found that Stewart smuggled into the facility a letter from Abdel Rahman's son which the interpreter covertly read to Abdel Rahman. During this same visit, the interpreter told Abdel Rahman that the U.S.S. Cole had been bombed on Abdel Rahman's behalf.[21]

The transfer of information between Abdel Rahman and "The Islamic Group" had international consequences, far exceeding the sharing of readily-available information obtainable from a multitude of websites.  At sentencing, the government argued for a 30-year term of imprisonment.

**David Hicks- 9 Months Imprisonment (84 Months with 75 Months Stayed)**

David Hicks, nicknamed the "Australian Taliban" is an Australian native who was detained by the United States at Guantanamo Bay. In March, 2007, the government released a charge sheet against Hicks setting forth the allegations of conspiracy, attempting murder by an unprivileged belligerent, and aiding the enemy. The overt acts set forth in the conspiracy charge are as follows:

a.  On or about January 2001, Hicks, with funding and a letter of introduction provided by LET [a terrorist organization known as Lashkar e Tayyiba], traveled to Afghanistan to attend al Qaida terrorist training camps.  Upon arriving in Afghanistan, Hicks went to an al

---

[21]  *Id*. at 16-17.

1    Qaida guest house, where he met Ibn Sheikh al Libi, a top ranking al

2    Qaida member, and others. Hicks turned in his passport and indicated

3    that he would use the *kunya,* or alias, "Muhammed Dawood."

4  b.    Hicks then traveled to and trained at al Qaida's al Farouq camp located

5    outside Qandahar, Afghanistan. In al Qaida's eight-week basic training

6    course, Hicks trained in weapons familiarization and firing, land mines,

7    tactics, topography, field movements, and basic explosives.



c.  On or about April 2001, Hicks returned to al Farouq and trained in al Qaida's guerilla warfare and mountain tactics training course. This seven-week course included: marksmanship; small team tactics; ambush; camouflage; rendezvous techniques; and techniques to pass intelligence to al Qaida operatives.

d.  While Hicks was training at al Farouq, Usama bin Laden visited the camp on several occasions. During one visit, Hicks questioned bin Laden regarding the lack of English al Qaida training material; accepting bin Laden's advice, Hicks began to translate the training camp materials from Arabic to English.

e.  After Hicks completed his first two al Qaida training courses, Muhammad Atef, then the military commander of al Qaida, summoned and interviewed Hicks about his background and the travel habits of Australians.  At the conclusion of this meeting, Muhammed Atef recommended Hicks for attendance at Al Qaeda's urban tactics training course at Tarnak Farm.

f.  On or about June 2001, Hicks traveled to Tarnak Farm and participated in this course. A mock city was located inside the camp, where trainees were taught how to fight in an urban environment. Training also included: marksmanship; use of assault and sniper rifles; rappelling; kidnaping techniques; and assassination methods.

g.   On or about August 2001, Hicks participated in an advanced al Qaida course on information collection and surveillance in an apartment in Kabul, Afghanistan. This course included "practical application" where Hicks and others conducted surveillance of various targets in Kaul, including the U.S. and British embassies and submitted reports.

h.   Following the information collection and surveillance course, Muhammed Atef again interviewed Hicks, and asked if he would be willing to undertake a "martyr mission," meaning an attack wherein Hicks would kill himself as well as the targets of the attack.

i.   At an al Qaida guest house in Qandahar, as well as at al Qaida training camps and other locations in Afghanistan, Hicks received instruction from al Qaida associates on their interpretation of lslam, the meaning and obligations of jihad, and other topics.

j.   On or about early September 2001, Hicks traveled to Pakistan to visit a friend. After watching television footage of the September 11, 2001 attacks on the United States, Hicks returned to Afghanistan to rejoin his al Qaida associates.

k.   Arriving in Qandahar, Afghanistan, Hicks reported to Saif al Adel, who was assigning individuals to locations where they were to fight alongside other al Qaida associates against U.S. and Coalition forces. Give a choice of three different locations, Hicks chose to join a group of

al Qaida fighters near Qandahar Airport.  Armed with an AK-47 automatic rifle, ammunition, and grenades, Hicks traveled with his al Qaida associates to the Qandahar Airport.

l.      On or about October 2001, after Coalition bombing operations commenced, Hicks joined an armed group outside the airport, where they guarded a Taliban tank.

m.      After guarding the tank for approximately one week, Hicks, still armed with the AK -4 7 rifle, ammunition, and grenades, traveled with an LET acquaintance to Konduz, Afghanistan, arriving around November 9, 2001. There, he joined others, including John Walker Lindh, who were engaged in combat against Coalition forces.[22]

He was also charged with attempting to murder diverse persons by "directing small arms fire, explosives, and other means intended to kill American, British, Canadian, Australian, Afghan, and other Coalition forces, while he did not have combat immunity.[23]

---

[22]      *United States v. David Mathew Hicks,* charge sheet as reported at www.defenselink.mil/news/d20070301hicks.pd.

