EXHIBIT C

# UNLOCKING AMERICA

*Why and How to Reduce America's Prison Population*

NOVEMBER 2007

PUBLISHED BY:
THE JFA INSTITUTE | 5 Walter Houp Ct, NE | Washington, DC 20002 | www.jfa-associates.com



**UNLOCKING AMERICA**

*Why and How to Reduce America's Prison Population*

NOVEMBER 2007

WWW.JFA-ASSOCIATES.COM

Authors

James Austin, President, The JFA Institute
Todd Clear, Professor, John Jay College of Criminal Justice
Troy Duster, Professor, New York University
David F. Greenberg, Professor, New York University
John Irwin, Professor Emeritus, San Francisco State University
Candace McCoy, Professor, City University of New York
Alan Mobley, Assistant Professor, San Diego State University
Barbara Owen, Professor, California State University, Fresno
Joshua Page, Assistant Professor, University of Minnesota

Acknowledgments

Many people made important contributions to this report either by providing data, reviews of earlier reports, and editing of the final report. They include Patricia Hardyman, Charles Jones, Frank Zimring, Ron Huff, Michael Jacobson, Marvin Mutch, Keith Hardison, Judith Green, Eric Sterling, Gene Guerrero, Nkechi Taifa, Susan Tucker, Aurie Hall, Robert Schwartz, Debra Rubino, Belinda Cooper, Amy Solomon, Rachel Barkow, Jodi Lewen, and  Frank Cullen.

Funding provided by:

THE ROSENBAUM FOUNDATION

and

OPEN SOCIETY INSTITUTE

Designed by:
Darcy Harris
www.herdesignereye.com



# UNLOCKING AMERICA
## *Why and How to Reduce America's Prison Population*

## TABLE OF CONTENTS

**1**
Prologue

**3**
I. Crime Rates and Incarceration

**11**
II. Three Key Myths about Crime and Incarceration

**15**
III. The Limits of Prison-Based Rehabilitation and Treatment Programs in Reducing the Prison Population

**18**
IV. Decarceration, Cost Savings, and Public Safety

**20**
V. Six Recommendations

**29**
VI. Concluding Remarks

# Prologue

*"Mr. Libby was sentenced to 30 months of prison, two years of probation and a $250,000 fine…I respect the jury's verdict. But I have concluded that the prison sentence given to Mr. Libby is excessive."—President George W. Bush. July 2, 2007.*

President Bush was right. A prison sentence for Lewis "Scooter" Libby was excessive—so too was the long three year probation term. But while he was at it, President Bush should have commuted the sentences of hundreds of thousands of Americans who each year have also received prison sentences for crimes that pose little if any danger or harm to our society.

In the United States, every year since 1970, when only 196,429 persons were in state and federal prisons, the prison population has grown. Today there are over 1.5 million in state and federal prisons. Another 750,000 are in the nation's jails. The growth has been constant—in years of rising crime and falling crime, in good economic times and bad, during wartime and while we were at peace. A generation of growth has produced prison populations that are now eight times what they were in 1970.

And there is no end to the growth under current policies. The PEW Charitable Trust reports that under current sentencing policies the state and federal prison populations will grow by another 192,000 prisoners over the next five years. The incarceration rate will increase from 491 to 562 per 100,000 population. And the nation will have to spend an additional $27.5 billion in operational and construction costs over this five-year period on top of the over $60 billion now being spent on corrections each year.[1]

This generation-long growth of imprisonment has occurred not because of growing crime rates, but because of changes in sentencing policy that resulted in dramatic increases in the proportion of felony convictions resulting in prison sentences *and* in the length-of-stay in prison that those sentences required. Prison populations have been growing steadily for a generation, although the crime rate is today about what it was in 1973 when the prison boom started. It is tempting to say that crime rates fell over the past dozen years because imprisonment worked to lower them, but a look at data about crime and imprisonment will show that prison populations continued to swell long after crime rates declined and stayed low. Today, whatever is driving imprisonment policies, it is not primarily crime.

Prisons are self-fueling systems. About two-thirds of the 650,000 prison admissions are persons who have failed probation or parole—approximately half of these people have been sent to prison for technical violations. Having served their sentences, roughly 650,000 people are released each year having served an average of 2-3 years. About 40% will ultimately be sent back to prison as "recidivists"—in many states, for petty drug and property crimes or violations of parole requirements that do not even constitute crimes. This high rate of recidivism is, in part, a result of a range of policies that increase surveillance over people released from prison, impose obstacles to their reentry into society, and eliminate support systems that ease their transition from prison to the streets.

Prison policy has exacerbated the festering national problem of social and racial inequality. Incarceration rates for blacks and Latinos are now more than six times higher than for whites; 60% of America's prison population is either African-American or Latino. A shocking eight percent of black men of working age are now behind bars, and 21% of those between the ages of 25 and 44 have served a sentence at some point in their lives. At current rates, one-third of all black males, one-sixth of Latino males, and one in 17 white males will go to prison during their lives. Incarceration rates this high are a national tragedy.[2]

Women now represent the fastest growing group of incarcerated persons. In 2001, they were more than three times as likely to end up in prison as in 1974, largely due to their low-level involvement in drug-related activity and the deeply punitive sentencing policies aimed at drugs. The massive incarceration of young males from mostly poor- and working-class neighborhoods—and the taking of women from their families and jobs—has crippled their potential for forming healthy families and achieving economic gains.

The authors of this report have spent their careers studying crime and punishment. We are convinced that we need a different strategy. Our contemporary laws

and justice system practices exacerbate the crime problem, unnecessarily damage the lives of millions of people, waste tens of billions of dollars each year, and create less than ideal social and economic conditions in many sections of our largest American cities.

This report focuses on how we can reduce the nation's prison population without adversely affecting public safety. For this to happen, we will need to reduce the number of people sent to prison and, for those who do go to prison, shorten the length of time they spend behind bars and under parole and probation surveillance. People who break the law must be held accountable, but many of those currently incarcerated should receive alternative forms of punishment, and those who are sent to prison must spend a shorter period incarcerated before coming home to our communities. Our recommendations would reestablish practices that were the norm in America for most of the previous century, when incarceration rates were a fraction of what they are today.

We first summarize the current problem, explaining how some of the most popular assumptions about crime and punishment are incorrect. In particular, we demonstrate that incarcerating large numbers of people has little impact on crime, and show how the improper use of probation and parole increases incarceration rates while doing little to control crime. We then turn to ideas about how to change this flawed system. We set out an organizing principle for analyzing sentencing reform, embracing a retributive sentencing philosophy that is mainstream among contemporary prison policy analysts and sentencing scholars.

Based on that analysis, we make a series of recommendations for changing current sentencing laws and correctional policies. Each recommendation is practical and cost-effective. As we show through examples of cases in which they have been tried, they can be adopted without jeopardizing public safety. If implemented on a national basis, our recommendations would gradually and safely reduce the nation's prison and jail populations to half their current size. This reduction would generate savings of an estimated $20 billion a year that could then be reinvested in far more promising crime prevention strategies. The result would be a system of justice and punishment that is far less costly, more effective, and more humane than what we have today. ■

| "Punishment Does Not Fit the Crime" Some Recent Examples | | | | |
|---|---|---|---|---|
| "Offenders" | Prior Record | Crime | Description | Prison Sentence |
| Elisa Kelly<br>George Robinson<br>*Mother and stepfather*[3] | None | Nine counts of contributing to the delinquency of a minor | Hosting drinking party for son's nine friends at parent's home | Original sentence of 8 years- later reduced to 27 months |
| Cecilia Ruiz<br>*Single parent – two children ages 6 and 8*[4] | None | Forgery | Deleting a DUI conviction from the county DUI data base | 42 months |
| Jessica Hall<br>*Unemployed mother of three children with Marine husband serving in Iraq*[5] | None | Throwing a missile at an occupied vehicle | Threw a cup of McDonald's coffee at another car that cut her off while driving | 24 months |
| Lewis "Scooter" Libby[6] | None | Perjury | Provided false testimony to U.S. Attorney (four counts) | 30 months |
| Stephen May[7] | None | Child Molestation | Inappropriately touched two girls and a boy – there was no sexual activity or penetration | 75 years |
| Genarlow Wilson[8] | None | Aggravated child molestation | 17 year old male had consensual oral sex with a 15 year old girl at a party that was video taped. | 10 years |

[1] Public Safety, Public Spending: Forecasting America's Prison Population 2007-2011. Philadelphia, PA: Pew Charitable Trusts, 2007.
[2] In some cites the percentages are higher. For example, in Baltimore, one in five young black men between ages 20 and 30 is incarcerated, and 52% are under some form of correctional supervision. Jason Ziedenberg and Eric Lotke. *Tipping Point: Maryland's Overuse of Incarceration and the Impact on Public Safety*. Washington, DC: Justice Policy Institute, 2005.
[3] Washington Post, July 4, 2007, pages A1, A11, "Penalties for Teen Drinking Parties Vary Widely in Area".
[4] Washington Post, June 30, 2007, page B4, Ex-Aide Given 3 ½-Year Sentence.
[5] www.washingtonpost.com/wp-dyn/content/article/2007/02/17/AR2007021701560.htt
[6] Washington Post, July 4, 2007, page A4, "Bush Says He's Not Ruling Out Pardon for Libby".
[7] State of Arizona vs. Stephen May, Maricopa Superior Court, No. CR2006-030290-001 SE.
[8] abcnews.go.com/Primetime/LegalCenter/story?id=1693362&page=1.

*I*

*By far the major reason for the increase in the prison populations at least since 1990 has been longer lengths of imprisonment.*

# Crime and Incarceration

## WHY THE PRISON EXPLOSION?

America's incarceration rate is exploding. In 1970, there were fewer than 200,000 people in prison. By 2006, there were approximately 1.6 million state and federal prisoners (or nearly 500 per 100,000 population). Each year over 730,000 people are admitted to state and federal prisons, and a much larger number (over 10 million) go to local jails. If we add to the prison population the nearly 750,000 people incarcerated in local jails today—at the beginning of 2007—the total number imprisoned in the U.S. on any given day is 2.2 million.[1]

The United States is the world leader in imprisonment. China, with a much larger population, has the second largest incarcerated population, with 1.5 million imprisoned. With 737 people incarcerated per 100,000 persons, the U.S. also leads the world in rates of incarceration—well above Russia, which has the next highest rate of 581 per 100,000.[2]   The other Western democratic countries manage with prison populations far smaller than ours.

By far the major reason for the increase in prison populations at least since 1990 has been longer lengths of imprisonment. The adoption of truth in sentencing provisions that require prisoners to serve most of their sentences in prison, a wide variety of mandatory minimum sentencing provisions that prevent judges from placing defendants on probation even when their involvement in the conduct that led to the conviction was minor, reductions in the amount of good time a prisoner can receive while imprisoned, and more conservative parole boards have significantly impacted the length of stay.

For example, in a special study by the U.S. Department of Justice on truth in sentencing, between 1990 and 1997, the numbers of prison admissions increased by only 17% (from 460,739 to 540,748), while the prison population increased by 60% (from 689,577 to 1,100,850). This larger increase in the prison population can only be caused by a longer length of stay.[3]

This is further confirmed in Table 1, which shows sentence lengths, time served, and period spent on parole supervision. These U.S. Department of Justice data are based on individuals released in 1993 and 2002. The 2002 data underestimate the average length of current prison sentences because they do not include time served by prisoners sentenced under

| Table 1: Sentence Lengths, Time Served, and Length of Parole Supervision, 1993 versus 2002 | | |
|---|---|---|
| Length of Supervision | 1993 | 2002 |
| Average Sentence | 66 months | 65 months |
| Average Time Served | 21 months | 30 months |
| Average Parole Supervision | 19 months | 26 months |
| Total Time Under Supervision | 40 months | 56 months |

Source: Prison Statistics. US Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. 1 Aug. 2006.  http://www.ojp.usdoj.gov/bjs/prisons.htm

[1] William J. Sabol, Todd D.Minton, and Paige M.Harrsion. Prison and Jail Inmates at Midyear 2006. Bureau of Justice Statistics Bulletin, Washington, DC: US DOJ,Office of Justice Programs, 2007.
[2] *Prison Brief—Highest to Lowest Rates.* International Centre for Prison Studies, King's College, London. 2006 http://www.kcl. ac.uk/depsta/rel/icps/world/
[3] Paula M. Ditton and Doris James Wilson. "Truth in Sentencing in State Prisons." Washington, DC: US DOJ, Bureau of Justice Statistics, 1999.

recent punitive laws (such as "three strikes and you're out") who have not yet been released. Nevertheless, the average time served by those who were released still increased substantially—from 21 to 30 months. Similarly, the parole supervision period increased from 19 to 24 months, and the total average period of supervision increased from 40 to 56 months.

| Table 2: Economic Loss to Victims and Costs of Incarceration | | | | | | |
|---|---|---|---|---|---|---|
| Type of Crime | Average Victim Loss | Prison Sentence (in mos) | Pretrial Time (in mos) | Prison Time Served (in mos) | Total Time (in mos) | Incarceration Costs* |
| Robbery | $1,258 | 94 | 5 | 55 | 60 | $113,000 |
| Burglary | $1,545 | 52 | 5 | 29 | 34 | $64,000 |
| Larceny Theft | $730 | 34 | 5 | 20 | 25 | $47,000 |
| Auto Theft | $6,646 | 27 | 5 | 17 | 22 | $41,000 |

*Source: Matthew R. Durose and Patrick A. Langan. Felony Sentences in State Courts, 2000. Washington, DC: Bureau of Justice Statistics, 2003, and Callie M. Rennison and Michael Rand. Criminal Victimization, 2002. Washington, DC: Bureau of Justice Statistics, 2003.*

Not only are our lengths of imprisonment significantly longer than they were in earlier periods in our penal history, but they are considerably longer than in most Western nations. For the same crimes, American prisoners receive sentences twice as long as English prisoners, three times as long as Canadian prisoners, three times as long as Dutch prisoners, five to 10 times as long as French prisoners, and five times as long as Swedish prisoners.[4] Yet these countries' rates of violent crime are lower than ours, and their rates of property crime are comparable.[5]

Most prisoners are incarcerated for crimes that do not compare with the costs of their imprisonment. We spend over $200 billion each year to fund the criminal justice system.[6] In contrast, the total economic loss to victims of crime in 2002 was an estimated $15.6 billion, or about one-tenth of the total cost of the nation's criminal justice system.[7] The typical (median) costs per crime for each victim was $100, which includes losses from property theft or damage, cash losses, medical expenses, and lost pay. While the financial losses and physical and emotional injuries sustained by victims can be significant, they represent only a fraction of what it costs to incarcerate the offenders.

