Michael C. Ormsby
United States Attorney
Eastern District of Washington
Russell E. Smoot
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone:  (509) 353-2767

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | 11-CR-00075-LRS |
| ) | |
| vs. ) | United States' Sentencing |
| ) | Memorandum |
| JOSEPH JEFFEREY BRICE, ) | |
| ) | |
| Defendant. ) | |
| ) | |

Plaintiff, United States of America, by and through Michael C. Ormsby,

United States Attorney for the Eastern District of Washington, and Russell E.

Smoot, Assistant United States Attorney for the Eastern District of Washington,

respectfully submits the following Sentencing Memorandum:[1]

**SENTENCING MEMORANDUM**

**I.    RELEVANT FACTS:**

**A.    Plea Agreement:**

Pursuant to the Plea Agreement, the parties stipulated that the following

facts were accurate, provable beyond reasonable doubt, and constituted an

adequate basis for the entry of the Defendant's guilty pleas.

---

[1]The Sentencing Exhibits referenced in this memorandum will be produced

in hard copy form and sent via FedEx to the Court and hand-delivered to defense

counsel on Friday, May 24, 2013.

United States' Sentencing Memorandum - 1
P30523LH.RSA.sentmemo.wpd

(a).    <u>Count One</u>:

On April 18, 2010, at approximately 4:16 p.m., the Whitman County Sheriff's Office ("WCSO") received a call reporting a firearms accident on SR193 at approximately Mile Post 1 (the location of the incident was subsequently determined to be Mile Post 3), in Whitman County, in the Eastern District of Washington.  At the scene, WCSO Deputy Keller encountered Defendant JOSEPH JEFFEREY BRICE (hereinafter "BRICE") who appeared to have been injured during the detonation of a home-made Improvised Explosive Device ("IED").  BRICE was at the scene being treated by paramedics for injuries to both legs.  BRICE was heard stating, "What have I done to myself?"  Due to the injuries BRICE sustained during the explosion (including severe burns to his legs, broken bones, loss of consciousness for approximately 12 days, and damage to his vocal chords), WCSO Deputy Keller was not able to interview BRICE until approximately four months after the incident.

On August 14, 2010, Deputy Keller spoke with BRICE over the telephone.   BRICE stated he made the IED out of a combination of ammonium nitrate fertilizer, acetone peroxide, hydrogen peroxide and concrete bleach (a strong acid).  According to Federal Bureau of Investigation ("FBI") Special Agent Bomb Technician ("SABT") Lee McEuen, the combination of  ammonium nitrate fertilizer, acetone peroxide, hydrogen peroxide and concrete bleach is used to make Triacetone Triperoxide Peroxyacetone ("TATP") explosives, and Acetone Peroxide Ammonium Nitrate ("APAN") explosives, both of which are highly unstable and have no known legal commercial use.  BRICE indicated that the IED weighed about 2.5 pounds (however, based on BRICE's own statements in text-messages and internet postings, it may have been as much as 8 pounds).   BRICE stated he has always been good at chemistry and "likes doing things like this."

FBI SABT McEuen contacted the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") and learned that BRICE had not registered the IED with the National Firearms Registration and Transfer Record.

(b).    <u>Count Three</u>:

In early January 2011, Federal Bureau of Investigation ("FBI") and the Inland Northwest Joint Terrorism Task Force ("INJTTF") had received information concerning BRICE's on-going interest in explosives – and possible *new* growing interest in terrorist activities, Specifically, FBI SABT McEuen learned that between December 2010, and January 2011, BRICE posted at least five videos on the "*StrengthofAllah*" channel on the internet site "YouTube."   One video, posted by *StrengthofAllah* on January 10, 2011, was titled, "50 Kg ANFO," with the comment, "50 Kilograms ANFO inside a small house Praise be to Allah (SWT)."  The video began with a logo known to be associated with Al-Tawhid Wal Jihad (translation: "Al-Qa'ida in Iraq") and a Nashid chant soundtrack.  The video depicted a small, dark-red house being destroyed by an explosion. The shockwave destroyed the house and sent debris across the road before knocking the camera down.

Two additional videos, titled ".5 kg APAN" and ".3KG APAN," had been posted by *StrengthofAllah* on December 28, 2010. Each of the videos began with the same logo for Al-Tawhid Wal Jihad (translation: "Al-Qa'ida in Iraq") and a Nashid chant soundtrack, followed by a small explosion on the ground near a dirt access road along a river with rolling hills in the background. The author's comment for the video titled ".3KG APAN" read, "All praise due to Allah under all conditions. Sorry about the camera work, was too close had to step back and caused bad filming." The "APAN" videos depicted explosions of less magnitude than the video of the 50 pound charge.

Finally, two more videos, titled "shaheedan" and "zmuzh ghanian," were posted by the user *StrengthofAllah* on December 29, 2010. Each of the videos began with a logo, comprising a map of Afghanistan with two swords and an image of the Koran. Both videos depicted still photographs of mujahedeen and martyrs. A Nashid chant soundtrack was looped for the duration of the video.

After viewing the videos, FBI SABT McEuen contacted Whitman County Sheriff's Office Sergeant Chris Chapman to review the incident reports from the April 18, 2010, IED explosion that injured BRICE. Based on his review of the crime scene photographs, and visual comparison of the location of the April 18, 2010, incident, FBI SABT McEuen determined that the location of the April 18, 2010, incident and location depicted in the APAN videos posted on the *StrengthofAllah* YouTube channel was the same.

FBI SABT McEuen continued the investigation through the execution of search warrants, grand jury subpoenas, and pen register orders on email accounts, cellular telephone service, and IP addresses believed to be associated with BRICE. In aggregate, the "electronic media" phase of FBI SABT McEuen's investigation resulted in FBI receiving an extensive amount of email correspondence, text-messaging, and internet postings (including conversations and/or "chats") evidencing BRICE's on-going interest in explosives and terrorist groups who utilize explosive devices. The "electronic media" phase of the investigation also identified contact between computers used by BRICE, in the Eastern District of Washington, and a foreign-based internet web-site that provides opportunities for both public and private discussions of jihad and terrorist activities.

On March 30, 2011, "Abu Harith" requested an account on the above-referenced internet web-site. The account, which was activated several days later, allowed Abu Harith to access the private part of the web-site and conduct a review of numerous postings by username "Yusuf90," which was known to be associated with BRICE. The account also facilitated Abu Harith's contact with BRICE.

During the FBI review of the internet web-site, FBI learned that on December 26, 2010, in response to a "thread" titled, "I'm a Proud Terrorist" in the English Section "General Discussion" forum on the internet web-site (the "thread" was created by an unrelated third-party), "Yusuf90" [BRICE] replied with the following posting:

1   Strike fear into the hearts of the Kuffar namely the
    United States and it's [sic] allies.  But I call not for the
2   lives of the innocent citizens of the United States but
    mainly it's [sic] government systems which are the real
3   criminals.  There are so many ignorant Americans it's
    unbelievable.  They don't even know their own holy
4   book, we know theirs [sic] better than they do.

5   Allah grants blessings to those who fight against tyranny
    and prey on the weak.
6
    On May 1, 2011, Abu Harith initiated contact with BRICE
7   through the internet web-site by replying to a "Medical Care" thread
    of which BRICE had previously replied.  Abu Harith also sent a
8   private message to "Yusuf90" [BRICE] titled, "Help."  The "medical
    care"-related discussion between Abu Harith and BRICE continued.
9
    On May 2, 2011, during the continuation of the internet
10  conversation between Abu Harith and "Yusuf90" [BRICE], Abu
    Harith stated:
11
                                    * * *
12
    Shukran [*Translation: "Thank you"*] Akhi [*Translation:*
13  *"Brother"*] for your eagerness to help.  I am sure in lieu
    of the yesterday's events [*the death of Osama Bin Laden*
14  *had occured the previous day*] the time to help with
    calcium carbonate has passed.  Before we can trust you
15  to help us we need to know about you and your
    expertise.
16
    For security reasons all I can divulge to you is that I [sic]
17  live in, midwest, Dar El Harb [*Translation: "America"*].
    We need to be very careful akhi [*Translation:*
18  *"Brother"*] and in the future I would like to
    communicate through secure e-mail like gmail.
19
                                    * * *
20
    On May 3, 2011, Abu Harith sent an additional reply to the
21  private message from "Yusuf90" [BRICE] titled, "Re: Help," with the
    following posting:
22
    Akhi [*Translation: "Brother"*] Yusuf,
23
    I have reading your posts and it is time to act.   Are you
24  willing help.
    contact me on abuharith1978@gmail.com
25
    Jazak Allah Kheyr
26
    Akhook Abu Harith [*Translation: "Your brother Abu Harith"*]
27
    On May 5, 2011, BRICE created the email account
28  allahguidance@gmail.com.  and sent a message to Abu Harith

United States' Sentencing Memorandum - 4
P30523LH.RSA.sentmemo.wpd

through his gmail account titled, "The Beginning," with the following posting:

> as-salaamu 3alaykum  [*Translation: "Peace be upon you."*]

> I am sorry it took me days to respond Akhi [*Translation: Brother*] Abu. I am also in Dar al-Harb [*Translation: "America"*]

> Indeed, now is the time for action. But we must keep safe in this time as well.