[23]      *Id.*

On March 26, 2007, Hicks entered a guilty plea to the charge of material support. Unlike Mr. Brice, who only provided access to information already readily available elsewhere, David Hicks received advanced, specialized training in weaponry, explosives, kidnaping, sniper shooting and other extremely violent specialities. On March 31, 2007, a United States military tribunal imposed a 7 -year prison sentence but suspended all but nine months of that sentence.[24] Hicks has since returned to Australia.

**Mohamad Kamal Elzahabi– Time Served (44 Months)**

Mohamad Kamal Elzahabi was charged in a Superseding Indictment with various counts of making false statements and possession of fraudulent immigration

---

[24]    www.npr.org/templates/story.php?storyiD=9248761.

documents. Ezahabi proceeded to trial on Counts 3, 4 and 5; Counts 1 and 2 having been severed prior to trial. The jury convicted on all three counts. On March 14, 2008, Elzahabi appeared for sentencing.  At the time, the government sought an upward departure claiming Elzahabi was a terrorist and "has admitted to serious acts of terrorism and violence, ..."[25]  The government sets forth at length Elzahabi's terrorist activities as provided below:

> [He] has been identified both by his own admission and by third party sources as a terrorist trainer and well-known sniper. Beginning on April16, 2004, Elzahabi participated in 17 days of voluntary debriefings with special agents of the FBI. In the course of his statements to the FBI, Elzahabi admitted to two trips to Afghanistan, to serving as a sniper against the Russians and providing training at Khalden Camp, to knowing and working with Abu Zubeydah and Abu Musab al Zarqawi, to providing training to Bassam Janj's group and other fighters in Lebanon, and to traveling to Chechnya and serving as a sniper there, where he admitted to shooting at least one Russian solder. It is also believed that he functioned as a repacker and reshipper to Abdullah Al-Malki, anal Qaeda procurement official, when living in New York in approximately 1995-96, and that he assisted Ri'ad Hijazi, now convicted and imprisoned in Jordan for his role in the failed Millennium plot to destroy tourist sites and hotels in the Middle East, to obtain a driver's licence, when they both lived in Massachusetts in 1997.
>
> During the course of the FBI interview, Elzahabi admitted fighting with and training armed Islamic groups in Afghanistan, training the armed Islamic group the Al-Dinnayyah Rebels in Lebanon, and fighting in Chechnya. Specifically, Elzahabi admitted that, in early 2000, he delivered nearly $300,000 to the leaders of a Chechen terrorist group and that he fought with them as a sniper against Russian forces. Elzahabi admitted having personal contact with both Ibn Khattab and Shamil Besayev, leaders of the Checken liberation movement, who have committed numerous acts of terrorism in and around Russia. Finally, Elzahabi admitted taking part in multiple ambushes of Russian solders and, in his role as a sniper, shooting and

---

[25]    Position of the United States with Respect to Sentencing, *United States v.*

*Mohamad Kamal Elzahabi,* Crim. No. 04-282 (JRT/FLN), 2.

1   killing specific Russian soldiers.

2           In addition, as set out in an affidavit a copy of which has been
    submitted to probation, Elzahabi has been identified by an individual
3   associated withal Qaeda (CS-1) as a very well-known sniper who assisted in
    the teaching of sniper skills at an assassination course run at anal Qaeda
3   training camp located in Afghanistan. Another individual (CS-2), also
    associated withal Qaeda, identified Elzahabi as a jihad fighter in Afghanistan
4   during 1990-1992, who suffered serious wounds in combat. This individual
    understood that Elzahabi had also been in combat in Lebanon's civil war. .. In
5   short, Elzahabi has a long history of activities as a *jihadi* and terrorist.[26]