Table 2 illustrates the vast disparity between the economic losses associated with four common crimes and the amount expended to incarcerate the offender. For example, the average loss associated with a robbery reported to the police is $1,258. The typical prison sentence for robbery in the United States is 94 months, or about eight years, of which the typical time served is 55 months. Together with the time spent in jail pre-trial, the average robbery offender is incarcerated for 60 months at a cost of approximately $113,000.

This historic rise in incarceration has often been attributed to the "fact" that



**Figure 1: Crime and Incarceration Rate Comparisons**

---

[4] David P. Farrington, Patrick A. Langan, and Michael Tonry, eds. *Cross-National Studies in Crime and Justice.* Washington, DC: US DOJ, Bureau of Justice Statistics, 2004.
[5] Franklin E. Zimring and Gordon Hawkins, *Crime Is Not the Problem: Lethal Violence in America.* New York: Oxford UP, 1997.
[6] http://www.ojp.usdoj.gov/bjs/eande.htm
[7] Callie M. Rennison and Michael Rand. *Criminal Victimization, 2002.* Washington, DC: Bureau of Justice Statistics, 2003.

in the early 1970s, the U.S. faced a steadily increasing crime problem, leaving no choice but to increase the use of incarceration massively. But this explanation for the imprisonment binge is misleading and incomplete. Crime rates have grown in other countries and states within the U.S. without provoking a large growth in prison populations. There are various ways a country can respond to increased crime; more prisons is just one of them. Moreover, statistics show that it was not primarily a rise in crime that fueled the increase in incarceration rates.

Figure 1 compares changes in the nation's crime rates—as measured by the FBI's Uniform Crime Reports (UCR) that are based on police records that primarily reflect victim reports to their local police departments—with changes in the rates of incarceration from 1931 to 2004. After being relatively stable for decades, between 1964 and 1974 the UCR Crime Index—which measures murder, assault, rape, burglary, robbery, theft, auto theft, and arson—increased significantly even as the incarceration rate remained relatively stable.[8] Thereafter, the UCR

crime rate swung up and down until 1992 when it began a steady decline.

The UCR is one of two ways that the government tracks crime rates. The other, the National Crime Victimization Survey (NCVS), was established in 1973 in recognition of the fact that the UCR had major biases in the way it gauged crime. The NCVS is often considered a more accurate and complete picture of crime in the U.S., as it is based on interviews of household members.

As shown in Figure 2, NCVS shows no increases in property crimes from 1973 to 1980. Similarly, NCVS show no increase in violent crimes between 1973 and in 1993, unlike the UCR data which showed a steady increase over the same time period. There is contradictory evidence of a 1970s crime epidemic, which was a major rationale for expanding the use of imprisonment.[9] Regardless of which measuring method is used, there was no large drop in the incarceration rate before crime rates began to increase after 1963. While a variety of theories exist as to why crime rates rose from 1964 to 1974, the cause was not a large drop in prison populations, which remained fairly stable until 1973.[10] Prison populations began increasing only *after* crime rates had already stabilized or, according to the crime victimization surveys, had already began to decline.

Beginning in the 1960s, law and order advocates declared a war on crime. Conservative politicians (starting with Barry Goldwater in the early 1960s), backed by religious groups (the Moral Majority of the 1970s) and right-wing media figures (such as talk-radio hosts of the 1980s), argued that crime was out of control largely because lenient judges gave lawbreakers too



**Figure 2: UCR and NCVS Crime Rate Comparisons**

[8] Prison populations fell by about eight percent between 1960 and 1970. This small drop could not remotely have been a major cause of the 2.4-fold rise in UCR index offenses in that decade. *Sourcebook of Criminal Justice Statistics.* US DOJ, Bureau of Justice Statistics. 278, 500 http://www.albany.edu/sourcebook/
[9] Criminologists debate the sources of the discrepancy between the growth in violent crime shown in UCR data and the decline shown by the NCVS. The U.S. Department of Justice has suggested that victims were more likely to report crimes to the police, and law enforcement agencies improved their recording and reporting systems. If these explanations are correct, these changes in reporting created the illusion of a growing crime problem when there actually was none. Also note that the NCVS property rate is based on the number of households, which is lower than the number of persons.
[10] As the NCVS was started in 1973, it cannot be used to determine if—or how much—crime rates increased between 1964 and 1973. Most criminologists agree, however, that there was an increase, and that some of the increase was due to demographics–the large numbers of baby boomers passing through their high crime-committing years. People aged 15 to 24 commit a substantial proportion of index crimes. The persons in the baby-boom cohorts started reaching 15 in 1964, and began turning 40 around 1990. But demographics cannot explain all of the increase.

many chances before they were punished, predatory criminals avoided punishment because of technicalities in the law, and criminals returned to the streets after serving short sentences. These advocates of a war on crime suggested harsh mandatory punishments were needed that would both incapacitate people convicted of serious crimes and deter others from breaking the law.



Figure 3: Incarceration Rates by Crime Category (1980-2003)

The media contributed to the fervor over the "crime problem" through its unrelenting focus on crime—the more heinous and sensational, the better. Broadcast journalists discovered that sensational crimes drew large audiences. The media publicized horrific but rare crimes (the kidnapping and murder of Polly Klass, the sexual murder of Megan Kanka, and the attack perpetrated by Willie Horton while on work release). In so doing, it led Americans to believe wrongly that they were at high risk of being assaulted, raped, or murdered.

During this same period, a growing number of neoconservative social scientists claimed that "law and order" ideas and policies rested on a sound scientific foundation. In 1975, political scientist James Q. Wilson published the widely read *Thinking About Crime*, in which he soberly admonished liberal/humanitarian social scientists to remember that *"...wicked people exist. Nothing avails except to set them apart from innocent people."*[11]

For Wilson and those who initially shared his views, incapacitating what they believed was a growing and more menacing type of criminal was a necessary weapon in the war against crime. By insisting that *only* stepped-up criminal justice interventions could cope with crime, Wilson and others like John J. DiIulio and William Bennett were arguing against the strategies recommended by the riot commissions of the 1960s and by experts on poverty and racial problems: alleviating poverty, combating discrimination, and opening up opportunities that had previously been shut off by racial discrimination and class inequality.

Remedying social inequities, they maintained, was not the job of the government and would not reduce crime. Their solution—more people in prison—rested on the use of an institution that had become substantially discredited among penologists in the 1960s. Their views were enthusiastically supported by the federal government, which subsequently funded studies to identify the "career criminal."

Public receptivity to this hawkish perspective was enhanced by anxieties associated with the rapid rise in crime during the 1960s, the eruption of riots in a number of American cities, and the advent of the civil rights and feminist movements, challenging longstanding racial and gender hierarchies. These developments, exploited by well-funded conservative polemicists whose arguments were widely publicized in the media, helped to shape public response to the high-profile death of athlete Len Bias from a cocaine overdose in 1986. Along with the growing use of crack cocaine, his death sparked a rapid government response. All these factors converged, creating a "perfect storm" that drove the imprisonment binge.

Thus after 1975 many laws were passed, supported by politicians of both parties, designed to increase the probability of a prison sentence rather than jail or probation, dramatically increasing the length of prison sentences for certain crimes, and requiring prisoners to serve a greater proportion of their sentences—three results that we will

[11] James Q. Wilson. *Thinking About Crime*. New York: Random House, 1975. 235. See also by Wilson: "Lock 'Em Up." *New York Times Magazine* 9 March 1975: 11.

discuss in greater detail below.

New legislation increasing the penalties for the sale and possession of cocaine, particularly crack cocaine, intensified the upward trend. As is evident in Figure 3, increased penalties for drug offenses strongly fueled much of the growth of state prison populations starting in the late 1980s. Since then most of the growth in prison systems has been due to the increased incarceration of persons for violent crimes (mostly robbery and assaults) and behavior related to "public order." Once begun, prison expansion has continued under its own momentum, oblivious to any obvious need and unrelated to any useful social function, at large social cost. Though penologists have called attention to the failures of mass imprisonment, the expansion has taken on a life of its own.

Along the way, Americans have become accustomed to demonizing certain people who break the law. This is somewhat odd, given the fact that breaking the law is neither a rare nor demonic act. Few citizens go through life without ever violating a law.

A significant number of Americans cheat on their taxes, steal from their employers, receive stolen goods, purchase illegal cable boxes, illegally download music, use illegal drugs, or participate in many other illegal acts. Hardly a day goes by without a newspaper story about corporate executives indicted for fraud, insider trading, or price fixing. Politicians are arrested and convicted for soliciting or accepting bribes. The most prestigious Wall Street firms have engaged in large-scale illegal trading practices. Some of our most successful and idolized entertainment figures are indicted for shoplifting, domestic violence, drunk driving, possessing drugs, and molesting children. Policemen are filmed using excessive use of force on citizens, make arrests based on racial stereotypes, deal in drugs, plant evidence on innocent people, and lie under oath. Sports figures are accused of rape, assault and taking steroids.

Priests are charged with child molestation. Doctors bill Medicare for procedures they did not perform. Each day thousands drive while legally drunk, with sometimes-fatal consequences.[12] Self-report surveys find that lawbreaking is widely distributed among the young, especially males. As many as one-third of all boys are arrested before reaching adulthood. A majority of males will be arrested for a non-traffic offense at some point in their lives.[13]

But given that most of us commit some type of crimes in our lifetimes, the most severe punishments are targeted toward lower class citizens. It is this class of people we are willing to punish disproportionately to their criminal acts.

| | | **Table 3:  If Black and Latino Prisoners Had the Same Jail and Prison Incarceration Rates as White Prisoners** | | |
|---|---|---|---|---|
| **Race** | **Current Prisoners** | **Male Incarceration Rates** | **Female Incarceration Rates** | **Prison Population If Same Incarceration Rates as Whites** |
| **Whites** | 731,200 | 681 | 75 | 731,200 |
| **Blacks** | 899,200 | 4,834 | 352 | 125,773 |
| **Latino** | 392,200 | 1,778 | 148 | 136,540 |
| **Total** | **2,022,600** | | | **993,513** |

This willingness to punish them is rooted in our culture of individualism, which holds that we are free-willed and fully responsible for our acts. This belief speaks to our tendency to assign personal blame for every disapproved act. The truth is that many factors, particularly race and economic status, affect our life situations and limit or expand our available choices.

Consider young people with college-educated parents. Middle and upper-class parents impart values of achievement through education to their children, arrange for their admission into better schools, help them get into good colleges, and support them after graduation while they attempt to start their "careers." Their children have a much higher chance of succeeding in America's economy than youth from poor, welfare dependent, and often broken families who are exposed to a much different life, including dangerous public housing buildings and dys-

---

[12] In 2002, an estimated 1.5 million drivers were arrested for driving under the influence of alcohol or narcotics—surely more escaped arrest.  In 2004, the National Center for Statistics and Analysis reported that just over 17,000 people died in alcohol-related crashes in 2003.  This is slightly more than the 16,503 murdered or who died from non-negligent homicide in the same year.

[13] In a study of a Philadelphia male birth cohort, 35 percent of the youths had at least one incident of contact with the police before age 18. These 3,475 boys with a contact were linked to 10,214 offenses, including 2,786 index crimes (Marvin E. Wolfgang, Robert M. Figlio, and Thorsten Sellin. *Delinquency in a Birth Cohort*. Chicago: University of Chicago Press, 1972. 65, 68-69. By age 30, 47% had at least one police contact for a non-traffic offense (James J. Collins. *Offender Careers and Restraint: Probabilities and Policy Implications*. Washington, DC: US DOJ, Law Enforcement Assistance Administration, 1977). In a similar study carried out in Racine, Wisconsin, 59-69% had a non-traffic police confrontation by the same age. Joan Petersilia. "Criminal Career Research: A Review of Recent Evidence." *Crime and Justice: An Annual Review of Research* 2 (1980): 321-79.

functional public schools. For many of these youth, the expectation or norm is to drop out of high school and end up hanging out in neighborhoods filled with other under-educated, unemployed young people.[14] Rather than going to college they are headed toward prison.

Where lawbreakers differ culturally and socially, others are less able to empathize with their life circumstances. Middle- and upper-class people understand that they themselves, their families, and close associates are not defined entirely by their law violations. But they often lack understanding for those whose life circumstances are different from their own.

The demonization of criminals has become a special burden for young black males, of whom nearly one-third will spend time in prison during their life.[15] The fear of black men and other factors fuel the racially disproportionate imprisonment and convinces many Americans that black males are an especially "dangerous" class of people, different from the rest of us, the so-called "law-abiding."[16] Today approximately 60% of those incarcerated today are black or Hispanic.[17] In effect, the imprisonment binge created our own American apartheid.

To illustrate the significance of race in our incarceration policies, we estimated the size of today's prison and jail population assuming blacks and Latinos had the same incarceration rate as their white counterparts. The results are striking. *As shown in Table 3, if blacks and Latinos had the same rates of incarceration as whites, today's prison and jail populations would decline by approximately 50%.* While we may differ on the basis for racial differences in imprisonment, there can be no disagreement that this is not the sign of a healthy society.