> Knowledge is for acting upon, so our duty as Muslims is to act swift and with strength.

> Stay safe.

> May Allah, the merciful, watch over us.

> Amen [*Translation: "Amen"*]

> Yusuf

On May 6, 2011, Abu Harith replied to the email titled, "Re: The beginning," with the following posting:

> Akhi [*Translation: "Brother"*] Yusuf,

> Assalamu 3alaykum wa ra7matu Allahi wa barakatihi. [*Translation: "Peace be upon you and Allah's blessing and blessings."*]

> Thank you for the reply I was start to worry about you not wanting to help. Let me command you for your cautiousness by reaching for me on gmail, it is safest. Living in Dar El Harb [*Translation: "America"*] we have to be very safe.

> Akhi [*Translation: "Brother"*] we read your posts on Din el Haqq and are very impressed by your know of chemistry. We are in the middle of planning something big that will hurt the kuffar [*Translation: "Infidels"*] and inshallah [*Translation: "God willing"*] teach them a lesson. Forgive me for not providing you with details, the less you know the better for you. But we need your help very soon.

> We have the needed material but are having problems with consistently making the tafjir [*Translation: "Detonation"*]. Can you help us?

> Jazak Allah Kheyr Akhi. [*Translation: "May Allah reward you for your good deeds brother."*]

Akhook Abu Harith [*Translation: "Your brother Abu Harith"*]

On May 7, 2011, "Yusuf" [BRICE] at allahguidance@gmail.com. replied to the email titled, "Re: The beginning," with the following posting:

[*Arabic Printing*] [*Translation: "Peace be upon you"*]

I am always willing to help my brothers but I must know more specific parts of your plan. I must also stress that the kafir [*Translation: "infidel"*] is becoming very smart in order to fool fellow brothers and sisters into joining them , then they are arrested . Can you prove to me you are who you say you are and that I can trust you?

What problems are you having with your project? If you have the needed materials, insha'Allah [*Translation: "Allah or God willing"*]. you should be able to build the correctly. My trust is in you, therefore I expect in return.

Stay safe.

[*Arabic Printing*] akhi [*Translation: "May Allah reward you for your good deeds brother"*]

Y.

On May 7, 2011, Abu Harith replied to the email titled, "Re: The beginning," with the following posting asking for BRICE's help in providing advice or information concerning "problems" Abu Harith, who had previously indicated was in America, claimed to be having igniting explosives that Abu Harith explained were to be used against those who have been hurting their "brothers" in Iraq and Usama Bin Laden.

[*Arabic Printing*] [*Translation: "Peace be upon you as well and Allah's mercy and blessings."*]

Akhi [*Translation: "Brother"*] Yusuf

I am very impressed by your cautiousness and have to agree with you about the Kufar [*Translation: "Infidels"*]. I have been living in Dar El Harb [*Translation "America"*] for a while and have seen too many ikhwan mujahideen [*Translation: "Holy warrior brothers"*] being arrested, because of carelessness and have to be honest wondered about you as weell [sic]. WHat [sic] can I do to prove to you that I am who I say I am?

As for the target I cannot go into details for the same reasons we talked about before, but I can tell you that the target is those who have been hurting our Ikhwan [*Translation: "Brothers"*] in Iraq and other places for years and specifically our Sheikh Abu Abdallah

[*Translation: "Usama Bin Laden"*] last week, the junud [*Translation: "Soldiers"*].

Akhi [*Translation: "Brother"*] I will let you decide whether you want to help or not. Here is our problem. We are using nail polish remover (acitone) [sic] and beroxide [sic] cap in diesel fuel and amoniom [sic] ntrate [sic] but we are not always getting infijar [*Translation: "Detonation"*] all the time, ahyanan [*Translation: "Sometimes"*] yes wa [and] ahyanan [*Translation: "Sometimes"*] No.

Akhi [*Translation: "Brother"*] you decide if you want to help or not but either way let me know soon.

[*Arabic Printing*] [*Translation: "May Allah reward you for your good deeds."*]

[*Arabic Printing*] [*Translation: "Your brother in Allah Abu Harith.*]

On May 8, 2011, "Yusuf" [BRICE] at allahguidance@gmail.com  replied to the email titled, "Re: The beginning," with the following posting:

The only way to earn my trust is to give me more information what you are planning.

Do not use nail polish remover. Use real 90% or higher acetone , you can buy this at hardware stores. If you are making TATP which is acetone peroxide, you cannot use this as a blasting cap for ANFO (ammonium nitrate/diesel). If you are using tatp for your caps you need to build a booster to bridge the two. ANFO is difficult to detonate. You need to take your acetone peroxide and dehydrate your nitrate by baking in the oven for 30-60 minutes. Ammonium nitrate will not work properly if the water molecules from the air are absorbed. DO NOT PUT THE ACETONE PEROXIDE IN THE OVEN. JUST THE FERTILIZER.

A booster should be around 300-500 grams.

To make this , take a ratio of 12:88 APAN (Acetone peroxide -ammonium nitrate). So if you have 100 grams of APAN, you should measure 12 grams of AP and 88 grams of nitrate .. and then mix the two well. This booster can be detonated with a simple acetone peroxide blast cap. Bury the cap in the booster with just the fuse or wire from the cap sticking out. It's important to cover the cap inside the booster entirely or you may have a failed detonation.

Once you have a booster made, you can then mix your Ammonium nitrate- diesel fuel at a ratio of 94:6 .

United States' Sentencing Memorandum - 7

P30523LH.RSA.sentmemo.wpd

Remember that this measurement is by weight so if you made a 100 gram anfo device, you would measure 94 grams of nitrate and 6 grams of fuel. Mix this well and let it absorb for a hour. Make sure to seal both the booster and the anfo so it does not absorb water from the air. Plastic gallon sized bags are good to use . Double wrap them to avoid fuel leaking through and getting on your hands or to hide the smell of fuel.

Wrap the AN-FO around the booster . If you have done this correctly , your nitrate will detonate. ANFO requires heavy detonation so you must use a booster to build a bridge between the cap and the ANFO.

BUT, you have to perfect your work , there are often many failed detonations before you achieve success. Be careful , this is dangerous work, follow all precautions safely.

First you need to make sure you are making correct acetone peroxide, then move on to your booster. Test your booster before building a large explosive as to avoid wasting your time.

You will most likely need to ask me more questions because it is hard to explain everything in one email. But I need you to tell me , where are you getting your ammonium nitrate from ? You have to be using the correct type. Some have new ingredients in the nitrate so that they cannot be made into explosives.

I will design a diagram for you to better understand how to use the booster but first I need you to answer these questions in the next email.
-Where are you getting your nitrate from?
-Are you stabilizing the acetone peroxide with baking soda powder after you filter it ?
-In acetone peroxide there are 3 chemicals; Acetone, hydrogen peroxide, and third is an acid. Sulfuric acid is too difficult to acquire, use an acid called "muriatic acid" . This is found in all hardware stores for a very low price, it is used to clean pools and concrete ground. It is dangerous so avoid inhaling.

Jazak Allah khayr akhi [*Translation: "May Allah reward you for your good deeds brother."*]

According to FBI SABT McEuen, the information BRICE provided to Abu Harith was correct and would have resulted in "fixing" the detonation problem.