6
    These allegations by the government– actual, specific and exceedingly
7
    violent jihadi activities – are in stark contrast to Mr. Brice's use of his home
8
    computer.  The Court sentenced Elzahabi to time served, which constituted a
9
    sentence of approximately 44 months.
10

11  **Jose Padilla- 208 Months**

12      The most egregious charge and conviction against Jose Padilla is conspiracy
13  to murder, maim and kidnap persons overseas in violation of 18 U.S.C. § 956(a)(1 ).
14  Padilla was tasked by his al Qaeda handlers to use explosives to destroy apartment
15  buildings in the United States. He completed the intensive training in Afghanistan
16  necessary to effect his task, including explosives training.
17

18

19

20
    _____

    [26]   *Id*. at 2-4.

In                                                        contrast,
Joseph Brice surfed the internet.

The government sought a sentence of life.[27]  Padilla was sentenced to a 208-month term of imprisonment.[28]  The Fifth Superseding indictment alleged as follows:

> It was a purpose and object of the conspiracy to advance violent jihad, including supporting and participating in armed confrontations in specific locations outside the United States, and committing acts of murder, kidnaping and maiming, for the purpose of opposing existing governments ...

---

[27]    Govermnent's Sentencing Memorandum and Response to Defendant's Objections to the Presentence Investigation Reports, 1; *United States v. Jassoun, Jayyousi, Padilla,* 04-cr-60001-MGC, document 1280, Entered on FLSD Docket 11/29/2007.

[28]    FLSD Docket, *United States v. Padilla,* 04-60001-MGC.

1    As set forth in the government's brief in *Padilla v. Hanft,* 545 U.S. 1123, 125

2  S.Ct. 2906 (2005):

3    In 2001, Mohamed Atef, a senior al Qaeda operative, asked petitioner to
undertake a mission to blow up apartment buildings in the United States. Rapp

4  Decl. para. 11. Petitioner agreed to the mission and received further training
from an al Qaeda explosives expert. *Ibid.*

5    When the United States commenced combat operations against the
Taliban and al Qaeda, petitioner and other al Qaeda operatives moved from

6  safehouse to safehouse in Afghanistan to avoid bombing or capture, and later
began moving towards Afghanistan's mountainous border with Pakistan in

7  order to evade United States forces and air strikes. Rapp Decl. para. 10.
Armed with an assault rifle, petitioner took cover with other operatives in a

8  network of caves and bunkers near Khowst, Afghanistan, and was eventually
escorted into Pakistan by Taliban personnel. *Ibid.*

9    Soon after entering Pakistan, petitioner met with senior Osama
bin Laden lieutenant Abu Zubaydah to discuss the possibility of conducting

10  terrorist operations in the United States. Rapp Decl. para. 10. Zubaydah sent
petitioner to Karachi, Pakistan, to meet with Khalid Sheikh Mohammad

11  (KSM), al Qaeda's operations leader. *Id.* para. 12. KSM suggested that
petitioner revive the plan to detonate apartment buildings, as petitioner had

12  initially discussed with Atef. *Ibid.* Petitioner accepted the assignment, and
KSM gave him full authority to conduct the operation. *Ibid.*  Before departing

13  for the United States, petitioner received training from Ramzi Bin al-Shibh, a
senior al Qaeda operative, on the secure use of telephones and e-mail

14  protocols. *Ibid.* Al Qaeda operatives also gave petitioner $15,000, travel
documents, a cell phone, and an e-mail address to notify al Qaeda facilitator
Ammar al-Baluchi upon arrival in the United States. *Ibid.*

15    On May 8, 2002, petitioner flew from Zurich, Switzerland, to
Chicago's O'Hare International Airport, where he was detained and arrested in

16  the customs inspection area pursuant to a material witness warrant. Petitioner
had been monitored by FBI agents in the Zurich airport and on the plane.

17  Stipulations of Fact paras. 3, 6, 10. Petitioner was carrying $10,526 in
currency, the cell phone that he had been given, and the e-mail address that he

18  was to use to update al-Baluchi. Rapp Dech para. 13.[29]

19    _____
        [29]

20    Appellant's Petition, Motion, and Filing, 3-4, *Padilla v. Hanft,* 2005 WL

1112138, *4-*5 (May 9, 2005).