## DID PRISON EXPANSION CUT CRIME?

Proponents of prison expansion have heralded this growth as a smashing success.[18] But a large number of studies contradict that claim. Most scientific evidence suggests that there is little if any relationship between fluctuations in crime rates and incarceration rates. In many cases, crime rates have risen or declined independent of imprisonment rates. New York City, for example, has produced one of the nation's largest declines in crime in the nation while significantly *reducing* its jail and prison populations.[19] Connecticut, New Jersey, Ohio, and Massachusetts have also reduced their prison populations during the same time that crime rates were declining.[20]

A study of crime and incarceration rates from 1980 to 1991 in all 50 states and the District of Columbia shows that incarceration rates exploded during this period. The states that increased incarceration rates the least were just as likely to experience decreases in crime as those that increased them the most.[21] The study's authors pointed out that although San Francisco and Alameda counties in California *reduced* the number of individuals sentenced to state prison, their crime rates dropped as much if not more than those California counties that *increased* their prison commitments.

Other studies reach similar conclusions, finding "no consistent relationship between incarceration rates and crime rates"[22] and "no support for the 'more prisoners, less crime' thesis."[23] One study discovered an initial decrease in crime related to increases in rates of incarceration, but no decrease from further increases in incarceration.[24]

Focusing on California, whose incarcerated population more than tripled during the 1980s, Franklin Zimring

[14] See Pierre Bourdieu and Jean Claude Passeron. *Reproduction in Education, Society, and Culture.* London: Sage Publications, 1990, and, Jay MacLeod. *Ain't No Makin' It: Aspirations & Attainment in a Low-Income Neighborhood.* Boulder, CO: Westview. 1995. These books address the issues of transmission of cultural capital and success.

[15] *Prevalence of Imprisonment in the U.S. Population, 1974-2001.* Washington, DC: US DOJ, Bureau of Justice Statistics, 2003.

[16] Controlling for crime rates, prison populations have grown faster in states with more black residents. Katherine Beckett and Bruce Western. "Governing Social Marginality: Welfare, Incarceration, and the Transformation of State Policy." *Punishment and Society* 3 (2001): 43-59; David F. Greenberg and Valerie West. "State Prison Populations and Their Growth, 1971-1991," and David F. Greenberg, "'Justice' and Criminal Justice." *Criminology* 39.3 (2001): 615-53. Darnell F. Hawkins, Samuel L. Myers Jr., and Randolph N. Stone, eds. *Crime Control and Social Justice: The Delicate Balance.* Westport, CT: Greenwood Press, 2003.

This is not to deny that for UCR crimes, rates of black involvement are higher than rates of white involvement. However, these disparities do not fully explain the racial disparities in prison populations, or their growth.

[17] *Prisoners in 2004.* US DOJ. Washington, DC: Bureau of Justice Statistics, 2005.

[18] John DiIulio. "Prisons Are a Bargain, by Any Measure." *New York Times* 26 Jan. 1996: A19.

[19] Between 1993 and 2001, violent crime in New York decreased by 64%, and homicides by 69% while its jail population dropped by 25%, and the number of people sentenced to prison fell by 42%. Some analysts attribute the dramatic reductions in serious crime and felony arrests to the introduction of new methods of policing, particularly Compstat. However, San Diego, which also reduced its commitments to prison, experienced comparable declines in crime without using New York's methods (Michael Jacobson. *Downsizing Prisons: How to Reduce Crime and End Mass Incarceration.* New York: NYUP, 2005. 37, 113, 125-27.

[20] Ibid., 128.

[21] Irwin and Austin, loc. cit., 154-56. For an updated version of this type of analysis, see: Jenni Gainsborough and Marc Mauer. *Diminishing Returns: Crime and Decarceration in the 1990s.* Washington, DC: The Sentencing Project, 2000.

[22] Michael Lynch. "Beating a Dead Horse: Is There Any Basic Empirical Evidence of the Deterrent Effect of Imprisonment." *Crime, Law and Social Change* 31.4 (1999): 361. Lynch examined data on U.S. crime and imprisonment trends from 1972 through 1993.

[23] Tomislav V. Kovandzic and Lynne M. Vieratis. "The Effect of Country-Level Prison Population Growth on Crime Rates." *Criminology & Public Policy* 5.2 (2006): 234. The authors examined the effect of incarceration on crime rates in different Florida counties.

[24] Raymond Liedka, Anne Morrison Piehl, and Bert Useem. "The Crime-Control Effect of Incarceration: Does Scale Matter?" *Criminology & Public Policy* 5.2 (2006): 245-76. This study analyzed the data on crime rates and incarceration rates for all 50 states and the District of Columbia in the period from 1972 to 2000. The authors believe that whatever gains were achieved in the dramatic rise in imprisonment that began in the 1970s, there was a diminishing effect over time.

and Gordon Hawkins concluded that this remarkable expansion was paralleled by a reduction in crime of about 15%. Almost all this decrease was in burglary and larceny. For the other offenses the reduction was "weak to negligible." The role of the prison expansion in bringing about even that 15% was doubtful, because arrest statistics showed that the drop occurred mainly for juveniles, who were less likely than adults to be locked up.[25] A contrary view has been offered by some analysts, such as William Spelman, who argues that the crime rate today would be 25% higher were it not for the large increases in imprisonment from 1970 to 1990.[26] Assuming for the sake of discussion that this figure is correct, it is not a large effect, considering the enormous increase in imprisonment needed to achieve it. However, Spelman's estimate is probably too large. His analysis is based on national trends and does not explain why some states and counties that lowered their incarceration rates experienced the same crime reductions as states that increased incarceration; and his estimates of crime reductions rely on controversial data in the form of prisoners' own claims about how much crime they had committed before incarceration. More significantly, Spelman agrees that further investment in expanding the prison population will have little if any impact on crime rates.

More recent estimates based on individual states and counties within states have estimated the crime-reduction impact of prison growth to be much smaller or nonexistent.[27] Research on crime and incarceration does not consistently indicate that the massive use of incarceration has reduced crime rates.

In sum, studies on the impact of incarceration on crime rates come to a range of conclusions that vary from "making crime worse" to "reducing crime a great deal." Though conclusive evidence is lacking, the bulk of the evidence points to three conclusions: 1) The effect of imprisonment on crime rates, if there is one, is small; 2) If there is an effect, it diminishes as prison populations expand; and 3) The overwhelming and undisputed negative side effects of incarceration far outweigh its potential, unproven benefits.

These studies have led former pro-incarceration advocates to change their positions. James Q. Wilson now concedes that we have reached a tipping point of "diminishing returns" on our investment in prisons.[28] According to Wilson, judges have always been tough on violent offenders and have incarcerated them for relatively long periods. However, as states expanded incarceration, they dipped "deeper into the bucket of persons eligible for prison, dredging up people with shorter and shorter criminal records."[29] Increasing the proportion of convicted criminals sent to prison, like lengthening time served beyond some point, has produced diminishing marginal returns in crime reductions. Similarly, former incarceration advocates such as John Dilulio and former U.S. Attorney General Edwin Meese are calling for a repeal of mandatory minimum sentencing and challenging the wisdom of a massive imprisonment policy.[30]

### THE NEGATIVE SIDE EFFECTS OF INCARCERATION

Incarceration may not have had much impact on crime, but it has had numerous unintended consequences, ranging from racial injustice and damage to families and children to worsening public health, civic disengagement, and even *increases* in crime.

Bruce Western demonstrates the extraordinarily disparate impact of imprisonment on young black males compared to any other subgroup of society. For example, he shows that nearly one-half of all young black males who have not finished high school are behind bars, an incarceration rate that is six times higher than for white male dropouts. He then shows how incarceration damages the lifetime earnings, labor market participation, and marriage prospects for those who have been to prison and concludes that the U.S. prison system exacerbates and sustains racial inequality.[31]

British penologists Joseph Murray and David Farrington have analyzed data sets about child development from three nations and found that parental incarceration contributes to higher rates of delinquency, mental illness, and drug abuse, and reduces levels of school success and later employment among their children.

[25] Franklin E. Zimring and Gordon Hawkins. *Incapacitation: Penal Confinement and the Restraint of Crime.* New York: Oxford UP, 1995. 101; Thomas B. Marvell and Carlisle E. Moody Jr. "Prison Population Growth and Crime Reduction." *Journal of Quantitative Criminology* 10.2 (1994): 109-40, similarly found just a small reduction in crime resulting from national prison expansion.

[26] William Spelman. "The Limited Importance of Prison Expansion." The Crime Drop in America, Revised edition. Ed. Alfred Blumstein. New York: Cambridge UP, 2006. 97-129. Spelman based this estimate on the amount of crime recently incarcerated felons told interviewers they had committed the year before their arrest. Spelman then assumed that incarcerating and incapacitating those individuals averted the same amount of crime he assumed would be committed subsequently.

[27] Bruce Western. *Punishment and Inequality in America.* New York: Russell Sage, 2006; James P. Lynch and William J. Sabol. "Did Getting Tough on Crime Pay?" *Crime Policy Report No. 1.* Washington, DC: Urban Institute, 1997. http://www.urban.org/publications/307337.html; Don Stemen. *Reconsidering Incarceration: New Directions for Reducing Crime.* New York: Vera Institute of Justice, 2007.

[28] James Q. Wilson. "Crime and Public Policy." *Crime.* James Q. Wilson and Joan Petersilia. Oakland, CA: ICS Press, 1995: 489-507.

[29] Wilson, op. cit., 501.

[30] Jacob Sullum. "Prison Conversion: After studying non-violent drug offenders, a criminologist who once said, "Let 'Em Rot" now says "Let 'Em Go." *Reason* Aug./Sept. 1999.

[31] Bruce Western, op. cit. See also, Raphael, op. cit.

Their comparative analysis of data from high-imprisonment and low-imprisonment nations reveals that the negative effects of incarceration are most pronounced when a nation's incarceration rate is high, as it is in the United States.[32]

Epidemiologist James Thomas has analyzed incarceration rates in North Carolina, and shows that high rates of incarceration are associated with increased rates of teenage single-parent births and the risk of sexually-transmitted diseases among women. Other analyses have shown that the high rate of HIV among black women can be attributed to incarceration rates of black men.[33]

There are an estimated five million Americans who are ineligible to vote because of felony convictions. About half of these are African-Americans; consequently, black communities' have lost a significant amount of political power. Christopher Uggen and Jeffrey Manza have demonstrated that the loss of voting rights by felons has changed election outcomes across the nation, including in the two most recent presidential elections, weakened the political influence of minority communities, and detracted from civic participation by large classes of people of color.[34]

Clearly, prison terms have a residual impact on the families and communities of the imprisoned. Enduring years of separation from family and community—deprived of material possessions, subjected to high levels of noise and artificial light, crowded conditions and/or solitary confinement, devoid of privacy, with reduced options, arbitrary control, disrespect, and economic exploitation—is maddening and profoundly deleterious. Anger, frustration, and a burning sense of injustice, coupled with the crippling processes inherent in imprisonment, significantly reduce the likelihood that prisoners are able to pursue a viable, relatively conventional life after release. ∎

[32] Joseph Murray and David Farrington. "Effects of parental imprisonment on children." *Crime & Justice: A Review of Research.* Forthcoming; and Joseph Murray, Carl-Gunnar Janson, and David Farrington. "Crime in Adult Offspring of Prisoners: A Cross-National Comparison of Two Longitudinal Samples." *Criminal Justice & Behavior* 34 (2007): 133-49.

[33] James Thomas and Elizabeth Torrone. "Incarceration as Forced Migration: Effects on Selected Community Health Outcomes." *American Journal of Public Health* 96 (2006): 1762–65; Rucker C. Johnson and Steven Raphael. "The Effects of Male Incarceration on Dynamics of AIDS Infection Rates Among African-American Women and Men." Unpublished paper presented to the incarceration study group of the Russell Sage Foundation (July 2006).

[34] Christopher Uggen and Jeff Manza. *Locked Out: Felon Disenfranchisement and American Democracy.* New York: Oxford UP, 2006.

# II

*Why has there been such a growth in imprisonment? The incarceration explosion has been based on a series of ideas that were widely accepted and broadly popular at the time, but have turned out to be erroneous.*



# Three Key Myths about Crime and Incarceration

The research summarized above shows that mass incarceration has a limited potential for reducing crime and has collateral consequences that outweigh its benefits. Why then has there been such a growth in imprisonment? The incarceration explosion has been based on a series of ideas that were widely accepted once, but have turned out to be erroneous. The three main myths are:

1. **There are "career criminals" we can identify and whose imprisonment will reduce crime;**
2. **Tougher penalties are needed to protect the public from "dangerous" criminals; and**
3. **Tougher penalties will deter criminals.**

Because these ideas have been so central we discuss them in some detail.

## Myth #1:  There are "career criminals" we can identify and whose imprisonment will reduce crime.

One of the primary justifications for lengthy sentences is that we can identify the "career criminals" or "violent predators" who commit most of the serious crime and who are not deterred or rehabilitated by short sentences or alternative punishments to incarceration. These people, it is argued, must be "incapacitated" for long periods of time to reduce crime significantly. However, scientific efforts to develop methods for identifying career criminals have failed.

In 1978, a National Academy of Science study by a panel of prestigious criminologists concluded that while most people have a relatively brief and modest criminal career, a small group persists in crime. However, the panel was unable to produce any valid methods for identifying the persistent criminals at the beginning of their criminal careers.[35]

Shortly thereafter, a group of RAND researchers thought they had found a way to identify persons who would eventually become repeat offenders. They discovered a group of "high-rate offenders" among samples of males imprisoned for robbery and burglary in three states (California, Texas and Michigan).[36] Significantly, the vast majority of the surveyed prisoners reported committing very few if any crimes the year before they were arrested (five or less). But the so-called "high-rate" offenders, who comprised 10% of the samples, claimed they had committed 4-5 robberies and burglaries per week in the preceding year. The researchers developed a profiling scale that distinguished the high-rate offenders, whom they labeled "violent career criminals", from the others. Peter Greenwood claimed that if the people so

---

[35] Jacqueline Cohen. "Research on Criminal Career: Individual Frequency Rates and Offense Seriousness." *Criminal Careers and "Career Criminals*. Alfred Blumstein et. al., eds. Washington, DC: National Academy Press, 1986.
[36] Peter Greenwood and Alan Abrahamse, op. cit.; Jan M. Chaiken and Marcia Chaiken. *Varieties of Criminal Behavior*. Santa Monica, CA: RAND, 1982.

identified were incarcerated for at least eight years, crime would decline by 20%. Because the lower-rate offenders could be released after serving reduced sentences, prison expansion could be avoided.