On May 9, 2011, FBI and INJTTF arrested BRICE. When BRICE was taken into custody, FBI SABT McEuen and FBI RAC Harrill advised BRICE of his rights. BRICE waived his right to remain silent, signed an Advice of Rights form, and provided a

recorded statement to FBI SABT McEuen and FBI RAC Harrill. Essentially, BRICE confirmed that he had established the *Strength of Allah* YouTube channel and posted the explosive-related and terrorist-related videos. Additionally, BRICE stated he was a member of the "jihadi" website "Deen al-Haqq" and used the screen name "Yusuf90" on that site. BRICE admitted that he posted files that contained step by step instructions to make the improvised explosives, including TATP and APAN on that site. BRICE indicated he created the account allahguidance@gmail.com and sent Abu Harith detailed information on how to make and use explosives. BRICE stated he supplied the explosives knowledge and files to the jihadists in order to gain their trust, obtain access to them, and learn what their plans were. He stated he did not report any of his activities to law enforcement, but may have in the future.

During the post-arrest interview, BRICE also signed a Consent to Assume Online Presence and provided the screen name allahguidance@gmail.com. and the password "ronald55." On May 16, 2011, the FBI accessed the account using the provided screen name and password. The string of email communications between "Yusuf" [BRICE] at allahguidance@gmail.com and "Abu Harith" was located. "Abu Harith" was an alias created by an FBI undercover employee.

(*See* ECF Doc. 342, pgs. 5-13).

**B.    Additional Facts:**

In addition to the above-stipulated facts, the parties agreed that the "statement of facts does not preclude either party from presenting and arguing, for sentencing purposes, additional facts which are relevant to the guideline computation, the sentencing factors, or any other sentencing arguments by the United States or the Defendant." *(See* ECF Doc.342, pg. 5).

**C.    Presentence Investigation Report:**

On March 25, 2013, U.S. Probation Officer Petretee disclosed a comprehensive Presentence Investigation Report ("PSIR"). In addition to detailing the relevant terms of the Plea Agreement, the PSIR expands upon the agreed upon facts to include information provided in the United States' Bill of Particulars, Road Map, and Discussion of Relevant Evidence, (*compare* ECF Doc. 314 *with* PSIR ¶¶ 16-75) the United States Supplemental Notice of Expert Testimony, (*compare* ECF Doc. 186 *with* PSIR ¶¶ 147-164) and the results of two jail cell searches conducted on May 18, 2012, and recorded telephone

conversations from Spokane County Jail. (*compare* ECF Doc. 385 *with* PSIR ¶¶ 103-107).

### 1.    Charge(s) and Conviction(s):

The United States concurs in PSIR ¶¶ 1-12.

### 2.    The Offense Conduct:

The United States does not anticipate any Defendant objections to PSIR ¶¶ 15-19 as such paragraphs address the offense conduct related to Count One, the manufacturing of an unregistered firearm (destructive device), in violation of 26 U.S.C. § 5861(f). There is no factual dispute that on April 18, 2010, the Defendant was severely injured as a result of the pre-detonation of a homemade, chemical-based, Improvised Explosive Device ("IED") that the Defendant manufactured on or about April 18, 2010. *See* ECF Docs. 314 (Bill of Particulars), 342 (Plea Agreement).

Beginning at ¶ 20, and continuing through ¶ 67, the PSIR discusses the offense conduct relevant to Count Two (which the United States agreed to move to dismiss at sentencing) and Count Three, the attempt to provide material support to terrorists, in violation of 18 U.S.C. § 2339A(a), (b)(1-3). The PSIR notes that although the Whitman County Sheriff's Office "thought that [the Defendant] had learned his lesson the hard way" concerning the manufacturing and detonation of IEDs, (*See* PSIR ¶ 19), "[l]aw enforcement's interest in [the Defendant] was renewed in January 2011." (*See* PSIR ¶ 20). The PSIR continues to discuss in greater detail the same "StengthofAllah" facts to which the parties stipulated in the Plea Agreement. (*See* PSIR ¶¶ 20-21, 23-28; *see also* PSIR ¶ 42). One point of interest in the PSIR is the reference to the Defendant appearing to have "undergo[ne] a 'rapid radicalization' to Islam."[2] (*See* PSIR ¶ 21).

---

[2](*See* Sentencing Exhibit 1).

United States' Sentencing Memorandum - 10

P30523LH.RSA.sentmemo.wpd

After the discussion of the "StrengthofAllah" videos, the PSIR provides highlights from the "electronic media" phase of the investigation.  (*See* PSIR ¶¶ 29-53).  As noted in the Plea Agreement,

> In aggregate, the "electronic media" phase of FBI SABT McEuen's investigation resulted in FBI receiving an extensive amount of email correspondence, text-messaging, and internet postings (including conversations and/or "chats") evidencing BRICE's on-going interest in explosives and terrorist groups who utilize explosive devices.  The "electronic media" phase of the investigation also identified contact between computers used by BRICE, in the Eastern District of Washington, and a foreign-based internet web-site that provides opportunities for both public and private discussions of jihad and terrorist activities.

(*See* ECF Doc. 342).  The PSIR expands upon this brief, generalized summary of the evidence obtained through the subpoenas, pen register orders, and search warrants, and includes specific and abbreviated examples of anti-government, terrorism-related, jihad-related, and explosive-related statements, and emulating, idolizing references to Timothy McVeigh, made by the Defendant.  (*See* PSIR ¶¶ 30-32; *see also* ECF Doc. 314).[3]  The PSIR explicitly highlights the Defendant's

---

[3]Pretrial, the Defendant challenged the United States' intended use of many of the statements that were arguably political in nature.  (*See* ECF Doc. 192).  As the United States noted, however, while such statements may have some level of First Amendment relevance, such possibly "protected" speech is not per se inadmissible. (*See* ECF Doc. 235 (quoting and citing *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993)("The First Amendment does not prohibit the evidentiary use of speech to establish the elements of a crime or prove motive or intent.")).  Further, as the United States explained during the August 6, 2012, Pretrial Hearing:

> I would argue that we're looking at a day and age to where, here's a defendant whose anywhere from 18, 19, 20, 21 years old, and is a part of a generation, arguably, that communicates through text messages, communicates through social media, communicates through YouTube.

United States' Sentencing Memorandum - 11

1  statement that "[McVeigh]'s characteristics are nearly the same as myself,

2  physically/politically[,]" (*see* PSIR ¶ 31), and the "[c]hronology of

3  [c]omments"made in social media that evidence an ongoing interest in explosives

4  and general terrorist activities.  (*See* PSIR ¶ 32; *see also* ECF Doc. 314).

5      The PSIR continues to note the numerous email accounts used by the

6  Defendant (including joeybrice55@gmail.com; rzaforshiza@gmail.com; **and**

7  StrengthofAllah@gmail.com**),** (*See* PSIR ¶ 33), and the computer contact between

8  to Internet Protocol addresses associated with the Defendant and the Internet

9  Protocol address used by the website commonly referred to as: Deen Al Haq. (*See*

10 PSIR ¶ 34).  In addition to the connection between the Deen Al Haq website and

11 the Defendant's subsequent email correspondence with FBI undercover employee,

12 the PSIR provides a is the description of the website itself.  (*See* PSIR ¶ 36 (noting

13 that the website contained "images of crossed swords and two men whose faces

14 were obscured by scarves, and one of the men holding a rocket-propelled grenade

15 launcher[;] * * * images of holy sites in Mecca[;] * * * the words 'Islamic

16 ───────────────

17                              * * *

18      We see that, Your Honor, on Spokesman Review articles that
   are posted on the web.  S soon as something's current, there's a blog
19 or whatever they call it, to where people can post comments.

20      Those comments in and of themselves constitute statements
   made by an individual, but those statements are in response to,
21 arguably, a statement made by the Spokesman Review.

22      I this case, if a video, if there's a comment that the United
   States believes that the video is necessary to provide the relevance of
23 the comment, then arguably it's a two-part conversation.  The video is
   the first part of the conversation, the defendant's comment is the
24 second part of the conversation.