SENTENCING MEMORANDUM- 162

In contrast to Joseph Brice, Padilla personally met with Al Qaeda's operational manager Khalid Shaikh Muhammad. Mr. Padilla engaged in protracted operations in conjunction with senior Al Qaeda operatives.

**John Walker Lindh- 240 Months**

John Walker Lindh, born on February 9, 1981, was captured as an enemy combatant during the Battle of Qala-i-Jangi, a violent Taliban prison uprising where American CIA officer Johnny "Mike" Spann was killed.

On November 24, a bright, warm Saturday, 300 Taliban soldiers who had fled the American bombardment of Kunduz, their last stronghold in the north of Afghanistan, laid down their weapons in the desert a few miles north of Mazar-i-Sharif. They surrendered to Northern Alliance General Abdul Rashid Dostrum, who crowed that his forces had achieved a "great victory" as the POWs were herded 50 at a time onto flatbed trucks.[30]

Things went wrong almost immediately. Once inside Qala-i-Jangi, a 19th century prison, the prisoners were individually searched. As the alliance commander approached one of the prisoners, the prisoner pulled out and detonated a grenade,

---

[30]

"Inside the Battle of Qala-1-Jangi" TIME, 1. This document can be found at www. time. com/time/nation/article/ /0.8599.186592.00 .html.

killing himself and the commander.[31]  The next day, two American CIA agents began interviewing the inmates, but did so *en masse* rather than individually.  They asked the inmates who they were and why had they joined the Taliban.  John Walker Lindh was questioned by the officers.  As shown on British Channel 4 news, Spann asked Lindh many questions, one of which was, "Are you a member of the IRA?"  Lindh refused to answer. Soon thereafter, the prisoners massed around the two men.  "'Why are you here,' Spann asked one. 'To kill you,' came the reply."  The inmate attacked Spann. Spann drew his gun, the other agent grabbed an AK-47 and the battle began.[32] The battle raged through the week.



---

[31]    *Id.*

[32]    *Id.*

SENTENCING MEMORANDUM- 164

By Monday morning the Alliance had established a new command post at the northeast tower on top of what an American commander described as "10 tons of munitions, rockets, mortars, the works."  A tank was driven onto the tower.  From his seat on the garrison roof, commander Mohammed Akbar guided mortar and tank fire to Taliban positions in the southwest. "Excellent-right on the nose!" he shouted, as bullets from Taliban snipers whizzed just over his head.[33]



By Tuesday, the Taliban forces were beginning to flag, but they persisted in their fight as best they could.

> Even in the heat of battle, warriors can be rational; few fight to the death. But the Taliban at Qala-i-Jangi truly did, and beyond it. Spann's body, recovered by a special-operations squad, had been booby-trapped; a grenade had been hidden under the corpse of a Taliban fighter that lay on top of the American. As late as Thursday, those removing bodies were still taking fire from Taliban

---

[33]    *Id*. at 2.

1
2
3

> fighters who had somehow survived in the basements underneath the fort.  On Saturday the basements were flooded; Northern Alliance observers expected perhaps five or six surviving Taliban to come out.  In fact, at 11 a.m. no fewer than 86 filthy and hungry prisoners emerged; ...[34]

John Walker Lindh, the "American Taliban," was one of those surviving Taliban soldiers.

On February 5, 2002, Lindh was indicted by a federal grand jury on ten charges:  Count 1 – conspiracy to murder U.S. citizens or U.S. nationals; Counts 2 and 4 – conspiracy to provide material support to a designated foreign terrorist organization; Counts 3 and 5 – providing material support; Count 6 – conspiracy to contribute services to al Qaeda; Count 7 – contributing services to al Qaeda; Count 8 – conspiracy to supply services to the Taliban;  Count 9 – supplying services to the Taliban; and Count 10 – using and carrying firearms and destructive devices during crimes of violence.[35]

In the face of a life sentence (*see,* 18 U.S.C. § 2332(b )), Lindh and the government reached a plea agreement.  On July 15,2002, Lindh pled guilty to supporting the Taliban and using a firearm or explosive device during a crime of violence. He received a twenty-year term of imprisonment.

John Lindh made a conscious decision to arm himself with grenades and guns,

---

[34]    *Id.* at 4.