These claims were widely disseminated by the U.S. Department of Justice and used by elected officials to justify sentencing reforms such as mandatory minimums, truth in sentencing, and the abolition of parole boards. However, when Greenwood and his associate Susan Turner later followed a group of released prisoners identified as high-rate offenders by their profiles, they found that these individuals had not committed crimes of the type and at the rate expected.[37]

More recent research, nearly twenty years after the first studies on the topic, continues to discredit the claim that career criminals can be identified early by a profiling system. John Laub and Robert Sampson have re-examined data from Sheldon and Eleanor Glueck's 1930s seminal publication following the life careers of 500 Boston delinquents.[38] Although the vast majority desisted from crime after the age of 25, a small minority persisted in committing crime into their later years. Using all available criteria, Laub and Samson could not distinguish these "persisters" at the beginning of their delinquent careers from the others who had followed the normal pattern of criminal involvement in adolescence and desistance after their early twenties.

Laub and Sampson were able to find a different set of predictive factors, none of which could be observed when the young people first committed crimes. Instead, they found there were major "turning points" in a person's life—such as getting and holding a good job, enlisting in the military, marrying, and establishing contacts with conventional institutions and groups—rather than personality characteristics or early childhood experiences that dis-

tinguished the careers of "desisters" from "persisters". Laub and Sampson also found that delinquents who had been incarcerated were more likely to commit crimes later in life than those who had been sentenced to probation or local jail time. The implication was that imprisonment itself can encourage criminality.

In a subsequent study, Michael E. Ezell and Lawrence E. Cohen published their analysis of the criminal careers of three cohorts of "serious chronic offenders" released from California youth prisons in the 1980s and 1990s. Although the offenders varied in the amount of crime they committed after their release from prison, all "aged out" of crime.[39] Similar to the other studies, Ezell and Cohen could not find any background characteristics that reliably distinguished those with different post-release criminal trajectories. Other researchers have employed mixes of psychological test scores and behavioral measures to predict serious violent recidivism or involvement in new sex crimes.[40] These methods predict recidivist crime better than random guessing, but they are also inaccurate.

Though improvements in statistical methods for predicting violent recidivism have produced modest gains in accuracy, they rely on data that would normally not be available in a typical criminal justice application.[41]

Criminologists have been unable to develop practical and reliable methods to select those who will become career criminals.[42] Attempts to incarcerate based on any predictive criteria will inevitably end up incarcerating a large number of people who do not persist in serious crime. As advocated later in the report, sentencing should not be based on what we think a person will do but rather on what they have done and in proportion to the seriousness of the crime.

---

[37] Peter Greenwood and Susan Turner. *Selective Incapacitation Revisited: Why High-Rate Offenders Are Hard to Predict.* Santa Monica, CA: RAND, 1987. Christy A. Visher also found methodological weaknesses in the study; see "The Rand Inmate Survey: A Reanalysis." *Criminal Careers and "Career Criminals,"* Vol. 2. Alfred Blumstein et. al., eds. Washington, DC: National Academy Press, 1986.

[38] Sheldon and Eleanor T. Glueck. *Unraveling Juvenile Delinquency.* New York: The Commonwealth Fund, 1950. John Laub and Robert Sampson continued the follow up study of this cohort into the members' 70's. John Laub and Robert Sampson. *Shared Beginnings, Divergent Lives: Delinquent Boys to Age 70.* Cambridge, MA: Harvard UP, 2006.

[39] Mike E. Ezell and Lawrence E. Cohen. *Desisting from Crime: Continuity and Change in Long-Term Crime Patterns of Serious Chronic Offenders.* New York: Oxford UP, 2005. 163. This "aging out" of crime is a consistent finding of most research on criminal careers. See, for example, David Greenberg. "Delinquency and the Age Structure of Society." *Contemporary Crises* 1.2 (1977): 189-224; David Farrington. "Age and Crime." *Crime and Justice: An Annual Review of Research.* Michael Tonry and Norval Morris, eds. Chicago: University of Chicago Press, 1986: 189-250.

[40] Erica Beechner-Monas and Edgar Garica-Rill. "Genetic Predictions of Future Dangerousness: Is There a Blueprint for Violence?" *Law and Contemporary Problems* 69 (2006): 301-41; Richard Wollert. "Low Base Rates Limit Expert Certainty When Current Actuarials Are Used to Identify Sexually Violent Predators: An Application of Bayes' Theorem." *Psychology, Public Policy, and Law* 12 (2006): 56-85; Robert A. Prentky et. al. "Sexually Violent Predators in the Courtroom: Science on Trial." *Psychology, Public Policy, and Law* 12 (2006): 357-93.

[41] John Monahan. "The Future of Violence Risk Management." *The Future of Imprisonment.* Ed. Michael Tonry. New York: Oxford UP, 2004. 237-63.

[42] Kathleen Auerhahn. "Selective Incapacitation and the Problem of Prediction." *Criminology* 37.4 (1999): 703-34; Jacqueline Cohen. "Incapacitation as a Strategy for Crime Control: Possibilities and Pitfalls."*Crime and Justice: An Annual Review of Research* 5 (1983): 1-84; Jacqueline Cohen and Jose A. Canela-Cacho. "Incarceration and Violent Crime, 1965-1988." *Understanding and Preventing Violence: Consequence and Control,* Vol. 4. Albert J. Reiss and Jeffrey A. Roth, eds. Washington, DC: National Academy Press, 1994; Rudy A. Haapanen. *Selective Incapacitation and the Serious Offender: A Longitudinal Study of Criminal Career Patterns.* New York: Springer-Verlag, 1990.

*Unlocking America*

| Table 4: Percent of Arrests Attributed to Released Prisoners | | |
|---|---|---|
| **Arrests in 7 States** | **Number** | **Percent** |
| **Total Arrests in 1994-97** | 2,994,868 | 100 |
| **Total Arrests of Prisoners Released in 1994-97** | 140,543 | 5 |
| **Total Arrests of Released Prisoners for Violent Crimes** | 36,000 | 1 |

*Source:* Recidivism of Prisoners Released in 1994. *US DOJ. Washington, DC: Bureau of Justice Statistics, 2002*

### Myth #2: Tougher penalties are needed to protect the public from "dangerous" criminals.

*We can't seriously address our crime problem until repeat offenders learn that they will get no more breaks from the criminal justice system. … When incarcerations increase, serious crimes go down.*

—Andrew Thomas, County Attorney,  Maricopa County, Arizona [43]

The failure of efforts to develop methods of accurately identifying the small number of offenders who do commit particularly horrendous crimes after serving their sentences fueled demands for longer sentences across the board.[44] The logic of this argument was that if we can't single out the truly dangerous, we will assume that anyone with two or three convictions for a relatively wide range of offenses is a dangerous habitual criminal, and keep them all in prison for an extremely long time. On the basis of this reasoning, a number of states adopted mandatory sentencing, truth in sentencing and in some states "three strikes" laws, all of which extend prison sentences.

These laws have done little to reduce crime. Few convicted persons have the requisite number of previous felony convictions to qualify for the enhanced sentences.[45] This is because rates of return to serious crime on the part of those released from prison are not high. Just 1.2% of those who served time for homicide and were released in 1994 were rearrested for a new homicide within three years of release, and just 2.5% of released rapists were arrested for another rape. Sex offenders were less likely than non-sex-offenders to be rearrested for any offense.[46] Their rates of re-arrest for a new sex offense were only 5.3%. A substantial percentage (over 60%) of released prisoners are eventually rearrested, but mostly for drug offenses or violations of parole regulations. Many of those eligible for sentence enhancements under these "habitual offender" statutes are at an age when they are reducing their involvement in crime, or abandoning it altogether.

The U.S. Department of Justice conducted a major study of criminal involvement of prisoners who had been released in 1994. It found that only 5% of the 3 million ar-

| Table 5: Chances of Being Caught | | |
|---|---|---|
| **Indicator** | **Number** | **% of Total** |
| **Victimizations** | 25,036,030 | 100 |
| **Reported to Police** | 9,721,205 | 39 |
| **Arrests** | 13,699,254 | 55 |
| **Less Drug, Alcohol, and Other Victimless Crimes** | 4,642,803 | 19 |
| **State and Federal Felony Convictions** | 983,823 | 4 |
| **Convictions Resulting In Prison or Jail** | 680,000 | 3 |

*Source: U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, Prison Statistics. Online.  Available: http://www.ojp.usdoj.gov/bjs/keyfacts. htm. Accessed: August 1, 2006.*

[43] Christian Richardson. "Thomas: Probation Out in Major Felony Cases." East Valley Tribune 29 Nov. 2006.
[44] Jonathan Simon. "Reversal of Fortune: The Resurgence of Individual Risk Assessment in Criminal Justice." Annual Review of Law and Social Science 1 (2005): 397-421; Bernard E. Harcourt. Against Prediction: Profiling, Policing, and Punishing in an Actuarial Age. Chicago: University of Chicago Press, 2007.
[45] Franklin E. Zimring, Gordon Hawkins, and Sam Kamin. *Punishment and Democracy: Three Strikes and You're Out in California.* New York: Oxford UP, 2001.
[46] A meta-analysis of 61 studies also concluded that sex offenders have low rates of recidivism. See R. Karl Hanson and Monique T. Bussierre. "Predicting Relapse: A Meta-Analysis of Sexual Offender Recidivism Studies." *Journal of Consulting and Clinical Psychology* 66 (1998): 348-62; and R. Karl Hanson et. al. "Sex Offender Recidivism: What We Know and What We Need to Know." *Annals of the New York Academy of Science, Sexually Coercive Behavior: Understanding and Management.* Robert A. Prentky et. al., eds. (2003): 154-.

rests made in seven states between 1994 and 1997 were of recently released prisoners (Table 4).[47]  California's "three strikes" law has had a number of evaluations; almost all found that it failed to reduce crime.[48]

These studies make clear that, while many people who are released from prison end up back behind bars, they are but a fraction of the overall crime problem. Lengthening their sentences, as a means of dealing with crime will at best have only marginal impact.

### Myth #3: Tougher penalties will deter criminals

The hope that the presence of brutal prisons will deter law violators is as old as the invention of the prison itself. Contemporary supporters of longer sentences argue that longer and harsher punishments are necessary to deter crime by making criminals think twice before committing another crime. This notion simplifies and distorts the dynamics of criminal behavior.  When most people commit a crime, they correctly believe that they will not be caught. According to NCVS surveys, about 60% of all crimes are not reported to police. The FBI reports that 4.6 million arrests were made for property or violent crimes, a number representing only 19% of the reported victimizations.  State and federal courts dealing with serious felony crimes produce about one million convictions—of which 68% result in a prison or jail sentence. Therefore, as illustrated in Table 5, the immediate chances of being arrested, convicted, and sentenced to jail or prison are quite small.

Further, different types of crimes vary markedly in their potential for being deterred and people differ in their susceptibility to being deterred by the threat of punishment.  The population roughly divides into three groups: 1) those who, because of personal values and so-cial commitments, would not knowingly commit crimes under any circumstances; 2) those who are deterred when they believe that there is some likelihood they will be caught and punished; and 3) those who are not deterred.  The type of crime most likely to be reported and to result in arrest and conviction tends to be committed by those least likely to be deterred—generally young males excluded from the conventional pathways to success, many of whom already have been severely punished by the juvenile justice system early in their lives and are unlikely to be deterred in the future.  The vast majority of these youth desist from crime after their twenties for reasons unrelated to any penalties the state imposes on them.  Ironically, those who are deterred when punishment is seen as likely—polluters, price fixers, slum lords, inside traders, stock swindlers, workplace safety violators, and other "white-collar" criminals—receive relatively lenient punishment when caught.

At the turn of the 19th century reformers realized that brutal prisons embitter prisoners rather than reform them. Yet this persistent faith that prisoners can be discouraged from returning to crime by subjecting them to harsh penalties, or that the population at large can be deterred more effectively with severe penalties than with milder ones, has never had empirical support. Decades of research on capital punishment have failed to produce compelling evidence that it prevents homicide more effectively than long prison sentences.[49]  Community penalties, it has been shown, are at least as effective in discouraging return to crime as institutional penalties.[50]  Rigorous prison conditions substantially increase recidivism.[51]  Evaluations show that boot camps and "scared straight" programs either have no effect on recidivism or increase it.[52] "Tough" sanctions are popular, but they do not reduce crime. ∎

[47] *Recidivism of Prisoners Released in 1994*. US DOJ. Washington, DC: Bureau of Justice Statistics, 2002.
[48] John L. Worrall. "The Effect of Three-Strikes Legislation on Serious Crime in California." *Journal of Criminal Justice* 32 (2004): 283-96.
[49] Sarah T. Dike. *Capital Punishment in the United States*. Hackensack, NJ: National Council on Crime and Delinquency, 1982; Richard A. Berk. "New Claims about Executions and General Deterrence: Deja Vu All Over Again?" *Journal of Empirical Legal Studies* 27 (1998): 209-19.
[50] Joan Petersilia and Susan Turner. *Prison versus Probation in California: Implications for Crime and Offender Recidivism*. Santa Monica, CA: RAND, 1986.
[51] M. Keith Chen and Jesse M. Shapiro. 4 Dec. 2006. "Does Prison Harden Inmates? A Discontinuity-Based Approach." Cowles Foundation, Harvard University http://home.uchicago.edu/c~jmshapir/prison120406.pdf/
[52] Doris Layton MacKenzie and James O. Finckenauer. *Scared Straight: Delinquency and the Panacea Phenomenon*. Englewood Cliffs, NJ: Prentice Hall, 1982; Doris Layton MacKenzie. *What Works in Corrections; Reducing the Criminal Activities of Offenders and Delinquents*. New York: Cambridge UP, 2006; Mark W. Lipsey. "What Do We Learn from 400 Research Studies on the Effectiveness of Treatment with Juvenile Delinquents?" *What Works: Reducing Reoffending*. Ed. J. McGuri. New York: Wiley, 1995.