25 (*See* ECF Doc. 314).  As such, the United States submits that the Defendant's

26 "statements" are as relevant to sentencing, in terms of assessing sentencing

27 factors, *see* 18 U.S.C. § 3553(a),  as they would have been in terms of proving the

28 Defendant's state-of-mind at trial.

United States' Sentencing Memorandum - 12

P30523LH.RSA.sentmemo.wpd

Caliphate written across a map of the Middle East[;] * * * men holding weapons [;] * * * [a] caption stat[ing] 'Allah grants respite to the oppressor, but when he finally seizes him, he will not let him escape[;] * * * [and a] picture [that] changed back and forth from a map of the Middle East to a picture of Osama Bin Laden[.]").[4]

The PSIR also references the Defendant's postings on other websites or forums. (*See* PSIR ¶¶ 39-40, 44). On the website known as the "Young News Channel" or "YNC," which according to the PSIR "caters to users that wish to post extreme pornographic and violent video content[,]" the Defendant acted as a "super moderator." (*See* PSIR ¶ 39). Postings of significance include the reference and link to *Inspire* magazine,[5] which the YNC noted as a "jihad

---

[4]In a pre-sentence motion, the Defendant asserted that

[i]n prior pleadings, the Government has repeatedly referenced its intention to introduce evidence regarding the Deen Al Haq website. [Citations to prior ECF files omitted.] Such pleadings leave no doubt that the Government will argue that the Deen Al Haq website was frequented by radical Islamic jihadists who either had committed acts of terrorism, were seeking to commit acts of terrorism or were prone to support acts of terrorism. According to the Government's theory, simply frequenting that website is itself evidence of the intent to support terrorism. [The Defendant did not cite any statement by the United States supporting this conclusion.]

(*See* ECF Doc. 358). In the motion, which sought evidence related to the Deen Al Haq website, the Defendant noted that "[i]t appears that the Government intends to introduce evidence regarding the Deen Al Haq website at sentencing." (*See* ECF Doc. 358). The Defendant seems to be foreshadowing an argument that minimizes the significance of the Deen Al Haq website being arguably "terrorist" or "jihad" friendly. The very construction of the website (*see* Sentencing Exhibit 2) and the Defendant's own post-arrest confession (*see* Sentencing Exhibit 3), however, suggest otherwise.

[5](*See* Sentencing Exhibit 4).

United States' Sentencing Memorandum - 13

P30523LH.RSA.sentmemo.wpd

1    magazine" released by Al Qaeda, and an image of the mutilated victims of a

2    suicide bombing.  (*See* PSIR ¶¶ 40, 41).

3         In addition to the Defendant's internet postings and comments, the PSIR

4    quotes from an email between the Defendant and a third party in which the

5    Defendant discussed using "a bomb threat and make real explosives although there

6    won't be an active trigger detonator * * * to leave on school property" as a

7    distraction for a planned bank robbery.  (*See* PSIR ¶ 47).  The Defendant appears

8    to have planned for the possibility of "hav[ing] to kill someone."  (*See* PSIR ¶

9    47).[6]

10        The PSIR continues to set forth  the offense conduct through a discussion of

11   the details of the Defendant's contact with the Deen Al Haq website and the FBI

12   undercover employee that initially made contact with the Defendant through the

13   website (the Defendant used the moniker "Yusuf90") and subsequently though

14   gmail accounts (the Defendant used the moniker "allahguidance@gmail.com").

15   (*See* PSIR ¶¶ 48-67).   On significance in the Deen Al Haq-related postings and

16   other communications is the Defendant's December 26, 2010, posting to the

17   thread: "I'm a Proud Terrorist[,]" which read:

18

19

20

21

22

23

─────────────────

24        [6]The email, which appears to have been sent on April 12, 2010, discusses a

25   potential date for the bank robbery as April 30, 2010.  (*See* PSIR ¶ 47).  Due to the

26   Defendant severely injuring himself on April 18, 2010, during the pre-detonation

27   of the IED he manufactured, it is speculative as to whether the bank robbery would

28   have occurred as discussed.

United States' Sentencing Memorandum - 14

> Strike fear into the hearts of the Kuffar[7] namely the United States and it's [sic] allies. But I call not for the lives of the innocent citizens of the United States but mainly it's [sic] government systems which are the real criminals. There are so many ignorant Americans it's unbelievable. They don't even know their own holy book, we know theirs [sic] better than they do.
>
> Allah grants blessings to those who fight against tyranny and prey on the weak

(*See* PSIR ¶ 51; *see also* ECF Doc. 342). The PSIR notes that the Defendant posted a link to a second *Inspire* magazine,[8] (*see* PSIR ¶¶ 52, 53), and discussed the covert acquisition of a blood clotting agent that could be used to "help the Jihad movement." (*See* PSIR ¶¶ 54-59). On May, 3, 2011, the FBI undercover employee contacted the Defendant, indicated that "it is time to act[,]" and asked the Defendant if he was "willing help [sic]." (*See* PSIR ¶ 61). Through a newly created email account, allahguidance@gmail.com, the Defendant responded: "Indeed, now is the time for action."[9] (*See* PSIR ¶ 62). The PSIR then includes the stipulated email exchange between the Defendant and the FBI undercover employee during with the Defendant provides the chemical formula for

---

[7]The Defendant used the term "kuffar" on other occasions, including in commenting to a YouTube video of a report on the shooting of Congresswoman Gabriel Giffords titled: "Witness to AZ Shooting Told Investigators Someone Else Was Working With Shooter." The Defendant used his "StengthofAllah" identification to post in relevant part: "* * * Anyway, as long as its one more dead American kuffar, what difference does it make to me if she is a democrat or gop?" (*See* Sentencing Exhibit 5).

[8](*See* Sentencing Exhibit 6).

[9]The string of emails between the Defendant and the FBI undercover employee does not appear to be the first time the Defendant expressed an interest in "action" in support of jihad or terrorist activity. (*See* Sentencing Exhibit 7).

United States' Sentencing Memorandum - 15
P30523LH.RSA.sentmemo.wpd

constructing the firing mechanism an ANFO chemical IED.  (*See* PSIR ¶¶ 63-66).

The PSIR specifically notes that the Defendant

> engaged in an online conversation with an FBI [undercover employee], during which [the Defendant] provided his expertise in manufacturing APAN explosives to a person he believed was a jihad terrorist planning retaliation for the elimination of Osama Bin Laden.

(*See* PSIR ¶ 67).

The PSIR then notes the Defendant's post-arrest confession,[10] (*see* PSIR ¶¶ 68-70), and the results of FBI's search of computers seized during the execution of search warrants.  (*See* PSIR ¶¶ 71-75).  Of significance is that the post-arrest confession and the computer searches corroborated the Defendant's contact with the Deen Al Haq website (which the Defendant indicated was a "jihadi" site); the Defendant's posting on Deen Al Haq and contact with the FBI undercover employee; and the Defendant's other postings and monikers.[11]  (*See* PSIR ¶¶ 68, 69, 70).

### 3.    Offense Behavior Not Part of Relevant Conduct:

After outlining the Sentencing Guidelines calculations, see *infra*, the PSIR provides information concerning events that occurred after the offense conduct appeared, but nevertheless deemed significant enough to sentencing to be included.  (*See* PSIR ¶¶ 101-107).  The post-offense conduct information is essentially broken down into three categories: items seized from the Spokane County Jail cell search of convicted inmate Wayde Kurt;[12] items seized from the

---

[10](*See* Sentencing Exhibit 3).

[11](*See also* Sentencing Exhibit 8 (FBI created time-line initialed by the Defendant during the post-arrest interview)).

[12]Wayde Kurt, a confirmed White Supremacist with an extensive criminal history, was recently convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), and unlawful production of an identification card, in violation of 18 U.S.C. § 1028.  During the sentencing hearing, Senior

Spokane County Jail cell search of the Defendant; and telephone conversations between the Defendant and non-attorney-third-parties that were recorded (with a warning provided to the Defendant) by the Spokane County Jail telephone recording system.

First, in terms of the items seized from the search of Wayde Kurt's cell, the PSIR references a number of letters that appear on the face of the envelope top be from the Defendant's brother to Wayde Kurt.  (*See* PSIR ¶ 103).  The content of one of the letters, however, suggests that the writer of the letter was actually the Defendant.  (*See* PSIR ¶ 103 (subparagraph 2)).  Of significance are the references in the letter to "X<", which according to the case agent is code for what has been described as "Asatru runes." (*See* PSIR ¶ 103 (subparagraph 2); *see also* Sentencing Exhibit 9).

Second, in terms of items seized from the Defendant's cell, the PSIR references a number of writings from the Defendant, including a note scratched on

---

District Court Judge Nielsen added four points to the Defendant's base offense level for possession of a firearm in connection with another felony offense under U.S.S.G. § 2K1.1(b)(6)(B).   When overruling the Defendant's objection to the enhancement, the district court stated,

> there was a lot of evidence, primarily in the form of transcriptions of conversations that Mr. Kurt was involved in, in which he went into some detail about plans to commit what would certainly be referred to as "terrorist acts." There was going to be a final [solution]. There was reference to nuclear material. There was reference to killing or harming or implying that the President should be killed. There was never a specific plan as to exactly what was going to be done. But there were so many references to it in so many conversations that it was clear that, in his mind, preparations were being made to commit that type of a -- what would be referred to as a "terrorist" or a "violent act," doing harm. Even indicated that it was going to be such a severe act that, if he ever got caught, he'd be eligible for the death penalty. There were other references along that line that made it clear that he had this plan in mind that he was working toward.