[35]    Indictment, *United States v. John Phillip Walker Lindh.* This document can be found at www. usdoj .gov/ag/2ndindictment.htm.

to fight in Afghanistan with the Taliban and al Qaeda, still supporting the *jihadi* cause, even after 9/11.  He was present when a CIA officer was murdered and he continued to resist.  One must also remember that Lindh was sentenced just one year after the horrific attacks of 9/11 when the wounds were still fresh, emotions high and fear abounded.

The sentences outlined above span broadly from 9 months to 20 years in prison.  This is because the conduct involved in each case also spans broadly. Being convicted of a terrorism-related offense is simply not a rubber stamp for a maximum sentence as the government may claim.  In fact, post-*Booker*, there can be no rubber stamp sentences.  Each defendant and each defendant's conduct must be looked at individually. Mr. Brice's alleged conduct in this case, when compared to the conduct outlined above, simply does not fall at the high end of any sentencing calculation. To find otherwise would create an unwarranted sentencing disparity.

Some additional examples of downward departures based on a combination of factors include the following cases: *United States v. Blake,* 89 F. Supp. 2d 328 (E.D.N.Y. 2000) (here a 21 level departure was granted, based on a combination of factors);  *United States v. Gamez,* 1 F. Supp. 2d 176 (E.D.N.Y. 1998) (10 level departure based on a combination of factors);  *United States v. Blackwell,* 897 F. Supp. 586 (D.C. Cir 1995).

**Ehsanul Sadequee and Syed Haris Ahmed**

These two cases are important cases for comparison. *See United States v. Ehsanul Sadequee*, 06 CR-00147-WSD, Northern District Georgia, *United States v. Syed Harris Ahmed*, Docket No. 06-CR-147-WSD, Northern District Georgia. In the case of Sadequee, the government recommended a sentence far below the guidelines. Sadequee received a sentence of 17 years. Sadequee traveled overseas for training. Sadequee tried to join the Taliban in 2001 and was active on forums including Tibyan Publications where he was an administrator and translator. While he was in Bangladesh, he communicated with another co-conspirator, Younis Tsouli. He was accused of videotaping landmarks as potential targets around Washington D.C. and sending these videos to Tsouli. He also supported a group that sought to establish Al-Qaeda in Northern Europe and supported an individual who had explosives in his apartment when he was arrested. Sadequee was found guilty of several counts of providing material support and conspiracy to provide material support. His guideline sentence called for life in prison. The government sought a 20 year sentence stating that it served the deterrence purpose for both the defendant and others.

Sadequee reiterated his beliefs in Islam at his allocution. In pronouncing a sentence of 17 years, the Court told Sadequee that his conduct was "calculated and dangerous, cunning and disturbing." *United States v. Sadequee*, Docket No. 06-cr-00147-WSD, Transcript of Sentencing Proceedings before Hon.William S. Duffey, Jr., U.S. District Court, Northern District of Georgia, Atlanta Division, December

14, 2009, at p. 43.

Ahmed received a sentence of 13 years. Ahmed engaged in various communications with Sadequee and others about jihad including exchanges of websites and publications that promoted jihad, trained with paintball guns in the North Georgia mountains, traveled to Canada and discussed a plan to obtain training in Pakistan. He and Sadequee made 62 videos of United States landmarks as targets in order to show their commitment to jihad and thus be accepted for training overseas. Ahmed went to Pakistan on a one way ticket but did not enter a training camp. He returned to the United States and lied to federal agents about his purpose in going to Pakistan. Upon his return, he continued to engage in internet communications. He also conducted online research regarding explosives, methods to defeat SWAT teams and ways to encrypt messages. Ahmed warned his co-conspirators that law enforcement was monitoring them and advised precautions. He encouraged them to read indictments in terrorism cases. After he was interviewed by the FBI, he warned Sadequee not to return from overseas.

At sentencing, the Court (Duffy, William, J.) spoke at length about his view of Ahmed and described him as "a myopic, self-interested person who seeks to achieve what you want to achieve at the cost of other people." *United States v. Syed Harris Ahmed*, Docket No. 06-CR-147-WSD, Transcript of Sentencing Proceedings before Hon. Williams S. Duffey, Jr., U. S. District Court, Northern District of Georgia, Atlanta Division, December 14, 2009, at p. 61. In sentencing the defendant to 13

years, the Court stated: "I am convinced now more than ever that you personally need to be deterred. And I am certain that others like you – we don't know where they are, but we know that they eventually emerge – to let them know that what you wanted to do and what you plan you put into place and the steps that you took are going to be dealt with harshly and severely, and it's not worth the risk." *Id.* at p. 66.