# III



*The danger of relying on treatment and programs to solve America's imprisonment crisis is that when recidivism isn't reduced, imprisonment will be regarded as the only viable answer to the crime problem.*

# The Limits of Prison-Based Rehabilitative and Treatment Programs

There is a growing belief that prison populations can be reduced simply by expanding rehabilitative and treatment programs within our prisons. This position is based largely on new studies showing that treatment or rehabilitation services can reduce recidivism and thus reduce the number of persons being re-admitted to prison after release. Increasingly, completion of rehabilitative or addiction treatment programs can and do result in a reduced period of confinement.

Our concern is that we delude ourselves that treatment programs hold the key to reducing the prison population. Prison populations did not increase in the 1970s because programs disappeared, causing crime and recidivism rates to increase. Rather—and it is important to be clear about this—prison populations increased because laws were passed that increased the number of people sent to prison and their length of stay.

Even if treatment programs were effective in reducing recidivism, recidivism is not the primary cause of the explosion in the prison population, as we have argued above. Evidence suggests, however, that such programs are in fact not particularly effective in reducing even the portion of prison overcrowding caused by recidivism. The most recent probation and parole success rates and the reasons for not completing probation or parole

| Table 6: Probation and Parole Success Rates—1995-2003 | | |
|---|---|---|
| **OUTCOME MEASURES** | **PROBATION** | **PAROLE** |
| **SUCCESSFUL COMPLETIONS** | | |
| 1995 | 62% | 45% |
| 2000 | 60% | 43% |
| 2003 | 59% | 47% |
| **REASON FOR FAILURES** | | |
| Re-incarcerated | 16% | 38% |
| New Conviction and Sentence | 5% | 11% |
| Revocation | 7% | 26% |
| Other | 4% | 1% |
| Absconded | 4% | 9% |
| Other | 22% | 6% |

*Source: Probation and Parole in the United States, 2003. US DOJ. Washington, DC: Bureau of Justice Statistics, 2004.*

| Table 7: 1983 and 1994 Prisoner Three Year Follow-Up Recidivism Rates | | |
|---|---|---|
| **Recidivism Measure** | **1983 Prison Releases** | **1994 Prison Releases** |
| **Re-Arrested** | 63% | 69% |
| **Re-Convicted** | 47% | 47% |
| **Re-Imprisoned** | 41% | 40-52%* |

*52% readmission to prison with California prisoners and 40% without California prisoners included.

Sources: Recidivism of Prisoners Released in 1994. US DOJ. Washington, DC: Bureau of Justice Statistics, 2002; Recidivism of Prisoners Released in 1983. US DOJ. Washington, DC: Bureau of Justice Statistics, 1989.

supervision have not changed since the U.S. Department of Justice began reporting them in 1995 (Table 6). The same holds true for recidivism rates of prisoners released from prison (Table 7). The Bureau of Justice Statistics national recidivism rates of prisoners after release have not changed between 1983 and 1994. Figure 4 shows recidivism rates for the states of Washington and New York, which have been recording their three-year return prison rates as early as 1985. Thus despite a number of reforms that have been designed to increase the availability of program services, recidivism rates have remained unchanged.[53]

A growing literature on "what works" in correctional programming has found that many programs have no impact on recidivism rates. A recent "meta-analysis" of treatment programs reviewed 291 evaluations of adult offender treatment programs, both in-prison and in-community, conducted in the United States and other English-speaking nations.[54] It reports that 42% of the evaluated programs, including jail diversion programs, domestic violence programs, faith-based, psychotherapy or behavior therapy for sex offenders, boot camps, electronic monitoring, and restorative justice programs *had no impact* on recidivism.

Of the 167 effective programs, only one-fourth were prison-based treatment programs. Of these programs,

the reduction in recidivism rates generally ranged from 4% to 10%. These recidivism reduction results are similar to those found in other major evaluations of "what works" (or "doesn't work"). Notably, many other programs do not reduce recidivism and may actually increase rates of failure.[55]

Treatment and rehabilitative programs tend to be most effective when they are disassociated from government coercion.[56] Someone who doesn't want to be rehabilitated is not a promising candidate for being rehabilitated. Requiring someone to sit through a program designed to deal with dependence on alcohol or drugs may lead to resentment and shammed participation. It is not likely to bring about the inner transformation that will end involvement in crime. The association of help with punishment that occurs when courts require treatment is likely to discourage those who could benefit from programs to seek them out on their own. The presence of substantial numbers of reluctant participants may undermine the quality of the programs, reducing their ability to help those who want to be helped. Those who administer programs are likely to become demoralized if they are forced to accept "clients" sent to them by a court, rather than working with those who seek help on their own.

Even under the most optimistic assumptions, the effect of in-prison rehabilitative programs is to reduce failure rates by 10% or so. If *all* correctional programs were to achieve this level of success, they would reduce failure rates for about one-third of those confined from about 40% to about 30%. A 10% reduction in return-to-prison rate for one third of the population translates to an overall system rate reduction in recidivism of 3%. This is not large enough to substantially reduce a prison population.

The inability of rehabilitation programs to stem prison expansion can be seen in several major states. The Florida Department of Corrections reported that it offered a wide array of treatment, education and vocational programs to over 6,500 prisoners released in 1995 and 1996. For those who completed the programs, a recidivism rate reduction of 6-10% was achieved. But the estimated number of prisoners thus not returning to prison because of involvement in the programs was about 400 or two percent of the more than 18,000 persons admitted to prison in

---

[53] See "State of New York Department of Correctional Services" (undated), 2001 Releases: Three Year Post-Release Follow-Up. Albany, New York; and the Washington State Department of Corrections Web site at: http://www.doc.wa.gov/BudgetAndResearch/ResearchData/Recidivism20.pdf/
[54] Steve Aos, Marna Miller, and Elizabeth Drake. *Evidence-Based Adult Corrections Programs: What Works and What Does Not*. Olympia, WA: Washington State Institute for Public Policy, 2006. Only 20% of the evaluations used random assignment procedures to create treatment and control groups. The other studies used "matching techniques" to approximate the attributes of the "treatment" group, which is less rigorous.
[55] Donald A. Andrews. "Principles of Effective Correctional Programs." *Compendium 2000 on Effective Correctional Programming*. Laurence L. Motiuk and Ralph C. Serin, eds. Ottawa: Correctional Service Canada, 2001; Larry Sherman et. al. *Preventing Crime: What Works, What Doesn't, What's Promising*. Washington, DC: National Institute of Justice, 2006.
[56] Ojmarrh Mitchell, David B. Wilson, and Doris L. MacKenzie, "The Effectiveness of Incarceration-Based Drug Treatment on Criminal Behavior," which is a meta-analysis of in-prison treatment programs for drugs.

*Unlocking America*

the same year. Indeed, while these programs operate, both prison admissions and the prison population have continued to escalate.[57]

In California, a recent study by the state's Inspector General's Office concluded that California's $1 billion investment in drug treatment for prisoners since 1989 has been "a complete waste of money," and has failed to reduce recidivism rates. In fact a study by UCLA found that the state's two largest in-prison programs produced higher recidivism rates for inmates who participated in the programs as opposed to those who did not receive treatment.[58] Some of the reasons cited for the lack of impact are improper program design and operations.

With respect to treatment in lieu of incarceration, we agree that large numbers of persons charged with felony crimes should be sentenced to alternatives to state prison that also provide treatment services and education programs. But numerous studies of prison diversion programs show that these, too, may not reduce prison admissions. Too often, alternative programs have been reserved for people who would not otherwise have been sentenced to prison.[59] In some instances, diversion programs actually *increase* prison populations. This can occur when people who plead guilty to be eligible for treatment fail to complete the program and end up being sent to prison. In many of these cases, they would have had their charges dropped if they had not pled guilty or been given a county jail sentence or a shorter prison sentence than the one they received after failing the treatment program.[60]

Ultimately, the purpose of treatment and rehabilitation—and the criteria for assessing their usefulness and efficacy—should not be a major reduction in recidivism, much less reducing the size of the prison population. These are unreasonable burdens to place on programs that are, by their very nature, limited.

There is no question that providing meaningful work, education, and self-development programs to prisoners promotes more human and safer prisons. And a growing body of research, as noted below, suggests that prisoners who seriously take advantage of well-administered rehabilitative services and complete the programs are more likely to succeed in achieving satisfying conventional lives after prison than persons who do not receive these services. But expanding treatment services has not been shown to be an effective means of reducing prison populations. Indeed, relying on treatment and programs to solve America's imprisonment crisis carries the risk that, when they fail to reduce recidivism, imprisonment will be regarded as the only viable answer to the crime problem.[61] Treatment programs are necessary and humane, but they are not answers to the crisis of prison overpopulation. ■



**Figure 4: Three-Year Recidivism Rates**

*Note: CA rates are 2 yr.*

Legend: New York, Washington, California, Pennsylvania, Ohio

Year of Release

57 *Analysis of the Impact of Inmate Programs on Recidivism. Tallahassee: Florida Department of Corrections, 2001* http://www.dc.state.fl.us/pub/recidivismprog/index.html/.
58 Matthew L. Cate. "Special Review into In-Prison Substance Abuse Treatment Programs Managed by the California Department of Corrections and Rehabilitation." Sacramento: California Bureau of Audits and Investigations, 2007.
59 Larry Sherman et. al., op. cit.
60 Joan Petersilia. "A Decade of Experimenting with Intermediate Sanctions: What Have We Learned?" *Corrections Management Quarterly* 3.3 (1999): 19-27.
61 In 1973, New York Governor Nelson Rockefeller proposed the infamous Rockefeller drug laws, imposing life sentences for possessing or selling drugs, after concluding that treatment programs for heroin users were not working. Other states followed suit with similarly long sentences for drug-law violators. These laws are widely seen as failures because they imprison low-level "mules" or street-level dealers for very long stretches, without capturing major operators or substantially reducing drug use. It is only because so much faith had been placed in rehabilitation that the publication of Robert Martinson's conclusion that most treatment programs had not been shown to be effective could have been construed, 30 years ago, as providing support for prison expansion. Robert Martinson. "What Works? Questions and Answers about Prison Reform." *The Public Interest* 35 (1974): 22-54.

# Decarceration, Cost Savings, and Public Safety

IV

The overuse of incarceration, along with the mistaken justifications that have supported this policy, have corrupted and compromised our criminal justice policies and paralyzed efforts to reform them. The net result is an expensive system that relies much too heavily on imprisonment, is increasingly ineffective, and diverts large sums of taxpayers' money from more effective crime control strategies. Even some of the leading criminologists who lobbied for putting more people in prison are now advocating that we invest some of the tens of billions we are now spending on imprisonment in more productive crime-reduction practices.

*The impact of a $1 million investment in ... cash and other incentives to disadvantaged students to graduate from high school would result in a reduction of 258 crimes per year, and parent training therapy for families with young "acting out" children 160 crimes per year, compared to a reduction of 60 crimes a year through building and operating prisons.[62]*

But to make such investments we must reduce the system that is draining our resources. The facts indicate that placing large numbers of people in prison and jail or on probation and parole for long periods of time is not an effective crime control strategy. One study found that after imprisonment exceeded a certain tipping point, it became counter-productive. When too many men are removed from a community, family and social life are destabilized, leading to higher crime rates.[63]

Making matters worse, we have squandered lean government budgets on corrections (responding to the symptom) instead of funding programs that shepherd dislocated young people onto conventional paths (responding to the cause). While we build prisons, we do not increase funding for academic and technical education, job training, healthcare, affordable housing, or other social services that assist people in getting a foot in the door to a better life.

The loss of manufacturing jobs in recent decades has reduced the opportunities for non-white, inner-city youth to get their feet in that door.[64] Prison expansion, by stigmatizing such a large number of black and Latino male youth, has placed an additional obstacle in their path. It interferes with family formation, strains existing family relationships, and disrupts careers.[65] Because employers commonly discriminate against minorities and also

*The facts indicate that placing so many people in prison and jail or on probation and parole for long periods of time is not an effective crime control strategy.*



[62] Peter W. Greenwood et. al. *Diverting Children from a Life of Crime*. Santa Monica, CA: RAND, 1998.
[63] Dina R. Rose and Todd R. Clear. "The Problem with 'Addition by Subtraction': The Prison-Crime Relationship in Low-Income Communities." *Invisible Punishment: The Collateral Consequences of Mass Imprisonment*; Marc Mauer and Meda Chesney-Lind, eds. New York: The New Press, 2003. 181-94; Todd R. Clear. *Imprisoning Communities: How Mass Incarceration Makes Disadvantaged Places Worse*. New York: Oxford UP, 2007.
[64] John M. Hagedorn. *People and Folks: Gangs, Crime, and the Underclass in a Rustbelt City*. Chicago: Lake View Press, 1988; Loïc Wacquant. "When Ghetto and Prison Meet and Mesh." *Punishment and Society* 3.1 (2001): 95-134; Steven Raphael, op. cit.; Bruce Western, op. cit.; Thomas J. Sugrue, *The Origins of the Urban Crisis: Race and Inequality in Postwar Detroit*. Princeton, NJ: Princeton UP, 1996.
[65] John Hagan and Ronit Dinovitzer. "Collateral Consequences of Imprisonment for Children, Communities, and Prisoners." *Crime and Justice: A Review of Research* 26 (1999): 121-62; Bruce Western. *Punishment and Inequality in America*. New York: Russell Sage, 2006.

against ex-convicts, our current crime-control strategy dooms many people who start life with major disadvantages. The long-term association of minority status with crime in the public mind is strengthened when a highly disproportionate number of blacks and Latinos are locked up.

In the long run, these stereotypes reinforce discriminatory residential and employment patterns. Prospective employers, faced with a black male job applicant, are now more likely than in the past to suspect that the applicant has a criminal record, and decline to offer a job.[66] High rates of imprisonment may thus reduce legitimate stakes in conformity and eliminate lawful alternatives to crime, not just for those who are sent to prison but also for those who are not.