Kurt was sentenced to the maximum term on the firearm conviction and a consecutive three year term on the subsequent false identification conviction.

United States' Sentencing Memorandum - 17

P30523LH.RSA.sentmemo.wpd

1   the Defendant's bunk (signed "Lykos"[13]), (*see* PSIR ¶ 104), and papers containing

2   the Defendant's handwriting (signed "John Lykos") and what is believed to be

3   consistent with Wayde Kurt's handwriting.  (*See* PSIR ¶ 105).  Of significance is

4   the note that appears to be a letter or note with an inquiry to Wayde Kurt and a

5   response from Wayde Kurt back to the Defendant; (*See* PSIR ¶ 105 (subparagraph

6   3)); a note that includes prison survival notes; (*See* PSIR ¶ 105 (subparagraph 4));

7   multiple pages of what appears to be consistent with Wayde Kurt's handwriting

8   that details both "Asuatru" religious status and tips on prison survival, specifically

9   who to contact and what to say.   (*See* PSIR ¶ 105 (subparagraph 10)).  The PSIR

10  also indicates that pending trial/resolution on the charges of manufacturing a

11  chemical IED, providing explosive-related information, and attempting to provide

12  material support to terrorists, the Defendant continued to research chemistry.  (*See*

13  PSIR ¶ 105 (subparagraph 14)).

14         Finally, in terms of the recorded telephone conversations, the PSIR notes

15  that several violations of the jail rules, including: obtaining medication for his

16  roommate and receiving contraband books "from his attorney using the ruse that

17  they were for his case."   (*See* PSIR ¶ 107).  The recorded jail conversations also

18  corroborated the connection between the Defendant and Wayde Kurt.  (*See* PSIR ¶

19  107).

20                    **4.    Mental and Emotional Health**

21         After discussing the Defendant's physical and mental health, (*see* PSIR ¶¶

22  129-146), the PSIR notes that "[h]ad this case proceeded to trial, the government

23  intended to call Gregory Saathoff, M.D., a board-certified psychiatrist as an expert

24

25

26         [13]According to FBI SABT McEuen, the term "Lykos" is significant as it is

27  code for "wolf," which, in the context of terrorism often denotes an individual

28  work conducts terrorist activities alone (i.e. as a "lone wolf").

United States' Sentencing Memorandum - 18
P30523LH.RSA.sentmemo.wpd

witness."[14]  (*See* PSIR ¶ 147).  According to the PSIR, Dr. Saathoff noted a number of personal characteristics, gleaned from discovery materials, that serve as factors relevant to violent behavior, including "covert behavior[;]" (*see* PSIR ¶ 148); "clandestine activity[;]" (*see* PSIR ¶ 149); detailed plans including "violence, criminal enterprise and use of diversionary tactics[;]" (*see* PSIR ¶ 150); chronic use and abuse of street drugs[;]" (*see* PSIR ¶ 152); "significant history of risk-taking behavior[;]" (*see* PSIR ¶ 154); "continued * * * interest in bomb-making[;]" (*see* PSIR ¶ 155); demonstrated interest * * * regarding the use of deadly poisons * * * demonstrated disregard for human life[;]" (*see* PSIR ¶ 155). In summary, the PSIR states that

> Dr. Saathoff stated that few of [the Defendant's] friends and associates were aware of [the Defendant's] Internet communication with others who claimed to be associated with violent groups. [The Defendant's] written communications revealed him to be sympathetic to disparate ideologies with one overriding commonality: the use of violence.  Research demonstrates that positive attitudes toward problem behaviors (illegal activities and violence) have been shown to be associated with risk of future violence.

(*See* PSIR ¶ 156). The PSIR then continues to list the examples Dr. Saathoff provided to support his conclusion.  (*See* PSIR ¶¶ 157-164).[15]

[14]This statement in the PSIR is actually incorrect.  While the United States included Dr. Saathoff in its Supplemental Notice of Expert Testimony, (*see* ECF Doc 186), this Court excluded Dr. Saathoff's testimony from the United States' case-in-chief on the finding that such conclusions of "future" dangerousness were more relevant to the sentencing phase than trial.

[15]Note that many of the examples cited by Dr. Saathoff were included in the United States Bill of Particulars, (*see* ECF Doc. 314), and elsewhere in the PSIR. (*See generally* PSIR ¶ 15-76).

Prior to outlining the sentencing options, the PSIR addressed substance abuse; education[16] and vocational skills; employment record; and the Defendant's financial condition.  (*See* PSIR ¶¶ 165-177).

## II.    IMPOSITION OF A REASONABLE SENTENCE

The statutory penalty for Manufacturing an Unregistered Firearm, in violation of 26 U.S.C. § 5861(f), is not more than ten (10) years imprisonment; a fine not to exceed $250,000; a term of supervised release of not more than three (3) years; and a $100 special penalty assessment; and the statutory penalty for Attempt to Provide Material Support to Terrorists, in violation of 18 U.S.C. § 2339A(a), (b)(1-3), is not more than fifteen (15) years imprisonment; a fine not to exceed $250,000; a term of supervised release of not more than life, pursuant to 18 U.S.C. § 3583(j) and 18 U.S.C. § 2332b(g)(5)(B); and a $100 special penalty assessment.[17]  *See also* PSIR pgs. 1-2.

---

[16]The PSIR notes that the Defendant became very upset when Clarkston High School would not allow him to graduate due to incomplete credits.  (*See* PSIR ¶ 170).  Coincidentally, in addition to the computer evidence of Google Earth "surveillance" of the Zion Bank (target of plan/discussion bank robbery), (*see* Sentencing Exhibit 10), and Google Earth "surveillance" of the U.S. Courthouse in Spokane (target of plan/discussion to blow up the federal building), (*see* Sentencing Exhibit 11) FBI located a saved Google Earth screen shot of the back side of the bleachers outside of Clarkston High School.   (*See* Sentencing Exhibit 12).

[17]Notwithstanding the United States' agreement to recommend the 10-year and 15-year sentences be imposed concurrently, pursuant to the Plea Agreement,

[t]The Defendant further understands that pursuant to *United States v. Booker*, 543 U.S. 220 (2005), the Court could impose consecutive sentences on each count of conviction, resulting in an aggregate maximum possible penalty of not more than twenty-five (25) years imprisonment; a fine not to exceed $500,000; and a term of

United States' Sentencing Memorandum - 20
P30523LH.RSA.sentmemo.wpd

Pursuant to the Plea Agreement,

The United States agrees to recommend not more than a ten (10)-year term of imprisonment on Count One and not more than a fifteen (15)-year term of imprisonment on Count Three to be served concurrently.   The Defendant is free to make whatever recommendation concerning the imposition of a term of imprisonment he believes is reasonable and sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a)(2).

(*See* ECF Doc. 314).  The United States' recommendation represents the maximum sentence that can be imposed on each count of conviction.

## A.    CONSIDERATION OF THE SENTENCING GUIDELINES:

The Defendant understands and acknowledges that the United States Sentencing Guidelines (hereinafter "U.S.S.G.") are applicable to this case, in that the Court must consider and determine the Defendant's applicable sentencing guideline range at the time of sentencing.  The Defendant also understands, however, that pursuant to United States v. Booker, 543 U.S. 220 (2005), the U.S.S.G. range is advisory, and that the Court is required to consider the factors set forth in 18 U.S.C. § 3553(a), and to impose a reasonable sentence.

### 1.    Offense Level for Count One:

#### (a).    Base Offense Level:

The base offense level for Manufacturing an Unregistered Firearm, in violation of 26 U.S.C. § 5861(f), at eighteen (18).  See U.S.S.G. §2K2.1(a)(5).

#### (b).    Specific Offense Characteristics:

The base offense level is increased by an additional two (2) levels because the offense involved a destructive device that was not a portable rocket, a missile,

---

supervised release of not more than life.  The Defendant understands that a separate $100 special penalty assessment must be applied to *each* count of conviction (Counts One and Three).