Ahmed and Sadequee were two individuals who sought training overseas but did not succeed.  They made false statements to the FBI about the purposes of their trips. They came home and took far more serious actions than Mr. Brice, including filming landmarks as targets for terrorist attacks to prove their commitment and continuing to seek operational information through the internet and other co-conspirators.


**Zeinab Taleb-Jedi**

Taleb-Jedi was a registered agent for a federal designated terrorist organization that opposed the government in Iran. She traveled to the organization's camp in Iraq in 2004 where she taught English classes, translated documents and was assigned to the Political Department. Taleb-Jedi was charged with providing material support. This charge was dismissed and she pleaded guilty to violation of an

executive order and received a sentence of time served (one to two days upon arrest) and supervised release or a period of one year.

1

## VI.    The Need to Provide Restitution

There is no restitution component to this case.

## Conclusion

In conclusion, it is submitted that this case is a difficult one, and raises a lot of troubling issues, which should very carefully



taken into consideration. These include troubling aspects of the guidelines, a lack of criminal history, repeated efforts by law enforcement to entice Mr. Brice into committing a crime, and the obvious psychological damage Mr. Brice sustained when he almost died.

1

2

3

4

5

6

7

8

9

10

These issues warrant the considerable departure and variance requested.

11

12

13

14

15

16

17

18

19

20



1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20







Joey Brice is not the single-minded jihadist that the government portrays. Rather, the sweet, kind young man lives within him still. The helpful young man described by friends and families remains within him. The child with the smile on his face remains, as does the young man who graduated high school. While the last few years have been, in many ways, lost time, that does not mean that he is a lost cause. On the contrary – his adulthood has yet to really begin. But with the help of family and friends, he still has much to live for, and much to accomplish.

Mr. Brice asserts that the guideline calculation in this case is vastly overstated. Mr. Brice suggests that, under the Guideline ranges proposed herein, the very highest advisory sentencing range which should be considered is 70 to 87 months, prior to departure or variance. This range is reached as follows:

Base and Adjusted Offense Levels

   Count One via application of U.S.S.G. §§ 2K2.1(a)(5) and (b)(3)(B): 20

   Count Three via application of U.S.S.G. § 2M5.3: 30

| Multiple Count Adjustment U.S.S.G. § 3Dl.4 | Units |
|---|---|
| Count One Adjusted Offense Level: 20 | 0 |
| Count Three Adjusted Offense Level: 30 | |
| | |
| Combined Adjusted Offense Level  U.S.S.G. § 3Dl.4 | 30 |

| | |
|---|---|
| Acceptance of Responsibility | -3 |
| Final Adjusted Offense Level | 27 |
| Criminal History Category | I |
| Advisory Guideline Range | 70-87 months |

Mr. Brice asks the Court to utilize this range as the starting point for imposing a sufficient sentence and requests that the Court consider the mitigating factors set forth herein to depart and/or vary downward from this advisory range.  As discussed herein, Mr. Brice submits that a sentence of time served, which amounts to slightly over two years, is sufficient imprisonment in this case.

Should the Court find that additional imprisonment is necessary, Mr. Brice asks that the Court focus on the concerns addressed herein, avoid sensationalism, and apply the parsimony principle to sentence Mr. Brice to a term no longer tahn necessary to achieve the proper sentencing goals.  Mr. Brice asks that the Court give him credit for the time he has already served, recommend him for the RDAP program and recommend that he be placed at FCI Sheridan in order to facilitate family visits.

Mr. Brice recognizes that he scarred, both physically and mentally.  As psychological testing shows, "Profile patterns of [his] type are usually associated with marked distress and severe impairment in functioning."  (Exh. M at 4).  Mr. Brice has a long way to go in addressing his issues, but recognition of those

1    issues is the first step along that path.  Moreover, this constellation of issues shows

2    that for some time now, Joey Brice has been a prisoner in his own mind, and needs

3    help and assistance to navigate the psychological hurdles he faces:

> 4    *After many hours and a great deal of reflection, interwoven with the degree of*
> *skepticism I hold for any criminal defendant prior to sentencing, I have come*
> 5    *to sincerely believe that Joey Brice is motivated by distorted psychological*
> *goals, rather than political or destructive goals. I believe he is far more sick*
> 6    *than sinister.*
>
>                                      – Dr. Mark Mays (Exh. M at 12)

7

8

9    Mr. Brice is not the same man who was so willing to discuss and share

10    information about explosives.  He knows well that he will never escape the watchful

11    eye and abiding interest of the federal government's varied and various law

12    enforcement agencies.  Mr. Brice recognizes that there are challenges facing him

13    because of his involvement in all of this.  The collateral consequences of this

14    conviction are certain but remain largely undefined.  What is known is that Mr.