Careful analysis of variations in states' crime and incarceration rates reveals a consistent relationship: states with the *lowest* crime rates also have the *lowest* incarceration rates, and this is not primarily a result of incarceration reducing crime. Put differently, if incarceration were the key to a safer society, cities and states with exceptionally high incarceration rates (e.g., Baltimore, Washington, D.C., Louisiana, Texas, and Oklahoma) would be the safest—not the most dangerous—places to live. What makes a place safe are social and economic factors that deliver a high quality of life as measured by good education, strong families, informal social controls, viable networks, and opportunities for stable, meaningful, and well-paid work.[67]

While incarceration does not make us safer, decarceration, as recommended in this report, would free up the resources necessary to produce neighborhoods that are good places to live, work, and play, making people safe (and feel safe) from common forms of interpersonal violence and theft. It lies beyond the scope of this document to specify a program for doing this. There are, however, steps that government, business, and community organizations can take in preventing communities from deteriorating and in helping them improve when they are in trouble. The criminal justice system has a role to play in this process. Businesses will be reluctant to invest in communities where they will be at high risk for violence and theft. Neighbors will be reluctant to participate in and take responsibility for community affairs when the streets are unsafe. At the same time, it must be recognized that criminal justice agencies cannot do the job alone. We focus here on criminal justice, but insist that the contribution it makes must be informed by key facts we have spelled out above if the result is to be progressive, humane, and effective. ∎

[66] John R. Lott Jr. "The Effect of Conviction on the Legitimate Income of Criminals," *Economic Letters* 34 (1990): 381-85; Devah Pager. "The Mark of a Criminal Record." *American Journal of Sociology* 108 (2003): 937-75 and "Double Jeopardy: Race, Crime, and Getting a Job," *Wisconsin Law Review* (2005): 617-60; Robert J. Sampson and John H. Laub. *Crime in the Making: Pathways and Turning Points Throughout Life.* Cambridge, MA: Harvard UP, 1993; Joel Waldfogel. "The Effect of Criminal Conviction on Income and the Trust Reposed in the Workmen." *Journal of Human Resources* 29 (1994): 62-81 and "Does Conviction Have Permanent Effect on Income and Employment?" *International Review of Law and Economics* 18 (1998): 25-40; Jeffrey Grogger. "The Effect of Arrests on the Employment and Earnings of Young Men." *The Quarterly Journal of Economics* 11 (1995): 51-71; Marc Mauer. *Race to Incarcerate.* New York: New Press, 1999; Richard B. Freeman and Jeffrey Fagan. "Crime and Work." *Crime and Justice: A Review of Research* 265 (1999): 225-90; Marc Mauer and Meda Chesney-Lind, eds. *Invisible Punishment: The Collateral Consequences of Mass Imprisonment.* New York: New Press, 2002; Michael Tonry. *Malign Neglect.* New York: Oxford UP, 1995; Bruce Western. *Punishment and Inequality in America.* New York: Russell Sage, 2006.
[67] Arnold S. Linksy and Murray A. Straus. *Social Stress in the United States: Links to Regional Patterns in Crime and Illness.* Dover, MA: Auburn House, 1986.

# Recommendations
## Our Orienting Idea: Punishment Should Fit the Crime.

We have argued that using imprisonment to reduce crime by deterring, incapacitating, or rehabilitating is of limited value, and is now yielding diminishing returns. What then should imprisonment be used for? The size of the literature addressing this subject is not matched by its success in forging a consensus on the matter, and we do not intend to settle all debates here. That said, we think it useful to be clear about our own guiding thoughts.

Imprisonment can legitimately satisfy a social and personal need for retribution toward those who violate society's laws. Most contemporary philosophies of punishment give a large role to retribution.

In addition to satisfying victims' needs, punishing lawbreakers according to what they deserve can perform important social functions. Punishment can promote social solidarity, while failure to respond to crime weakens commitment to social norms. At the same time, excessive punishment can exacerbate social tensions and widens divisions, reducing solidarity. It can corrode a nation's political culture, and obstruct efforts to deal constructively with social problems, including crime.

Retribution should not be used as an excuse for mindless punitiveness as is the case now. The essence of the retribution is to punish people proportionately to what they deserve, based on the crime they have committed. Excessive leniency and undeserved harshness both violate the principle of proportionality. Failure to limit the severity of

punishment to what is deserved is unjust. It alienates citizens from the government and undercuts the effectiveness of law enforcement. When those who are punished are disproportionately poor and members of minority groups, it is inevitable that they will believe that the law is being used to repress them, rather than holding them accountable for their crimes.

Public opinion polls have consistently shown that substantial numbers of people think that the courts are too lenient. These sentiments cannot be taken at face value, and should not be allowed to dictate sentencing policy unthinkingly. For example, the vast majority of crimes are neither as serious as the public believes them to be nor as heinous as the media portrays them. As shown in Table 8, very few (about 15%) of the crimes for which people are arrested are either violent or serious property crimes. Yet many of these arrests are resulting in prison terms. We have already noted that the costs of these crimes to the public are only a fraction of the costs of punishing those who are arrested and convicted. The volume of serious crime attributed to released prisoners is also much lower than is commonly believed.

In addition, many people do not fully appreciate how harsh and disruptive any form of imprisonment is because they have never experienced the total loss of agency and privacy that imprisonment entails. Most prisoners experience monotonous routines, medical neglect, physical danger, extreme isolation, and a myriad of deprivations—all

V



*Our resources are misspent, our punishments too severe, our sentences too long.*

—*Justice Anthony M. Kennedy[68]*

---

[68] Justice Anthony M. Kennedy. "Speech at the American Bar Association, Annual Meeting: An Address by Anthony M. Kennedy, Associate Justice, Supreme Court of the United States." American Bar Association. San Francisco, CA. 9 Aug. 2003.

*Unlocking America*

of which worsen the trauma of imprisonment.

When people are presented a fuller picture of the facts of particular crime and the criminals' characteristics, they generally favor more moderate sanctions. Recent studies show that "when nonviolent offenders are involved, there is substantial support for intermediate sanctions and for restorative justice."

We also note that problems can potentially arise when prosecutors, defense counsel and judges want to modify a sentence by taking into account other factors that are more related to the goals of deterrence, incapacitation and rehabilitation. For example, should we allow different prison sentences for two people who have committed the same crime but have different prior records or have been assessed to present a lower risk to public safety (male versus female, older versus younger, drug addiction versus none)? Similarly, one could argue that someone who has committed only a very minor crime but has been assessed as a "high risk" to commit a serious crime if released and hence in need of being deterred, incapacitated or rehabilitated should be incarcerated as opposed to someone convicted of a more serious crime but poses no such threat to public safety.

The prestigious American Law Institute's recently issued Model Penal Code endorses a concept of "limited retribution", which allows for the introduction of rehabilitative, deterrence and incapacitation factors which can influence sentences within minimum and maximum limits based on retributive considerations. This position has the merit of limiting the extent to which sentence lengths can be extended far beyond what a defendant deserves. Prosecutors and judges currently take such considerations into account as they negotiate pleas and set sentences.

Nevertheless we are concerned about the potential for injustice and discrimination associated with this practice. When decisions made as to whether someone should be imprisoned or for how long on the basis of what crimes one might commit if released, or on the basis of a person's needs for rehabilitation, they will often be incorrect. Subjecting people who will not commit serious new crimes to prison sentences (or to longer sentences) simply on the basis of predictions that are false is simply unfair.

We are also concerned that determinations of dangerousness or in need of treatment are likely to be skewed by racial and class biases. Racial stereotypes sometimes operate unconsciously and can influence perceptions of dangerousness even on the part of decision-makers who harbor no conscious prejudices.

Minority offenders' personal circumstances may make them appear to some judges as unlikely prospects for rehabilitation. Those who can pay for private drug or mental health treatment, provide restitution in large amounts to vic-

| Table 8: Arrests by Type of Crime, 2005 | | |
|---|---|---|
| **Crime Type** | **Number** | **Percent** |
| **Total Arrests** | **14,094,186** | **100%** |
| **Total Serious Violent** | **603,503** | **4%** |
| Murder and non-negligent manslaughter | 14,062 | 0% |
| Forcible rape | 25,528 | 0% |
| Robbery | 114,616 | 1% |
| Aggravated assault | 449,297 | 3% |
| **Total Serious Property** | **1,609,327** | **11%** |
| Burglary | 298,835 | 2% |
| Larceny theft | 1,146,696 | 8% |
| Motor vehicle theft | 147,459 | 1% |
| Arson | 16,337 | 0% |
| **Drug abuse violations** | **1,846,351** | **13%** |
| Alcohol/Liquor | 2,525,924 | 18% |
| Driving under the influence | 1,371,919 | 10% |
| Liquor laws | 597,838 | 4% |
| Drunkenness | 556,167 | 4% |
| **All Other Crimes** | **10,035,005** | **53%** |
| Other assaults | 1,301,392 | 9% |
| Forgery and counterfeiting | 118,455 | 1% |
| Fraud | 321,521 | 2% |
| Embezzlement | 18,970 | 0% |
| Stolen property; buying, receiving, possessing | 133,856 | 1% |
| Vandalism | 279,562 | 2% |
| Weapons | 193,469 | 1% |
| Prostitution | 84,891 | 1% |
| Non-rape sex offenses | 91,625 | 1% |
| Gambling | 11,180 | 0% |
| Offenses against the family | 129,128 | 1% |
| Disorderly conduct | 678,231 | 5% |
| Vagrancy | 33,227 | 0% |
| All other offenses | 3,863,785 | 27% |
| Suspicion | 3,764 | 0% |
| Curfew/loitering | 140,835 | 1% |
| Runaways | 108,954 | 1% |

*Source: UCR 2005, Federal Bureau of Investigation.*

*\*Percentages do not add up to 100% due to rounding.*

| Table 9: Three Year Follow-Up Rate of Re-Arrest of State Prisoners Released in 1994, By Time Served in Prison | |
|---|---|
| Time Served | Three Year Re-Arrest Rates |
| 6 Months or Less | 66.0% |
| 7-12 months | 64.8% |
| 13-18 months | 64.2% |
| 19-24 months | 65.4% |
| 25-30 months | 68.3% |
| 31-36 months | 62.6% |
| 37-60 months | 63.2% |
| 61 months or more | 54.0% |
| Source: Prison Statistics. US DOJ. 1 Aug. 2006 http://www.ojp.usdoj.gov/bjs/prisons.htm/ | |

tims and communities, or attend educational and vocational programs often unavailable to the poor are likely to receive milder punishments than others who have committed exactly the same crimes.

This is especially so in the current political context, which increasingly relies on the private sector to provide correctional services. This means that middle-class criminals with drug or mental health problems get help because they can pay for it—and stay out of prison—while poor people who cannot do so go to jail. By reducing the magnitudes of sentences and restricting them within narrow limits, such disparities are likely to be reduced. But we remain concerned that poor and non-white people might be likely to receive harsher punishments within these limits.

For all of these reasons we oppose the practice of imposing prison sentences "so that the defendant can be rehabilitated," or "to protect society" from "a dangerous" person. On the other hand, retributivism does not require that everyone who violates a given statute receive exactly the same sentence. In determining the appropriate punishment in a particular case, some characteristics of the person and the crime committed can legitimately be considered. All violations of a particular criminal statute are not alike. A sentencing system should be "flexible enough to permit individualized sentences when warranted by mitigating or aggravating factors not taken into account in the establishment of general sentencing practices."

At the same time it should not be so unstructured as to create "unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar criminal conduct." Flexibility and equity in sentenc-

ing can thus be achieved by considering the criminal's personal circumstances, the circumstances of the crime itself (e.g. was it spontaneous or premeditated?) and criminal record to influence the sentence.

The implementation of these very general principles is a matter that deserves careful attention by state legislators. It lies beyond the scope of this report to specify the details of such a sentencing scheme. Nevertheless, we insist that the presumption against imprisonment should hold firm in all cases.

Given the excessive lengths of sentences now being imposed on many defendants, a reconsideration of sentencing structures should begin with the premise that sentence lengths should be reduced substantially. Furthermore, innovative methods of serving in-community sentences should be explored. Especially promising are programs of victim-offender restoration and community reparation such as are already operating in Europe, Australia and New Zealand.

### FOUR RECOMMENDATIONS THAT WILL REDUCE PRISON POPULATION

To reduce the prison population, we propose four recommendations. If implemented, they would dramatically reduce current prison, parole, probation, and jail populations. All of these recommendations have been successfully implemented in some fashion in several jurisdictions *with no adverse impact on crime rates*.[69] By lowering the prison population, the associated costs—tens of billions of dollars now spent in an ineffective war on crime—could either be returned to tax payers or reinvested by the public and private sectors in those social, family, community, and economic

---

[69] Reducing prison populations by shortening sentences and ceasing returning parole violators to prison could only occur over a span of several years and, therefore, there would be little or no impact on crime rates due to influx of released prisoners. In several instances, prison populations have been reduced in a short period of time and there was no resultant increase in crime rates. Similarly, decriminalization of drug crimes, even heroin and cocaine possession and use, has occurred with no increase in drug use or other crimes.

institutions that have more direct influence on crime rates.

### RECOMMENDATION 1:  Reduce time served in prison.

The fundamental and most powerful reform that must occur if we are to have any hope of reversing the imprisonment binge is to reduce the severity of the sentences they are given. For many prisoners now sent to prison, this would mean probation or a short jail sentence; for others, it would mean less time spent in prison, as well as less time on parole. An in-depth examination of sentence lengths and time conserved is called for, it might begin with the presumption that terms be cut back to what they were circa 1975 when the imprisonment binge began.

This central recommendation is grounded in three facts: 1) many prisoners are now serving longer prison terms; 2) the longer prison terms are not proportionate to the severity of the crimes they were convicted of; and 3) the extension of their length of incarceration has no major impact on their recidivism rate, or crime rates in general.  As shown in Table 9 there is no association between length of stay and recidivism rates.  Coupled with the previous research finding that released prisoners account for a small percentage of all arrests, one has to question the benefits of increasing the length of time served.