(*See* ECF Doc 314 (Plea Agreement)).  The possibility of the imposition of consecutive terms was discussed during the plea colloquy.

United States' Sentencing Memorandum - 21

P30523LH.RSA.sentmemo.wpd

or a device for use in launching a portable rocket or a missile.  <u>See</u> U.S.S.G.
§2K2.1(b)(3)(B).

  **2.** **<u>Offense Level for Count Three:</u>**

  **(a).** **Base Offense Level:**

  The base offense level for Attempt to Provide Material Support to
Terrorists, in violation of 18 U.S.C. § 2339A(a), (b)(1-3), is twenty-six (26).  <u>See</u>
U.S.S.G. §2M5.3(a); <u>see also</u> U.S.S.G. §2X5.1 ("If the offense is a felony for
which no guideline expressly has been promulgated, apply the most analogous
guideline.").  The BOL determination is complicated in relation to Count Three.
USSG Appendix A (Statutory Index) directs the user to USSG §2X2.1 and §2X3.1
for 18 U.S.C. § 2339A offenses.  USSG §2X2.1 states: "The offense level is the
same as that for the underlying offence."  The *Commentary* includes 18 U.S.C. §
2339A, and the *Application Note* provides:

  1. <u>Definition</u> – For purposes of this guideline, "underlying
    offense" means the offense the defendant is convicted of aiding
    or abetting, or in the case of 18 U.S.C. § 2339A or §
    2339C9a)(1)(A), "underlying offense" means the offense the
    defendant is convicted of having materially supported or
    provided or collected funds for, prior to or during its
    commission.

  Thus, one turns to the underlying offense, which in this case is 18 U.S.C. §
2332a (use of a weapon of mass destruction).  USSG Appendix A (Statutory
Index) directs the user to USSG §A6.1, §2K1.4, and §2M6.1 for a 18 U.S.C. §
2332a offense.  USSG §2A6.1 addresses "Threatening or Harassing
Communications; Hoaxes; False Liens," which appears to be clearly inapplicable
to the offense conduct.  USSG §2K1.4 addresses "Arson; Property Damage by Use
of Explosives'" which also appears to be inapplicable.  Finally, USSG §2M6.1
addressed "Nuclear, Biological, and Chemical Weapons and Materials, and other

*Weapons of Mass Destruction*." (Emphasis added.) At first blush, §2M6.1 would appear to apply. However, upon review of the *Application Notes*, it appears that the precise "weapon of mass destruction" applicable to the facts of this case is a "destructive device" as defined in 18 U.S.C. § 2332a(c)(2)(A) (specifically including "destructive device" as defined in 18 U.S.C. § 921) is not included in §2M6.1. *Application Note 1* explicitly provides: "Weapon of mass destruction" has the meaning given that term in 18 U.S.C. § 2332a(c)(1)(B), (C), (D)." – *not subsection (A).* Therefore, faced with no on-point "statute-to-guideline-provision" reference, one must analyze the case through the guideline provision that is most applicable to the offense conduct.

In this case, the most applicable guideline provision found in USSG Chapter Two - Offense Conduct is USSG §2M5.3, which addresses "Providing Material Support or Resources to a Designated Foreign Terrorist Organization or Specifically Designated Global Terrorists, *or For a Terrorist Purpose*." (Emphasis added.) Pursuant to §2M5.3, the base offense level is 26. Additionally, pursuant to subsection (b)(1) (Specific Offense Characteristics), "[i]f the offense involved the provision of (A) dangerous weapons; (B) firearms; (C) explosives; (D) funds . . . (E) material support . . . " increase by 2 levels." *Application Note 1* defines "weapon of mass destruction" as it is defined pursuant to §2M6.1, *see supra*, and "explosives" as it is defined in *Application Note 1* of §2K1.4 (noting that "'explosives' includes any explosive, explosive material, or destructive device."). As such, it appears that the applicable guideline provision for 18 U.S.C. § 2339A, when the specified federal offense is 18 U.S.C. § 2332a, *and* the weapon of mass destruction is defined as a "destructive device," *see* 18 U.S.C. § 2332a(c)(1)(A), is USSG §2M5.3.

### (b).   Specific Offense Characteristics:

The base offense level is increased by an additional two (2) levels because the offense involved the provision of material support with the intent, knowledge

1    or reason to believe the material support is to be used to commit or assist the

2    commission of a violent act.  See U.S.S.G. §2M5.3(b)(1)(E).

3                    **(c).    Terrorism Enhancement:**

4          The adjusted offense level is increased by an additional twelve (12) levels

5    because the offense is a felony that involved, or was intended to promote, a federal

6    crime of terrorism, as defined in 18 U.S.C. § 2332b(g)(5).  See U.S.S.G.

7    §3A1.4(a).

8            **3.    Multiple Count Analysis:**

9          Due to the agreement to move to dismiss Count Two at sentencing, the

10   offense level does not increase based on a multiple count analysis because the

11   offense level for Count One is 9 levels less serious than the offense level for

12   Count Three.  See U.S.S.G. §3D1.4(c).

13          **4.    Acceptance of Responsibility:**

14         The Defendant plead guilty and demonstrated a recognition and an

15   affirmative acceptance of personal responsibility for the criminal conduct.  If he

16   provides complete and accurate information during the sentencing process; and

17   does not commit any obstructive conduct; the United States will move for a three

18   (3) level downward adjustment in the offense level for the Defendant's timely

19   acceptance of responsibility, pursuant to U.S.S.G. §3E1.1(a) and (b).

20          **5.    Final Adjusted Offense Level:**

21         If the Court applies a downward adjustment for acceptance of responsibility

22   pursuant to U.S.S.G. §3E1.1, the final adjusted offense level is thirty-seven (37).

23          **6.    Criminal History:**

24         Because the offense is a felony that involved, or was intended to promote, a

25   federal crime of terrorism, as defined in 18 U.S.C. § 2332b(g)(5), and U.S.S.G.

26   §3A1.4(a) applies to Count Three, the Defendant's Criminal History Category is

27   VI.  See U.S.S.G. §3A1.4(b).

28

### 7.    Applicable Sentencing Guideline Range:

With a Final Adjusted Offense Level of 37 and a Criminal History Category of VI, the applicable sentencing guideline range is *360 months to life*.

### 8.    Guideline Sentence and Total Punishment:

Pursuant to U.S.S.G. §5G1.1(a), "where the statutorily authorized maximum sentence is less than that the minimum of the applicable guideline range, the statutorily authorized maximum sentence shall be the guideline sentence." In this case, had the Defendant been convicted of either Count One or Count Three (but not both), the "guideline sentence" would be *120 months* (Count One) or *180 months* (Count Three). However, notwithstanding the non-binding[18] terms of the Plea Agreement, due to the convictions on *both counts*, a correct consideration of the sentencing guidelines indicates that the "total punishment" would an aggregate *300-months* term of imprisonment. *See* U.S.S.G. §5G1.2(d) (noting that multiple counts of conviction shall run consecutively to reach the guideline range).

### B.    CONSIDERATION OF THE SENTENCING FACTORS:

Pursuant to 18 U.S.C. § 3553(a), in relevant part,

> The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider–
>
> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed–
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;

---

[18]The pleas were not entered pursuant to Fed. R. Crim. P. 11(c)(1)(C). Thus, this Court is not bound to accept the parties' recommendations.

United States' Sentencing Memorandum - 25
P30523LH.RSA.sentmemo.wpd

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established

### 1.    **Nature and Circumstances of the Offenses:**

#### (a).    **Count One:**

On April 18, 2010, the Defendant was severely injured during the pre-detonation of a chemical-based IED that he had manufactured, transported, detonated.  Notwithstanding the sever injuries the Defendant suffered, the Whitman County Sheriff's Office ultimately dismissed the seriousness of the offense and concluded that the Defendant had most likely learned his lesson the hard way.

Looking at the single incident in a vacuum, one might be tempted to agree with the first responding officers and chalk the incident up to "boys being boys." In fact, during a recorded telephone conversation between the Defendant and his father, his father stated that "everyone's made a bomb."  (*See* PSIR ¶ 107).  During another recorded conversation, the Defendant's father said that he was not surprised that the Defendant had made a bomb, and that had he (Defendant's father) known, he would have gone with the Defendant to watch the explosion. (*See* PSIR ¶ 107).