15    Brice's life is irrevocably changed.

16    Mr. Brice does have the support, love and respect of his community and his

17    family.  And it is well settled that familial support is an absolute necessity to the

18    successful avoidance of new criminal activity.  As Mr. Brice ages, he is confident

19    that he can overcome this part of his life.  He is hopeful and optimistic, respectfully

20    asking the Court to recognize that individuals change and, sometimes, it takes a

1  shocking or traumatic event to effect that change.

2      And what of punishment?  For that is as necessary a part of the sentencing

3  analysis to be undertaken by the Court as the examination of Mr. Brice's life and can

4  surely not be omitted from the calculus of sentencing.  Mr. Brice broke the law. He

5  must be punished for his transgressions lest it lead to contempt for the law; this is,

6  after all, quite a serious offense.  Mr. Brice most assuredly, recognizes the

7  seriousness of this offense. He has lived with this offense since it began and will,

8  without question, deal with the consequences, both actual and collateral for the rest

9  of his life.

10      Accordingly, Mr. Brice respectfully asks that he be sentenced to time served.

11  This is a sentence which recognizes the extraordinary circumstance of this case, as

12  well as Mr. Brice's life, reflects his culpability and punishes him for the crime of

13  which he stands convicted.  That sentence is proportional when compared to the

14  other sentenced discussed herein, in cases in which those defendants committed far

15  more serious crimes.  Such a sentence constitutes a just punishment that is sufficient

16  but not greater than necessary to effect the statutory purposes of criminal sentencing.

17      *Oh Progeny of Heaven! Empyreal Thrones! With reason hath deep*
     *silence and demur Seized us, though undismayed. Long is the way*
18   *And hard, that out of Hell leads up to light. Our prison strong, this*
     *huge convex of fire, Outrageous to devour, immures us round*
19   *Ninefold; and gates of burning adamant, Barred over us, prohibit all*
     *egress. These passed, if any pass, the void profound Of unessential*
20   *night receives him next, Wide-gaping, and with utter loss of being*
     *Threatens him, plunged in that abortive gulf.*

SENTENCING MEMORANDUM- 178

John Milton, PARADISE LOST, 2:430-441

Joey's journey will be both long and hard.  For that, he has himself to blame.  But to prohibit all egress, and plunge him into the abortive gulf of seemingly endless imprisonment accomplishes nothing other than punishment for its own sake.  It is with reason that he has been seized.  But reason equally demands that he be allowed to begin his journey.  Joey has reached the lowest point in his life.  Given the opportunity, he is young enough to ascend to heights far beyond his current fate.

> *And what in me seems wanting but that I May also in this poverty as*
> *soon Accomplish what they did, perhaps and more?*

John Milton, PARADISE REGAINED, 2:451-453

Dated:        May 23, 2013

Respectfully Submitted,


*s/Matthew Campbell*
Matthew Campbell, WA 38696
Federal Defenders of
Eastern Washington and Idaho
10 North Post, Suite 700
Spokane, Washington 99201
E-mail: Matt_Campbell@fd.org
Telephone: (509) 624-7606
Fax: (509) 747-3539

1

## CERTIFICATE OF SERVICE

2        I hereby certify that on May 23, 2013, I electronically filed the

3   foregoing with the Clerk of the Court using the CM/ECF System, which

4   will send notification of such filing to the following: Russell E. Smoot,

5   United States Assistant Attorney.

6

7                                  *s/Matthew Campbell*
                                   Matthew Campbell,  WA 38696
                                   Federal Defenders of
8                                  Eastern Washington and Idaho
                                   10 North Post, Suite 700
9                                  Spokane, Washington 99201
                                   E-mail: Matt_Campbell@fd.org
10                                 Telephone: (509) 624-7606
                                   Fax: (509) 747-3539

11

12

13

14

15

16

17

18

19

20

SENTENCING MEMORANDUM- 180