### RECOMMENDATION 2:  Eliminate the use of prison for parole or probation technical violators.

Today anywhere from 50-65% of the 650,000 prisoners admitted to state prison are those who have failed to complete their terms of probation or parole. Of those who have failed probation or parole, about half are being sent to prison for what is known as technical violations. Such violations include such behavior as absconding from supervision, failure to pay supervision fees, restitution costs, or fines, failure to attend treatment, drug use as detected by urine-analysis, failure to maintain employment, or being arrested (but not convicted) for misdemeanor or felony level crimes.

While these behaviors are troublesome, they do not reach the level of seriousness of requiring incarceration for many months or years in state or federal prison.  In many ways using the most severe form of punishment for behavior that only a probationer or parolee can be imprisoned for is a clear example of where the punishment does not fit the crime.  For those that suggest that by incarcerating people for non-felony crimes or non-compliance with the terms of probation or parole we are preventing more serious crimes to occur, there is no scientific data to support such a claim. In fact as shown in recommendation No. 3, the evidence is that parole supervision is either ineffective or criminogenic with respect to public safety.

Parolees who are returned to prison because of technical violations often serve relatively long prison terms.  The U.S. Department of Justice reports that parole violators returned to prison serve an average of 18 months before being re-released.  In Louisiana, the state with the highest incarceration rate in the United States, the average length of stay for a technical violator is 20 months.  Conversely, the state of Washington, by statute, does not allow technical violators to spend more than 60 days incarcerated for such violations and then only after a set number of violations.

These data clearly suggest that we are spending a great deal of money and wasting a large amount of prison space on people who fail to comply with parole and probation supervision rules and who have not committed new crimes. Prosecutors and correctional officials erroneously believe that unless individuals are re-incarcerated for technical violations, the individuals will commit serious crimes in the future. There is no scientific evidence to support this belief and attendant policy, yet it continues to be the primary rationale for re-incarcerating tens of thousands of people for criminal or non-criminal behavior for which ordinary citizens could not be incarcerated.

### RECOMMENDATION 3:  Reduce the length of parole and probation supervision periods.

| Table 10:  Re-Incarceration Rates by Type of Release for Selected States | | | |
|---|---|---|---|
| **Release Type** | **Kentucky** | **Texas** | **Pennsylvania** |
| Parole Supervision | 53% | 26% | 50% |
| Discharges | 18% | 11% | 19% |
| Total | 35% | 25% | 42% |

*Source: James Austin, Patricia Handyman, and John Irwin. "Exploring the Needs and Risks of the Returning Prisoner Population." (Presented to the From Prison to Home Conference, Jan. 30-31, 2002).*

Currently, persons placed on probation and parole remain in this status for extended periods of time (after three years or more). Violation of the rigorous rules imposed on probationers and parolees can result in return to prison. As we saw in Table 4, a substantial fraction of prison admissions are for these "technical" violations.

There is little evidence that lengthy parole and probation terms decrease crime. A number of studies in California discovered that 1) there was no relationship between the time on supervision and parole success, and 2) parole versus no parole supervision on recidivism rates.[70] Probation or parole supervision failure is most likely to occur within the first 12 months of supervision; thereafter, supervision is more of a nuisance than a means for assisting people after prison or preventing them from committing another crime.

Now, there is new research evidence indicating that parole supervision is largely ineffective with respect to reducing recidivism. Table 10 shows the recidivism rates by type of release for Kentucky, Texas, and Pennsylvania. Here one can see that people who complete their prison sentences without parole supervision have significantly lower recidivism rates than those placed on parole supervision. The obvious explanation is that people who have no parole obligations when they leave prison ("max out") can only be returned to prison if they are convicted of a new felony crime. Conversely, those placed on parole and probation can be re-incarcerated for either non-criminal behavior or misdemeanor crimes. A 2005 Urban Institute study, among others, revealed that individuals released with no parole supervision return to prison at a significantly lower rate than those released on parole.[71]

### RECOMMENDATION 4: Decriminalize "victimless" crimes, particularly those related to drug use and abuse.

In recent years, behaviors have been criminalized that are not dangerous and pose little if any threat to others. A large group of people are currently serving time for behaviors that have been criminalized to protect people from themselves. Their offenses involved the consent of all immediate parties to the transaction. Common examples in American history have included abortion, gambling, illicit sexual conduct that does not involve coercion (e.g., prostitution and, until recently, homosexual activity), and the sale

and possession of recreational drugs. According to the U.S. Department of Justice, approximately 30-40% of all current prison admissions involve crimes that have no direct or obvious victim other than the perpetrator (see Table 11).[72] The drug category constitutes the largest offense category, with 31% of all prison admissions resulting from such crimes.

In the late 19th and early 20th centuries, the United States government conducted a large-scale experiment regarding the social consequences of creating a new category of crimes by making it illegal to distribute alcohol. Prohibition aimed to stop people from drinking, and to an extent was successful. But the price of this success was ultimately considered too high. Revenues from selling alcohol illegally swelled the coffers of organized crime and magnified levels of corruption in local governments. Gangsters gunned one another down to gain control of the lucrative market for illegal liquor. Many died from drinking alcohol put on the market without quality control. Eventually, Americans realized that Prohibition was doing more harm than good and repealed it.

Politicians and the public have ignored the lessons of Prohibition in formulating drug policy. In an attempt to eliminate harms caused to individuals, their families and society from the abuse of heroin, cocaine, marijuana, and other drugs, legislatures have passed laws sending large numbers of users, abusers and low-level dealers to prison with very long sentences. This prohibition, like the earlier one, has led to violence as dealers have sought to eliminate rivals in the lucrative market. Like Prohibition, it has resulted in the distribution of adulterated drugs that have injured and killed users. The high profits of drug dealing are largely the consequence of legislation that eliminates competition from anyone unwilling to risk draconian penalties.

Every time a dealer is taken out of circulation by a prison sentence, a new dealer is drawn in by the lure of large profits. The prosecution and imprisonment of low-level traffickers has increased racial disparities, and is the largest factor contributing to the rapid rise in imprisonment rates for women. Dealers' use of violence to eliminate competition helps to sustain the myth linking drug use to violence. Notwithstanding our extraordinary effort to discourage the use and sale of illegal drugs, they remain widely available and widely used.

Though other Western nations have not decriminalized commerce in illegal drugs, they give greater weight to medical and public health considerations in the formulation

---

[70] Dorothy R. Jaman, Lawrence A. Bennett, and John E. Berecochea. *Early Discharge from Parole: Policy, Practice and Outcome.* Sacramento: California Department of Sacramento Corrections, 1974; Deborah Star. *Summary Parole: A Six and Twelve Month Follow-Up Evaluation.* Sacramento: California Dept. of Corrections, Research Unit, 1979; Patrick G. Jackson. "Living Together Unmarried: Awareness Contexts and Social Interaction." *Journal of Family Issues* (1983), and Patrick G. Jackson. "Bay Area Parole Project." Mimeographed, 1978.

[71] Amy L. Solomon, Vera Kachnowski, and Avinash Bhati. *Does Parole Work? Analyzing the Impact of Post-Prison Supervision on Re-Arrest Outcomes.* Washington, DC: The Urban Institute, 2005.

[72] Criminological literature refers to these crimes as "victimless" (Edwin M. Schur. *Crime Without Victims: Deviant Behavior and Public Policy.* Englewood Cliffs, NJ: Prentice Hall, 1965), suggesting that they do no harm, which is not always the case. For that reason we call these crimes "consensual."

*Unlocking America*

| Table 11: Most Serious Offense for Sentenced Prisoners, 2002 Prison Admissions | |
| --- | --- |
| **Most Serious Offense** | **Percent** |
| Number of admissions            508,955 | |
| | |
| **Violent offenses** | 27% |
| **Property offenses** | 30% |
| **Drug offenses** | 31% |
| *Possession* | 10% |
| *Trafficking* | 15% |
| *Other/unspecified drug* | 7% |
| **Public-order offenses** | 12% |
| **Weapons** | 3% |
| **Driving while intoxicated** | 3% |
| **Other public-order** | 5% |
| **Other offenses** | 1% |
| *Source: Prison Statistics. US DOJ. 1 Aug. 2006 http://www.ojp.usdoj.gov/bjs/keyfacts.htm/* | |

of drug policy. The violence that surrounds drug trafficking in the United States is largely absent in those countries, and governments are more receptive to needle exchange programs designed to limit the spread of AIDS.[73]

This does not mean that the government should simply walk away from the drug problem. It would be perfectly appropriate for governments to conduct educational campaigns about drugs, for example. Regulatory approaches, such as are now used for drugs that are not illegal should be given serious consideration. The success of recent referenda in several states allowing medical use of marijuana suggests that the public opinion may be changing.[74]

### TWO ADDITIONAL RECOMMENDATIONS THAT BEAR ON HUMANE JUSTICE

In addition to the four recommendations to reduce the prison population, there are two other recommendations that need to be made that bear on the quality and fairness of our use of imprisonment.

### RECOMMENDATION 5: Improve conditions of imprisonment.

Reducing the size of the prison population is not enough. We could not in good conscience recommend that anyone serve a prison sentence unless we ensure that those who do end up behind walls are treated in a humane manner. Prisons that systematically deny human dignity, basic human rights, and life necessities are creating festering sores that poison the entire society.

Unsafe, inhumane, and secretive prisons not only traumatize the incarcerated but also contaminate prison staff and their families, as well as townsfolk near the prison. More generally, support for an inhumane prison system requires that prison workers and the public embrace the simplistic concept that prisoners are unworthy beings that deserve their harsh punishment above and beyond the segregation from society and loss of freedom from incarceration itself.

The state can operate prisons efficiently and effectively while treating prisoners in a manner consistent with the minimum standards and rights for prisoners formulated by many private and public bodies in the 1960s and 1970s.[75] In the 1960s, the courts, particularly the U.S. Supreme Court, after virtually ignoring the plight of prisoners for decades, issued a number of decisions upholding prisoners' rights and

---

[73] Peter Reuter. "Why Can't We Make Prohibition Work Better? Some Consequences of Ignoring the Unattractive." *Perspectives on Crime and Justice: 1996-1997 Lecture Series,* Vol. 1. Washington, DC: National Institute of Justice, 1997 http://www.ncjrs.gov/pdffiles/166609.pdf/

[74] Between 1995 and the present, a majority of voters in state initiatives held in Alaska, Arizona, Colorado, Maine, Nevada, Oregon, the state of Washington, and Washington D.C., voted to allow marijuana use in connection with medical treatment. In state and national polls, substantial majorities support legalizing marijuana for medical use. Details are available at www.medicalmarijuanaprocon.org.

[75] In 1955, the United Nations Congress on the Prevention of Crime and the Treatment of Prisoners adopted a set of Standard Minimum Rules for the Treatment of Prisoners. See: Human Rights: A Compilation of International Instruments. New York: United Nations, 2002. Section G. In The Struggle for Justice: A Report on Crime and Punishment in America. American Friends Service Committee. New York: Hill and Wang, 1971. 168-69, the Working Party for the American Friends Service Committee, which consisted of individuals with a variety of prison-system experiences, produced one of the best-thought-out lists of humane conditions.

due process, and banning cruel and unusual punishment. These decisions produced an array of mandated changes in prisons across the country.   However, after the mid-1970s, the Supreme Court effectively returned to the "hands-off" policy.[76]

There are five fundamental features of prison administration that should be acceptable to anyone interested in accomplishing the prison's practicable purposes—punishment and deterrence—without engaging in unnecessary, counterproductive, and cruel practices.

### 1. Cruel and Unusual Punishment

Prison overcrowding, the adoption of excessively harsh and arbitrary control practices in reaction to prison violence, and the growing general punitive attitude toward prisoners have resulted in more punitive policies and practices.  These include denial of adequate medical services, excessive use of physical force, and housing prisoners in exceptionally punitive arrangements, such as solitary confinement units and cells.  The federal courts have ruled that all of these practices violate the Eighth Amendment of the United States Constitution.

### 2. Safety

Prisoners should be protected from assault, rape, murder, etc., by other prisoners and staff.  Effective strategies such as adequate surveillance, voluntary access to safe living areas within the prison, housing prisoners in small units, and "single-celling" should be practiced to ensure prisoners' safety.

### 3. Health

Prisoners should have access to the resources and services required to maintain their physical and mental health.  These include access to medical and psychiatric services, adequate diet, and recreation.  Prisoners should not be subjected to physically and mentally deleterious incarceration regimens such as extended periods of isolation and, restricted mobility, and excessive noise.

### 4.  Programs

Any rational and humane system of punishment should provide access to program opportunities that increase prison safety and improve prisoners' chances of making it in the community after prison.  Such programs would include academic, technical and citizenship education, as well as a wide variety of treatment programs that help prisoners improve themselves and develop more conventional, law-abiding interests and pursuits. These types of programs should be provided regardless

of whether they reduce recidivism.

### 5. Post-Release Assistance

Most prisoners receive little or no preparation for release from prison or assistance subsequent to their release. They face extraordinary difficulties in achieving stability, viability, and life fulfillment on the outside.  States should develop and provide access to transitional and permanent housing, education, vocational training and placement, counseling, coaching, and mentoring.

### RECOMMENDATION 6:  Restore ex-prisoner voting and other rights.

Prisoners face exceptional problems from their stigmatized and reduced social and civil status.  They are automatically barred from most city, county, and state employment and from some housing such as federally subsidized housing and are systematically denied employment by many private employers. Their right to vote varies from state to state, even from county to county in some states.

It will be difficult to overcome private employers' restrictions on hiring ex-prisoners, but persistent efforts should be made toward this goal. Perhaps laws against discrimination against employment of ex-prisoners can be adopted in the future.  Government agencies, however, could easily change their policies.  In San Francisco, the city government has removed the question regarding prior arrests on job applications. Other government jurisdictions should follow this example.  Opening up these relatively good-paying jobs to ex-prisoners greatly increases public safety by moving potential criminals into conventional pathways. Government subsidies for hiring ex-convicts could overcome some employers' hesitations.  In addition, exclusion from welfare, public housing, and subsidies should be ended as should rules barring ex-convicts from living in certain neighborhoods. Licensing restrictions should be maintained only when they are demonstrably necessary to protect the public.