The actual nature and circumstances of manufacturing the "unregistered firearm," which relevant to the incident charged in Count One was an Acetone Peroxide Ammonium Nitrate ("APAN") Improvised Explosive Device ("IED"), is nothing like lighting firecrackers in the driveway.  Rather, the actual incident charged in Count One was the result of years of internet research, experimentation with dangerous chemical mixtures, and involving others in both the manufacturing

United States' Sentencing Memorandum - 26

P30523LH.RSA.sentmemo.wpd

1   process and the detonation of pipe bombs and chemical IEDs.  Had this matter

2   gone to trial the United States was prepared to present an extensive amount of

3   "social media" evidence including conversations involving BRICE and known and

4   unknown individuals through email correspondence, text-messaging, and internet

5   postings (including conversations and/or "chats") evidencing BRICE's interest

6   with explosives.[19]   In addition to the "social media" evidence,[20] the Defendant

7   initialed a Timeline[16] of relevant events that included failed detonation of AN

8   bomb on August 14, 2009; detonation of a bomb in a suitcase on October 9, 2009;

9   making a batch of chemical explosives on January 15, 2010; purchasing explosive

10  material on January 25, 2010; making AP on February 1, 2010; filtering chemicals

11  on March 25, 2010; testing explosives and blasting caps on March 26, 2010;

12  requesting a third-party to purchase acetone and hydrogen peroxide and

13  manufacturing explosives on March 29, 2010; manufacturing nine jars of

14  explosives on April 2, 2010; detonating a bomb on April 3, 2010; detonating two

---

16  [19]The United States previously provided the Court with a CD and Exhibit

17  Notebooks containing trial exhibits relevant to explosives.  (*See* CD and Exhibit

18  Notebooks containing *Govt. Ex.* 38, 39, 41, 42, 45, 50, 55-58, 64, 67-71, 77-79,

19  82, 86-88, 91, 95-98, 100, 103, 107, 109, 115, 131, 137, 138, 157, 158, 160-162,

20  165, 167-192, 202, 208, 222, 224, 238, 234, 244) (including researching on line,

21  trial and error in manufacturing explosives, motives for using explosives (e.g.

22  bank robbery diversion and destruction of the U.S. Courthouse in Spokane,

23  Washington (*See Govt. Ex.* 41, 99)).

24      [20]Many of the Defendant's explosive-related comments are abbreviated and

25  set forth across the chronology of comments in PSIR ¶ 32.  (*See also* ECF Doc.

26  314, pgs. 23-33).

27      [16]The Timeline was created by FBI SABT McEuen prior to the post-arrest

28  interview based on the evidence gleaned from the investigation.

United States' Sentencing Memorandum - 27

P30523LH.RSA.sentmemo.wpd

pounds of ANFO using APAN on April 11, 2010; mixing chemicals with a third party on April 13, 2010; the manufacturing and pre-detonation incident relevant to Count One on April 18, 2010. (*See* Sentencing Exhibit 8). Most significant in regards to the level of dangerousness the Defendant disregarded in the context of manufacturing and detonating chemical-based IEDs is the cavalier manner in which he involved third-parties. Video evidence from one of his computers depicts the presence of his girlfriend ("A.P.") at more detonation than the April 18, 2010, incident. Despite any apparent caution taken by A.P. to keep a safe distance from the actual detonation, the Defendant indicated during the post-arrest interview that he had transported the highly unstable chemical mixture between his legs in the passenger seat while A.P. drove to the detonation site – with the improvised detonator already inserted into the explosive. (*See* Sentencing Exhibit 3). During one text message exchange between the Defendant and a third-party, the Defendant indicated that he had burned his eyes mixing chemicals. (*See* Sentencing Exhibit 14).

Finally, the nature and circumstances of manufacturing a bomb, or in this case a chemical-based IED, should be viewed in the context in which the April 18, 2010, incident actually occurred. During the time period leading up to the April 18, 2010, incident, the Defendant appeared to be researching, idolizing, and emulating Timothy McVeigh through social media comments and postings.[17] Many of the Defendant's social media comments included terrorist emulation and criticism.[18] When one adds the Defendant's Google Earth "surveillance" of the

---

[17]Many of the Defendant's Timothy McVeigh-related comments are abbreviated and set forth across the chronology of comments in PSIR ¶ 32. (*See also* ECF Doc. 314, pgs. 23-33). (*See also* Sentencing Exhibit 27).

[18]Had this matter gone to trial, the United States was prepared to present evidence of the Defendant's interest in Timothy McVeigh and other terrorist

United States' Sentencing Memorandum - 28

P30523LH.RSA.sentmemo.wpd

1   U.S. Courthouse in Spokane, Washington, (*See* Sentencing Exhibit 12), to the

2   Defendant's statements such as: "Tim's characteristics are nearly the same as

3   myself, physically/politically" (January 14, 2010), (*See* Sentencing Exhibit 13),

4   and numerous statements referencing the justification of killing innocent persons,

5   with the fact that the Defendant was manufacturing – and perfecting – the *same*

6   *type* of chemical IED utilized by Timothy McVeigh to destroy the Murrah Federal

7   Building in Oklahoma City, and the fact that the Defendant utilized the alias

8   "Timothy McVeigh," (*See* Sentencing Exhibit 14), the nature and circumstances of

9   manufacturing an "unregister firearm," specifically a chemical-based IED, in

10   violation of 26 U.S.C. 5861(f), is very serious indeed.

11           **(b).   Count Three:**

12       Between December 22, 2010, and May 9, 2011, the Defendant attempted to

13   provide material support to terrorists by assisting an individual he thought was a

14   terrorist with a formula relevant to the manufacturing of a acetone peroxide

15   ("AP") ignition booster for the type of chemical-based IED the Defendant had

16   manufactured on April 18, 2010.  In terms of the nature and circumstances of the

17   offense, it takes very little imagination to put the act into perspective.  The

18   Defendant, an individual with a demonstrated interest and expertise in chemical

19   explosives, a demonstrated interest in violence, a demonstrated interest in the IRA,

20

---

21   individuals, groups and martyrs who utilize explosive devices, (*See* CD and

22   Exhibit Notebooks containing *Govt. Ex.* 40, 43, 44, 47-49, 51-53, 59-61, 66, 76,

23   80, 81, 83, 84, 85, 89, 90,93, 94, 99, 101, 102, 104, 105, 106, 108, 110-130, 132-

24   136, 138-140, 143-145, 159, 163, 164, 166, 202, 211, 220, 221, 225, 226, 229-

25   233, 237, 254-256)), and other violent acts (including anti-government statements

26   (*See* CD and Exhibit Notebooks containing *Govt. Ex.* 41, 46, 49, 54, 62, 72, 73,

27   75, 92, 99, 119, 122, 128, 138, 140, 141, 142, 211).  (*See also generally See* CD

28   and Exhibit Notebooks containing *Govt. Ex.* 146, 150, 156, 168, 185, 193, 206).

jihad, and other acts of terror, provided his expertise – in recipe form – to an individual who indicated that given the prior day's events (the elimination of Osama Bin Laden) that now is the time to act. (*See* ECF Doc. 342 (Plea Agreement).

The fact that the Defendant provided a ratio of a mixture of chemicals is significant in two ways. First, the 12:88 ratio was correct and one already perfected through the Defendant's own experimentation. (*See* Sentencing Exhibit 8). Second, the fact that the Defendant provided a ratio (or recipe) on how to manufacture the detonation booster does not limit the size of IED the "terrorist" could have made. Both facts cuts against the Defendant's post-arrest minimization of his providing the information. (*See* Sentencing Exhibit 3). If the Defendant was truly joking with the "terrorist," why would he provide a *correct* ratio. Furthermore, there is no evidence, other than the Defendant's attempt to minimize during the post-arrest interview,[19] that the "terrorist" intended to manufacture a small, insignificant explosive device.

Indeed, the nature and circumstances of attempting to provide material support to an individual who expressed an intent to retaliate – against Americans – for the recent elimination of Osama Bin Laden, is a factor that supports a significant sentence.

### 2.    History and Characteristics of the Defendant:

Perhaps in this case, the "history and characteristics" of the Defendant is the most important factor. Whereas the relevant pretrial question may have been

---

[19]Recall that the Defendant told the FBI agents conducting the interview:

It's going to look like I'm a fucking Muslim terrorist, but I was just fucking with these guys. I was just toying with them. I drink beer, I drink beer every day. I do, I do everything opposite of whatever it looks like. I was just fucking with them, there's a guy, this is going to look so bad!