### ESTIMATED IMPACT OF THESE RECOMMENDATIONS ON PRISON POPULATIONS

To illustrate what our recommendations can accomplish in reducing prison populations without impacting crime rates and at considerable savings to taxpayers, we have developed rough projections based on three of the four major recommendations for changing current sentencing and correctional practices.:[77]

---

[76] See: Jack E. Call. "The Supreme Court and Prisoners' Rights." Federal Probation (1995): 36-46, for a discussion of the Court's shift in prisoners' rights matters.
[77] We are unable to estimate the effect of reducing the length of parole and probation supervision.

*Unlocking America*



Figure 5: Historical & Projected US Prision Population

1. **Time served in prison would be reduced.**
2. **Technical parole and probation violators would not serve time in prison for such behavior.**
3. **People convicted of "victimless" crimes would not be sentenced to state prison.**

We discuss below the implementation of these three policy reforms briefly.

### *1. Time served in prison would be reduced.*

Of the three recommendations, this one is clearly the most important and most powerful in terms of reducing the prison population. It also is the most acceptable to most politicians and the public as it does not eliminate incarceration but make the amount of time served proportional to the se-

| Table 12: Current and Projected State Prison Systems Based on Recommendations | | | | | | |
|---|---|---|---|---|---|---|
| | **Current Practices** | | | **New Practices** | | |
| **Prison Admissions** | **Admits** | **Time Served (mos.)** | **Prisoners** | **Admits** | **Time Served (mos.)** | **Prisoners** |
| **Total** | 650,000 | 27 | 1,446,250 | 422,500 | 19 | 666,250 |
| **New Court Admissions** | 390,000 | 30 | 975,000 | 292,500 | 21 | 511,875 |
| **Probation Technical Violators** | 65,000 | 30 | 162,500 | 32,500 | 21 | 56,875 |
| **Parole Violators** | 195,000 | 19 | 308,750 | 97,500 | 12 | 97,500 |
| **Parole Technical Violators** | 97,500 | 19 | 154,375 | 0 | 0 | 0 |
| | | | | | | |
| **Incarceration Rate** | | 483 per 100,000 | | | 222 per 100,0000 | |

The length of imprisonment can be modestly reduced (3-5 months) by immediately increasing the amount of good time awarded to prisoners for good conduct and program completion. Within states with indeterminate sentencing, parole grant rates can be immediately increased especially for prisoners who pose little risk to public safety. But ultimately, legislation will be needed to remove many of the restrictions that have served to increase the period of confinement (e.g., mandatory minimums, truth in sentencing, etc.). Such reforms should be retroactive to the current prison population.

### 2. Technical parole and probation violators would not serve time in prison for such behavior.

The imprisonment of technical parole violators is a clear example where the punishment does not fit the crime. Further, we also know that recidivism rates are lowest for persons who discharge from prison rather than facing a lengthy period of parole supervision.

This reform can be implemented administratively by not allowing revocations for such behavior. A number of states have administratively implemented such reforms including Michigan, Oregon, South Dakota, and Texas. As noted earlier, the state of Washington passed legislation more than 20 years ago that prohibits state imprisonment for technical parole violators with no adverse impact on the state's crime rate. For those who are readmitted for a parole violation, the period of re-confinement would be far shorter than what it has been (no more than 90 days). This is consistent with recent legislation in Louisiana, which limits the period of confinement for first time violators to 90 days and in Washington where violators can serve no more than 60 days in a local jail. Similar to parole violators, few persons should be sent to state or federal prison for anything that does not constitute a conviction for a felony crime or for non-criminal behavior.

### 3. People convicted of "victimless" crimes would not be sentenced to prison.

Large numbers of persons arrested and convicted of drug possession, disorderly conduct, public intoxication, drunk driving, prostitution, curfew violation, vagrancy, loitering, gambling, and a wide variety of motor vehicle violations are being incarcerated in our jails and are being placed on years of probation. Once placed on probation, they are vulnerable to being sent to prison as probation violators for continuing such behavior, failing to pay their probation

supervision fees, maintaining employment, attending treatment, or many other non-criminal acts.

*Collectively, these three reforms, if implemented, would drop the prison population by over 50% and produce an incarceration rate of 222 per 100,000 people, which is what it was in 1986 and which is still well above the rates that existed for some 50 years before that. The prison population would decline from 1.5 million to below 700,000 (see Table 12, and Figure 5). Persons convicted of serious and violent crimes would continue to be incarcerated. But large numbers of probation and parole violators and others now convicted of victimless crimes would be diverted from state prison. All of these reforms require no program funding—indeed the adoption of such reforms would more than pay for whatever prison and post-release programs that would be of benefit to released prisoners. All of this can be done without negatively impacting the crime rate.*

To those who say that these three basic recommendations are neither feasible nor practical we would simply note that these practices and laws are now in place in many states and other countries. There are nine states with incarceration rates that are near or well below the 222 per 100,000 population rate. The state of Washington, by statute, does not allow parole violators to be sent to prison. Louisiana recently passed legislation that greatly restricts first time technical violators to be re-admitted to prison. Nevada recently passed legislation that reduced the period of parole supervision, which has increased the parole success rate and reduced the size and costs of the parole population.

In the area of decriminalization, 12 states (Alaska, California, Colorado, Maine, Minnesota, Mississippi, Nebraska, Nevada, New York, North Carolina, Ohio, and Oregon) and several European countries along with New Zealand and Australia have largely decriminalized or reduced the penalties for drug possession.[78] A number of local cities have also modified their local ordinances and criminal justice practices to decriminalize pot (Berkeley, Oakland, and San Francisco, California; Breckenridge, Colorado; Amherst, Massachusetts; Madison and Milwaukee, Wisconsin; Urbana and Carbondale, Illinois; and Colombia, Missouri). In all of these jurisdictions there has been no associated increase in crimes rates. ∎

---

[78] Robert J. MacCoun and Peter Reuter. *Drug War Heresies: Learning from Other Vices, Times, and Places.* New York: Cambridge UP, 2001.

# VI



## Concluding Remarks

Reducing the number and length of prison terms will require changes in sentencing laws and parole and probation practices. This will not occur until the public passes referenda and successfully pressures legislators and executives, or enlightened political leaders better understand the realities and move on their own to make necessary changes. There are a variety of methods and strategies to achieve this goal. No particular political structure can guarantee or prevent the progress that is now needed. Sentencing commissions, for example, have been excellent devices for controlling over-incarceration in some states (Oregon, Minnesota), while in other jurisdictions, such as the federal, sentencing systems have been specifically designed to incapacitate as many people as possible, rather than focusing on what offenders deserve.

We also recognize that as the system of imprisonment has grown, so too has the investment and the vested interests that support its operations and growth.

In order to reverse the current trends we will have to find a way to re-allocate the money, political influence, and jobs that the current system provides. This will not be easy and it will take many years to wean us off the excessive use of imprisonment.

Our first goal was to document the negative and ineffective consequences of mass incarceration in human, economic, and public safety terms. Our second was to offer one basic and simple recommendation that by itself would have a significant reduction in the prison population -- shorter periods of imprisonment that are proportional to the harm inflicted upon society and individuals. We hope this report will stimulate a serious debate on the use of imprisonment and lead to a new policy of decarceration. If this would occur, we could re-invest some portion of the tens of billions of dollars we spend each year incarcerating millions of Americans into those communities and families that are now being unfairly devastated by imprisonment. ∎



## About the Authors

**JAMES AUSTIN** is the President of the JFA Institute. Prior to that, he was the Director of the Institute of Crime, Justice and Corrections at the George Washington University, and Executive Vice President for the National Council on Crime and Delinquency. Dr. Austin received his Ph.D. in sociology from the University of California, Davis. He began his career in corrections with the Illinois Department of Corrections in 1970 at Statesville Penitentiary. He was named by the American Correctional Association as its recipient of the Peter P. Lejins Research Award, and received the Western Society of Criminology Paul Tappin award for outstanding contributions in the field of criminology. He also has served as the Chair of the National Policy Council for the American Society of Criminology. In 2007 he was appointed to the California Department of Corrections and Rehabilitation Expert Panel on Adult Offender Recidivism Reduction Programs. He is the co-author of *Its About Time: America's Imprisonment Binge* (with John Irwin).



**TODD CLEAR** is Distinguished Professor, John Jay College of Criminal Justice, City University of New York. He received a Ph.D. in Criminal Justice from The University at Albany. Clear has also held professorships at Ball State University, Rutgers University, and Florida State University (where he was also Associate Dean of the School of Criminology and Criminal Justice). This year he was elected president of The American Society of Criminology. His work has been recognized through several awards, including those of the American Society of Criminology, the Academy of Criminal Justice Sciences, The Rockefeller School of Public Policy, the American Probation and Parole Association, the American Correctional Association, and the International Community Corrections Association. Dr. Clear is author of *Imprisoning Communities: How Mass Incarceration Makes Disadvantaged Communities Worse* (Oxford University Press, 2007)

**TROY DUSTER** is Silver Professor of Sociology and Director of the Institute for the History of the Production of Knowledge at New York University. Professor Duster received his Ph.D. in sociology from Northwestern University. He also holds an appointment as Chancellor's Professor at the University of California, Berkeley. He is the past-president of the American Sociological Association and a member of the Board of Advisors of the Social Science Research Council. He is the former Director of the Institute for the Study of Social Change, both at the University of California, Berkeley.

**DAVID F. GREENBERG** is Professor of Sociology at New York University. He received his Ph.D. in physics from the University of Chicago. He is the author, co-author or editor of *The University of Chicago Graduate Problems in Physics, with Solutions, Mathematical Criminology, Crime and Capitalism, Linear Panel Analysis: Models of Quantitative Change, The Construction of Homosexuality,* and *"Criminal" Careers*, as well as dozens of journal articles. His research focuses on crime and criminal justice, law, deviance and social control, human sexuality, statistical methods and mathematical modeling, computational linguistics and Assyriology. He (along with John Irwin) was a contributing author to the American Friends Service Committee's influential report *Struggle for Justice: A*


*Report on Crime and Punishment in America*.  Professor Greenberg is a Fellow of the American Society of Criminology.

**JOHN IRWIN** is Professor Emeritus at San Francisco State University where he taught sociology for nearly three decades. After serving a five sentence for armed robbery in California's prison system, he received his Ph.D. in sociology from the University of California, Berkeley.  His considerable research on prisons and sentencing has been published in five books:  *The Felon, Prisons in Turmoil, The Jail, It's About Time: America's Imprisonment Binge* (with James Austin), and *The Warehouse Prison*.  He (along with David Greenberg) was a contributing author to the American Friends Service Committee's influential report *Struggle for Justice: A Report on Crime and Punishment in America*.  As an organizer and leader of the Prisoners' Union in California, he worked closely with the California legislature on the Uniform Sentencing Act passed in 1976.  He received the August Volmer award from the American Society of Criminology for outstanding contributions to criminal justice.

**CANDACE MCCOY** holds an appointment at the Graduate Center of the City University of New York and teaches in the doctoral program of the John Jay College of Criminal Justice.  Dr. McCoy received a J.D. from the University of Cincinnati and a Ph.D. in Jurisprudence and Social Policy from the University of California and is a member of the Ohio bar.  She specializes in the study of criminal justice policies, researching and teaching on such topics as sentencing, plea bargaining, jury decision-making, and police practices. Her most recent publication on these matters is "Plea Bargaining as Coercion: The Trial Penalty and Plea Bargaining Reform," *The Criminal Law Quarterly*, Vol. 50, No. 1 (2005).  Professor McCoy has conducted many evaluations of innovative programs and has consulted widely with federal and state criminal justice agencies most recently as Chair of New Jersey's Criminal Disposition Commission, and is currently working with the Scottish Centre for Crime and Justice Research to develop restorative justice practices as conditions of probation.  She has received the American Society of Criminology's Herbert Block Award for distinguished service to the profession.

**ALAN MOBLEY** is an assistant professor in the School of Public Affairs at San Diego State University. He received his Ph.D. in Criminology, Law & Society from the University of California, Irvine.  While a prisoner in the Federal Bureau of Prisons he earned Master's (Sociology, Vermont College, 1994) and Bachelor's (Economics, SUNY, 1991) degrees.  Dr. Mobley is a founding member of All Of Us Or None, an organizing initiative to guarantee civil rights for former prisoners. He sits on the editorial board of The Journal of Prisoners on Prisons, and is a board member and Past-President of Visions for Prisons, a nonprofit agency offering support services to prisoners and prison staff. His current action-research focuses on community and restorative justice, peacemaking and multi-stakeholder dialog, and community based service-learning. He directs several grant funded projects in these areas.

**BARBARA OWEN** is a nationally-known expert in the areas of girls, women and crime, women-centered policy and women's prison culture. A Professor of Criminology at California State University, Fresno, she received her Ph.D. in sociology from the University of California, Berkeley in 1984.  Barbara Owen has written extensively on issues confronting women enmeshed in the criminal justice system. She is the author of *In the Mix*, an ethnography on women's prison culture and co-author of *Gender-responsive Strategies: Research, Practice and Guiding Principles for Women Offenders*, which received the University of Cincinnati award for contributions to correctional practice.  She regularly consults for state and federal correctional agencies on such gender related issues. Her work was most recently honored with the Saltzman Award by the Division of Women and Crime, American Society of Criminology.

**JOSHUA PAGE** is an assistant professor of sociology at the University of Minnesota.  He received his Ph.D. from UC Berkeley, where he published research on prison education and conducted an in-depth study of the California Correctional Peace Officers Association (CCPOA). Professor Page is currently writing a book on the CCPOA and the politics of punishment in California.  Further, he is directing a study on the transition of youthful offenders from juvenile correctional facilities into the community, identifying factors that facilitate or obstruct the youths' ability to live successful, crime-free lives.  He is also gathering survey data on the attitudes, demographic composition, and working conditions of prison officers in Minnesota.