(*See* Sentencing Exhibit 3).

"why?" (*See* ECF Doc. 314), the relevant question in terms of sentencing is arguably "who" is the Defendant?  Dr. Saathoff has indicated that the Defendant is a covert, clandestine individual who plans violent, criminal enterprises and the use of diversionary tactics.  (S*ee* PSIR ¶¶ 148-150).  Furthermore, the Defendant is a chronic user and abuser of street drugs, with a significant history of risk-taking behavior, and an interest in bomb-making, the use of deadly poisons, and a demonstrated disregard for human life.  (S*ee* PSIR ¶¶ 152, 154, 155).  The evidence obtained during the investigation includes: the use of false identification (*see* Sentencing Exhibit 15), including use of the name "Timothy McVeigh;" (*see* Sentencing Exhibit 14); attempting to keep his interest in jihad and terrorism secret; the posting of videos and comments on the internet through non-identifiable internet accounts such as chslosers@gmail.com; rzaforshiza@gmail.com; allahguidance@gmail.com; and StrengthofAllah@gmail.com),[20] the planning of a bank robbery, a FedEx truck robbery; (*see* Sentencing Exhibit 16); the discussion of retaliation against a former boyfriend of the Defendant's girlfriend; (*see* Sentencing Exhibit 17); the posting of visual depictions of the aftermath of a violent suicide bombing; (*see* Sentencing Exhibit 18); excessive violent and degrading pornography saved on his computer;[21] video recordings of what appears to be the Defendant consuming marijuana through a gas mask; (*see* Sentencing Exhibit 19); and all of the evidence related to experimenting with the manufacturing and detonation of IEDs. The United States defers the ultimate determination as to whether Dr. Saathoff's conclusion that the Defendant presents "a risk of future violence" to the Court.

---

[20]In fairness the Defendant did also use the internet account of **joeybrice55@gmail.com** for some internet communication.

[21]Not provided as a Sentencing Exhibit.  FBI SABT McEuen can testify as to the content of the saved pornography.

United States' Sentencing Memorandum - 31

P30523LH.RSA.sentmemo.wpd

1  The United States submits, however, that the factors Dr. Saathoff relied upon are
2  supported by the evidence.

3      In assessing the characteristics of the Defendant, an admitted "bomber," the
4  Court may find a study done by the National Center for the Analysis of Violent
5  Crime FBI Academy helpful.  (*See* Sentencing Exhibit 20).  In *Behavior and*
6  *Characteristics of Bomb Related Offenders*, the authors note that one of the
7  reasons for using explosives is that "they are exciting."  (*See* Sentencing Exhibit
8  20, pg. 66).  The evidence obtained during the investigation includes: the
9  Defendant's own admission that "it was kind of fun.  Seeing your work done, it
10  was, it's kind of weird ya know when you feel, when you feel that, when you feel
11  it hit your chest, ya know, the shock waves [unitelligible] kind of."  (*See*
12  Sentencing Exhibit 3, pg. 61).

13      Furthermore, in terms of "who" the Defendant is, it is significant that during
14  the investigation, FBI became concerned that the Defendant to had "undergo[ne] a
15  'rapid radicalization' to Islam."  (*See* PSIR ¶ 21).  Perhaps the most telling
16  evidence of the Defendant's characteristics, and possible movement toward
17  'radicalization" are the comments he has made to the some of the most dramatic
18  YouTube videos.  For example, to a video of the Twin Tower attack on September
19  11, 2001, (*see* Sentencing Exhibit 21), the Defendant commented "Allah Akbar."
20  (*See* Sentencing Exhibit 22).

21      **3.    Seriousness of the Offense; Respect for the Law; Just
22      Punishment:**

23      In short, the facts related to nature and circumstances of the offenses (*see*
24  *supra*), apply to the factors of "seriousness of the offense," "respect for the law'"
25  and "just punishment," as well.  If one looks at the at the seriousness of either
26  offense through the lens of objective reasonableness, it is difficult to conclude that
27  a reasonable person would not find the offenses to be extremely serious.  Although
28  it has been previously alluded to the may not be uncommon to want to watch

United States' Sentencing Memorandum - 32

P30523LH.RSA.sentmemo.wpd

1   things explode, the preparation and motivation (*see supra*) behind Count One

2   arguably raises the seriousness exponentially.  In terms of Count Three, it is

3   perhaps even more difficult to argue that the act of attempting to provide material

4   support to terrorists is anything but serious. In this case, where the act was to

5   provide expertise in manufacturing an explosive device, the potential for harm to

6   persons and property is infinite and uncontrollable.  The Defendant may have said

7   he was just joking with the "terrorist," but once he provided credible expertise, the

8   manner and means of how that expertise might be used was no longer in the

9   Defendant's control.  Furthermore, in relation to Count Three, the Defendant's

10  prior conduct leading up to the commission of the actual offense, though not

11  necessarily criminal in and of itself, shows a significant amount of preparation.

12  For example, the posting of the StrengthofAllah YouTube video ".5 kgs. APAN"

13  (*see* Sentencing Exhibit 23), represents the final compilation of items collected

14  from numerous sources.  (*See* Sentencing Exhibit 24).

### 4.    Adequate Deterrence:

16          During the pendency of this case, law enforcement discovered that the

17  Defendant and Wayde Kurt were communicating.  The concern that two

18  "bombers" were communicating resulted in two separate jail cell searches.  One of

19  the documents discovered during the search contained handwriting that appears

20  consistent with both the Defendant and Wayde Kurt.  The "document" suggests

21  that after release from Bureau of Prisons custody, the Defendant and Kurt plan to

22  associate together in possible future criminal conduct. (*See* Sentencing Exhibit 25;

23  *see also* PSIR ¶ 105 (subparagraph 3)).  Furthermore, the Defendant does not

24  appear to show remorse or contrition.  Instead, while the case was pending trial or

25  resolution, the Defendant bagged about his exploits, (*see* Sentencing Exhibit 26),

26  and indicated in a recorded telephone conversations that the government had a

27  choice of turning him into an asset or a liability, (*see* PSIR ¶ 107), which suggests

28  that *if the FBI chose to not use him,* he would continue to be a "liability."  The

1 United States submits that the Defendant's contact with Wayde Kurt suggests that
2 the Defendant has already made the choice to be a future liability.

3         **5.**    **Protect the Public:**

4      In light of the above, the United States respectfully submits that protection
5 of the public may be the single-most important factor in determining a reasonable
6 sentence.

7 **III.**   **RESERVATION OF RIGHT TO SUBMIT ADDITIONAL**
       **SENTENCING EXHIBITS AND TESTIMONY**
8
9      As previously discussed, the United States anticipates a lengthy sentencing
10 hearing.  The United States is evaluating whether to illicit testimony from as many
11 as 2-4 witnesses from the FBI and a number of video exhibits.  The United States'
12 sentencing presentation is not expected to take much longer than 3 hours
13 (including reasonable cross examination time).

14 **IV.**   **UNITED STATES' SENTENCING RECOMMENDATION**

15      Consistent with the Plea Agreement, the United States will recommend a
16 10-year term of imprisonment to be imposed on Count One and a 15-year to be
17 imposed on Count Three.  The United States will further recommend that the two
18 terms run concurrently and that a life-term of Supervised Release be imposed on
19 Count Three.  The United States' recommendation reflects the maximum term that
20 can be imposed on Count Three.

21      DATED May 23, 2013.

                                 Michael C. Ormsby
22                                  United States Attorney

23                                ***s/ Russell E. Smoot***

24                                Russell E. Smoot
25                                Assistant United States Attorney

26

27

28

United States' Sentencing Memorandum - 34

P30523LH.RSA.sentmemo.wpd

1    I hereby certify that on May 23, 2013, I electronically filed the foregoing

2  with the Clerk of the Court using the CM/ECF System which will send

3  notification of such filing to the following, and/or I hereby certify that I have

4  mailed by United States Postal Service the document to the following non-

5  CM/ECF participant(s):

6

7        Matthew Campbell
         Federal Defenders
8        10 North Post Street, Suite 700
         Spokane, WA 99201
9
         Gloria M. Petretee
10       U.S. Probation Officer
         920 West Riverside, Room 540
11       Spokane, WA 99201

12

13                          *s/Russell E. Smoot*

14                          Russell E. Smoot
                            Assistant United States Attorney
15

16

17

18

19

20

21

22

23

24

25

26

27

28